

**Earl Peeples, MD Orthopedic Surgeon**
*47 Hickory Hills Circle*
*Little Rock, AR 72212*
*Physician phone (501) 786-3756*
*Assistant (501) 786-1544*
*Facsimile (501) 224-8701*

*earl.peeples@att.net*

July 28, 2020

Ms. Camille Reifers
Boyle Brasher LLC
Brinkley Plaza
80 Monroe Avenue, Suite 410
Memphis, Tennessee 38103

RE:    Bradley Washam
        DOB: ▉▉▉▉▉▉
        PMLC: X0019

Dear Ms. Reifers:

At your request I reviewed medical records of Bradley Washam, DOB: 1▉▉▉▉▉▉ for the purpose of correlating them to reported injury or event at BNSF Railway on March 11, 2019.

METHODS:
See addendum.

MEDICAL RECORD:
Records from the following sources were reviewed:
1. Medical file of plaintiff
2. DRMC Neurosurgery and Spine Clinic
3. BNSF Fitness for duty recommendation
4. MLOA extension request
5. David Amidor, PT
6. Ozark Medical Center
7. Dr. Carl Recine, Fulton County Hospital
8. Palace Drug Pharmacy
9. Stephanie Terry, PT
10. Therapy Works, Inc.
11. St. Bernard's Medical Center.
12. Baxter Regional Medical Center.
13. Kevin Vaught, M.D.

**EXHIBIT**
**1**

Bradley Washam
PMLC# X0019
Page 2

14. Regional Brain and Spine Neurospine Center.
15. Tyler Ptacek, M.D.
16. Wal-mart Pharmacy
17. CRG, LLC.
18. Cape Radiology Group
19. Midway Medical Clinic
20. Walgreen's Pharmacy.
21. BRMC Neurosurgery and Spine Clinic
22. St. Bernard's Imaging Center
23. BNSF
24. Medical records produced by Plaintiff
25. Dr. McAlister's independent radiology report

Records were placed in chronologic order.

3-14-19 Primary care evaluation by nurse practitioner Tamara Ward from Family Health Care in the form of a handwritten clinic encounter on a pre-printed form contained minimal information. History was brief indicating a fall at work. No physical exam section recording neurological or other musculoskeletal exam was present. Assessment was "fall" and "back pain", symptom restatements. Radiographic studies were ordered.

3-15-19 Fulton County Hospital lumbar spine radiograph report was provided by radiologist Carl Recine, M.D. No acute findings were presents. Multi-level disc space narrowing associated with vertebral body spurring were identified. No destructive process was noted. The impression was "mild to moderate multi-level spondylosis." (Bony arthritis.) The same physician provided a thoracic spine report. The impression was "no acute abnormality."

3-21-19 Again Family Health Care records were provided on a pre-printed form. No physical exam or neurological examination was performed and recorded. Assessment was back pain, muscle spasms and anxiety, all symptom restatements.

3-28-19 MRI report was provided by Christophe Ryen, D.O. Mild retrolisthesis of L2 on L3 and L4 on L5 of 2 mm was identified. All levels had disc degenerative changes in the form of desiccation or loss of water content. The report stated:

L1-2: Disc desiccation disc at loss. Mild diffuse disc bulge. Mild facet arthropathy with small facet effusions. No narrowing of the spinal canal on the foramina.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 3

        L2-L3:  Disc desiccation with disc height loss. Mild diffuse disc bulge with annular fissure. Moderate facet arthropathy with trace facet effusions.  Mild bilateral neural foraminal stenosis.

        L3-L4: Mild diffuse disc bulge. Moderate facet arthropathy.  No narrowing of the spinal canal or foramina.

        L4-L5: Desiccation with disc height loss.  Large diffuse disc bulge. Moderate facet arthropathy. Moderate to severe spinal canal stenosis.  Moderate right neural foraminal stenosis. Moderate left neural foraminal stenosis.

        L5-S1: Disc desiccation with disc height loss. Moderate disc bulge. Moderate fcet arthropathy. Disc and facet osteophyte contact of the traversing left S1 nerve root. Disc contact traversing right S1 nerve root, left worse than right moderate to severe foraminal stenosis and contact of the exiting bilateral L5 nerve roots."

This radiologist identified no traumatic anatomy.  No acute signal changes or acute disc herniation (extrusion) were discovered. Degenerative changes were multi-level.  Included in his report was a classic description of an acquired stenosis at L4-5 involving changes in the facets, and narrowing the canal via arthritis change and disc bulge due to loss of disc height. No acute disc extrusion was discovered and reported. In fact, all disc changes were described as degenerative. No traumatic changes were identified.

3-29-19  For the third time the evaluation was provided by nurse practitioner Ward.  Mr. Washam reported his pain was "really bad after MRI was done." Ms. Ward does not review or record MRI findings.  [Dr. Kerry Burns, whose blank signature line was on the form, did not evaluate or sign the form.] Nurse Practitioner Ward did not provide a physical examination of neurological status. She diagnosed radiating back pain and sciatica, both symptom restatements.

4-1-19  Nurse Ward again interviewed Mr. Washam.. None of the encounters contained an appropriate history or legible or even preliminary lower extremity neurological examination.

4-3-19 A letter discussing postponing an investigation due to Mr. Washam's current medical status was in the file.

4-10-19 Regional Brain & Spine Neuro Spine Center records of Dr. Vaught discuss an initial examination.  History indicated a work related fall on 3-11-19.  Mr. Washam reported that he fell onto

Bradley Washam
PMLC# X0019
Page 4

a knuckle between railcars striking his buttocks and then the ground. He described immediate onset of back and buttock pain. "He continued to work most of the day." He went to a primary care provider and received two intramuscular injections, one of which was a steroid. Both radiographs and MRI were offered by the primary care provider. He was taken off work, and had been off work since March 14th. The pain was described as constant, aching, stabbing, bilateral low back pain radiating into his buttocks. There were occasional symptoms in the "S1 distribution bilaterally" to his ankles. Medical history was listed as follows:

- Spondylolisthesis, non-traumatic, lumbar
- Spinal stenosis of the lumbar region without neurogenic claudication.
- Sacroiliitis.
- SI joint dysfunction
- Disc disorder with radiculopathy lumbar

All of these diagnoses were made on this date. No surgical history was provided. Review of systems indicated that he had no musculoskeletal complaints and no neurological complaints.

No inclusion of a focused psychosocial history was identified in this record.

On examination Mr. Washam was 74 inches tall, 227 pounds, (BMI 29.25.) Detailed neurologic examination of the lower extremities was undertaken:
"Motor examination of the lower extremities revealed 5/5 strength in all major muscle groups. Muscle bulk and tone were symmetric and normal."

"Dermatomal challenges to light touch and pin prick revealed normal and symmetric sensation bilaterally in the lower extremities."

"Reflexes were symmetrical at the patella and Achilles tendons bilaterally. Ankle clonus right negative, ankle clonus left negative."

Dr. Vaught reviewed the MRI performed 3-28-19. Multi-level degenerative changes were noted including retrolisthesis L2 on L3 and L4 on L5. "At L5 there is disc desiccation with loss of disc height. There is a large diffuse disc bulge." (No acute disc extrusion/herniation was identified.) "These abnormalities produced moderate to severe canal stenosis." "At L5-S1 there is disc desiccation with loss of disc height. A moderate diffuse disc bulge.:"

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 5

Also noted by this physician were "disc and facet osteophyte contact with traversing left S1 nerve root disc contacting the transverse right nerve root."   (No acute MRI changes or traumatic anatomy was described by this physician's review.  Contact is not compression.)

Working diagnoses were:
1. SI joint dysfunction
2. Sacroiliitis
3. Spondylolisthesis, non-traumatic lumbar
4. Spinal stenosis of lumbar region without neurogenic claudication.

[None of these findings represented a traumatic event or alteration of anatomy due to violence. Radiculopathy was not diagnosed as there was no neurological deficit to support such a diagnosis. Due to symptoms in the SI joint area, but in the absence of objective SI findings, bilateral SI joint injections were ordered.  Physical therapy was also undertaken.]

[The examination above was a normal lower extremity neurological examination performed in a standard and thorough manner.  It placed Mr. Washam in the category of lumbar sprain/strain, low back pain (LBP) symptoms without neurological deficit.  Medical science provides excellent published protocols outlining best practice model for such a presentation easily obtained for application to a common clinical presentation.]

4-19-19 Letter from attorney Nelson Wolfe indicated litigation was underway.  This railroad event is the focus of a legal claim initiated some time before this date.

5-16-19 Reevaluation at Regional Brain and Spine was undertaken.  Since the last evaluation Dr. Vaught indicated that, "the patient obtained flexion and extension x-rays of the lumbar spine, underwent a course of physical therapy and underwent bilateral sacroiliac joint injections."

Some reduction of symptoms in the buttock region was noted. "He described primary axial aching and stabbing lower lumbar pain which occasionally extends into the posterior thighs to the knees,"  On examination he was noted to be "well nourished, no acute distress."  The detailed neurological examination was repeated in the upper and lower extremities and entirely normal with intact motor function, intact sensory function and intact reflexes in the lower extremities, 2+ and symmetric.

[Three important objective facts had been established.  Mr. Washam had normal neurological exam, without deficit.  He had multilevel degenerative non-traumatic lumbar anatomy documented by MRI, without evidence of traumatic alteration.  His spine was stable.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544      fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 6

No objective finding required medical treatment. Compensation context and legal representation were in place. Evaluation for a non-physical basis for chronic pain complaint was the next appropriate step in the differential diagnosis process.]

Dr. Vaught recommended that he have additional physical therapy and undergo medial branch blocks, start at L4-5 and L5 facets for "diagnostic purposes." (Dr. Vaught did not specify what he was attempting to diagnose.)

5-28-19 Initial physical therapy record was reviewed. Mr. Washam was reporting low back pain. His pain was rated from 4/10 at best to 8/10 at its worst with level 5 pain at the time of physical therapy evaluation. His gait was normal. Neurological examination was not undertaken. Physical therapy treatment was begun by Stephenai Terry, PT.

6-6-19 6-6-19 BRMC Neurosurgery Spine Clinic initial evaluation was performed by nurse Brandi Anderson. She provided a history that Mr. Washam had fallen in March and experienced low back pain since that time. He reported the pain was worsening and in addition reported some bilateral hip and bilateral leg pain. She noted that prior evaluation had been conducted by a neurosurgeon at an outside clinic or facility. (No comment on or review of these records was identified in any BRMC records.)

"He has undergone SI joint injections as well as blocks in the lumbar spine, none of this has been any great relief of pain for the patient. He would like to further discussion surgical options."

Physical examination indicated he was in no acute distress. Straight leg raising test was positive bilaterally. (Whether this was back, buttock, or sciatic type pain, important medical information, was not specified.) Neurological examination indicated full strength and full sensation in the lower extremities bilaterally with normal reflexes. (This is an entirely normal objective neurological examination, as straight leg raising is a subjective response and description.) Nurse Anderson diagnosed back pain with radiculopathy.

[Radiculopathy was diagnosed but was not present. No significant alteration of nerve function was present, rather normal neurological examination was documented.

AMA Guides defines radiculopathy as "Significant alteration in the function of a nerve root or nerve roots and is usually caused by pressure on one or several nerve roots. The diagnosis requires a dermatomal distribution of pain, numbness and/or paresthesias in a dermatomal distribution. A root tension sign is usually positive. The presence of findings on an imaging

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 7

study in and of itself does not make the diagnosis of radiculopathy." (AMA Guides to Permanent Impairment of Function, 5th Edition, page 382). This record does not document radiculopathy consistent with this definition. Symptoms are not radiculopathy. Data show that persisting radicular pain "is still compatible with function and that most patients should eventually return to their original type of work." (AMA Guides to the Evaluation of Work Ability and Return to Work, AMA 2011, p. 165). Radiating symptoms, without objective verification of actual nerve compression and damage, are not a basis for permanent work restriction or impairment.]

She reviewed the MRI with Dr. Gocio, "patient has lumbar spinal stenosis. There also appears to be more of an acute disc herniation at the L4-5 level." Immediate recommendation was made for surgical intervention. "Surgery was offered. We offered laminectomy at L3,4 and 5 with a right discectomy at L4-5, bilateral foraminotomies at L3-4, 4-5 and at 5-S1." (No mention of fusion procedure was made.)

[Despite the fact the presentation was one of chronic pain and exam produced the absence of any neurological deficit, focused psychosocial history appropriate for chronic pain evaluation particularly in a legal context was not undertaken by Dr Gocio or nurse Anderson.]

Nurse Anderson stated "the patient would like to proceed with surgical intervention. We will obtain x-rays to ensure no fusion is indicated."

Baxter Regional Medical Center radiograph report, flexion and extension views of the lumbar spine, "no subluxations are seen with flexion and extension."

[Radiculopathy did not exist. No acute disc herniation was present on the MRI. All findings were degenerative. Spinal stenosis, an acquired developmental condition was present, but no pseudoclaudication or neurological deficit was present. Acquired stenosis was not related to the fall.

Lumbar spinal stenosis is an acquired medical condition increasingly common as age advances. It is characterized by three degenerative anatomic changes in the spine, bulging of the disc associated with age-related dessication of the nucleus, ligament calcification and hypertrophy, and facet joint spondylosis (enlargement or hypertrophy). These changes are not caused by trauma. (AMA Guides to the Evaluation of Disease and Injury Causation, AMA 2008). Rarely, there are obvious cases of traumatic spinal stenosis, usually acute, associated with vertebral fracture and displaced anatomic elements. These are easily differentiated by

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 8

imaging studies and history of major trauma and fracture. This case is an example of the non-traumatic general medical condition, acquired lumbar spinal stenosis.

No differential diagnosis testing for the most probable medical explanation for his pain complaints was undertaken.]

6-21-19  History and physical examination was performed and dictated by nurse Brandy Anderson. No new problems were identified. Mr. Washam was evaluated for preoperative visit. "He suffered an acute disc herniation after a fall at work on March 11[th]. This has exacerbated his underlying diagnosis."

[There is no evidence in the MRI of any acute findings including a disc herniation. Exacerbation is a temporary increase in symptoms which return to baseline. Even if present an acute disc herniation, which would not explain back pain, in the absence of neurological deficit would not merit surgery, merely observation.]

Physical examination was repeated. He was "NAD" (no acute distress.) At this time straight leg raising test reproduced bilateral leg/hip/back pain. "Strength was diffusely weaker at 4+/5 or bilat lower extremities." Sensory examination indicated "slight sensory deficit in bilateral upper buttocks, full in the lower extremity." (This is not a dermatomal pattern of sensory change and cannot therefore be termed radicular pain.) Again, decompression surgery bilaterally at three levels was discussed. No plans for fusion were mentioned. No evaluation for the most likely cause of chronic back pain in a legal context was undertaken.

6-27-19  Operative note was dictated by Dr. Allen Gocio who noted a "failure to improve with conservative measures" as a basis for proceeding with multi-level surgical intervention. "Lumbar spine imaging reveals central disc herniation at L4-5 with significant compression of the thecal sac and severe stenosis, additional congenital and acquired spinal stenosis at multiple levels." Procedure was L3, L4, L5 bilateral decompression via discectomy and foraminotomy.

[Pressure on the thecal sac produces no neurological compromise and requires no treatment. It is a common finding. No nerve root compression or objective support for radiculopathy was identified as an indication for surgery. No pseudoclaudication due to stenosis had been identified.]

6-28-19 Discharge diagnosis again reinforced the presence of acquired stenosis. Surgery was described as uneventful.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 9

3-5-20 Dr. Gocio evaluated Mr. Washam for follow up and reported he was recovering from lumbar fusion. (Operative note does not indicate lumbar fusion was performed but rather that multi-level decompression was performed at three levels, six locations.)  He was taking Narco, an opiate, and continued to have low back pain complaints.   Neurological examination stated, "motor/sensory examination shows prior deficits, no new deficits or findings."

[No exam by Dr. Gocio preoperatively established any neuro deficit.  This encounter documents surgical failure.]

3-18-20 Repeat MRI was performed at Baxter Regional Medical Center with continued back pain complaints. Postoperative findings from L3 through L5 were identified. Multi-level disc degeneration was again present.

3-25-20 BRMC Neurosurgical and Spine Clinic record indicated follow-up examination with repeat CT of the lumbar spine. Again, the multi-level degenerative changes and facet degeneration were noted. Symptomatically, "patient's pain continues to be the same, he is having increased pain with even light activity at home.  We will continue off work, try another course of physical therapy, continue current medications, return in six weeks."   Records indicated that he was taking Hydrocodone for pain complaints. Neurological examination is not specified saying "only motor sensory examination shows prior defects, no new deficits or findings."

7-28-20   Dr. McAllister reviewed the MRI of March 2019.  There were no traumatic changes, no evidence of acute signal indicating physical damage, recent trauma, or acute disc herniation (extrusion).  All findings were preexisting and degenerative.

**SUMMARY:**
Mr. Washam reported a fall at work and presented with complaints of low back pain to a local nurse practitioner medical provider, Ms.Tamara Ward..

> Back pain is so common that it must be considered to be a normal part of life, rather than a medical abnormality.  The vast majority of presentations of low back pain are not injury-related, or otherwise associated with any general medical findings.  For 85-90% of back pain cases, there is no general medical (non-psychiatric, non-psychological) diagnosis that explains the pain (JAMA 2001, Feb 1: 344 (5): 363-70: AMA's Physicians Guide to Return to Work, Talmage and Melhorn, 2005, p. 165.) "Most authors today agree that, despite modern medicine, the pain-generating structure for most adults with low back pain cannot be reliably

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 10

scientifically established." (AMA Guides to the Evaluation of Disease and Injury Causation, 2nd edition, p.197)

"There is not a causative relationship between structural changes in the spine and serious low back pain." "There is not a credible basis for an 'injury model' for low back pain." (AMA Guides Newsletter, Jan/Feb 2013, Chronic Pain, Fundamental Scientific Considerations, Specifically for Legal Claims, p. 4)

"The prognosis for LBP [low back pain] usually is excellent.  However, a minority of patients, approximately 10%, are still off work at half a year.  This minority consumes a great majority of all the resources, and consequently the costs, spent on back problems." (Spine 25, #23, pp 3055-3069)  These individuals demand careful evidence based medicine evaluation and treatment which is verified to predictably produce benefit.  Failure to do this results in wasted resources and poor outcomes.

"The vast majority of evidence supports the notion that receiving compensation for low back pain or being unemployed is predictive of developing a chronic disability." (Barth RJ.  Chronic Pain: How to Make Sense of It Within Orthopedic Claims.  In:  Melhorn JM and Carragee E. 14th Annual American Academy of Orthopedic Surgeons Occupational Orthopedics and Workers Compensation: A Multidisciplinary Perspective. 2012 AAOS)

There is highest quality science available to all practitioners (MD, DO, PA, ANP) which outlines the proper method of evaluation and categorization for appropriate treatment.

Clinical Guidelines for the Diagnosis and Treatment of Low Back Pain produced by the combined efforts of the American college of Physicians and the American Pain Society were published in 2007.

Recommendation I: Clinicians should conduct a focused history and physical examination to help place patients with low back pain into 1 of 3 categories: nonspecific low back pain, back pain potentially associated with radiculopathy or spinal stenosis, or back pain potentially associated with another specific spinal cause.  The history should include assessment of psychosocial risk factors, which predict risk for chronic disabling back pain (strong recommendation, moderate-quality evidence).

Recommendation 2: Clinicians should not routinely obtain imaging or other diagnostic tests in patients with non-specific low back pain (strong recommendation, moderate-quality evidence).

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 11

> Recommendation 3: Clinicians should perform diagnostic imaging and testing for patients with low back pain when severe or progressive neurologic deficits are present or when serious underlying conditions are suspected on the basis of history and physical examination (strong recommendation, moderate quality evidence. (Annals of Internal Medicine, Vol. 147, Number 7, p 478-491).

Ms. Ward, acting as a primary care medical practitioner, evaluated Mr. Washam on three dates listing the following diagnoses:

3-14-19
   1. Fall
   2. Back pain

3-21-19
   1. Back pain
   2. Musculoskeletal spasm
   3. Anxiety

3-29-19
   1. Back pain
   2. Muscle spasm.

Mr. Washam had normal for age lumbar radiograph report of 3-15-19. That plus a normal neurological exam equals a lumbar strain diagnosis.

LBP presentation is a common presentation for all primary care providers who can easily follow published standards for history, physical exam, testing, and clinical diagnosis. Ms. Ward did not apply this science. There is no indication in the record that she obtained a "psychosocial history, performed a neurological exam, or assigned a category of clinical diagnosis (e.g. strain, back pain with neurological deficit and radiculopathy, multilevel degeneration on MRI – unchanged). Her care has little to commend. Her assessments are a regurgitation of symptoms which could have been provided by the appointment clerk.

On these three occasions Ms. Ward had the opportunity to apply her medical training, take an adequate history, define the symptom distribution, perform a lower extremity neurological examination to determine whether there was any evidence of change in neurological function, and to assign a clinical diagnosis. Thrice she failed to perform and document any of these primary health care

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance    (501) 786.1544    fax (501) 224.8701    earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 12

provider duties.   There is no evidence Ms. Ward understands the differential diagnosis for low back pain or how to evaluate this very common clinical problem.   Instead of following objective evidence-based medicine standards and protocols, she ordered an MRI, a test which does not diagnose the cause of back pain.

> Medical knowledge is useful in determining when MRI is clinically indicated.   Clinical Guidelines by well-known physician organizations are the highest level of medical literature. Clinical Guideline from the American College of Physicians (Best Practice Advice) state "Diagnostic imaging is indicated for patients with low back pain only if they have severe progressive neurologic deficits or signs or symptoms that suggest a serious or specific underlying condition.   In other patients, evidence indicates that routine imaging is not associated with clinically meaningful benefits but can lead to harms." (Annals of Internal Medicine, Feb 1,2011, Vol. 154, #3, 184189).   "MRI imaging cannot be used to predict back pain." (JBJS 2001, 83-A; 1306-1311).   Medical indications were not met for MRI to be utilized in this case.   Incidental anatomy unrelated to the incident has been identified and treated without good justification.   A detailed neurological exam, the screening evaluation preceding decision to use MRI, was not performed and recorded, a standard of care issue.   Conservative care and reassurance were appropriate

MRI showed extensive pre-existing degenerative lumbar conditions and documented the absence of any traumatic change in anatomy, thereby excluding new physical damage or injury.   No acute disc herniation was discovered.

As is known from later evaluations when examination was performed and recorded, there was no neurological deficit.   Therefore, the proper clinical category was lumbar sprain/strain.

> A spinal sprain or strain is diagnosed based upon the described onset of axial pain that a patient relates to a particular incident.   It is indistinguishable from spontaneous spinal pain, an unavoidable and common human condition.   There are no pathoanatomic findings on imaging, and no objective physical findings specific for the diagnosis.   Medicine cannot distinguish between a spinal sprain and a spinal strain.   These clinical diagnoses are interchangeable.

Complaints and symptoms related to spinal sprain and/or strain typically resolve within a few weeks in the non-litigant population, without measurable residuals.   Resolution cannot be accelerated by treatment, and there is little scientific basis for any medical or non-medical remedy.   The best treatment is for a person to remain active.   Bed rest is contra-

Bradley Washam
PMLC# X0019
Page 13

indicated. However, superfluous treatment, litigation, work issues, and mental pathology predictably prolong a person's symptoms.

Spinal sprain and strain are clinical diagnostic terms based on subjectively described symptoms without objective findings. Therefore, a sprain/strain diagnosis does not satisfy step 1 of the requirements of the NIOSH/AMA injury-relatedness or work/relatedness protocol (AMA Guides Newsletter May/June 2012) and is not useful for forensic or causation diagnostic purposes.

Nurse Ward did not apply best medical science which indicates that in the absence of acute physical damage and with the presence of normal neurological stateu, the best treatment was return to work unlimited without further medical care (see relevant science section). Instead, she opened the Pandora's box of additional treatment for pre-existing, unchanged anatomy via a medical non-indicated MRI, producing unnecessary invasive procedure to preexisting incidental anatomy to providers who willing collaborated.

Return to work unrestricted (RTWU) increased chances of successful outcome when compared to work restrictions based on patient's symptoms.   In the early treatment of acute low back pain, "The sooner the recommendation is made to return to work, the more likely the patient is to comply. The probability of return to work decreases as length of time off work increases," and, "There is no conclusive evidence that an early return to work causes harm to the back." (Spine; 1994, 19;#18:2033-2037) "Symptoms do not harm," so "work restrictions are not appropriate based only on symptoms." (AMA Guides to the Evaluation of Return to Work Ability and Return to Work, page 13).

Medical facts regarding low energy/minor trauma as it relates to chronic back pain was established by prospective medical analysis and summarized in the AMA Guides Newsletter on Chronic Pain (Jan/Feb 2013). " 'Minor trauma' was defined as 'any perceived injury to the low back area with a back-pain intensity >2/10 for at least 48 hours but not meeting the major injury definition.' The 'major injury' definition was 'LBP' associated with high energy trauma resulting in serious visceral injury, proximal long bone, or pelvic or spinal fracture or dislocation.'" The results are quoted "Minor trauma was only associated with serious low back pain in a compensation setting." "None of the participants who were not eligible for compensation developed serious LBP after minor trauma." (p. 2)  No anatomic major injury was present in this file.   In the absence of criteria which satisfy the definition for major trauma, the development of LBP complaints is predicted by eligibility for compensation, a medical fact consistent with other published information.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 14

Initial evaluation April 10, 2019 at Cape Gerardo by Dr. Vaught documented the absence of any
neurological abnormality of the lower extremities, thereby excluding damages to the lumbar neural
structures. Dr. Vaughn identified no traumatic anatomy or acute disc herniation, but pronounced the
diagnosis of inflammation or sacroiliitis as an excuse to perform invasive procedures. He also used
the diagnosis of sacroiliac dysfunction.

> AMA Guides to the Evaluation of Disease and Injury Causation (AMA, 2008: p. 119) comments
> regarding the diagnosis of sacroiliac dysfunction (mechanical, non-inflammatory sacroiliac
> pain) as "controversial and over-diagnosed—There is little significant evidence to correlate
> history and exam findings of this diagnosis." The same publication recommends imaging to
> rule out anatomic pathology in the joint.

A return evaluation one month later, May 16, demonstrated an additional normal neurological
examination, an absence of neurological abnormality in the lower extremities. This time a different
procedure was advised, facet neve bocks for "diagnostic purses"

> A variety of anatomic locations in the spine are proposed as pain generators. Medical science
> regarding this is specifically addressed by the AMA and its Guides Series. They note the 2005
> Jarvick study, "We do not find an association between new low back pain and type I end plate
> changes, disc degeneration, annular tears or facet degeneration." Regarding facet arthritis,
> "Although spondylosis is commonly invoked as a pain generator, outcome studies have been
> unable to reliably correlate this finding with pain." Degenerative discs are frequent in the
> cervical spine and "radiologic findings of cervical degenerative disc or arthritis are not
> predictive of pain or disability." Annular tears, high intensity zones, have also been proposed
> as painful, "There is no statistical correlation between high-end intensity zone changes and
> change in a patient's symptoms." (AMA Guides to the Evaluation of Disease and Injury
> Causation, AMA 2008, page 130-132).

Testing for the most probable medical explanation for pain complaints, now of almost three months
duration, was not undertaken.

Care move to evaluation by Dr. Gocio's nurse practitioner Brandi Anderson who performed
neurological examination which was again objectively normal (motor strength, sensory, reflexes
intact). The record does not indicate examination was performed by Dr. Gocio. There was comment
that Dr. Gocio identified two diagnoses, L4-5 acute disc extrusion and radiculopathy in addition to the
already established MRI identification of acquired lumbar stenosis.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544   fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 15

Both of these diagnoses are false. The presence of a normal neurological evaluation performed twice at the Neurosurgical Clinic in Cape Giradeau (records were not reviewed by either the nurse or Dr. Gocio) and by his nurse in clinic on June 6th eliminates radiculopathy as a diagnosis. [The published requirements for this diagnosis have been previously inserted.]

Acute disc extrusion is contradicted by the findings on MRI which showed all degenerative changes in the absence of any acute anatomic damage.  The initial radiologist report in March included no acute or traumatic disc diagnosis.  Dr. McAlister's independent opinion confirmed the absence of acute disc herniation.

> The standards to classify the MRI appearance of a disc as traumatic have been determined and detailed in medical literature by the North American Spine Society, the American Society of Spine Radiology, and the American Society of Neuroradiology (The Spine Journal 14 (2014) 2525-2545).

> "The category of trauma includes disruption of the disc associated with physical and/or imaging evidence of violent fracture and/or dislocation and does not include repetitive injury, contribution of less than violent trauma to the degenerative process, fragmentation of the ring apophysis in conjunction with disc herniation, or disc abnormalities in association with degenerative subluxations.  Whether or not a "less than violent" injury has contributed to or been superimposed on a degenerative change is a clinical judgement than cannot be made based on images alone; therefore, from the standpoint of description of images, such discs, in the absence of significant imaging evidence of associated violent injury, should be classified as degenerative rather than trauma." (p. 2530-31)

When best level published science is applied it is clear that Mr. Washam had no change in his pre-existing multi-level lumbar degeneration. He had no documented injury to the sacroiliac joints. He had no neurological deficit nor pseudoclaudication.

The lumbar spinal stenosis was preexisting and, unchanged.  In the absence of progressive neurological loss or clinical pseudoclaudication, the pre-existing developmental stenosis was not yet a basis for surgical intervention.

Compression of nerve roots produces lower extremity pain in a specific dermatomal distribution for each nerve root.  Mr. Washam did not have such findings.  When a nerve root is anatomically compromised, decompression may relieve lower extremity pain.  Nerve root decompression by disc excision or foraminotomy would not be expected to help back pain complaints.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 16

Medical science indicates that the vast majority of lumbar disc extrusions are not caused by a knowable or known traumatic event. (Spine Journal 10 (2010) 388-395, JBJS 72-A, 403-408). This science is consistent with my practice experience.  Disc extrusions (and other disc abnormalities) occur in all walks of life and are not limited to heavy labor or railroad workers. Many disc extrusions occur and remain asymptomatic.

Surgery for a "herniated disc" is the most commonly performed orthopedic/neurosurgical procedure in the USA.  In 80-90% of cases with actual herniation of disc, enzyme secreted by the body break down the disc material and the nerve pain disappears in time.

Disc surgery has serious potential risks.  Long-term results for operative and nonoperative treatment are similar.  (Spine; 1995, 20; 16:1829-1833 and Spine; 2010, 35; 12:1247-1251). People whose only symptom is low back pain are rarely helped by back surgery.  In most people with mild sciatica, the pain usually disappears within a few months, as the disc breaks down, except for secondary biopsychosocial issues which support chronic pain complaints.

EMG to confirm actual nerve damage or abnormality was never performed.

Surgical contraindications were not eliminated prior to elective intervention.

Anxiety/depression, secondary gain, job dissatisfaction, smoking, medication/substance abuse, workers' compensation, and litigation are confounding variables and are relative contraindications to elective spine surgery for degenerative changes.   Overall, compensated patients had more than 3.75 times the odds for an unsatisfactory outcome when compared to non-compensation cohort (JAMA, April 6, 2005).

Elective indications for the surgery Dr. Gocio performed were not satisfied.

Meta-analysis of 211 published articles established in medical science the following: "Compensation status is associated with poor outcome after surgery.  This effect is significant, clinically important, and consistent."  (JAMA April 6, 2005, Vol 293, #13, 1644-1652) "Compensation status was the most significant predictor of outcome (when compared to all other demographic, diagnostic, and treatment variables)." (Ibid) I have recognized this in my own practice.  The probability of poor outcome should be strongly considered when elective surgery for pain is considered in a compensation or litigation situation.  Unless surgery offers a

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 17

> decided advantage over conservative non-operative treatment in such cases, it should not be
> performed

There was no radiculopathy. There was no acute disc herniation. There was no pseudo-claudication.
I cannot identify medical logic for multilevel decompression to correct back pain complaints. Surgery
predictably failed.

In this medical record, the most probable medical diagnosis was not objectively tested for and
eliminated. Rather, a less likely diagnosis which was supported predominately by patient report was
pronounced and treated.

A physician must be scient (knowing, aware, knowledgeable) for the conditions and presentations he
or she accepts for treatment or evaluation, or refer to another physician who is capable in that task.

Medical school teaches student physicians to objectively test for the most likely explanation or
diagnosis matching a presentation composed of history and physical findings before proceeding to a
less likely diagnosis. Diagnoses are defined precisely so as to facilitate communication between
physicians, and the clinical criteria necessary to establish a diagnosis is available in published
medical science. The "Differential Diagnosis" list is ranked from probable, to likely, to unlikely, to
improbable, and finally to rare. Objective evidence-based published medical science is the standard
utilized to eliminate a more likely diagnosis before moving to a less likely condition and treating it.

The physician must be familiar with and consider all types of diagnoses, not just those of personal
specialty or interest. Applicable logic and method for securing an explanatory diagnosis is contained
in the NIOSH/AMA protocol. For a diagnosis to meet medical standards in a legal or forensic setting,
this process must be followed and documented. This is particularly true when a less likely diagnosis
is supported only by subjective data.

The responsibility to use best logic and science is not avoided by substituting physician belief, feeling,
training, or past clinical experience. When published scientific knowledge (best objective evidenced-
based medical science) does not establish the diagnosis, the diagnosis is rightly rejected as not
meeting medical standards. Presentations, primarily of pain complaints, are not an exception.
Science demonstrates that with such a clinical presentation, an anatomic general medical diagnosis
is, more probably than not, unobtainable.

Within the records there is a letter from Mr. Washam's attorney on April 19, 2019 indicating that legal
action had been initiated. In the presence of decision to pursue compensation via legal methods for

Bradley Washam
PMLC# X0019
Page 18

an alleged injury, symptomatic recovery cannot be expected. Since there was no objective evidence of traumatic anatomy or physical damage, symptoms and treatment would be a necessary substitute to support any claim of injury. In this, medical providers cooperated. They did not follow best objective evidence medical standards and in the absence of physical anatomic change test for a non-physical explanation.

No physician or nurse practitioner considered any explanation other than anatomy as a cause of his symptoms. A differential diagnosis for the most likely medical explanation was not performed nor objective testing (e.g. MMPI) done by any physician or nurse practitioner.

The dominant factor explaining chronic pain complaints in a legal context is eligibility for compensation. (AMA Guides Newsletter, Jan/Feb 2013, p. 2-9)

Mr. Washam has not benefitted from treatment.

The appropriate treatment (apparently unknown to Nurse Ward) was a return to work, unlimited with cessation of care. Further care and removal from work after that point has been harmful to Mr. Washam. who was removed from the work force, unnecessarily operated without recovery, placed on narcotics, and treated without testing undertaken to identify the most probable medical explanation or the most likely cause of his chronic pain complaints. .

The silence of this record regarding traumatic anatomy is deafening. This medical record objectively identifies no traumatic anatomy due to the event of March 11, 2019.

Mr. Washam's current situation, that of intact neurological function and a stable spine does not prevent a return to railroad duties based on American's with Disabilities Act of 1990. His post-op evaluations do not identify a condition which would result in a significant risk of substantial harm to himself or others which is imminent. If here is no objective medical basis for involuntary exclusion from work, there is no basis for work restriction. (See relevant science section.)

Mr. Washam's treatment has been driven by symptoms, not objectively identified physical damage. No traumatic anatomy has been documented, rather the absence of anatomic change was definitively established by the March 2019 lumbar MRI.

Symptoms do no harm and are not a basis for work restrictions and in and of themselves not a basis for medical intervention. Mr. Washam's anatomy on March 15th had been present on March 5th.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544   fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 19

Mr. Washam would have been better served had he just shrugged of the symptoms  and returned again to work the next day and thereafter.  Or if had he been properly evaluated by Nurse Ward, who, could have easily performed a neurological examination (normal), reviewed the radiograph report of 3-13-19 (normal) and returned him to full duty without restriction with a lumbar sprain/strain.

Non-physical drivers related to compensation and psychosocial factors produce long term pain complaints.  Psychosocial factors are not improved by surgical invention and narcotic medications. (See relevant science section)

At present Mr. Washam should be tested for the most likely cause of his prolonged pain complaints, personality disorder or other psychological cause.  Secondly, the importance of compensation as the dominant factor for chronic pain complaints should be recognized by those involved.

Mr. Washam will be further harmed if he is taken out of the work force and placed on permanent disability.

As reviewed at a recent educational American Academy of Orthopedic Surgeons publication (November 2011), compiled from multiple published studies, medical science documents that absence from work:
- is detrimental to a person's mental health
- is associated with elevated rates of substance abuse
- is associated with increased risk of disabling chronic low back pain
- causes exacerbation in the duration and severity of pain complaints
- prevents improvement in brain functioning after injury
- is a scientifically established risk factor for cancer
- is a scientifically established risk factor for hypertension
- is a scientifically established risk factor for heart attack
- is associated with increased rates of child abuse
- is associated with increased rates of marital violence
- is associated with increased rates of divorce
- is a scientifically identified risk factor for early death
- is also associated with early death for the spouse

A significant quote from Dr. Stanley J. Bigos, noted for his analysis of work-related injuries, is, "I am still waiting for the first studies which demonstrate that we can help somebody by taking them out of work."

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 20

Disability is not desirable if any other alternative is available. "Even worse than the monetary problems caused by our disability epidemic is the psychological trauma of taking a worker off work. The Canadian study demonstrated a doubling of the mortality rate in workers who are retired or are taken off work. And even if the worker doesn't die, it has been shown that there is no enjoyment of life. The worker is taken out of his/her social environments. Disabled workers do not enjoy life. Many are left acting sick to justify their disability. Illness behavior has been shown to be self-predicting. The sicker a worker acts, the sicker he/she becomes." (AMA Guides to the Evaluation of Disease and Injury Causation, AMA 2008, p. xvi). I make no apologies for using every tool at my disposal to return individuals without obvious and severe disability to work.

It is not too late for Mr. Washam to benefit from treatment of non- physical factors.

Personality disorders are associated with a tendency to be litigious. (Yudofsky, SC. Fatal Flaws. American Psychiatric Publishing, 2005.) "Since such individual [with personality disorders] does not realize that their personality creates problems, they tend to blame others for those problems." "As a consequence, personality disordered individuals file legal claims at an elevated rate, thereby causing personality disorder to be especially common in all types of litigation and disability claims ." (AAOS Occupational Orthopaedics and Workers' Compensation Course, 2013, pp. 913-919.) The importance of personality disorder is also reviewed in the AMA Guides Newsletter of Jan/Feb 2013, "Chronic Pain: Fundamental Scientific Considerations, Specifically for Legal Claims".

The fact that a claim has been filed or appealed merits consideration of personality disorder as a contributing or causative factor. This is especially true in chronic disabling pain or spine claims where personality disorders are discovered at a very high rate if they are considered and identifying testing performed.

Appropriate objective testing for this disorder, the most probable medical explanation for chronic pain complaints in a legal context should, of course, have been undertaken as part of the differential diagnosis by Dr. Gocio before surgery. There was no acute finding or neurological progressive compromise which required Dr. Gocio to acutely operate on multiple levels of the spine.

There are no physical findings at present which prevent Mr. Washam from regaining his position and becoming gainfully employed for the railroad, which would in the long term be in his best interest.

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701    earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 21

To summarize, the event of March 11, 2019 produced no change in anatomy or any other findings which when placed into the NIOSH/AMA injury relatedness protocol objectively establish a diagnosis of injury due to the event at the railroad.

Step one of the NIOSH/AMA injury relatedness protocol, the national standard for causation analysis, requires objective evidence of traumatic injury completely independent of patient report. This record does not fulfill that standard.

The logical explanation for symptoms which are unaccompanied by any change in anatomy is a non-physical basis. The most dominant explanations are eligibility for compensation (non-medical) and personality disorder/other psychological condition (medical). I am unable to apportion between these two documented scientific explanations.

An invisible, undetectable, incapacitating, industrial, impact injury is not consistent with medical science.

Mr. Washam's treatment and removal from the work force have little to commend. No change in physical structure of Mr. Washam's anatomy directly related to the incident of March 11, 2019 has been identified by any physician. Therefore, his conditions are created by non-physical factors, none of which have been objectively tested for or considered by his treating physicians. It is these factors which are explanatory.

No impairment rating is appropriate due to the railroad incident of 3-11-19 since no change in anatomy occurred. Personality disorder or other psychological condition is pre-existing and unrelated. Medical practitioner compassion and concern cannot be substituted for proper best objective evidence based medical care.

The combination of subjective patient report (unreliable) and "post hoc" reasoning (false logic) is not a satisfactory objective basis for causative attribution. This is emphasized in the AMA Guides Protocol for determining "Injury-Relatedness." (AMA Guides Newsletter, May/June 2012)

The opinions stated in this report are based on the medical information in the form of medical records provided to me. Should additional medical information or records be provided, it is possible my opinions might be modified or changed. Medicine is an inexact science, however, the opinions stated above are based on a reasonable degree of medical certainty.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

I may provide a report addendum to cover additional records and depositions reviewed after this report is submitted.

Bradley Washam
PMLC# X0019
Page 22

Earl Peeples, M.D.

EP/djl

Bradley Washam
PMLC# X0019
Page 23

## METHODS ADDENDUM:

Medical evidence is drawn from observation, and medical conditions are multifactorial and more likely to be controlled by probability than a single cause or event. (AMA Guides to the Evaluation of Disease and Injury Causation, AMA 2008, p. 14)

Evidence-based medicine is a "set of principles and methods intended to ensure that to the greatest extent possible, medical decisions, guidelines, and other types of policies are based on and consistent with good evidence of effectiveness and benefit." (Health Affairs 2005; 24 (1), 9-17) It is "The conscientious, explicit, and judicious use of current best evidence in making decisions about the care of individual patients." (Sackett er al. (2000) Evidence based medicine: how to practice and Teach EBM. Churchill Livingston)

Objective evidence-based methods were utilized in my analysis of these records. My opinions are based on sufficient facts or data and are the product of reliable principles and methods which have been applied to the facts of the case. My opinions are based on "review of experimental, statistical or other scientific data" provided by others in the form of medical records and radiology reports. This is the basis on which I was trained and on which I satisfied the requirements for board certification; that is, training in which a medical history, oral or written, and radiographs or other objective testing data is provided. Residents in training are then asked to determine a diagnosis and justify a specific treatment. It is this method which was utilized by the American Board of Orthopedic Surgery in 1980 when I was orally tested for board certification. A series of senior orthopedists presented radiographs and histories of patients, and I had to provide a diagnosis, discussion, and satisfactory plan of care for each in order to pass that exam. Review of medical records for forensic purposes is a similar, almost identical undertaking for a different purpose; that is, instead of proving one's proficiency in orthopedics, it is for the purpose of explaining either the presence of, or the absence of, evidence of a medical condition as it relates to specific alleged causation.

A general medical condition is a non-psychiatric, non-psychological diagnosis attributable to abnormal anatomy or physiology. In this medical record analysis, I have compared history, symptoms, findings, and treatment to established medical science and sought to objectively identify a musculoskeletal, orthopedic, or general medical condition or diagnosis related to the incident(s) or employment of interest. In many forensic cases, no general medical diagnosis can be objectively established and no general medical explanation for symptoms is discovered.

If called to testify live, I may use anatomic models or drawings to help explain my findings and opinions to a jury.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544   fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 24

Multiple published medical ethics guidelines state that physician charges may not be based on the outcome of a case or related to any type of contingency fee system. My charges are based on my time and not my testimony or content of a report. This is consistent with published ethics guidelines. (Ethics Manual, American College of Physician, 5th Edition, 2005, and Annals of Internal Medicine, 2005; 142:560-582, and AAOS Guidelines- Adopted April 18, 2005, Amended May 12, 2010)

I have reviewed these medical records as an independent physician, one who is not involved in treatment of the patient. As established in published AMA science (The Guides Newsletter, September/October 2005, AMA, Who Is in the Better Position to Evaluate, the Treating Physician or an Independent Examiner) this places me at an advantage in determining diagnosis and impairment on a factual scientific basis. Significant science from this publication includes:

"By definition the physician is not in an independent role if that physician already has accepted a treating role for the patient/examinee." " . . an independent evaluator may not be unbiased if he or she strays from the standards of the Guides . . . However, these issues are more likely to be problematic for the treating physician since there is an inherent patient advocacy role. It is probable that the treating physician will not consider new or alternative diagnoses at the time of rating. It also is possible that the treating physician will causally relate problems to an injury if this appears advantageous to the patient and/or the physician."

"In a 1992 article published in the Archives of Internal Medicine, Sullivan and Loesor, pointed out that it was unethical for a physician to serve in both a treating and an impairment evaluation role for the same patient when the focus of treatment is chronic pain."

"Clinical relationships typically benefit from the clinician adopting a supportive, accepting, and empathic attitude, while forensic evaluations typically benefit from the evaluator adopting a neutral, objective, and detached attitude."

" . . the treating clinician looks for disorders to treat, rather than introducing sufficient skepticism to recognize when there is no such disorder."

"All treating clinicians can benefit financially from offering opinions that a condition is work-related, injury-related, valid, disabling, and in need of further treatment. Treating clinicians often find themselves in a position where they would be cutting off a source of their own income if they were to offer opinions that the clinical presentation is not valid, not work- related, not injury-related, not disabling …, and/or not in need of further treatment."

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 25

"All treating specialties share the same bias toward offering treatment for almost any and all complaints, rather than engaging in the type of cautious skepticism that is necessary for competent impairment evaluation and other forensic duties."

My evaluation of these records was conducted using published AMA Guides Protocol to determine injury-relatedness or work-relatedness (AMA Guides Newsletter May/June 2012), using its methods to avoid just these types of bias and conflicts. This protocol was developed by NIOSH (National Institute of Occupational Safety and Health), adopted by the American College of Occupational and Environmental Medicine (ACOEM), adopted and published in the AMA Guides to the Evaluation of Disease and Injury Causation (Second Edition), published in condensed form in AMA Guides Newsletter May/June 2012, and recommended by AAOS (American Academy of Orthopedic Surgery) instructional courses as the current scientific method to separate work or injury related conditions from general medical conditions which are of non-work and non-injury origins. It is the current standard for this purpose.

Causation and impairment are inextricably linked. It is necessary to analyze for causation before impairment related to a specific event can be determined. [An individual with a missing index finger, a three-fingered hand, who presents to a physician with a bruise or hand strain has 20% impairment of function of the hand due to the absence of the index finger. However no impairment due to the event is present because the event did not cause the loss of the finger.] The AMA Guides Newsletter protocol "Determining Injury-Relatedness, Work-Relatedness, and Claim-Relatedness" (May/June 2012) summarizes a six step logical process from the second edition of the AMA Guides to the Evaluation of Disease and Injury Causation. If followed, it produces an objective opinion, free from bias.

"The original work toward the creation of this protocol was credited to the National Institute of Occupational Safety and Health, and prior adaptation of the protocol is credited to the American College of Occupational Environmental Medicine". (NIOSH and ACOEM)   It is an established part of the AMA Guides system and recommended as the standard by the American Academy of Orthopedic Surgeons (AAOS) at its educational courses.   The steps are as follows:

1) Definitively establish a diagnosis (an explanatory diagnosis)
2) Apply relevant findings from epidemiological science to the individual case
3) Obtain and assess the evidence of exposure (to that epidemiology)
4) Consider other relevant factors (differential diagnosis/other explanation)
5) Scrutinize the validity of the evidence
6) Evaluation of results from all of the above (review each previous step)

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 26

The protocol emphasizes that this analysis must be objective and credible. It stresses avoidance of unreliable information (patient reports) and false logic (post hoc reasoning) on page 5. The protocol emphasizes the use of objective evidence and science, rather than subjective information, in order to produce a reliable causation opinion.

Step 1 states that the evaluator must ask the question, "Did I find evidence of the diagnosis that is completely independent of what the examinee told me," and the evaluator should have "ruled out all other potential explanations for this clinical presentation, especially those that are more likely than my diagnosis?". This first step states that the evaluator should ask for a "full set of records", especially pre-claim records (Page 6).

Step 2 requires the evaluator to consider the most well established risk factors from epidemiological science for the diagnosis.

Step 3 asks the evaluator to consider if the accident or event in question produced the right type and magnitude of exposure to create the alleged condition.

Step 4 requires the evaluator to ask "are there risk factors other than the cause that is being claimed in this specific case that could contribute to the development of the clinical presentation?" (Page 8).

Step 5 requires the evaluator to review of the quality of evidence and warns: "evaluators should note the scientific findings to indicate an approximate rate of 100% of the examinee's reported history as being false when the examinee was blaming someone else for his or her health complaints" (p.9).

"When an examinee blames someone else for his or her injury or accident, and claims that he or she never experienced relevant health problems before the injury or accident; such denials of pre-existing health problems are almost always found to be false .... Given the extreme unreliability of such denials of relevant pre-existing problems, the common reliance on reports from claimants or plaintiffs for purposes of making causation determinations is not justifiable." (p. 5)

Additional information regarding the unreliability of patient reports is contained in the Guides Newsletter of Sept/Oct 2009, "Examinee-Reported History Is Not a Credible Basis for Clinical or Administrative Decision Making:"

> The unreliability of the examinee report is especially pronounced when the examinee has filed a medical/legal claim and consequently reports from examinees are simply not credible basis for clinical, forensic, or administrative decision making. (p. 1)

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 27

**RELEVANT SCIENCE SECTION:**

The AMA Guides specifies common developmental spinal findings as (1) spondylolysis found
normally in 7% of adults; (2) spondylolisthesis found in 3% of adults; (3) herniated disc without
radiculopathy, found in approximately 30% of individuals by age 40 years; and (4) aging changes
present in 40% of adults after age 35 years and in almost all individuals after age 50. As previously
noted, "the presence of these abnormalities on imaging studies does not necessarily mean the
individual has an impairment due to an injury." (AMA Guides to the Permanent Impairment of
Function, 5th Edition, page 383).

The appearance of new disc bulges and/or herniations is not proof of trauma, as these commonly
occur spontaneously due to degeneration. Such findings do not confirm symptoms nor are they a
dependable measure of symptom severity. Particularly in this case the pattern of multilevel cervical,
thoracic, and lumbar disc pathology is consistent with widespread spinal degeneration, not trauma.

Medical science indicates that degenerative disc changes are genetically determined and progressive
with age. They are not related to chosen occupation or activities. This has been identified in identical
twin studies of dissimilar occupations. (JBJS Vol. 88-A, 3-9, and The Spine Journal 9 (2009) 47-59).

This science is so important that it is described in the forward of AMA Guides to the Evaluation of
Disease and Injury Causation (p. xv). "When one identical twin had a light job and the other a heavy
job, requiring a lifetime of heavy lifting, there was no difference in the amount of DDD. There is no
scientific evidence, for instance, that working on a railroad all your life causes any more deterioration
of the lumbar spine than would have occurred from that natural history."

Individuals blame work for back problems often in the absence of specific incident using "post hoc"
reasoning. "If work is a toxin causing back problems, then altering work should result in fewer back
problems. A systematic review of back pain prevention trials found that the only factor or intervention
for which there was proof of efficacy in preventing back disorders was exercise. No ergonomic
intervention has been proven to decrease the incidence of 'work related' back pain." (AMA Guides to
the Evaluation of Work Ability and Return to Work, AMA 2011, pp. 168-9) (Spine 2009; 9:147-168)

Symptoms at work do not harm. Therefore, unless there is objective medical evidence that continued
work in the usual occupation will "pose a substantial risk of significant harm to self or others that is
imminent" physical employment activities should be continued for the exercise, medical, and social
benefits they produce for the worker.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 28

Medical science indicates that the vast majority of lumbar disc extrusions are not caused by a knowable or known traumatic event. (Spine Journal 10 (2010) 388-395, JBJS 72-A, 403-408). This science is consistent with my practice experience.  Disc extrusions (and other disc abnormalities) occur in all walks of life and are not limited to heavy labor or railroad workers.  Many disc extrusions occur and remain asymptomatic.

Surgery for a "herniated disc" is the most commonly performed orthopedic/neurosurgical procedure in the USA.  In 80-90% of cases with actual herniation of disc, enzyme secreted by the body break down the disc material and the nerve pain disappears in time.

Disc surgery has serious potential risks.  Long-term results for operative and nonoperative treatment are similar.  (Spine; 1995, 20; 16:1829-1833 and Spine; 2010, 35; 12:1247-1251).

People whose only symptom is low back pain are rarely helped by back surgery.  In most people with mild sciatica, the pain usually disappears within a few months, as the disc breaks down, except for secondary biopsychosocial issues which support chronic pain complaints.

In open discectomy, over the first 12 months, surgically treated had results superior to conservatively treated patients; however, "The advantage of surgery faded, so that after four years there was no difference in results of discectomy compared with conservative care."  "Disc removal is intended for relief of sciatic pain rather than back pain and because it does nothing to restore normal mechanics to the low back, continuation of low back pain does not represent a failure of disc surgery done for proper indications."  "Surgery is an option only for patients whose pain is severe and disabling.  Mild pain does not justify surgery.  Severity, duration, and persistence of neurological deficit must be weighed…less severe neurological deficit is not an indication for surgical treatment…"  "Social, economic and psychological factors play rolls when making a decision about surgical treatment of a ruptured disc."  Elective discectomy should be utilized for progressive neurological deficit causing severe pain.  Long-term results for operative and nonoperative treatment are similar.  (Spine; 1995, 20; 16:1829-1833 and Spine; 2010, 35; 12:1247-1251).

Medical knowledge indicates the most common reason for a surgical failure of lumbar spine surgery is "likely poor patient selection, which may be related to intrinsic psychological factors."  (Journal AAOS Vol 14, #9, Sept 2006, 534-541)  After failed spine surgery, psychological evaluation should be undertaken to discover such a cause before further treatment is recommended.

Scientific findings have indicated that psychological factors are the best predictor of new onset low back pain (rather than anything that would be indicative of an occupational injury being predictive.)

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 29

They indicate that the best predictor of the filing of such a workers' compensation claim is job dissatisfaction and a psychological vulnerability to developing physical complaints in the absence of general medical findings. (SPINE, 1991, 16, 1-6; SPINE 2005, Jul 1; 30 (13):1541. The predictors of persistent pain complaints are of a non-work-related, non-general-medical, psychological and social nature.

"The most important risk factor for the development of the types of chronic pain presentations which become the focus of medical-legal claims appears to be personality disorder." (Barth RJ. Chronic Pain: How to Make Sense of It Within Orthopedic Claims. In: Melhorn JM and Carragee E. 14th Annual American Academy of Orthopedic Surgeons Occupational Orthopedics and Workers Compensation: A Multidisciplinary Perspective. 2012 AAOS)

The science which documents importance of personality disorder as the most important risk factor explaining chronic pain complaints in a legal context is also reviewed in the AMA Guides Newsletter of Jan/Feb 2013, "Chronic Pain: Fundamental Scientific Considerations, Specifically for Legal Claims".

Personality disorder is defined as: "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has onset in adolescence or early adulthood, is stable over time and leads to distress or impairment." (American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, 4th Edition-Text Revision, 2000)

Other than compensation status, the presence of personality disorder dwarfs all other factors for the development of chronic pain. (Barth RJ. Chronic Pain: How to Make Sense of It Within Orthopedic Claims. In: Melhorn JM and Carragee E. 14th Annual American Academy of Orthopedic Surgeons Occupational Orthopedics and Workers Compensation: A Multidisciplinary Perspective. 2012 AAOS))

Medical knowledge indicates 15% of adult Americans (1 in 7) have a personality disorder. "Personality disorders are prevalent in the general population and are generally highly associated with disability." (Journal of Clinical Psychiatry; 2004; 65: 948-958). 73% of WC [worker's compensation] claimants claiming disability for chronic back pain have personality disorder (compared to 10-13% in the general population). (Spine 2006, May 1; 31 (10): 1156-62) Despite this medical science and the absence of anatomic trauma and general medical explanation for this clinical presentation in a compensation setting, testing to identify preexisting personality disorder has not been undertaken. Proper treatment is not possible without accurate.

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 30

Another source (AAOS Occupational Orthopaedics and Workers' Compensation Course, 2013, pp. 913-919.) provides additional science as seen in the following paragraphs:

"Compensation contingencies are the primary risk factor for chronic pain within a legal claim context. Of course, compensation contingencies are not a health issue." (p. 915)

"Among health issues, the most important risk factor for the development of the types of chronic pain presentations which become the focus of medical-legal claims appears to be personality disorders." (P. 915)

"Personality disorders are a pervasive form of mental illness. By definition, they are pre-existing for the purposes of any adult legal claim (because they are defined as first manifesting in adolescence or, at the latest, early adulthood). Also by definition, they lead to distress or impairment regardless of whether the individual has experienced an injury." (p. 915)

"When chronic pain populations have been credibly studied for the purposes of determining the extent to which personality disorders are risk factors for the development of chronic pain, the findings have dwarfed all other risk factors, with the exception of compensation contingencies." 9p. 915-6)

"Personality disorders are especially prevalent among chronic pain claimants . . ." (p. 918)

" . . claims of impairment from chronic back pain have a lack of correlation with general medical findings, while on the other hand, such claims have an extremely high correlation with personality disorders." (p. 919)

"..if evaluators fail to consider the possibility of a personality disorder in their causation evaluations, they will frequently be overlooking a critically important factor in the genesis of many impairment claims." (p. 913)

"In fact, it is likely that the evaluator who investigates for personality disorders will discover that some impairment claims are completely explained by personality disorders, rather than by the overt issue that is superficially associated with the claim." (p. 913)

"Therefore, evaluators would be wise to address the possibility of a personality disorder for almost all claimants, for almost all types of claims, and for all types of Guides-relevant evaluations." (p. 914)

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 31

"Given the prominence of personality disorders as a risk factor for the chronic pain, it is noteworthy (and distressing) that scientific findings have indicated that workers compensation claimants are almost never evaluated for the possibility of a personality disorder..." (p. 917)

The importance of personality disorder is also reviewed in the AMA Guides Newsletter of Jan/Feb 2013, "Chronic Pain: Fundamental Scientific Considerations, Specifically for Legal Claims".

Objective testing for personality disorder by a psychologist with interest and training in forensic cases must be undertaken for an accurate diagnosis to be established and proper medical recommendations to be made. Failure to consider personality disorder may result in harm to the claimant in the form of misdirected treatments or the usage of opiates for chronic pain complaints.

The dominant factor for chronic pain complaints in a legal context, established by causation science (AMA Guides Newsletter Jan/Feb 2013, p. 2), is eligibility for compensation. This medical record matches that science. Eligibility for compensation is not a medical diagnosis. The most probable medical explanation is a non-physical, non-general medical diagnosis, personality disorder/psychological condition (Ibid, p. 9).

Constant, severe, unrelieved pain complaints were often described by individuals I examined for forensic purposes. "A person, who claims symptoms are continuing to worsen, denies any change in symptoms, or claims symptoms have not responded to any treatment likely has a poor prognosis. Such symptom patterns are consistent with behavioral issues." (p.77, AMA Guides to the Evaluation of Disease and Injury Causation, AMA 2011) "Expected illness behavior typically begins shortly after trauma and gradually fades. Exaggerated behavior either has roots well before the alleged trauma, or has a late onset when objective symptoms of trauma are fading or have resolved." (p.84) These forensic symptoms point toward non-traumatic, non-work-related origin.

The basis for a willing worker to be excluded from a job under the 1990 Americans with Disabilities Act (ADA) is "only if, on the basis of objective information, the work activities of the 'essential job functions' pose a substantial risk of significant harm to self or others that is imminent. Under this law, these criteria would be the basis for physician-imposed work restrictions that would disqualify an applicant from working. . . Substantial harm means an objectively verifiable worsening in the patient's condition, and not merely an increase in previously present symptoms, like pain or fatigue."(AMA Guides to the Evaluation of Work Ability and Return to Work, AMA, 2011, p. 10)

Medically, if there is no objective basis to support an employer in an involuntary exclusion from work, there is no medical reason to prohibit or restrict from that job. "Symptoms do not harm, so 'work

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544   fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 32

restrictions' are not appropriate if based only on symptoms." (Ibid, p. 13)  In these circumstances, return to work is based on tolerance and secondary gain issues which are not medical in nature.

"Tolerance is exemplified when an individual chooses, because of pain, not to work for minimum wage at a job he dislikes, but, when offered a much more physically demanding job at three or four times minimum wage, he happily works and endures (tolerates) even greater pain." (Ibid, p. 13)

Due to the scientifically verified benefits of work and predictable harms of absence from work, a physician is under an ethical obligation to return an individual to his regular job if possible.  "As patient advocates, physicians therefore should strongly urge patients to return to work or to stay at work and should decline to certify disability unless it is obvious." (Ibid, p.5)

Symptoms, patient history, self-assessed work ability, and patient work preferences are subjective and not a scientific basis on which to determine work status or causative attribution. AMA expert advice contained in "The Guides Newsletter" (Sept/Oct 2009) in the article "Examinee-Reported History Is Not a Credible Basis for Clinical or Administrative Decision Making" states "Evaluators should consider adopting a strict policy of refusing to base any conclusions on examinee self-report, especially any forensic conclusions such as causative attributions or impairment determinations."

This is based on the knowledge that "the premise that examinee reports are accurate has repeatedly failed scientific testing." "The unreliability of examinee reports is especially pronounced when the examinee has filed a medical-legal claim. Consequently, reports from examinees are simply not a credible basis for clinical, forensic, or administrative decision making."  Thus, symptoms are not a reliable basis for work restrictions or impairment ratings, which must instead be based on objective evidence.

Since, I have discovered no objective criteria by ADA (1990) on which an employer or physician should prohibit prior employment based on substantial risk of significant imminent harm, since return to work (RTW) is both beneficial and healthful, and when possible the ethical obligation of a physician, and since tolerance is not a medical or measurable concept, this individual may return to work in his prior or similar occupation if he is able to obtain the essentials of work (motivation, determination, effort).

From 1978 to 2006 the US population increased from 225 to 300 million (35%) while at the same time individuals on disability increased from 2.9 million to 6.8 million (136%). (US Social Security data released 2008.)  This is not explained by improved medical care, availability, diagnosis, and surgical techniques.  It can be explained by social, legal, secondary gain and other non-physical factors. "By

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance  (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 33

far, the majority of workers on disability from chronic back pain have a diagnosable psychological condition and the evidence shows that the diagnosis pre-existed the onset of the chronic back pain. " (AMA Guides to the Evaluation of Disease and Injury Causation, AMA 2008, p. xv)

"Cumulative trauma" is not a term which can be substituted for genetically determined progressive age related anatomic changes such as spinal degeneration. The same is true for nerve compressions which occur in the sedentary population.

An example of cumulative trauma would be a quarterback who sustained an anterior cruciate ligament tear, reconstructed, several concussions, a separated shoulder, and finally an Achilles tendon tear. The cumulative impairment of each of these individually identified and treated injuries would put him in a situation where he would no longer be able to perform his activities as a quarterback. This is not the same situation of a 39-year old quarterback without history of specific injury who cannot outperform a 24 year old quarterback who does not have the accumulated changes of normal aging to 39 years.

Sitting and prolonged standing/walking are not associated with low back pain. (Spine, 2009, 34; 8:E281-293)

The lack of science supporting "cumulative trauma" is so notable that it is discussed on the first page of the foreword in AMA Guides to the Evaluation of Disease and Injury Causation (First Edition): "There is no evidence, for instance, that working on a railroad all your life causes any more deterioration of the lumbar spine than would have occurred from that natural history. In addition, the so-called cumulative trauma disorders have more to do with genetic makeup and anatomical variations rather than workplace injuries (P. xv)."

Motivation: "The art of helping people achieve what they want to achieve, by making them do what they don't want to do." Tom Landry

Bending, twisting, turning, lifting, and walking are all forms of exercise. Exercise either done at work or after work is healthful and of benefit to the spine. (The Back Letter, volume 21, #7, July 2006, 73 and following). Past assumptions that work was harm are not supported by science. "Contrary to these common beliefs, newer studies have found that cumulative or repetitive loading is not harmful to the disks. This is consistent with the general view that in other parts of the musculoskeletal system, repetitive activities with increased physical loading can increase the strength of bone, ligaments, muscles, and tendons." (AMA Guides to the Evaluation of Work Ability and Return to

Bradley Washam
PMLC# X0019
Page 34

Work, AMA 2011, p.166)  Work at the railroad or at other occupation is not trauma; it is exercise and is beneficial.

AMA Guides to the Evaluation of Work Ability and Return to Work states, "Few individuals function at capacity.  Current ability can be measured but can increase with activity or decrease with inactivity" (p. 19).  "Tolerance cannot be measured or verified (p. 13)." "Tolerance refers to the decision by the individual to endure symptoms such as pain or fatigue in exchange for the benefits of work (p. 23)." "Symptoms do not harm, so 'work restrictions' are not appropriate if based only on symptoms" (p. 13). Thus, if no substantial harm from his/her job is predicted by the medical facts in this case, the examinee may RTW if he/she can obtain the essentials of work (motivation, determination, effort).  In fact the American with Disabilities Act of 1990 "permits the employer to deny the tentatively offered employment only if, on the basis of objective information, the work activities of the 'essential job functions' pose a substantial risk of significant harm to self or others that is imminent." (p. 10) Physician restrictions in the absence of these facts are inappropriate by AMA standards.  Such medical facts were not discovered in this medical record.

Opiates were used in this case for chronic benign (non-malignant) pain.  AMA published guidelines science does not support the use of opiates for chronic pain management (AMA Guides Newsletter March/April 2011).  Relevant science from this publication includes the following statements:

"There is an increasingly severe epidemic of overuse, abuse, and death involving prescription narcotics."  (p. 1)  "Prescription narcotics have become a leading cause of death in the United States. For example , scientific findings indicate that prescription narcotics are the leading cause of death among worker' compensation claimants who have undergone back fusions." (p. 5)

"Equally noteworthy are the reports that poisoning deaths, primarily involving prescription medications (prominently including narcotics, which exceed the deaths caused by heroin and cocaine combined), have actually overtaken motor vehicle accidents as the top cause of death among middle-aged Americans." (p. 5)  This has been known for years, and the death rate is increasing.

A meta-analysis quoted in this review regarding opiates for chronic back pain "found that narcotics did not demonstrate an advantage in the reduction of pain compared to placebo or non-narcotic medication." (p.4)  Studies "concluded there has been a 423% increase in expenditures for opioids for back pain but that that dramatic increase has not led to any population-level improvements in clinical outcomes or disability rates." (p.4)

"Scientific findings have indicated that narcotics reliably cause an abnormally severe sensitivity to pain, termed hyperalgesia." (p.2)  They do not work for chronic benign pain and their use can result

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 35

in addiction. "Narcotic medications are the most important impediment to recovery from chronic pain." (p.4) Prescription narcotics cause other significant problems beyond the worsening of the pain. Fortunately, when they are discontinued, "The benefit that comes from eliminating narcotic prescriptions appears to be very reliable."

"Scientific findings have repeatedly and reliably indicated that the primary risk factors for chronic benign pain are of a psychological nature or a social nature. Given such indications that chronic benign pain is a psychological and social phenomenon, it is difficult to imagine any justification for narcotics as a treatment option." (p. 5)

"Such scientific findings indicate that prescription narcotics actually contribute to chronic benign pain in a harmful manner ...and that elimination of prescription narcotics is beneficial for such pain." "Therefore, until the patient's use of narcotics is eliminated, the permanence (or lack thereof) the pain cannot be known, and the patient cannot credibly be said to have reached MMI."

This medical record does not justify the use of chronic addictive opiates for complaints of pain of a non-malignant origin.

PAIN: The international Association for the Study of Pain defined pain as an unpleasant sensory and emotional experience associated with actual, or potential, tissue damage, or described in terms of such damage. Pain is thus not a primary sensation in the sense that smell, taste, touch, vision, and hearing are, but it is an emotional state like sorrow love, or hate.

Pain is "always a psychological state." (Merskey & Bogduk: Classification of Chronic Pain, Second Edition).

Because of the reliably detrimental health effects of litigation and compensation status, because this independent medical review failed to provide an injury-related explanation for the presentation, and also because of the inherently non-work-related nature of psychopathology, psychological evaluation and associated treatment should take place outside of the litigation or compensation system.

The scientific publication by Dr. R.J. Barth, Chronic Pain: How to Make Sense of It Within Orthopedic Claims (Melhorn JM and Carragee E. 14th Annual American Academy of Orthopedic Surgeons Occupational Orthopedics and Workers Compensation: A Multidisciplinary Perspective. 2012 AAOS) provides valuable recommendations. The following paragraphs summarize much of that science:

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 36

The findings from this review of records did not reveal an anatomic or general medical explanation for the continued complaints of chronic back pain. This is not a surprising result. The scientific knowledge base clearly indicates that psychological and social factors play a more significant role in the development of such chronic pain presentations, and that general medical factors generally do not play a significant role.

It is therefore recommended that further attempts to assist this individual focus on the scientifically established risk factors for such chronic pain presentations, rather than focusing on general medical issues which are highly unlikely to provide an adequate explanation.

For example, because scientific findings have revealed that compensation incentives are a dominant risk factor for the development of chronic pain, the examinee should be educated about the potential health benefits of extricating himself from compensation contingencies as soon as possible.

Additionally, the examinee should be adequately educated in regard to the primarily psychological nature of chronic pain. Subsequent to such education, the examinee should seek out a credible psychological evaluation (because scientific findings have revealed that psychopathology is another dominant risk factor for the development of chronic pain). The scope of that evaluation should include an intensive focus on the scientifically established risk factors for chronic pain (e.g. personality disorders), so that a relevant treatment plan can be developed for whatever findings emerge. For purposes of making sure that such an evaluation is credibly conducted, clear guidance can be found in the American Medical Association's Guides to the Evaluation of Disease and Injury Causation (mental illness chapter). Because the relevant issues are extremely unlikely to be injury-related or work-related, and because involvement in legal claims is reliably detrimental for health outcomes, the psychological evaluation and treatment should take place outside of a legal claims contest (e.g. outside of the workers compensation system).

The examinee should also be educated in regard to other scientifically established risk factors for chronic pain, such as smoking, obesity, and diabetes.

The examinee should be educated in regard to scientifically validated approaches to chronic pain, which have a high probability of being helpful regardless of what risk factory are actually applicable. Examples include the activity paradigm (responding to pain by increasing activity, instead of withdrawing from activity).

Back pain is so common that it must be considered to be a normal part of life, rather than a medical abnormality. The vast majority of presentations of low back pain are not injury-related, or otherwise

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 37

associated with any general medical findings. For 85-90% of back pain cases, there is no general medical (non-psychiatric, non-psychological) diagnosis that explains the pain (JAMA 2001, Feb 1: 344 (5): 363-70: AMA's Physicians Guide to Return to Work, Talmage and Melhorn, 2005.)

The International Association for the Study of Pain defined pain as an unpleasant sensory and emotional experience associated with actual, or potential, tissue damage, or described in terms of such damage. Pain is thus not a primary sensation in the sense that smell, taste, touch, vision, and hearing are, but it is an emotional state like sorrow, love, or hate.

"The prognosis for LBP usually is excellent. However, a minority of patients, approximately 10%, are still off work at half a year. This minority consumes a great majority of all the resources, and consequently the costs, spent on back problems." (Spine 25, #23, pp 3055-3069) These individuals demand careful evidence based medicine evaluation and treatment which is verified to predictably produce benefit. Failure to do this results in wasted resources and poor outcomes.

"The vast majority of evidence supports the notion that receiving compensation for low back pain or being unemployed is predictive of developing a chronic disability." (Barth RJ. Chronic Pain: How to Make Sense of It Within Orthopedic Claims. In: Melhorn JM and Carragee E. 14th Annual American Academy of Orthopedic Surgeons Occupational Orthopedics and Workers Compensation: A Multidisciplinary Perspective.

**QUALIFICATIONS:**

A copy of my curriculum vitae and testimony by deposition or in court since 2015 is attached. Also attached is a copy of my list of charges. I am licensed in the State of Arkansas, N5620. I was previously licensed in the States of Oklahoma and Colorado, allowing my licenses to become inactive as I no longer practiced there after completing my training.

I have visited UPRR facilities. I rode in the lead locomotive on a train from Little Rock to Memphis and observed the conditions and activities of the engineer and conductor. I performed the following activities without difficulty (at age 58 with arthritic hands and knees):

- Changed coupler knuckles
- Set and released various types of handbrakes
- Coupled and uncoupled air hoses for the brake system
- Operated various types of track switches manually

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 38

- Walked on ballast in yards and mainline track
- Pulled and drove spikes and pulled tie plates using various tools
- Climbed onto and off of various types of railroad cars and engines
- Pulled pin lifters and bleed rods

I have also viewed videos of the job duties of the engineers, conductors, and brakemen. I have toured and inspected locomotive and railcar repair facilities and observed railroad employees performing their jobs. I have been instructed in railroad safety and procedures and have performed same, assembling trains, coupling and uncoupling cars, and throwing switches to move trains from one track to another.

I have had the opportunity to operate a tie removal crane, rail mounted, and to understand the duties and activities involved in replacement of unsatisfactory railroad ties.