

**Earl Peeples, MD Orthopedic Surgeon**
*47 Hickory Hills Circle*
*Little Rock, AR 72212*
*Physician phone (501) 786-3756*
*Assistant (501) 786-1544*
*Facsimile (501) 224-8701*

*earl.peeples@att.net*

August 9, 2020

Ms. Camille Reifers
Boyle Brasher LLC
Brinkley Plaza
80 Monroe Avenue, Suite 410
Memphis, Tennessee  38103

RE:   Bradley Washam
      DOB: 10-11-1974
      PMLC: X0019


Dear Ms. Reifers:

At your request I reviewed the deposition by Dr. Alan Gocio of July 22, 2020.  I provide the following comments and observations.  I may provide other observations or opinions if asked specific questions about portions of the deposition.  I insert scientific paragraphs which will help you understand my comments.  All are taken from highest quality objective evidence based medical science publications.

The pre-deposition diagnoses from the medical record can be summarized as:
1. Spinal stenosis – preexisting and developmental
2. "Acute disc herniation" Lumbar traumatic extrusion of a disc due to single event
3. Radiculopathy – significant alteration of nerve function of a nerve root
4. Radicular pain (radiculitis) – subjective pain report in a dermatomal pattern

P. 13, l. 4-10  Dr. Gocio testifies he uses no medical publication or protocol, rather limiting his information basis to that contained in his records.

[Since he excludes published objective medical science by this testimony, his opinions are limited to information from his training and experience.]

Dr. Gocio's  records contain (in brief):
   Initial office encounter history and physical exam – performed by his nurse.
   Pre-operative history and physical exam – performed by his nurse.
   Operative note – Dr.Gocio
   Follow-up records

Bradley Washam
PMLC # X0019
Page 2

He did not refer to outside records or reports of objective findings (e.g. the March 27, 2019 lumbar MRI report from the interpreting radiologist).  He did not personally interview, obtain history of present illness, review of systems, perform focused psychosocial history for chronic pain presentation, review prior medical records, or personally perform physical examination.  His pre-surgery information input was second hand from his nurse practitioner supplemented by review of the lumbar MRI without reading the accompanying radiologist report.

> [Guidelines by recognized medical organizations are the highest level of medical literature.  The American Academy of Orthopedic Surgery (AAOS) endorsed The American Pain Society's Guidelines on Management of Low Back Pain which state in the first recommendation "The history should include assessment of psychosocial risk factors, which predict risk for chronic disabling back pain (strong recommendation, moderate-quality evidence)."  (Annals of Internal Medicine, Vol. 147, #7, 478-491)  This is an important prerequisite for the evaluation of chronic back pain or in evaluation for elective spinal surgery or invasive pain procedure.  For 85-90% of chronic back pain cases, there is no general medical diagnosis that explains the pain.  This means the overwhelming majority of back claims are not injury-related, not work-related, and not of a general medical nature.  (JAMA 2001, Feb 1; 344(5):363,70)  (AAOS Occupational Orthopedics Syllabus, p.367)  "75% of the time when a patient sees a doctor with a presenting complaint of pain, a general medical explanation for that complaint will not be found."  "At least half of such individuals show major personality problems."  (First and Tasman, DSM-IV Mental Disorders.  Diagnosis, Etiology, and Treatment, Wiley 2004)(AAOS Syllabus Occupational Orthopedics, 2012, p. 354).]

P. 15, L 13-15  He testifies that neurological (objective) exam was normal.

[This excludes diagnosis #3 which required a significant alteration in nerve function.  Normal exam is NO alteration in nerve function.]

P. 15, L 22-25 In response to a question that the MRI report indicated no acute findings Dr. Gocio testified:
    "No, I felt that he had an acute disc herniation at L4-5 level.  He also had preexisting lumbar stenosis at L3 through L5."

[The last statement eliminates Diagnosis #1 as related to the railroad event.  Dr. Gocio uses his feeling in place of any objective medical criteria (published or otherwise) to pronounce a diagnosis of acute disc herniation.  This eliminates diagnosis #2 as an objective finding using medical standards.]

Bradley Washam
PMLC# X0019
Page 3

P. 16, L. 2-5.  He recalled nothing from the radiologist's report.  [There is no comment on the radiologist's report in his nurses dictation from the initial encounter.]

P. 17, L 16-18  He did not use specific radiology standards or parameters to establish new anatomy. "Sometimes it's a little equivocal, and that's where I usually fall back on clinical findings."

[He has no such clinical findings.  He did not examine Mr. Washam.  MRI findings are purely anatomic and are not based on subjective patient symptoms.]

P. 19-20  Ms. Reifers read from the Spine Journal article summarizing required radiographic standards to term disc findings traumatic or acute and asked Dr. Gocio if he applied these so that in the absence of "associated violent injury" the disc changes should be classified degenerative:

> L 16-22  "No, I felt like he had what I would consider an acute disc herniation. . ."

[Dr. Gocia has his own classification system, based of his feelings.  He offered no science or objective findings to support his assertion.  Additional comments about surgical appearance supporting his feeling are invalid as at over three months post incident, all anatomy would be chronic in appearance.  Again, his feelings supervene published, accepted, medical objective standards.]

P. 21, L. 6.  Dr. Gocio, a neurosurgeon of 30+ years experience, was asked how common disc herniations are present.

> L. 7  "I'm not sure, two or three percent of the population will have a disc herniation in their lifetime."

[Knowledge of the incident rate is basic and required for orthopedists and neurosurgeons who evaluate individuals with back pain and MRI disc abnormalities.  Dr. Gocio's answer is not even close to published science incidence.]

P. 22-23  Ms. Reifers presents published information that disc herniation or extrusion incidence percentage roughly matches age.  Although arguing over the meaning of the terminology he agrees on page 23 that 50% of 50 year-olds have degenerative/herniated discs.

[As a 55 year-old Mr. Washam would be expected to have both degenerative and herniated (bulging-protruding-extruded) disc, more probable than not.]

Bradley Washam
PMLC# X0019
Page 4

[The AMA Guides specifies common developmental spinal findings as (1) spondylolysis found normally in 7% of adults; (2) spondylolisthesis found in 3% of adults; (3) herniated disc without radiculopathy, found in approximately 30% of individuals by age 40 years; and (4) aging changes present in 40% of adults after age 35 years and in almost all individuals after age 50. As previously noted, "the presence of these abnormalities on imaging studies does not necessarily mean the individual has an impairment due to an injury." (AMA Guides to the Permanent Impairment of Function, 5th Edition, page 383).

The appearance of new disc bulges and/or herniations is not proof of trauma, as these commonly occur spontaneously due to degeneration. Such findings do not confirm symptoms nor are they a dependable measure of symptom severity. Particularly in this case the pattern of multilevel cervical, thoracic, and lumbar disc pathology is consistent with widespread spinal degeneration, not trauma. ]

P. 23, L. 17-21  Dr. Gocio testified that disc herniation does not confirm an injury. He did not use objectively established traumatic anatomy as a basis for diagnosis and treatment but stated:

"Mr. Washam reported an injury and reported subsequent symptoms, and that's what I based my treatment on."

[Symptoms, patient history, self-assessed work ability, and patient work preferences are subjective and not a scientific basis on which to determine work status or causative attribution. AMA expert advice contained in "The Guides Newsletter" (Sept/Oct 2009) in the article "Examinee-Reported History Is Not a Credible Basis for Clinical or Administrative Decision Making" states "Evaluators should consider adopting a strict policy of refusing to base any conclusions on examinee self-report, especially any forensic conclusions such as causative attributions or impairment determinations. Instead, evaluators should request and seek out sources of information that are at least somewhat independent of the examinee's self-reports (such as medical records from the examinee's entire life, or any portion thereof that can be accessed.)" (page 5) This is based on the knowledge that "the premise that examinee reports are accurate has repeatedly failed scientific testing." "The unreliability of examinee reports is especially pronounced when the examinee has filed a medical-legal claim. Consequently, reports from examinees are simply not a credible basis for clinical, forensic, or administrative decision making."(page 1)

The combination of subjective patient report (unreliable) and "post hoc" reasoning (false logic) is not a satisfactory objective basis for causative attribution. This is emphasized in the AMA

Bradley Washam
PMLC# X0019
Page 5

    Guides Protocol for determining "Injury-Relatedness."  (AMA Guides Newsletter, May/June 2012) ]

P. 24 Questioned about his justification for treatment based on subjective symptom reports by a patient, Dr. Gocio did not offer science or published standards, but again deferred to his feelings:

    L. 2.  "Well, I feel like they're generally reliable, especially if they correlate with physical findings, imaging findings.  I tend to believe my patients."

[There were no abnormal physical findings; the neuro exam was normal.  There were no acute MRI findings consistent with published objective radiology standards; his diagnosis was a feeling.  Patient reports are not reliable as has been established by science.]

P. 27, L 11.  Although a neurosurgeon for 30+ years he testified he was unfamiliar with medical science that patient reports "cannot be relied upon."

P. 29, L. 22.  Dr. Gocio agreed that individuals involved in the legal (compensation) system are more likely to experience surgical failure.

P. 30, L. 1-11  Dr. Gocio abandoned his diagnosis of radiculopathy.  "Radiculopathy would have to be some type of objective findings of neurologic deficit, so I would call it radiculitis."

[By his testimony Diagnosis #3 is again excluded.  Radiculitis or radicular pain is a subjective symptom report in a dermatomal, nerve root, anatomic pattern.  It does not exist in this record.]

P. 31, L. 21-24  Dr. Gocia expresses a belief he saw Mr. Washam briefly with his nurse, but then admits that it is not in the medical record. (P. 32, L. 23)

"Not recorded, not done" is the standard understood by physicians for application in cases they are accused of negligence.  Competent physicians produce records which document what they do and what they find on personal examination of patients.

The evaluation of chronic pain in a legal context is a difficult and complex task for a physician and requires personal interview and consideration of non-physical or psychological explanation for pain complaints, accompanied by careful exam performed by the experienced surgeon to aid in the proper selection for elective surgery for pain complaints.  This is particularly true when no objective physical or MRI findings exist to unquestionably establish obvious explanatory anatomy, as in this case.  A

Bradley Washam
PMLC# X0019
Page 6

careful differential diagnosis is required to avoid improper selection which produces unnecessary social, vocational, and personal harms.]

P. 34, L 10-25  Radicular pattern of symptoms was abandoned by Dr. Gocio in this section.  Verifying that he did not examine Mr. Washam, he agrees that the pattern of decreased sensation reported in his nurses exam is not a dermatomal pattern.

    L. 17  "It does not relate to a specific area within the spine as you would notate for sensory neurological, correct?  He agrees.
    L.  24-5  "Yeah, I'm saying no, its not a radicular dermatomal type pattern."

[Radicular pain diagnosis was abandoned by this testimony, leaving NO diagnosis involving nerves or nerve pattern pain, only subjective pain reports in the back and sometimes the extremities.  All listed diagnoses possibly traumatic and related to the railroad incident had been eliminated by Dr. Gocio's testimony.  Only subjective pain complaints and post hoc reasoning remain.]

> ["The most important risk factor for the development of the types of chronic pain presentations which become the focus of medical-legal claims appears to be personality disorder." (Barth RJ.  Chronic Pain: How to Make Sense of It Within Orthopedic Claims.  In:  Melhorn JM and Carragee E.  14th Annual American Academy of Orthopedic Surgeons Occupational Orthopedics and Workers Compensation: A Multidisciplinary Perspective. 2012 AAOS)
>
> The science which documents importance of personality disorder as the most important risk factor explaining chronic pain complaints in a legal context is also reviewed in the AMA Guides Newsletter of Jan/Feb 2013, "Chronic Pain:  Fundamental Scientific Considerations, Specifically for Legal Claims".
>
> Personality disorder is defined as: "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has onset in adolescence or early adulthood, is stable over time and leads to distress or impairment."  (American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, 4th Edition-Text Revision, 2000)
>
> Other than compensation status, the presence of personality disorder dwarfs all other factors for the development of chronic pain.    (Barth RJ.  Chronic Pain: How to Make Sense of It Within Orthopedic Claims.  In:  Melhorn JM and Carragee E.  14th Annual American Academy

Bradley Washam
PMLC# X0019
Page 7

>of Orthopedic Surgeons Occupational Orthopedics and Workers Compensation: A Multidisciplinary Perspective. 2012 AAOS))
>
>Medical knowledge indicates 15% of adult Americans (1 in 7) have a personality disorder. "Personality disorders are prevalent in the general population and are generally highly associated with disability." (Journal of Clinical Psychiatry; 2004; 65: 948-958).  73% of WC [worker's compensation] claimants claiming disability for chronic back pain have personality disorder (compared to 10-13% in the general population).   (Spine 2006, May 1; 31 (10): 1156-62)  Despite this medical science and the absence of anatomic trauma and general medical explanation for this clinical presentation in a compensation setting, testing to identify preexisting personality disorder has not been undertaken.  Proper treatment is not possible without accurate diagnosis.
>
>Personality disorders are associated with a tendency to be litigious.  (Yudofsky, SC. Fatal Flaws. American Psychiatric Publishing, 2005.)  "Since such individual [with personality disorders] does not realize that their personality creates problems, they tend to blame others for those problems."  "As a consequence, personality disordered individuals file legal claims at an elevated rate, thereby causing personality disorder to be especially common in all types of litigation and disability claims  ." (AAOS Occupational Orthopaedics and Workers' Compensation Course, 2013, pp. 913-919.)  The importance of personality disorder is also reviewed in the AMA Guides Newsletter of Jan/Feb 2013, "Chronic Pain:  Fundamental Scientific Considerations, Specifically for Legal Claims".]

P. 36, L. 21-25  Regarding this most probable diagnosis, personality disorder, which must be excluded:
>L.21 Did you consider whether or not Mr. Washam had a personality disorder prior to his spinal surgery?
>L. 23  I didn't have a feeling that he did.  I didn't explore that any further than what evaluation was done at the time of his initial visit.

[Dr. Gocio's feeling displaces and overwhelms objective evidence based medical standards.  The evaluation was not his, but his nurse's.  He again does not apply medical science and perform a differential diagnosis, but uses his "feeling" that he did not sense a personality disorder.  This is not an example of the practice of medicine to required standards.

The most probable medical diagnosis was not objectively tested for and eliminated.  Rather, a less likely diagnosis which was supported predominately by patient report was pronounced and treated.

Bradley Washam
PMLC# X0019
Page 8

A physician must be scient (knowing, aware, knowledgeable) for the conditions and presentations he or she accepts for treatment or evaluation, or refer to another physician who is capable in that task.

Medical school teaches student physicians to objectively test for the most likely explanation or diagnosis matching a presentation composed of history and physical findings before proceeding to a less likely diagnosis.  Diagnoses are defined precisely so as to facilitate communication between physicians, and the clinical criteria necessary to establish a diagnosis is available in published medical science.   The "Differential Diagnosis" list is ranked from probable, to likely, to unlikely, to improbable, and finally to rare.  Objective evidence-based published medical science is the standard utilized to eliminate a more likely diagnosis before moving to a less likely condition and treating it.

The physician must be familiar with and consider all types of diagnoses, not just those of personal specialty or interest.  Applicable logic and method for securing an explanatory diagnosis is contained in the NIOSH/AMA protocol.   For a diagnosis to meet medical standards in a legal or forensic setting, this process must be followed and documented.  This is particularly true when a less likely diagnosis is supported only by subjective data.

The responsibility to use best logic and science is not avoided by substituting physician belief, feeling, training, or past clinical experience.   When published scientific knowledge (best objective evidenced-based medical science) does not establish the diagnosis, the diagnosis is rightly rejected as not meeting medical standards.  Presentations, primarily of pain complaints, are not an exception.  Science demonstrates that with such a clinical presentation, an anatomic general medical diagnosis is, more probably than not, unobtainable.]

P. 39, L. 13-15, 18  Dr. Gocia testified that no evaluation for psychological causation of any type was undertaken even though psychological issues increase risk of failure and can cause chronic pain complaints (L. 6).

P. 41, L 22  When questioned about surgical outcome Dr. Gocio reverted to "radiculitis" abandoned in earlier testimony because there was no dermatomal pattern.  [Mr. Washam did not have radiculitis.] Dr. Gocio then described mild neurological deficits noted on post-op visits.  Since the neurological exam was normal after the railroad incident pre-operatively,  these deficits would logically be due to his surgical intervention.

P 43,  L 7-15 Dr. Gocio confirms he was providing Mr. Washam repeated scripts for opiate medication for chronic post-operative pain complaints.  He then admits (P, 44, L. 2-6} that he knows that science indicates these narcotics actually increase pain.  He later agrees opiates worsen pain (P. 52, L 17)

Earl Peeples, MD    Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544     fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 9

P. 47 Dr. Gocio verifies that no published medical standard was used to determine work restrictions but that they were "based solely on Mr. Washam's statements . ."

["Solely" by definition excludes all other considerations, including medical science literature.  Mr. Washam has a blank check from Dr. Gocio to self-limit his work activities.]

[I cannot find in this deposition anywhere that published objective evidence based medical standards were used for decisions in his diagnosis, surgical treatment, or restrictions. ]

P. 60  L. 24  Dr. Gocio agreed with published medical ethical standards that physicians treating for pain complaints should not offer expert/causation opinions.

P. 67   Dr. Gocio agreed that his RTW decisions were based "solely on Mr. Warsham's subjective reports."  [Again Mr. Washam was handed control of his work status, whatever his motivation.  Medical standards for RTW were not applied.]

P. 69 Although Dr. Gocio previously testified about the importance of psychological factors in patient outcomes after surgery, he could not recall previously in his career a single patient he ever tested for those conditions pre-operatively.

P 72.  He testified that he believed the year of treatment was appropriate and necessary based on objective findings (L. 14).  [There were no objective findings of any physical changes due to the collision.  Dr. Gocio offered only his feelings as a basis for treatment and surgery.]

P. 84.  On questioning about his initial assesment he again failed to list objective findings of published science but instead again asserted his feelings:

> L. 3   "Yes, I felt that the patient had a significant disc herniation that was consistent with his reports of abrupt onset of symptomatology and worsening over time."
>
> [The physiological response to "injury" (in this case unidentified and invisible to neuro exam and MRI) is improvement.
>
> The dominant factor for chronic pain complaints in a legal context, established by causation (AMA Guides Newsletter Jan/Feb 2013, p. 2), is eligibility for compensation.  This medical record matches that science.  Eligibility for compensation is not a medical diagnosis.  The most

Bradley Washam
PMLC# X0019
Page 10

> probable medical explanation is a non-physical, non-general medical diagnosis, personality disorder/psychological condition (Ibid, p. 9).
>
> Constant, severe, unrelieved pain complaints were often described by individuals I examined for forensic purposes.  "A person, who claims symptoms are continuing to worsen, denies any change in symptoms, or claims symptoms have not responded to any treatment likely has a poor prognosis.  Such symptom patterns are consistent with behavioral issues." (p.77, AMA Guides to the Evaluation of Disease and Injury Causation, AMA 2011)   "Expected illness behavior typically begins shortly after trauma and gradually fades.  Exaggerated behavior either has roots well before the alleged trauma, or has a late onset when objective symptoms of trauma are fading or have resolved." (p.84)   These forensic symptoms point toward non-traumatic, non-work-related origin.]

P 87  When asked to justify his surgical decision, Dr. Gocio again avoided published medical standards or citation of practice standards stating instead:

> "I felt that the correlation of the symptomatology, the physical findings, and the imaging along with the history of the patient that surgical treatment could be beneficial to him, and I recommended that to him."

[Symptoms are not reliable reports.  There were no physical findings – neuro exam was normal.  Imaging by two radiologists report was normal for age, without trauma.  History of increasing pain is non-physiologic rather forensic in pattern.  He uses "could" (a possibility), instead of "more probable than not by medical criteria and standards" (a probability).]

P 102.  Work restrictions were based, according to Dr. Gocio's answer, on a risk to Mr. Washam if he operated a motor vehicle.  All individuals are at risk for injury when operating a car or motor vehicle.  Risk is not a basis for work restriction.  Work restriction is only appropriate "only if, on the basis of objective information, the work activities of the "essential job functions" pose a substantial risk of significant harm to self of others that is imminent."  Dr. Gocio has already testified that this is not the case, and that work restrictions were based "solely" on Mr. Washam's self-reports.  He stated there was no medical indication that Mr. Warsham would injure himself if he returned to his job (P. 67, L. 12-14)

P 130  Dr. Gocio is asked to base a causation opinion on the concept that prior to the railroad incident there were no back symptoms (patient report) and that troubles and symptoms following that reported event indicated injury (post hoc logic).

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 11

[In many cases a physician may form an opinion based on temporal appearance that an event aggravated a preexisting condition.  Such an assertion, be it belief or opinion, is specifically eliminated on page 5 of the AMA Guides summary of the injury-relatedness protocol:

"My opinion is that this clinical presentation is injury-related, and that opinion is based on the patient telling me that he/she did not have this problem prior to the litigated accident."  The logical fallacy of "post hoc" reasoning is explained.  "..the common reliance on claimed pre-versus-post differences for purposes of making causation determinations is not justifiable."  But the subjective patient report is discussed first.  "..when an examinee blames someone else for his or her injury or accident, and claims that he or she never experienced relevant health problems before the injury or accident; such denial of pre-existing health problems are almost always found to be false…Given the extreme unreliability of such denials of relevant preexisting problems, the common reliance on reports from claimants or plaintiffs for purposes of making causation determinations is not justifiable."

Readers of this report unfamiliar with the scientific basis of the protocol and those statements would benefit from reading the entire newsletter and understanding the NIOSH/AMA protocol (AMA Guides Newsletter May/June 2012), the standard to determine injury-relatedness or work relatedness consistent with best current published science, the standard I use to form my opinions.

"Finally, all treating clinicians owe their allegiance to the patient, rather than to the judicial and administrative decision-makers who are dependent upon impairment evaluations and other forensic conclusions to complete their duties.  Thus, decision makers are in no position to demand accountability from such treating clinicians and cannot reasonably expect objectivity.

"Given all of the above considerations, treating clinicians may be well advised to avoid forensics activity, regardless of what their specialty might be."

"All treating specialties share the same bias toward offering treatment for almost any and all complaints, rather than engaging in the type of cautious skepticism that is necessary for competent impairment evaluation and other forensic duties."

"And no treating clinician, regardless of specialty, can offer their allegiance to the judicial and administrative decision-makers who are dependent upon medicolegal evaluations and other forensic reports, when that treating physician has already established allegiance to the patient."  (AMA Guides Newsletter, September/October 2005, p. 11)

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 12

**SUMMARY:**

I reviewed the deposition from a medical causation analysis and objective evidence-based medical treatment perspective.

Dr. Gocio's testimony fails the first step of the NIOSH/AMA protocol on injury relatedness.  Thus, there was no injury or damage due to the railroad event meeting best published medical causation science standards  (NIOSH/AMA Injury-relatedness Protocol, the current standard.)

Dr. Gocio never cites medical standards or protocols, in fact avoids them, substituting his feelings repeatedly.  Proper medical treatment is not a feeling, but the dispassionate application of the best objective evidence based medical science.

Dr. Gocio's own testimony eliminates all diagnoses possibly related to the railroad event.  He admits the stenosis was preexisting.  No anatomic change due to the event was objectively established.

"Ipse dixit" pronouncements of diagnosis, treatment, and restrictions pervade the record.

Dr. Gocio did not perform a differential diagnosis (nor even perform a standard in person physician history and exam in a difficult presentation of pain complaints in a legal context).  Thus, any diagnosis or proposed treatment does not meet medical standards and is rightly rejected..

The surgical outcome was predictable, but even the failure assessment is based "solely" on Mr. Washam's self-reported symptoms and self-determined limitations, rubber stamped by Dr. Gocio.

During a legal/compensation action, in the absence of objectively identified physical damage, symptoms and treatment are substituted as an effort to prove "injury" has occurred.   Modern medical exams by experienced physicians using current technology such as MRI can objectively establish evidence of damage completely independent of patient report.  This would satisfy the initial step of the NIOSH/AMA Injury-relatedness protocol and settle the issue of whether injury occurred with science and published national standards.  Feelings are not necessary or useful for this process.

The following facts are established or confirmed by Dr. Gocio's testimony.

1. Dr. Gocio does not use published medical standards or guidelines science but instead uses his feelings to pronounce diagnosis and determine treatment.

Earl Peeples, MD   Orthopedic Surgeon 47 Hickory Hills Circle, Little Rock, AR 72212
scheduling assistance   (501) 786.1544    fax (501) 224.8701   earl.peeples@att.net

Bradley Washam
PMLC# X0019
Page 13

2. No objective evidence of any traumatic anatomy or physical damage was established by his testimony.  "Acute disc herniation" was an ipse dixit pronouncement based on feeling, disregarding radiology standards.

3. No observation of Mr. Washam at interview or exam for recognizing pain behavior or facial expressions (or other appearance) to establish or screen for psychological cause occurred.

4. No objectively identified neurological deficit or abnormality was identified preoperatively.  Therefore, radiculopathy did not exist.

5. No radicular pattern of pain complaints existed.  Therefore, no radiculitis or radicular pain diagnosis existed.

6. No objective or medical basis for work restriction was established.  Work restrictions were determined "solely" by Mr. Washam's subjective reports.

7. No objective medical basis for preventing RTW or RTWU was established.  RTW status was determined "solely" my Mr. Washam's subjective reports.

8. No testing which explained pain complaints in the absence of obvious physical explanation or new trauma was conducted.  Psychological factors were acknowledged as significant, yet not evaluated.

9. No "more probable than not" medical basis or logic was established for operative intervention on six nerve roots with a normal neurological exam.  Dr. Gocio testified he felt surgery "could" improve Mr. Washam's symptoms (but did not explain how nerve root decompression would relieve back pain complaints).

10. Dr. Gocio acknowledged there was no risk in Mr. Washam's RTW.   Therefore, by ADA and AMA standards there was no medical basis for work restriction.

11. Dr. Gocio admitted that opiates increase chronic pain complaints but provided no basis for his one year prescribing these same narcotics after the acute recovery from surgery was past (>3 months is chronic pain).

12. No objective psychological testing was performed before or after surgery to identify the most probable medical cause explaining chronic pain complaints in a legal context was discussed or

Bradley Washam
PMLC# X0019
Page 14

13. performed.  He did not perform a medical differential diagnosis but used feelings to determine diagnosis and surgery.

14. Dr. Gocio agreed that he should not serve as an expert opinion (this eliminates his providing causation opinions).

I would be happy to discuss the medical science and logic of this document with you.


Earl Peeples