Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF ARKANSAS, NORTHERN DIVISION
 2

    BRADLEY WASHAM,
 3
            Plaintiff,
 4
    vs.                              No. 3:19-CV-00231-KGB
 5
    BNSF RAILWAY COMPANY,
 6
            Defendant.
 7

 8  _____
 9           VIDEO DEPOSITION OF ALLAN GOCIO, M.D.
              TAKEN ON BEHALF OF THE DEFENDANT
10        ON JULY 22, 2020, BEGINNING AT 4:45 P.M.
                IN MOUNTAIN HOME, ARKANSAS
11           REPORTED BY MIKE WASHKOWIAK, CCR
12                     APPEARANCES:
13  On behalf of the PLAINTIFF
14          Nelson G. Wolff
            SCHLICHTER BOGARD & DENTON, LLP
15          100 South Fourth Street, Suite 1200
            St. Louis, Missouri 63102
16          314-621-6115
            nwolff@uselaws.com
17
18  On behalf of the DEFENDANT
19          S. Camille Reifers
            BOYLE BRASHER LLC
20          80 Monroe Avenue, Suite 410
            Memphis, Tennessee 38103
21          901-521-2860
            creifers@boylebrasher.com
22
23
    Videographer:  John Gore
24
25  Job No. CS4172876
```

**EXHIBIT 3**

Page 2

1                              INDEX

2                                                        Page

3    Direct Examination by MS. REIFERS              4

4    Cross Examination by MR. WOLFF                70

5    Redirect Examination by MS. REIFERS          140

6    Recross Examination by MR. WOLFF             143

7

8                            EXHIBITS

9    Number   Description                        Page

10   1       CV                                    7

11   2       CV                                    7

12   3       Expert disclosures                   12

13   4       Spine Journal, Fardon, et al.        21

14   5       "Arthritis Advisor" May 2011         23

15   6       Guides Newsletter, Sept/Oct '09      28

16   7       Spine Clinic initial note            33

17   8       Clinic note of June 20, 2019         35

18   9       Guides Newsletter, March/April '11   50

19   10      AAOS paper, Nov. 2013                56

20   11      Guides Newsletter, Jan/Feb 2013      58

21   20      Dr. Gocio's medical records          73

22   21      illustrations                        88

23   22      illustrations                        94

24   23      X-rays                              103

25                      EXHIBITS (Continued)

Page 3

| Exhibit | Description | Page |
|---|---|---|
| 23a | enlarged 23 | 103 |
| 24 | illustration | 127 |

STIPULATIONS

It is stipulated that the deposition of ALLAN
GOCIO, M.D. may be taken pursuant to agreement and in
accordance with the Federal Rules of Civil  Procedure on
JULY 22, 2020, before Mike Washkowiak, CCR.

Page 4

1        THE VIDEOGRAPHER:  We are on the record at

2   4:45 p.m.  Today's date is July 22 in the year 2020.  This

3   is deposition of Dr. Allan Gocio taken in the case of

4   Bradley Washam versus BNSF Railway Company currently

5   pending in the United States District Court for the

6   Eastern District of Arkansas, Jonesboro Division, case

7   number 3:19-CV-00231.  Would counsel identify themselves

8   for the record, please?

9        MR. WOLFF:  Nelson Wolff on behalf of Brad

10  Washam.

11       MS. REIFERS:  Camille Reifers representing BNSF.

12       THE VIDEOGRAPHER:  Thank you very much.  Would

13  the reporter please swear in the witness?

14              ALLAN GOCIO, M.D.,

15  after having been first duly sworn, deposes and says in

16  reply to the questions propounded as follows, to-wit:

17              DIRECT EXAMINATION

18  BY MS. REIFERS:

19       Q    Sir, would you state your full name for the

20  record?

21       A    Allan C. Gocio, M.D.

22       Q    Dr. Gocio have you treated a Mr. Bradley Washam?

23       A    Yes.

24       Q    What is your area of specialty?

25       A    Neurosurgery.

Case 3:19-cv-00231-KGB Document 108-4 Filed 08/10/20 Page 5 of 183

1     Q   Let's take a moment and go through some of your

2  education and training.  Where did you receive your BA?

3     A   University of Arkansas, Fayetteville.

4     Q   That was in 1974?

5     A   Yes.

6     Q   After you completed your BA you went to medical

7  school?

8     A   Yes, ma'am.

9     Q   That was from '74 until '78?

10     A   Yes.

11     Q   Was that also the University of Arkansas?

12     A   Yes, that's in Little Rock.

13     Q   After you completed your medical school

14  training, what did you do next?

15     A   After that I went to an internship in

16  Springfield, Massachusetts, a straight surgery internship.

17  Then I did my neurosurgery residency in Little Rock,

18  finished with a completed program in 1984.  I went into

19  private practice at that time and have been in clinical

20  practice of neurosurgery since that time.

21     Q   It appears that when you went into private

22  practice in 1984, you were working out of Hot Springs,

23  Arkansas; is that correct?

24     A   Yes.

25     Q   You worked out of Hot Springs from '84 until

Page 6

1    2000?

2         A    Yes.

3         Q    Then you moved to Cape Girardeau, and you

4    practiced there from 2000 until 2003?

5         A    Yes.

6         Q    And then you moved to St. Louis from 2003 until

7    2005?

8         A    Yes.

9         Q    You next moved to Carbondale, Illinois from 2005

10   until 2007, correct?

11        A    Yes.

12        Q    Then from 2007 to 2009 you moved to Paducah,

13   Kentucky?

14        A    Yes.

15        Q    Correct?

16        A    Yes.

17        Q    From February 2009 until December 2009 you moved

18   to Marion, Illinois?

19        A    Yes.

20        Q    From December 2009 until March '11 you practiced

21   out of Rockford, Illinois?

22        A    Yes.

23        Q    From March 2011 until October 2012 you practiced

24   again out of Paducah, Kentucky?

25        A    Yes.

Page 7

1      Q    And then from 2012 to present, were you out of

2  Little Rock for a while?

3      A    I was in Little Rock until 2018.  I've been

4  full-time here in Mountain Home from 2018 to the present

5  time.

6      Q    Okay.  So you were out of Little Rock from

7  October 2012 until sometime in 2018?

8      A    Right.

9      Q    And for the last two years you've been

10 practicing at Mountain Home?

11     A    Yes.

12     Q    Did we miss any locations where you've

13 practiced?

14     A    No.

15     Q    I'm going to Mark as Exhibit No. 1 the CV, your

16 older CV, which lists your locations where you've

17 practiced.

18          (WHEREUPON, Exhibit 1 was marked for

19 identification.)

20     A    Uh-huh.

21     Q    And then we'll mark as Exhibit No. 2 your

22 updated CV that you given me today.

23          (WHEREUPON, Exhibit 2 was marked for

24 identification.)

25     A    Okay.

1          MS. REIFERS:  Any objection?

2          MR. WOLFF:  To what, moving for their admission

3     or just marking them?  I don't have an objection to

4     marking them.  I think they're duplicative.  I think they

5     probably contain the same material.

6          MS. REIFERS:  The updated one does not contain

7     the practice locations.

8          Q     (BY MS. REIFERS)  Dr. Gocio, would you please

9     look at Exhibit No. 2?  I understand it does not have your

10    work locations.  Other than that, is it up-to-date and

11    accurate to the best of your knowledge?

12         A     Yes.

13         Q     Thank you, sir.  Exhibit No. 1, I understand

14    this exhibit, this CV, does not contain your present

15    location in Mountain Home.  Other than that, is it

16    up-to-date and accurate?

17         A     Yes.  Well, except for the location.  I'm not in

18    Little Rock anymore.

19         Q     Yes, sir.  Other than that change, are there any

20    other changes that you would have made?

21         A     No, I don't think so.

22         Q     Thank you.  Dr. Gocio, since you've been in

23    private practice, have you always been a specialist in

24    neurosurgery?

25         A     Yes.

1      Q    Tell me physically where are your offices

2   located.

3      A    Current office is at 310 Buttercup, Suite A,

4   Mountain Home, Arkansas 72653.

5      Q    Are you with part of a practice group?

6      A    Yes.

7      Q    What's the name of the practice group?

8      A    It's called Baxter Regional Medical Center

9   Neurosurgery and Spine Clinic.

10     Q    What states are you licensed to practice

11  medicine?

12     A    Arkansas.

13     Q    Have you been licensed in any other states in

14  the past?

15     A    Yes.

16     Q    In which states?

17     A    Illinois, Kentucky, Missouri.

18     Q    Why are you no longer licensed in Illinois,

19  Kentucky, and Missouri?

20     A    I don't practice there anymore.

21     Q    So your let your license lapse?

22     A    Yes.

23     Q    In Missouri did you have a license as a doctor

24  of healing arts?

25     A    Gosh, I guess.  I don't know.  I don't know what

Page 10

1    they call it.  Could be.

2         Q    Okay.  Are you a member of any medical

3    societies?

4         A    No.

5         Q    Have you ever held a leadership position in any

6    medical society?

7         A    No.

8         Q    What hospital appointments do you hold?

9         A    I'm on staff at Baxter Regional Medical Center

10   here in Mountain Home.

11        Q    Tell me generally, Doctor, what does a

12   neurosurgeon do from a high level?

13        A    Neurosurgeons are educated and trained in the

14   treatment of disorders of the brain, spine, spinal cord,

15   peripheral nerves, and that treatment can include medical,

16   physical measures as well as surgical measures for those

17   conditions.  Neurosurgeons are trained to diagnose those

18   conditions and treat those conditions.

19        Q    How many occasions do you estimate that you've

20   had to do back surgery similar to the kind that you did on

21   Mr. Washam?

22        A    Probably do about around 250 surgeries per year,

23   of which probably 80 percent of those have been spine

24   surgery, and probably around 150 lumbar surgeries per

25   year, I'd say, would be an average over the course of my

```
 1   career.  So it would be several thousand times, probably.

 2   If you want to, you know, parse it down lumbar

 3   decompression with discectomy, I'd have a hard time giving

 4   you a clear number on that.  But just lumbar surgery in

 5   general, probably 150 a year for 30 something years.

 6       Q    Did you know that you were named as a potential

 7   expert witness in the Bradley Washam case?

 8       A    No.  I assumed that the deposition was about

 9   treatment of the patient, that I was a fact witness or

10   deponent.  So, I mean no, I'm not aware of that.  I

11   haven't seen any paperwork to that effect.

12       Q    I'm just going to show it to you so you will

13   understand a bit why I have to ask you some of the

14   questions I ask today.

15       A    Okay.

16       Q    If you flip to the second page at the bottom of

17   the page.

18       A    Okay.

19       Q    You'll see that you're disclosed as a potential

20   non-retained expert.

21       A    Okay.

22       Q    We'll mark as Exhibit No. 3 the disclosure that

23   I've shown to Dr. Gocio.

24            Sir, would it be fair to say that during the

25   time period that you saw and treated Mr. Washam that your
```

1   focus was on his treatment?

2          (WHEREUPON, Exhibit 3 was marked for

3   identification.)

4      A    Yes.

5      Q    During the time that you saw Mr. Washam, is it

6   fair that your primary focus was not expert testimony?

7          MR. WOLFF:  Object to the vague form to the

8   extent you haven't defined what expert testimony means in

9   a federal court case.

10         MS. REIFERS:  I'm so happy to rephrase.  Thank

11  you, sir.

12     Q    (BY MS. REIFERS)  Dr. Gocio, is correct during

13  your treatment of Mr. Washam that you did not see him for

14  the purpose of developing facts and information necessary

15  to form opinions on, for example, causation?

16     A    I don't recall any conversations about causation

17  of his condition.  I did, of course, describe his

18  condition and, you know, treatment options for that.  I

19  can give an opinion about that, but that would be strictly

20  as a treating physician within the realm of his medical

21  care and his condition.

22         I mean, I really don't separate it out.  I

23  include my opinions and thoughts about a patient's

24  condition and how the condition evolved as part of the

25  treatment planning.  It's hard to separate one out from

1    the other, in my opinion.  But no, I specifically wasn't

2    asked, you know, will you give expert testimony about the

3    causation of my condition?

4         Q    If I understand what you're telling me, you're

5    indicating that any causation opinions that you were to

6    give in this case would be limited to the information that

7    happens to be contained in your medical records from

8    treatment of Mr. Washam; is that correct?

9         A    Yeah, I think that's a pretty fair

10   characterization.

11        Q    Doctor, when is the first occasion that you had

12   or that your office had to see Mr. Washam?

13        A    There's a record from June 6, which I believe is

14   the initial contact with Mr. Washam.  He was seen by

15   Brandy Anderson, who is a nurse practitioner in this

16   office.  And I think it's a little confusing; there's June

17   6, there's June 7.  This is an older medical record system

18   that we're in; we're not in that system anymore.  I think

19   that's the first encounter.  I don't have the subsequent

20   visits, but I saw him subsequently in follow-up visit.

21        Q    When did you see him in a follow-up visit so I

22   understand the timeline?

23        A    It would have been probably in August of 2019.

24        Q    I see.  As I look at your timeline of treatment,

25   it appears that Mr. Washam came to your offices and saw

Page 14

1  nurse practitioner Brandy Anderson on June 6?

2       A    Yes.

3       Q    Fourteen days later the surgery was performed on

4  June 20?

5       A    Oh, June?  Okay.

6       Q    Is that correct?

7            MR. WOLFF:  June 26, I think.

8       A    Well, it could've been, yeah.  Yeah it would've

9  been probably within the same month that Brandy saw him

10 initially.  Okay, I'm sorry, I have some notes from 2020

11 in here, July 2020, so that's my mistake.

12      Q    (BY MS. REIFERS)  That's okay.  Do you see the

13 June 20 record?  Is that the preoperative record you were

14 referring to?

15      A    No.  No, I don't have that record with me.

16      Q    Okay.  Let's look first at the first visit of

17 Mr. Washam to this clinic on June 6, 2019, sir.

18      A    Okay.

19      Q    When Mr. Washam came on June 6, he was seen

20 solely by Ms. Anderson; is that correct?

21      A    Yes.

22      Q    It appears that Ms. Anderson did a physical

23 exam?

24      A    Yes.

25      Q    What was the result, the objective findings, of

1    her neurological exam?

2         A    He had paraspinous muscle spasm, had pain with

3    range of mobility in the low back area, had an antalgic or

4    abnormal gait.  Also has a positive straight leg raise on

5    the right -- bilaterally.

6         Q    Isn't it correct that a straight leg raise is

7    subjective?

8         A    Yes.

9         Q    Okay.  As far as objective findings from the

10   neurological exam, numbness, muscle weakness, reflexes,

11   those all appear to be normal; is that correct?

12        A    Yes.

13        Q    So he had a normal neurological exam on June 6,

14   2019, correct?

15        A    Yes.

16        Q    With regard to MRI, it appears that an MRI was

17   brought to the exam?

18        A    Yes.

19        Q    Did you review that MRI, or do you have any

20   notes that you reviewed that MRI?

21        A    Yes, I did review the MRI.

22        Q    The MRI indicated that there were no acute

23   findings; is that correct?

24        A    No, I felt that he had an acute disc herniation

25   at L4-5 level.  Also had preexistent lumbar stenosis at L3

1    through L5.

2         Q    Did the MRI indicate acute findings by the

3    radiologist or the person who performed the MRI?

4         A    I don't know.  I'm not sure I read the report,

5    but I would make my own determination on the MRI scan.

6         Q    Okay, so you're not sure if you read the report

7    from the MRI that he brought?

8         A    No, I can't say that I did.

9         Q    So your finding was that there was an acute disc

10   herniation?

11        A    Yes.

12        Q    What is your understanding of when Mr. Washam

13   experienced an incident, if at all?

14        A    That was in March, I believe, where he

15   experienced worsening of his back pain, also hip and leg

16   pain.

17        Q    When you are saying experienced worsening of his

18   back and hip and leg pain, are you reading from

19   information that Mr. Washam provided to you?

20        A    Yes.

21        Q    So Mr. Washam's incident was about three months

22   prior to you seeing him; is that correct?

23        A    Yes, that's my understanding from the record.

24        Q    What's the date of the MRI that you looked at?

25        A    I don't have the date recorded.

1    Q    Are there certain parameters that are required

2  to be met in order to determine that a disc herniation is

3  acute versus degenerative?

4    A    Not really.  Disc protrusions can be related to

5  degenerative changes, and certainly part of the

6  degenerative process in a disc would be disc protrusion or

7  disc bulging.

8    Q    So as I understand it, your testimony is that

9  there are not defined protocols for determining by

10  radiographic imaging if there's an acute finding such as

11  trauma; is that what you're telling me?

12    A    Well, I mean, if you had serial imaging and you

13  saw an abrupt change, you know, that would confirm an

14  acute change.  I just kind of look at the scan and look at

15  the elevation of the posterior ligament and the appearance

16  on the scan.  Sometimes it's a little equivocal, and

17  that's where I usually fall back on clinical findings,

18  patient's reports of pain and their physical exam.

19    Q    Did Mr. Washam tell you that other professionals

20  had reviewed his X-ray and his MRI and found no acute

21  findings?

22        MR. WOLFF:  Object to the leading form.  Lack of

23  foundation.

24    A    No.

25    Q    (BY MS. REIFERS)  Let me rephrase the question.

1    What did Mr. Washam tell you about whether or not other

2    professionals had reviewed his X-ray and reviewed his MRI

3    and whether they found any acute findings?

4         A    I don't recall any discussions along those

5    lines.  The information that I have is in the chart, and

6    that's what I base my treatment on.

7         Q    Is there a fracture in Mr. Washam's spine?

8         A    Not that I recall.

9         Q    I'd like to hand you an article out of the Spine

10   Journal.  Are you familiar with the Spine Journal?

11        A    Yes.

12        Q    Do read it?

13        A    No.

14        Q    What do you do to stay up-to-date in your

15   medical practice as far as continuing education?

16        A    I do some spine review on a regular basis.  It's

17   called -- it's from Lippincott, Williams and Wilkins.

18   It's called Spine Journal.

19        Q    But you're familiar with this publication, the

20   Spine Journal?

21        A    Yes.

22        Q    Is it a reputable publication?

23        A    Yes.

24        Q    If we turn to the sixth page under trauma,

25   there's a protocol for indicating when the findings are

```
 1   from trauma or acute or degenerative changes; is that
 2   correct, Doctor?
 3            MR. WOLFF:  I'll object to the leading form and
 4   the lack of foundation and ask that you give me a
 5   continuing objection as to questions regarding this
 6   article.
 7            MS. REIFERS:  Sure.
 8       A    Where are we now?
 9       Q    (BY MS. REIFERS)  We're on the sixth page, it
10   looks like this, Doctor.
11       A    Okay.
12       Q    There's one paragraph that leads into the next
13   page on trauma.
14       A    Okay.
15       Q    So the Spine Journal article by lead author
16   Fardon published in 2014 indicates as follows:  "The
17   category of trauma includes disruption of the disc
18   associated with physical and/or imaging evidence of
19   violent fracture and/or dislocation and does not include
20   repetitive injury, contribution of less than violent
21   trauma to the degenerative process, fragmentation of the
22   ring apotheosis, in conjunction with disc herniation or
23   disc abnormalities and associated with degenerative
24   subluxations.  Whether or not less than violent injury has
25   contributed to or been superimposed on the degenerative
```

1    change is a clinical judgment that cannot be based on

2    images alone.  Therefore, the standpoint of description of

3    images such as discs in the absence of significant imaging

4    evidence of associated violent injury should be classified

5    as degeneration rather than trauma."

6            Did I read that correctly?

7        A    I think so.

8        Q    And you didn't find a fracture on the MRI,

9    correct?

10       A    No, not that I recall.

11       Q    Having read the formal definition of trauma, do

12   you agree that the findings on Mr. Washam's MRI should

13   have been classified as degenerative?

14       A    No.

15       Q    Why do you state that?

16       A    No, I felt like he had what I would consider an

17   acute disc herniation, and the findings were compatible

18   with the findings at the time of surgery that he had a

19   disc protrusion that was extruded through the annulus in

20   the subligamentous space at the disc space at L4-5 with

21   bilateral compression of the spinal nerves and the fecal

22   sac.

23       Q    Tell me exactly what led you to believe and put

24   in your note that his disc herniation was acute?

25       A    Well, the appearance on the MRI scan.

1        Q    Can you describe in any greater detail?

2        A    Yeah, the elevation of the posterior ligament,

3    the sequestration of the fragment beneath the posterior

4    longitudinal ligament.  It seemed clear to me and still

5    does.

6        Q    How common are disc herniations?

7        A    I'm not sure, two to three percent of the

8    population will have a disc herniation in their lifetime.

9        Q    I'd like to mark as Exhibit No. 4 the article

10   from the Spine Journal shown to Dr. Gocio.  Can disc

11   herniations occur without injury?

12            (WHEREUPON, Exhibit 4 was marked for

13   identification.)

14       A    Sure.

15       Q    Your testimony is two to three percent of the

16   population has a disc herniation?

17       A    May experience symptoms of a disc herniation and

18   findings of disc abnormality.  I'm not sure they're all

19   herniations, but I think it's pretty common.

20       Q    Disc herniations are common, aren't they?

21       A    I think so.

22       Q    Let's look at information from the Cleveland

23   Clinic.  Dr. Gocio, I handed you the arthritis advisory

24   from the Cleveland Clinic, volume ten, number five from

25   May 2011.  Are you familiar with this publication?

Page 22

1      A      No.

2      Q      Are you familiar with the Cleveland Clinic?

3      A      Yes.

4      Q      Is that a reputable organization and medical

5  provider?

6      A      Yes.

7      Q      So in this article it indicates with regard to

8  herniated discs, if you do a magnetic resonance imaging,

9  or MRI, scan of 100 people who have never had any back

10  symptoms in their life, the chances of somebody having a

11  herniated or significant disc problem is roughly equal to

12  their age, 20 percent for 20-year-olds, 50 percent for

13  50-year-olds.  Did I read that correctly?

14           MR. WOLFF:  Object to the form of the question.

15  First of all, it's leading, and second of all, lack of

16  foundation because use of this article is beyond hearsay.

17      Q      (BY MS. REIFERS)  Did I read that correctly?

18      A      Yes.

19      Q      This article indicates that if you look at MRIs

20  of the general population, the percentage that will have a

21  disc herniation is roughly equal to their age.  So a

22  50-year-old, as this article indicates, 50-year-olds,

23  50 percent of them would have herniated discs, correct?

24           MR. WOLFF:  Same objections.

25      A      No, it's saying they would have either a

Page 23

1  herniated disc or significant disc problems.  So that's

2  kind of casting a little bit broader net than a disc

3  herniation.  They're talking about disc pathology in a

4  general sense.

5      Q    (BY MS. REIFERS)  Do you agree that 50 percent

6  of 50-year-olds would have disc herniations or disc

7  degeneration if you looked at MRIs of the general

8  population?

9      A    Yes.

10     Q    I'd like to mark this article as Exhibit No. 5,

11 please.

12          So the mere fact that Mr. Washam had a disc

13 herniation doesn't necessarily mean that he experienced an

14 injury, correct?

15          (WHEREUPON, Exhibit 5 was marked for

16 identification.)

17     A    No, a disc herniation can occur without

18 significant injury, and in a general sense a disc

19 herniation doesn't confirm an injury.  Mr. Washam reported

20 an injury and reported subsequent symptoms, and that's

21 what I based my care and treatment on.

22     Q    And I understand that as a treating physician.

23 With regard to Mr. Washam's statements to you about when

24 he began experiencing back pain, if at all, and if there

25 was a fall at work, how do you view patient statements to

1    you concerning their medical condition?

2        A    Well, I feel like they're generally reliable,

3    especially if they correlate with physical findings,

4    imaging findings.  I tend to believe my patients.

5        Q    Isn't the medical literature very well

6    established that you cannot rely on patient statements?

7            MR. WOLFF:  Object to the leading form of the

8    question.

9            MS. REIFERS:  I'd be happy to rephrase.  Let me

10   do that, Dr. Gocio.

11       Q    (BY MS. REIFERS)  What is your understanding of

12   the scientific literature concerning the reliability of

13   patient statements?

14       A    That patient statements can be unreliable,

15   patients can have problems with recollection or reporting

16   of symptomatology and events, but that if -- in my opinion

17   if a patient's symptoms and reports and objective findings

18   correlate, then there's reliability there.

19       Q    What documentary evidence do you have in your

20   file that would indicate whether Mr. Washam had back pain

21   before a March 2019 event at work?

22       A    He had reported that he had back been for quite

23   some time, and I assume that is prior to his injury.  He

24   described a worsening of his back pain, so that's what I

25   base that opinion on.

Case 3:19-cv-00231-RGB   Document 109-1   Filed 08/12/20   Page 25 of 183

Page 25

1  Q So your entire opinion, if you provide one on

2 whether or not his symptoms occurred at work due to a fall

3 at the railroad, those are all based on Mr. Washam's

4 statements to you; is that correct?

5  A No, based on his statements, also objective

6 findings and physical exam.

7  Q His neurologic exam on June 6 was normal?

8  A Yes.

9  Q You reviewed the MRI and you found a disc

10 herniation, correct?

11  A Yes.

12  Q And we do know that disc herniations are found

13 in the general population absent an injury, correct?

14  A Yes.

15  Q Are you familiar with the AMA's Guides

16 Newsletter that they issue every month?

17  A No.

18  Q Are you familiar with the American Medical

19 Association?

20  A Yes.

21  Q Is that a reliable authority in your view?

22  A Yes.

23  Q If we look to the first page, third paragraph,

24 first sentence the following is written:  "Unfortunately,

25 the premise that examinee reports are accurate has

1    repeatedly failed scientific testing."

2            Did I read that correctly?

3            MR. WOLFF:  Object to the leading form of the

4    question and lack of foundation for the use of this

5    article.

6        Q    (BY MS. REIFERS)  Did I read that correctly?

7        A    Yes.

8        Q    If you turn to page three, the left bottom of

9    page, "The findings from the Lees-Haley projects indicate

10   that there are extra layers of unreliability when the

11   examinee is a claimant, layers beyond the unreliability

12   that Barsky reviewed generically.  In addition to

13   documenting their own findings, the Lees research team

14   also provided a review scientific studies that has

15   previously demonstrated that there is a pronounced

16   tendency for claimants to exaggerate their current

17   impairment."  Did I read that correctly?

18           MR. WOLFF:  Same objection.  Are you giving me a

19   continuing objection to this document?

20       Q    (BY MS. REIFERS) Did I read that correctly?

21       A    Yes.

22           MR. WOLFF:  Are you going to give me a

23   continuing objection?

24           MS. REIFERS:  Of course, yes, sir.

25       Q    (BY MS. REIFERS) Right-hand column, "Given these

1    multiple layers of distortion, the fundamental purposes of

2    impairment evaluations and other types of forensic

3    evaluations cannot be credibly addressed through reliance

4    on examinee self-report."

5            Did I read that correctly?

6    A    Yes.

7    Q    Doctor, are you familiar with the scientific

8    literature that indicates in a forensic evaluation when

9    you're looking at causation, reports of patients cannot be

10   relied upon?  Are you familiar with that?

11   A    No.

12   Q    You've never read any of these studies?

13           MR. WOLFF:  Object to the extent it

14   characterizes this as a study.  This is an opinion by a

15   PhD.  Lack of foundation.

16   Q    (BY MS. REIFERS)  Dr. Gocio, have you read any

17   scientific literature or medical literature at all that

18   indicates you cannot rely on a patient's words to you when

19   that patient is a claimant, particularly when you're doing

20   a causation analysis?

21   A    You know, I don't recall anything specifically.

22   I have a general knowledge of that concept and certainly

23   agree with it that reliability is difficult when a patient

24   is a claimant.

25   Q    I'd like to mark that document as number six,

Page 28

1   please.

2            Did Mr. Washam indicate to you or Ms. Anderson

3   on June 6, 2019 that he had hired an attorney to represent

4   him in a claim against the railroad?

5            (WHEREUPON, Exhibit 6 was marked for

6   identification.)

7            MR. WOLFF:  Object to the lack of foundation.

8       A    No.

9       Q    (BY MS. REIFERS) And was that question asked at

10  that point?

11      A    Yes, at some point during his early treatment

12  before his surgery, I asked him if he had filed a

13  workman's comp claim or if this would be workman's comp

14  claim, and he said no.  That's my recollection.

15      Q    Did you or Ms. Anderson ask Mr. Washam on

16  June 6, 2019 on his first visit if he had hired an

17  attorney to file a lawsuit in relation to his alleged

18  fall?

19      A    I don't think I specifically asked him about

20  hiring an attorney, but I do recall asking him if this

21  would be a workman's comp claim.

22      Q    Dr. Gocio, so as we proceed through today's

23  deposition, just so that you and I are on the same page, I

24  will correctly refer to any claim by Mr. Washam as a

25  lawsuit.  He's not under Worker's Compensation as a

Page 29

1   railroad employee.

2        A    Okay.

3        Q    Just so you and I are on the same page, I want

4   to give you that information.

5             Proceeding on, do you recall or see any

6   notations in your medical record regarding whether or not

7   Mr. Washam indicated to you that he had hired an attorney

8   to file a lawsuit?

9        A    No.

10       Q    Do you agree that whether or not Mr. Washam was

11  pursuing a claim is particularly important to you and

12  other neurosurgeons when it comes to back surgery?

13            MR. WOLFF:  Object to the lack of foundation.

14       A    It's a factor in my evaluation.

15       Q    (BY MS. REIFERS)  And that's based on scientific

16  literature, correct?

17       A    Yes.

18       Q    Individuals who are claimants are statistically

19  more likely for their surgeries to fail, correct?

20            MS. REIFERS:  Object to the leading form.  Lack

21  of foundation.

22       A    Yes.

23       Q    (BY MS. REIFERS) With regard to Nurse

24  Practitioner Anderson's evaluation on June 6, we talked

25  about this a couple of times, the neurologic exam from the

1 objective findings was normal. It appears that there's no

2 foundation for a finding of radiculopathy on that occasion

3 other than the words of Mr. Washam, correct?

4       MR. WOLFF: Objection, leading, compound, and

5 repetitive.

6    A   I would characterize his condition to include

7 radiculitis or radicular type that doesn't rise to the

8 level of radiculopathy. Radiculopathy would have to be

9 some type of objective findings of neurologic deficit, so

10 I would call it radiculitis. Some people use sciatica

11 kind of synonymously with that.

12    Q   (BY MS. REIFERS) Those were reports from Mr.

13 Washam, correct?

14    A   Yes.

15    Q   The objective findings don't show radiculopathy,

16 correct?

17    A   That's correct.

18    Q   With regard to Nurse Practitioner Anderson's

19 straight leg exam, that is a, we talked about this

20 earlier, that is a subjective test, correct?

21       MR. WOLFF: Objection, repetitive.

22    A   Yes.

23    Q   (BY MS. REIFERS) I don't see in any notation in

24 Nurse Practitioner Anderson's notes when Mr. Washam

25 complained of pain during the straight leg raise of the

1    distribution pattern; is that correct?

2        A    No, it just says straight leg raise positive

3    bilateral.

4        Q    And straight leg raise tests can indicate a

5    number of potential areas within the spine at issue,

6    correct?  It's not just one portion of the spine?

7        A    No, there are several areas of the spine that

8    can be activated by a straight leg raise.

9        Q    So if you wanted to know particularly from a

10   straight leg raise, you would have to do more work than is

11   seen in the medical record on June 6, correct?

12       A    Sure.

13       Q    As I understand it, you then saw Mr. Washam

14   preoperatively on June 20; is that correct?

15       A    Probably.  I don't have the record in front of

16   me.

17       Q    It appears that from his June 6 visit with Nurse

18   Practitioner Anderson a surgery to spine was scheduled; is

19   that correct?

20       A    Yes.

21       Q    So Mr. Washam never saw you before his back

22   surgery was scheduled; is that correct?

23       A    I believe I saw him briefly with Ms. Anderson's

24   initial evaluation.

25       Q    And where do we see that on the June 6 note?

 1      A    It may not be in the note.  That's my

 2  recollection.

 3      Q    Would you normally put in your medical record if

 4  you saw and examined in any fashion the patient?

 5      A    I might not always when I'm seeing a patient in

 6  conjunction with a nurse practitioner.  If I had different

 7  findings or had additional findings that I felt were

 8  pertinent, but I may not.

 9      Q    As we look at the June 6, 2019 record, there's

10  no indication that you personally examined Mr. Washam, is

11  there?

12           MR. WOLFF:  I object to the extent the question

13  calls for speculation, lack of foundation.

14           MS. REIFERS:  Let me rephrase that.

15      Q    (BY MS. REIFERS)  When you look at the June 6

16  medical records, is there any indication in those medical

17  records that you personally examined Mr. Washam?

18      A    No, there's no objective entry to that effect.

19      Q    As we look at the medical records in this case,

20  there is no documented evidence that you examined Mr.

21  Washam before his back surgery was scheduled, correct?

22           MR. WOLFF:  Objection, leading and repetitive.

23      A    No, I don't see anything in the June 6 note.

24      Q    Sir, I'm going to hand you the records that I

25  have from June 6 such that you can indicate if those are

1    correct to the best of your knowledge, and I'd like to

2    mark them as number seven.

3            (WHEREUPON, Exhibit 7 was marked for

4    identification.)

5            MR. WOLFF:  Do you have a copy for me?

6            MS. REIFERS:  I do.  If you'll give me a moment,

7    I'll tell you the Bates numbers.  I believe it's 331

8    through 341, produced by the plaintiff.

9        A    Yeah, this appears to be a complete record.

10       Q    (BY MS. REIFERS)  Thank you, sir.  I understood

11   you didn't have it, Dr. Gocio, so I wanted to hand you

12   Bates number 305-308 and ask if this is your exam prior to

13   surgery or visit with Mr. Washam before surgery on

14   June 20, 2019?

15       A    I think this is another note from Ms. Anderson.

16       Q    So the June 20, 2019 record is a visit with

17   Nurse Practitioner Anderson?

18       A    I'm assuming that.  I'm not sure.  The label is

19   history and physical exam, so I'm assuming that's not my

20   exam.

21       Q    Okay.  I appreciate that.

22       A    It appears to be signed by Brandy Anderson and

23   cosigned by me, of course, as the supervising physician.

24       Q    With regard to the June 20 visit, having looked

25   at the record is it correct that you believe that you did

```
 1    not perform that --

 2         A     No.

 3         Q     -- exam?

 4         A     No.

 5         Q     That was performed by Ms. Anderson?

 6         A     Right, that's what I see from looking at the

 7    record.

 8         Q     With regard to the June 20, 2019 visit, were the

 9    objective neurological exam factors normal?

10         A     Let's see.  Describes slight sensory deficits in

11    the upper buttocks bilateral.  Other than that, nothing

12    objective.

13         Q     The description as it is written in the medical

14    record on June 20 regarding any sensory deficits, that is

15    not a correct dermatomal distribution; is that correct?

16         A     No, that's not a dermatome.

17         Q     It does not relate to a specific area within the

18    spine as you would notate for sensory neurologic deficit,

19    correct?

20         A     No.

21         Q     Do you agree with me?

22         A     Yeah.

23         Q     When you say no?

24         A     Yeah. I'm saying no, it's not a radicular

25    dermatomal type distribution.
```

1    Q    Thank you, sir.  I'd like to mark that record as

2    number eight, please Exhibit No. 8, please.

3         Doctor, the next record I have in my timeline is

4    your surgery of Mr. Washam.  Does that appear to be

5    correct from your medical records as well?

6         (WHEREUPON, Exhibit 8 was marked for

7    identification.)

8    A    Uh-huh.  Yes.

9    Q    Tell me what type of surgery you did to Mr.

10   Washam.

11   A    I did a multilevel lumbar laminectomy with

12   foraminotomy, also a discectomy bilateral at L4-5.

13   Q    Reading through the operative report, it appears

14   that you did a laminectomy at three levels in his spine;

15   is that correct?

16   A    Yes.

17   Q    You did surgery on six locations in the spine,

18   correct?

19   A    Well, I mean, I did a lumbar laminectomy at L3,

20   L4 and L5, did foraminotomies bilateral at those levels,

21   including the L2-3 for partial decompression, did a

22   discectomy at L4-5.  I mean, it's all part of the same

23   surgery.  It's just different portions that are described

24   to describe what was done.

25   Q    So you did a surgery to three levels of Mr.

1    Washam's spine?

2         A    Yes.

3         Q    And you had never -- it is not documented in

4    your medical records that you had ever examined him

5    personally, correct?

6         A    No, I'm sure that I did evaluate him with the

7    initial visit with Ms. Anderson and observed his findings

8    from her.  I don't know how much or how little exam I did.

9         Q    It's not documented in any medical record --

10        A    Right, I understand that.

11        Q    -- that you examined him?

12        A    Yeah.

13        Q    Is that correct?

14        A    That's correct.

15        Q    Prior to surgery?

16        A    Yes.

17        Q    Doctor, I want to ask these questions because

18   you've been identified as potentially giving causal

19   testimony in this case, so I want you to understand that.

20        A    Okay.

21        Q    Did you consider whether or not Mr. Washam had a

22   personality disorder prior to his spinal surgery?

23        A    I didn't have a feeling that he did.  I didn't

24   explore that any further than what evaluation was done at

25   the time of his initial visit.

Page 37

1    Q    Well, we don't have any documentation in the

2    medical records that you examined or met with Mr. Washam,

3    correct?

4         MR. WOLFF:  Objection, repetitive.

5    A    I'm certain that I met Mr. Washam on the first

6    visit.  Like I said, I have no recollection and no

7    documentation of how much or how little exam was performed

8    by me, if any.  I did speak with him.  I met him at that

9    visit and reviewed his imaging as well as reviewed the

10   findings with Ms. Anderson, and I didn't observe or

11   suspect any personality disorder at that time.

12   Q    What, if anything, did you do to eliminate the

13   possibility of having a personality disorder?

14   A    Nothing other than speaking with the patient and

15   reviewing Ms. Anderson's evaluation.

16   Q    Did you speak to the patient in an effort

17   diagnose whether or not he had a personality disorder?

18   A    I don't have any clear recollection of that.

19   I'm sure my conversation was mostly about his symptoms and

20   his treatment to that point.

21   Q    Did you ask for any type of personality testing,

22   like the Minnesota Multiphasic Personality Inventory?

23   A    No.

24   Q    MMPI?

25   A    No.

1      Q    Tell me why it's important in many contexts to

2  screen individuals before back surgery for a personality

3  disorder.

4           MR. WOLFF:  Object to the leading form, lack of

5  foundation.

6           MS. REIFERS:  I think that was a what question

7  or a tell me question.  Let me rephrase it to be sure.

8      A    Okay.

9      Q    (BY MS. REIFERS)  What is the importance of

10 screening an individual for a personality disorder before

11 back surgery?

12          MR. WOLFF:  Same objection.

13     A    I think it is important to assess a patient's

14 potential for improvement with surgery to see if there's

15 any factors that might prevent a good outcome from

16 surgery, especially if there's no demonstrable, objective

17 findings on imaging or symptomatology that's consistent

18 with pathology that could benefit from spinal surgery.

19 The most extreme situation would be a patient that's

20 histrionic or has a feigned condition.  But that's an

21 assessment that you would make on any patient that you

22 would see with complaints of back pain.

23     Q    (BY MS. REIFERS)  Have you read the scientific

24 and medical literature indicating that 73 percent of

25 patients claiming chronic low back pain have a personality

Page 39

1   disorder?

2        MR. WOLFF:  Objection, leading, lack of

3   foundation.

4        A    No, I haven't seen that one.

5        Q    (BY MS. REIFERS) Are psychological problems a

6   cause of chronic back pain absent any anatomical change?

7        A    Can be, sure.

8        Q    As I looked through your medical records, I

9   don't see that there was any documented effort to

10  determine if Mr. Washam had a psychological factor that

11  was resulting in his back pain; is that correct?

12       A    Yes.

13       Q    You agree with me, don't you, Doctor, that

14  individuals with psychological issues or personality

15  disorders are more likely to fail treatment?

16       MR. WOLFF:  Objection, compound, vague,

17  repetitive.

18       A    Yes.

19       Q    (BY MS. REIFERS) What are other causes of

20  chronic low back pain, Doctor?

21       A    Gosh, there's a lot of potential causes;

22  muscular ligamentous abnormalities, deconditioning,

23  arthritic conditions.  There's a lot of potential causes

24  for low back pain.

25       Q    Obesity?

1      A    Sure, that kind of goes along with the

2  deconditioning.

3      Q    Did you categorize Mr. Washam as medically

4  obese?

5      A    No.

6      Q    I'm sorry, sir, if you'll look at your March 25,

7  2020 record.

8      A    March 25, I don't have that in front of me.

9      Q    Mister -- I'm sorry, I'm looking at the wrong

10  Bates number.  Sir, Bates number 649.  Let me hand you

11  this record, Dr. Gocio.  If you'll turn to Bates number

12  649, sir, this is a record of your March 25, 2020 visit

13  with Mr. Washam.

14      A    Uh-huh.

15      Q    Is that correct?

16      A    Uh-huh.

17      Q    Do you indicate that Mr. Washam was medically

18  obese?

19      A    I don't think so.  His BMI is 28, his weight is

20  listed at 220.

21      Q    Under medical history middle of the page,

22  problem, obesity, right here?

23      A    That's has to be an error.  I have no idea how

24  that got in there.  This is -- some of this history is

25  entered by medical assistants.  I would never categorize

1    him as obese.  I mean his -- I don't know.  He may have

2    been obese in a different time, but he's certainly not

3    obese now and when he underwent surgery, so I don't know

4    how that got in there.  I don't.  That's an error.  That

5    shouldn't be there.

6         Q    What was his height and weight?

7         A    His height the last visit I had, 74 inches was

8    his height, weight is 204.59, BMI of 26.26, so I don't

9    think that qualifies as obesity.

10        Q    So you're saying that your medical record,

11   although it indicates that he had a problem with obesity,

12   is incorrect?

13        A    Yes.  I mean incorrect as far as my knowledge of

14   him.  Now, he may have been obese at an earlier age, I

15   don't know.  It may be a past medical history, but I think

16   that's an error and related to just something that was

17   entered incorrectly.  I've never seen that before.  I

18   certainly would've corrected that if I'd seen it because

19   he's not obese, at least as he exists presently.

20        Q    Doctor, what was the outcome of Mr. Washam's

21   spinal surgery?

22        A    Mr. Washam had improvement in some respects with

23   his radiculitis, his leg symptoms improved.  He does have

24   some mild weakness and sensory deficit in the lower

25   extremities, especially on the right side he has some

1    numbness and tingling, mild weakness of the right ankle.

2    His back pain is less severe but certainly has continued.

3    It's related to activity.  Specific activities in

4    particular that seem to aggravate his pain is prolonged

5    sitting, riding or driving in a vehicle, those sorts of

6    things.  He does fairly well with his back pain with

7    sedentary to light activity.

8         Q    Well, Mr. Washam reported back pain subjectively

9    before his spinal surgery, correct?

10        A    Yes.

11        Q    And there is no objective correlation to that,

12   correct?

13        A    He reported back pain.

14        Q    After the surgery he still reports back pain?

15        A    Yes.

16        Q    So in some respects Mr. Washam's back surgery

17   was a failure, correct?

18        A    He didn't have a hundred percent resolution of

19   back pain, so I would agree with that.

20        Q    That's based on his statement?

21        A    Yes.

22        Q    Has Mr. Washam continued to take prescription

23   pain medications after his surgery?

24        A    Yes.

25        Q    What does he take with regard to prescription

Page 43

1  pain medicines?

2      A    He takes Norco, which is hydrocodone with

3  acetaminophen.

4      Q    So -- I'm sorry, didn't mean to interrupt you.

5      A    He takes that on an as-needed basis for his

6  pain.

7      Q    Every time you've seen Mr. Washam after the

8  surgery, is it correct that you prescribed prescription

9  pain medication, hydrocodone as Norco?

10     A    Yes, he has taken that medication on an

11 as-needed basis since his surgery, and he has had refills

12 of that medication.  I'm not certain if it was refilled

13 every visit.  In fact, I think his refills have been less

14 than monthly.  I'd have to just look at the record and

15 see.

16     Q    Do you have the last record from July of this

17 year before you?

18     A    Yes.

19     Q    Did you prescribe him 90 hydrocodone pills?

20     A    I think 120 was the fill on July 9.  That's the

21 one I'm looking at.

22     Q    How often does Mr. Washam come see you?

23     A    Oh, he returns various times.  I'd have to, you

24 know, chart it out, probably six or eight-week intervals

25 most recently.  I'd just have to graph it out.  I can't

1    give you that off the top of my head.

2         Q    Dr. Gocio, are you familiar with the medical

3    literature that indicates that prescription narcotics

4    actually cause a worsening of pain, especially for chronic

5    pain presentations?

6         A    Yes.

7         Q    Tell me why, knowing that prescription pain

8    medicines can cause a worsening of pain, that you continue

9    to prescribe hydrocodone to Mr. Washam.

10        A    Well, I'm tapering off the medication.  He's

11   gradually reducing his dose.  He still has flareups of his

12   symptomatology requiring the medication.  We're moving

13   toward reducing that and ultimately getting him off that

14   medication if possible.

15        Q    It's been a year since his surgery.

16        A    Right.

17        Q    What do you base the statement that you're

18   tapering him off?

19        A    He's reducing his dosage.

20        Q    Do you see that?  Show me that in the records.

21        A    The intervals between his refills have

22   increased.  That's my recollection.

23        Q    Show me in the records.

24        A    I don't have all the records here.  I don't have

25   all the records in front of me.

1     Q    So you can't say that as we sit here today?

2     A    Well, no, I'm saying that from my recollection.

3  I don't have it in front of me.  I'd be happy to review

4  it.

5     Q    We know that every medical record you have in

6  front of you you prescribed him hydrocodone, correct?

7     A    I don't know that for a fact.  I'd just have to

8  look at them.  I have prescribed hydrocodone and I have

9  refilled hydrocodone.  My last refill was July 9.

10    Q    For 120 pills, right?

11    A    Yes.

12    Q    Do you want to look at your other medical

13 records that you brought with you today that you

14 prescribed hydrocodone at each of those visits?

15    A    I can.  I'd be happy to.  I don't have all of

16 the records.  I just have the initial visit and then my

17 last visit.  I'll be happy to look at all the interval

18 visits.

19    Q    Why any physical restrictions on Mr. Washam?

20    A    His symptomatology seems to worsen with certain

21 activities, so I restricted activities that consistently

22 worsen his pain, things like heavy lifting, twisting,

23 stooping, bending, prolonged sitting.  I alluded to that

24 earlier.  It seems to increase his symptomatology, so I've

25 asked that he limit that.

1     Q    When you say symptomatology, those are based on

2  statements from Mr. Washam, correct?

3     A    Yes.

4     Q    So Mr. Washam tells you heavy lifting causes

5  pain, correct?

6     A    Yes.

7     Q    Mr. Washam tells you stooping and bending causes

8  pain, correct?

9     A    Yes.

10     Q    Those are not indications from objective

11  testing, correct?

12     A    That's correct.

13     Q    Do you agree, sir, that symptomatology of a

14  report of pain does not equate to risk of injury?

15         MR. WOLFF:  Object to the vague form.

16     A    Sure.  I mean, injury can occur, you know,

17  without significant symptoms.  I'm not sure I understand

18  the question.

19     Q    (BY MS. REIFERS) That's okay.  Let me ask the

20  question in a different way.  Simply because Mr. Washam

21  reports to you that he feels pain when he lifts a heavy

22  object, do you agree that does not mean he is at risk of a

23  physical injury postsurgery?

24     A    No, I mean, his pain doesn't -- I don't think it

25  really correlates with risk of injury.

1     Q   And simply because he reports pain, self

2  reporting pain on heavy lifting doesn't mean that he is

3  putting anyone else at risk from lifting heavy objects,

4  correct?

5         MR. WOLFF:  Object to the leading form, lack of

6  foundation.

7     A   No, I don't think his pain would correlate with

8  any risk for others either.

9     Q   (BY MS. REIFERS)  I saw that in your medical

10  records at one point his restriction was no more than

11  50 pounds lifting.

12     A   Yes.

13     Q   His restriction was then reduced to lifting no

14  more than 30 pounds.  Why was that done?  Was that based

15  on Mr. Washam's statements?

16     A   Yes.

17     Q   So the reduction in his lifting was based solely

18  on Mr. Washam's statements to you of symptomatology,

19  correct?

20     A   Yes, that and I believe he may have had a

21  functional capacity assessment.  I can't recall the

22  specifics of that.  Let's see.  No, I think he had a -- he

23  returned to, I can't remember exactly what he called it,

24  some type of observation by the railroad about his

25  activity, but that would be subjective, yeah, he had

1   reported increased pain with increased weight lifting.

2        Q    Have you had patients with similar surgery to

3   that of Mr. Washam who were able to go on and do heavy,

4   physically demanding jobs?

5        A    Yes.

6        Q    Is it correct, sir, that according to the

7   medical literature by definition a patient cannot be at

8   maximum medical improvement as long as they are on

9   prescription pain medications?

10            MR. WOLFF:  Object to the form.  Lack of

11  foundation and leading.

12       A    I don't know.  I'm not sure that that's true.

13       Q    (BY MS. REIFERS)  May I show you one from the

14  American Medical Association?

15       A    Certainly.

16       Q    And again you're familiar with the American

17  Medical Association, correct, sir?

18       A    Yes.

19       Q    You agree that the American Medical Association

20  is a reputable authority for information?

21       A    Sure.

22            MR. WOLFF:  Objection, repetitive.

23       Q    (BY MS. REIFERS) Medical information?

24            MR. WOLFF:  Excuse me, Doctor.

25            THE WITNESS:  Sure.

1          MR. WOLFF:  Object.  It's repetitive.  Also,

2     this is not authored by the AMA; it's authored by an

3     individual.  The AMA specifically disclaims this, so it's

4     a lack of foundation and it's misleading the way you're

5     representing it.

6          MS. REIFERS:  Thank you, sir.

7     Q    (BY MS. REIFERS) I've handed you the AMA Guides

8     Newsletter for March and April of 2011.  The first page,

9     sir, under background, second paragraph, second sentence,

10    the following is written:  "Given the scientific knowledge

11    base regarding prescription narcotics for chronic, benign

12    pain, it is difficult to imagine how any patient could

13    credibly be considered to have reached maximum medical

14    improvement if that patient has a narcotic prescription in

15    place."

16         Did I read that correctly?

17         MR. WOLFF:  Objection, leading, lack of

18    foundation.

19    A    Yes.

20    Q    (BY MS. REIFERS) Has it been your experience in

21    your practice as a neurosurgeon that when patients are

22    taken off prescription pain medications their pain level

23    improves in a physical ability?

24    A    I wouldn't say universally.  I think some

25    patients do improve.

1          Q     Because some patients do improve in your

2     personal experience, do you agree that Mr. Washam may have

3     greater physical abilities once he is off hydrocodone?

4               MR. WOLFF:  Objection, lack of foundation, calls

5     for speculation.

6          A     I'm not certain that he would.  I have tried to

7     reduce his medications from the time of his surgery, and

8     he's continued to require both tramadol and also the

9     hydrocodone.  He didn't get adequate relief with the

10    tramadol, so I switched him back to the hydrocodone.

11    That's the specifics of his treatment, so I felt like he

12    failed with the reduction of that medication.

13         Q     (BY MS. REIFERS)  Dr. Gocio, aren't prescription

14    pain medications supposed to be used only for short-term

15    treatment?

16         A     That's the ideal, yes.

17         Q     I'd like to mark as Exhibit No. 9 the AMA Guide

18    Newsletter.  I'll pass it to you, sir.  Are you familiar

19    with the American Academy of Orthopedic Surgeons?

20               (WHEREUPON, Exhibit 9 was marked for

21    identification.)

22         A     Yes.

23         Q     Is that a reputable organization?

24         A     Yes.

25         Q     Have you ever attended any of their continuing

1    education presentations?

2         A    No.

3         Q    Let me hand you the 15th Annual AAOS

4    Occupational Orthopedics and Worker's Compensation Course,

5    a Multidisciplinary Perspective Breakout Session.

6              MS. REIFERS:  Mr. Wolff, here is your copy.  It

7    is absent the first page, which I'm happy to provide to

8    you at a later date.

9              MR. WOLFF:  I would like to have that.

10             MS. REIFERS:  Sure.  I will e-mail that you, and

11   we will also make it an exhibit so it's clear exactly.

12        Q    (BY MS. REIFERS) Would you turn to page 116,

13   sir, under narcotics?

14        A    116?

15        Q    I'm sorry, 1016.  That's my fault.

16        A    Okay.

17        Q    The third bullet point the following is written:

18   "Narcotic medications appear to cause more harm than good

19   for chronic benign pain patients."

20             Did I read that correctly?

21        A    Yes.

22        Q    Do you understand the medical literature to

23   indicate that narcotic medications appear to cause more

24   harm than good for chronic benign pain patients?

25        A    Yes.

Page 52

1    Q    The fourth bullet point, sir reads as follows:

2    "Narcotics reliably cause a worsening of pain, especially

3    for chronic pain presentation."

4         Did I read that correctly?

5         MR. WOLFF:  Are you going to give me a

6    continuing objection as to the lack of foundation for this

7    document?

8         MS. REIFERS:  Sure.

9    Q    (BY MS. REIFERS) Did I read that correctly?

10   A    Yes.

11   Q    Do you agree with the medical science which

12   indicates a worsening of pain through the use of narcotics

13   for chronic pain?

14        MR. WOLFF:  Object to leading and

15   mischaracterization with no foundation to establish this

16   is medical science.

17   A    Yes.

18   Q    (BY MS. REIFERS)  Doctor, the scientific

19   findings discussed on page 1016 also indicate under the

20   sub-bulletin that participant's pain thresholds, taking

21   narcotics, dropped by an average of 16 percent and their

22   pain tolerance dropped an average of 24 percent on

23   prescription narcotics, correct?

24   A    Yes.

25   Q    Are you familiar with medical literature of that

1   type that indicates similar findings?

2        A    Yes.

3        Q    Dr. Gocio, why is it that patients on

4   prescription pain medications their pain tolerance drops?

5   Would you explain that to us?

6        A    I'm not certain.  I'm assuming it's related to

7   pain receptors and activation and stimulation of pain

8   receptors.

9        Q    If you look to the next page, 1017, there's a

10  bullet point that begins in a large-scale study involving

11  almost 2000 participants reporting pain, if we move --

12  please feel free to read that entire paragraph, but as we

13  move to the last sentence the following is written:  "The

14  researchers noted the remarkable nature of the findings

15  that narcotics did not seem to have even a superficial

16  beneficial effect on any of the key goals of pain

17  treatment, pain reduction, improvement of quality of life,

18  or improvement of function."

19            Did I read that correctly?

20        A    Yes.

21        Q    Are you familiar with medical literature which

22  indicates similarly that prescription pain medicines do

23  not help with pain reduction, improvement of quality of

24  life, and improvement of function if taken for long

25  periods of time?

1      A    Yes.

2      Q    There seems to be better news on this page to

3   the next bullet, two bullet points down.  The following is

4   written:  "The harmful effects of prescription narcotics

5   do not appear to be permanent."

6           Has that been your experience, Dr. Gocio, that

7   patients' pain tolerance level improves once they're taken

8   off prescription pain medications?

9           MR. WOLFF:  Objection, compound.

10     A    It can.

11     Q    (BY MS. REIFERS)  Dr. Gocio, what has been your

12  personal experience with patients when you take them off

13  prescription pain medications as a whole?

14     A    Most improve as their condition improves and

15  they can tolerate withdrawal from narcotic pain

16  medication.  Most do improve and most will tolerate

17  gradually reducing and then stopping the medication,

18  especially if you can substitute nonnarcotic medications

19  that are helpful.

20     Q    What has been your experience regarding the

21  susceptibility of a patient to go on disability or quit

22  working if they're on prescription pain medication?

23     A    I think it probably does have a dilatory effect

24  to work and pain, reports of pain, so I think there is

25  kind of a downward spiral with chronic opioids on some

1    patients.

2         Q    Do you agree that patients are more likely to go

3    back to work if they're taken off prescription pain

4    medicines?

5         A    I think there's a lot of factors.  That may be

6    one of them, so I would agree with that in part.

7         Q    If we look to the second to last bullet point on

8    the page, Doctor, the following is written:  "A

9    claimant/plaintiff who has a prescription for narcotic

10   medication in place cannot credibly be considered to have

11   reached a point of maximum medical improvement, MMI, or to

12   be demonstrating permanent impairment.  The medication can

13   actually be creating an artificially severe presentation

14   of pain and other forms of impairment.  The elimination of

15   the medication can lead to an improvement in the pain.

16   Therefore, until the examinee's use of narcotics is

17   eliminated, the permanence or lack thereof of the pain and

18   other forms of impairment cannot be known."

19              Did I read that correctly?

20        A    Yes.

21        Q    Do you agree with those statements?

22        A    Yeah, I think I would agree with that.

23        Q    I'd ask that document from the American Academy

24   of Orthopedic Surgeons be marked as Exhibit No. 10,

25   please.

1         We talked about this a little earlier in your

2    deposition, and I asked you if Mr. Washam had informed you

3    that he had hired an attorney and filed a lawsuit,

4    correct?

5              (WHEREUPON, Exhibit 10 was marked for

6    identification.)

7              MR. WOLFF:  Objection, repetitive.

8         Q    (BY MS. REIFERS)  Correct?

9         A    Yes.

10        Q    It was your understanding that he was not

11   pursuing a lawsuit, correct?

12             MR. WOLFF:  Objection, repetitive, lack of

13   foundation.

14        A    That was my impression.

15        Q    (BY MS. REIFERS)  Are you familiar with the

16   medical literature that indicates that when there's a

17   minor trauma, long-term back pain has only been found to

18   be present when the patient is pursuing a lawsuit?

19             MR. WOLFF:  Objection, lack of foundation,

20   leading.

21        A    I'm not familiar with that, but I think that's

22   kind of a...

23        Q    (BY MS. REIFERS)  Is that a no-brainer?

24             MR. WOLFF:  Objection, compound.

25        A    Well, I'm having a hard time understanding, you

Case 3:19-cv-00231-RGB Document 108-4 Filed 08/27/20 Page 57 of 183
Case 3:19-cv-00231-RGB Document 99-3 Filed 08/27/20 Page 57 of 183

Page 57

1    know, how you're defining minor trauma, and the trauma I'm

2    not sure.

3        Q    (BY MS. REIFERS) Let's go to page two, the

4    bottom of the page, last sentence.

5        A    Okay.

6        Q    It's talking about the study referenced above,

7    which please feel free to take all the time if you want to

8    read the entire page, there's no hurry, published in

9    Spine, the Spine Journal in 2006, Dr. Carragee's study,

10   which indicates he explained, "Minor trauma was only

11   associated with serious low back pain in a compensation

12   setting."  What has your experience been concerning minor

13   trauma and whether the patient develops chronic pain?

14        MR. WOLFF:  Objection, leading, compound, and

15   lack of foundation.  Subject to that, you can answer.

16        A    I think it's more commonly correlated in

17   patients that have compensation motivation, a claimant I

18   guess is the best way to put it.  I think it's more

19   commonly associated; I don't think it's 100 percent

20   excluded.  I do see patients that are not claimants that

21   have chronic pain associated with injuries that I would

22   consider minor.

23        There may be other factors, and mostly those

24   factors are related to factors outside of anatomic

25   abnormality.  I think in general claimants are the biggest

```
 1    group in this category, people that have minor trauma and

 2    then subsequent reports of severe chronic pain, but there

 3    are others.

 4         Q    (BY MS. REIFERS) You agree that the majority are

 5    persons with lawsuits?

 6              MR. WOLFF:  Objection, leading, lack of

 7    foundation.

 8         A    Well, claimants, you know, whether there's

 9    lawsuits --

10         Q    (BY MS. REIFERS) Fair enough.

11         A    -- or gain to be obtained by continuing to have

12    pain.

13         Q    You agree that the majority of individuals who

14    claim to develop serious low back pain after minor trauma

15    are claimants, correct?

16              MR. WOLFF:  Objection, leading.

17         A    I think so.

18         Q    (BY MS. REIFERS) I'll mark the document that

19    I've just shown you as Exhibit No. 11.  Of course you

20    agree, I think you've agreed but I want to make sure, you

21    agree that compensation status, in other words an

22    individual being a claimant, is associated with a poor

23    outcome after surgery?

24              (WHEREUPON, Exhibit 11 was marked for

25    identification.)
```

Page 59

1    A    Yes.

2         MR. WOLFF:  Objection, leading.  Excuse me,

3    Doctor.  Objection, leading, repetitive, lack of

4    foundation.

5    Q    (BY MS. REIFERS)  Let me correct the leading in

6    that question, Dr. Gocio.  With regard to whether or not a

7    person pursuing a lawsuit or is a claimant has a poor

8    outcome after surgery, what has been your experience?

9    A    I think a claimant is more likely to have a poor

10   outcome from surgery, barring any, you know, objective,

11   clear complications or problems from the surgery itself.

12   I think that would be more common with a claimant than

13   someone that was not.

14   Q    Dr. Gocio, I understand that you did not see Mr.

15   Washam with any idea during your treatment of him that you

16   would be potentially named to give expert opinions, fair?

17        MR. WOLFF:  Objection, leading, lack of

18   foundation, repetitive.

19   A    No, I had no indication that that was expected

20   or required.

21   Q    (BY MS. REIFERS)  And what are the problems with

22   a treating doctor giving opinions as an evaluator or

23   expert in litigation?

24        MR. WOLFF:  Objection, lack of foundation.

25   A    Well, the inability to be objective after you've

Page 60

1    offered treatment and participated in the care of the

2    patient.

3         Q    (BY MS. REIFERS) Doctor, I'd like to hand you

4    the AMA Guides Newsletter from May-June 2012.  It seems to

5    indicate exactly what you just said, that there are

6    problems with a treater becoming or giving opinions as an

7    evaluator.  If you'd turn to page two, please, first

8    paragraph, last sentence the following is written:

9    "Therefore, treating clinicians should refrain from

10   engaging in any forensic work that involves their

11   patients, including refraining from causation

12   discussions."

13            Did I read that correctly?

14            MR. WOLFF:  I'll object to the leading form of

15   the question, compound.  I'll object to counsel's

16   continued testimony and commentary on articles.

17        Q    (BY MS. REIFERS) Did I read that correctly?

18        A    Yes.

19        Q    Do you agree with that statement from the AMA

20   Newsletter?

21            MR. WOLFF:  I also object to the lack of

22   foundation of this document and any questions and ask for

23   a continuing objection.

24        A    Yes.

25        Q    (BY MS. REIFERS)  As a medical professional and

Case 3:19-cv-00231-RGB Document 108-4 Filed 08/27/20 Page 61 of 183

Page 61

1    a neurosurgeon who sees patients on a regular basis, do

2    you agree the best practice is for treating physicians not

3    to serve as causation witnesses or experts in litigation?

4         A    Yeah, I think sometimes, you know, you kind of

5    are forced to participate in that as things evolve, but

6    certainly if from the beginning of treatment that's part

7    of the reason that you're seeing the patient, I think you

8    should try as much as possible to be either a treating

9    physician or an expert and keep those separate.  Your

10   options are to either treat the patient and not be an

11   expert in a litigation or to decline treatment of the

12   patient if you know that in the beginning, and that's

13   generally what I would do.  It makes it difficult.

14        Q    May I see the first page of that?  Okay, thank

15   you, sir.  I would like to hand you another guide

16   newsletter from the American Medical Association dated

17   September-October 2005.  If we look to the second page,

18   considerations from chronic pain literature, right-hand

19   column, the following is written:  "In a 1992 article

20   published in the archives of Internal Medicine, Soloman

21   and Lozier pointed out that it was unethical for a

22   physician to serve in both a treating and impairment

23   evaluation role for the same patient when the focus of

24   treatment is chronic pain."

25             Did I read that correctly?

 1          MR. WOLFF:  Object to the form of question, lack

 2    of foundation for the use of this document.

 3          A    Yes.

 4          Q    (BY MS. REIFERS)  Do you agree with that

 5    statement, Dr. Gocio, that treating physician should not

 6    play a role of evaluator or causation expert?

 7          A    Well, like I said earlier, in general I wouldn't

 8    do that, and I don't think you should do that.  Sometimes

 9    patients' treatment and care evolves over time, and they

10    may end up in litigation and, you know, after the fact.

11    Sometimes it's not where not always possible to keep those

12    two things separate, but I think certainly on the front

13    end if you know if a patient is in litigation about their

14    condition, you have to be wary and you have to clearly

15    define what your role is, if you're going to serve as a

16    treating physician or if you're going to serve as expert

17    testimony in litigation.  So yeah, I agree in that sense.

18    Sometimes it's hard to separate the two.

19          Q    If you were asked to serve as an expert in this

20    case and look at causation in the eyes of an expert, would

21    you have done an analysis to exclude factors such as Mr.

22    Washam having a lawsuit, whether or not Mr. Washam had a

23    personality disorder, whether or not Mr. Washam had given

24    you reliable statements in his medical history, things of

25    that kind?

1    MR. WOLFF:  Objection, leading, lack of

2  foundation.

3    A    Yes, and more likely, like I said earlier, I

4  wouldn't try to do both.  I would either, you know,

5  decline to offer any kind of expert testimony and treat

6  the patient, or more likely I would decline to treat the

7  patient and refer to other treating physicians.  I

8  wouldn't try to wear both hats if I knew on the front end

9  that that was what was expected or required.

10    Q    (BY MS. REIFERS) Would you have obtained more

11  information if you were asked to serve as an expert and

12  look at causation in this case?

13    A    Yeah, if I was approached to be an independent

14  expert to give testimony in this patient's care,

15  certainly.

16    Q    Tell me what type of information you would have

17  wanted to know to get to the bottom of causation in this

18  case if you were serving as an expert?

19    A    Well, injury reports, any kind of initial

20  treatment from the injury, treating records from other

21  physicians.  I mean, you would want a very thorough

22  evaluation.

23    Q    Were you provided with the treatment records of

24  Mr. Washam before he saw you other than an MRI?

25    A    No.

1    Q    So as we sit here today, you were never provided

2    the records from Nurse Practitioner Tamara Ward, the

3    person he saw days after this alleged fall, correct?

4    A    That's correct.

5    Q    Do you feel that you are able to give opinions

6    on causation in this case based on what you have in your

7    medical records?

8    A    I can give an opinion based on the subjective

9    reports and what I had as information.  I don't think that

10   would rise to the level of expert testimony.  It would

11   just strictly be facts about treating the patient.

12   Q    Those would simply be reports of Mr. Washam?

13   A    Yes.

14   Q    About what caused his accident, correct?

15   A    Yes.

16   Q    Dr. Gocio, have you ever been sued for medical

17   malpractice?

18   A    Yes.

19   Q    And how many times have you been sued for

20   medical malpractice?

21   A    Oh, I think the total is about 104, of which 84

22   were from the same action, the same group of patients.

23   They tried to get qualified as a class but couldn't, so

24   they sued individually case-by-case.  It's been called the

25   ortho block cases.

Page 65

1     Q   Was that a series of cases relating to you using

2  a ceramic disc?

3     A   Yes.

4     Q   In spinal surgery?

5     A   Yes.

6     Q   Was the allegation that the ceramic disc was not

7  approved by the FDA?

8     A   Yes, it was a failure of informed consent and

9  off-label use issue.

10    Q   Were any of those lawsuits resolved by jury

11  verdict?

12    A   I think three.  Well, two went to a jury; one

13  was declared a mistrial or was dismissed because the fact

14  witness failed to show up.  The plaintiff attorneys lied

15  to the court and said that the patient had had medical

16  problems while he was traveling in Scotland.  We went in

17  chambers, called the guy's office and he was sitting in

18  his office and said he didn't come because he didn't get

19  paid on the last two cases.  Two went to the jury.  One

20  was a judgment in federal court, that was the first one.

21    Q   Judgment for the patient?

22    A   Yes.  And the second was in circuit court.  That

23  was a judgment for the patient as well.  So two really

24  went to the jury and got a judgment.  Subsequently, the

25  cases were settled, the remaining cases were settled.

1    Q    And there were 84 of those disc block cases?

2    A    Yeah, I think there were 84.

3    Q    How many were settled, approximately?

4    A    80 plus, something like 81, 82.  It was -- it

5    took about ten years to work through all that.  I think it

6    finally resolved in 2002 or 2003, something like that.

7    Q    Has your license been investigated in Arkansas

8    with regard to your prescribing of prescription of

9    narcotics?

10   A    Ummmm --

11   Q    2014.

12   A    There were inquiries, but that was responded to,

13   and no actions were taken.

14   Q    As we sit here today do you know how frequently

15   Mr. Washam is taking hydrocodone?

16   A    His report to me is that he takes it frequently,

17   two to three times per week, that he go several days

18   without having to take the medication, that it's related

19   to activities and flareups of his pain.  That's my

20   recollection with our last visit.

21   Q    Do you have any understanding of the specific

22   job duties of Mr. Washam with the railroad?

23   A    A little bit.  He's described mostly prolonged

24   sitting, standing, walking over rough surfaces.  He's

25   described some occasional heavy lifting of parts of the

 1   train, the coupling mechanisms I think is how he described

 2   it.

 3        Q    We talked about Mr. Washam's pain being

 4   subjective, correct?

 5             MR. WOLFF:  Objection, repetitive.

 6        Q    (BY MS. REIFERS)  Correct.

 7        A    Yes.

 8        Q    Do you agree that any opinion of yours that Mr.

 9   Washam cannot return to his job at the railroad is based

10   solely on Mr. Washam's subjective reports of pain?

11        A    Yes.

12        Q    There's no indication medically that Mr. Washam

13   would reinjure himself by returning to his job, correct?

14        A    That's correct.

15        Q    Have all of your opinions today been to a

16   reasonable degree of medical certainty?

17             MR. WOLFF:  Objection, ridiculously overbroad

18   and vague.  It's unfair.  Lack of foundation.

19        A    That's by -- yeah, that's how I practice.  I try

20   to practice within a reasonable degree of medical

21   certainty for individual treatment of patients.

22        Q    (BY MS. REIFERS)  At any point in this

23   deposition when you weren't reasonably certain, did you

24   make an effort to qualify that statement?

25             MR. WOLFF:  Objection, leading, overly broad and

1    unfair to the witness.  You should've asked that question

2    at the beginning.

3         A    I believe so.  I've tried to be clear and

4    responsive.

5         Q    (BY MS. REIFERS)  Dr. Gocio, is there any topic

6    today in which you believe there's even the possibility

7    that your testimony was not to a reasonable degree of

8    medical certainty?

9              MR. WOLFF:  Objection, calls for speculation.

10        Q    (BY MS. REIFERS) I'd be happy to explore it.

11        A    No, I don't believe so.

12        Q    I believe your charge for deposition time is

13   $1800 for the first hour?

14        A    Yeah, that's -- that was set by the office

15   manager.

16        Q    You charge $900 for every 30 minutes after that,

17   correct?

18        A    Yes.

19        Q    Doctor, how many --

20        A    Now that, see, I'm a little confused.  I don't

21   know if I'm an expert or if I'm the treating physician.

22   I'm assuming I'm the treating physician.  Experts

23   typically charge more, so I'm assuming I'm the treating

24   physician and a fact witness, so, yes.

25        Q    Doctor, in all the patients you've seen in the

 1   past, have you ever ordered a personality disorder test

 2   before doing back surgery?

 3       A    Possibly.  Especially in situations where it was

 4   readily available, and there was concern about correlation

 5   of symptoms and symptom magnification.  But I don't think

 6   that's a frequent practice or has been a frequent practice

 7   of mine.  It's mainly the availability of that type of

 8   testing.

 9           We do minor types of exams mainly looking at the

10   patient's affect and their response to questioning and

11   response to an exam like the straight leg raise test.

12   Waddell's testing is a further test for symptom

13   magnification of low back pain, and I do that sometimes

14   when I have a suspicion that there may be some

15   exaggeration magnification of a patient's symptoms.

16           MS. REIFERS:  Those are all of the questions

17   that I have today.  Thank you for your time.

18           THE WITNESS:  Okay.

19           MR. WOLFF:  Doctor, we've been going for well

20   over two hours.  I would like to call for a break, and

21   then we can ask my questions.

22           THE WITNESS:  Okay.

23           THE VIDEOGRAPHER:  We're off the record at 6:46.

24           (BREAK FROM 6:46 TO 6:54)

25           THE VIDEOGRAPHER:  We're back on the record at

1    6:54.

2                    CROSS EXAMINATION

3    BY MR. WOLFF:

4        Q    Good evening, Doctor.  My name is Nelson Wolff.

5    I represent your patient Bradley Washam.  Have you had a

6    chance to walk around and catch your breath a little bit

7    following the two hours of questioning from the railroad's

8    lawyer?

9        A    Yes.

10       Q    So I'm here to ask you today questions so we can

11   present your testimony to the jury regarding the care and

12   treatment that you provided to Brad.  Before you came into

13   the deposition today, what were you doing?  Did you treat

14   patients today?

15       A    Yes, I saw patients in clinic today.

16       Q    So it's almost 7 o'clock in the evening now.

17   What time did you report to work, and how many patients

18   did you see?

19       A    Well, we start clinic patients at eight.  I

20   usually come a little early, so I was here probably by

21   7:15.

22       Q    So this is now a 12-hour day for you, and I

23   appreciate your patience to endure some additional

24   questions about this matter.  Now, there may have been

25   some confusion, but we have identified you in this case as

1    the court rules require as somebody who was involved in

2    treating Brad in providing care, providing surgery, and

3    providing some work restrictions.  Are all those things

4    that you have done in the ordinary course of your medical

5    practice?

6         A    Yes.

7              MS. REIFERS:  Objection, summarizes the pleading

8    as opposed to stating them exactly as they are written.

9    You may proceed.

10        Q    (BY MR. WOLFF)  Doctor, you were not retained

11   solely for the purpose of litigation in this matter by me

12   or on behalf of Brad, correct?

13        A    That's correct.

14        Q    You were contacted by Brad for the purpose of

15   evaluation and treatment alone.  Would that be an accurate

16   statement?

17        A    Yes.

18        Q    Did you understand that when he came to see you

19   and your office the first time that he had already been

20   evaluated and treated by a family doctor and by a physical

21   therapist, had seen a pain management doctor and had also

22   seen another surgeon?

23             MS. REIFERS:  Objection, misstates the medical

24   history.

25        A    I was aware that he had had evaluation and

Page 72

1   treatment.

2       Q    (BY MR. WOLFF) By way of background, your

3   education, are you qualified as a treating doctor to

4   testify as to whether or not your care and treatment for

5   Brad was all medically necessary and appropriate?

6       A    Yes.

7       Q    Do you have an opinion that the year of

8   treatment that you have provided Brad up to this date has

9   all been medically appropriate and necessary?

10          MS. REIFERS:  Objection.  Mr. Washam did not

11  provide full information to the Doctor.

12      A    I believe that my care and treatment based on

13  the information and evaluation of Mr. Washam, including

14  objective findings such as his imaging has been

15  appropriate and reasonable.

16      Q    (BY MR. WOLFF)  Are you also qualify based upon

17  your experience as a medical doctor and your training as a

18  surgeon to express opinions about the cause of

19  neurological and spine injuries?  Are you qualified to do

20  that?

21      A    Yes.

22      Q    Are you qualified by way of your experience and

23  education to prescribe appropriate physical limitations

24  and permanent restrictions for work?

25      A    Yes.

Page 73

1    Q    Are those some of the things that you've done

2    for Brad as part of your care and treatment?

3    A    Yes.

4    Q    I know that you have been handed some pages of

5    some of your medical records.  I would like to hand you a

6    set that I have marked as Plaintiff's Exhibit 20 and have

7    some page numbers written at the bottom that I hope will

8    help us go through your records, and I have also

9    highlighted in yellow some portions of the records that I

10   would like to address.

11          (WHEREUPON, Exhibit 20 was marked for

12   identification.)

13          MS. REIFERS:  Let's note for the record at this

14   time that the exhibits stopped at Exhibit No. 11.

15   Plaintiff's counsel is now identifying an Exhibit No. 20.

16   There will not be Exhibits 12 through 19.

17          MR. WOLFF:  I'm marking consecutively from all

18   depositions that I'm involved in in this case, and I

19   believe Defendants should do the same with letters, but

20   that's why I've marked it 20.

21   Q    (BY MR. WOLFF)  Doctor do you see in the first

22   page of this record that it establishes Brad as a new

23   patient for your clinic?

24   A    Yes.

25   Q    When you and your physician's assistant or your

1    nurse practitioner meet with a patient for the first time,

2    do you record a history of why the patient is there?

3         A    Yes.

4         Q    In addition to doing a physical exam and talking

5    to the patient, do you also have the patient fill out some

6    forms?

7         A    Yes.

8         Q    So you'll see that I have provided you on page

9    three through eight the patient forms that your office

10   provided Brad that he completed.  Do you see those?

11        A    Yes.

12        Q    Would you agree with me, sir, that nowhere in

13   here does it ask whether or not the patient has an

14   attorney or whether he has a claim or an on-duty injury or

15   any other kind of legal action?

16        A    Yes, that doesn't appear in the form.

17        Q    You provide treatment to patients that come from

18   all walks of life, isn't that right?  Patients who just

19   have developmental conditions and patients who suffer

20   traumatic injuries, correct?

21        A    Yes.

22        Q    So when you do ask a patient to fill out the

23   form, do you ask them in these forms to provide

24   information as to whether or not they are there because of

25   an injury or because of just an illness?

Page 75

1      A    Yes.

2      Q    So if you look at page four, please, do you see

3 what I've highlighted there that it specifically asked the

4 question who was the referring physician, and it was his

5 family doctor, Tamara Ward, or T. Ward.

6           MS. REIFERS:  Objection, mischaracterization of

7 Ms. Ward.  She's a nurse practitioner.

8      Q    (BY MR. WOLFF)  Do you see the indication in the

9 line asking for a physician and it says T. Ward?

10     A    Yes.

11     Q    In Arkansas are nurse practitioners qualified to

12 provide primary care treatment?

13     A    Yes.

14     Q    Then if you'd please go down to the question

15 that ask "was this due to an injury?" can you tell us what

16 was indicated in Mr. Washam's patient forms?

17     A    He stated that it was related to an injury and

18 went on to describe the injury briefly.

19     Q    Did he describe in those one and a half lines

20 that were provided that he fell off a railcar and landed

21 on the knuckle on my butt then onto the ground and that it

22 took place in Jonesboro, Arkansas at Anchor Packaging at

23 work?

24     A    Yes, that's correct.

25     Q    Does it indicate there in response to your

1    form's written question whether or not he saw another

2    healthcare provider, and in response to that, he

3    indicated, yes, Dr. Kevin Vaught at the Regional Brain and

4    Spine Clinic and also the Physical Therapy Works facility.

5    Do you see that?

6         A    Yes.

7         Q    Do you know Dr. Kevin Vaught who is in Cape

8    Girardeau?

9         A    Yes.

10        Q    Do you know him to be a spine surgeon, a neuro

11   spine surgeon like yourself?

12        A    Yes.

13        Q    Is he a qualified medical professional?

14             MS. REIFERS:  Objection, he can't speak to

15   another physician's qualifications.

16             MR. WOLFF:  He can if he knows him.

17        Q    (BY MR. WOLFF) Go ahead.

18        A    My recollection is that he is.

19        Q    Is it somewhat common for patients to obtain

20   second opinions before undergoing spine surgery?

21        A    Yes.

22        Q    So then let's turn back to the first page, and

23   is this part of the dictated record that's generated after

24   the patient has completed the forms and after he's been

25   examined?

1  A  Yes.

2  Q  Please read to us specifically what is reported

3 in the history of present illness?

4  A  The patient is here today as a new patient to

5 the clinic.  He brought MRI imaging of the lumbar spine

6 with him.  He has had back pain for quite some time.  He

7 states he fell back in March and has had worsening back

8 pain since that time.

9  Q  Can I stop you just right there, Doctor?  You

10 were asked some question about whether or not Brad had

11 ever reported or indicated that he had ever had any back

12 pain before the date of the incident.  Would you agree

13 with me that in this notation and in the patient history

14 form that there is zero indication that Brad had ever had

15 any back pain before the date of the incident in March,

16 which was about three months before he came to see you?

17    MS. REIFERS:  Objection, vague as to what

18 worsening means in the context of the sentence as written

19 in the history.

20  A  There's no specific mention of preexistent back

21 pain, but my assumption was that he had had some degree of

22 back pain in the past based on reviewing this notation.

23  Q  (BY MR. WOLFF)  But you would defer to what the

24 records actually provide and what Brad's actual history

25 is?

1      A    Yes.

2      Q    So if we look at what literally is written here,

3   it simply says that he has had back pain for quite some

4   time.  It doesn't say how many months.  It doesn't say

5   whether it's even years, correct?

6      A    That's correct.

7      Q    So when you say quite some time, what you do

8   know is that he had reported to your office that he had

9   back pain from a traumatic injury while working for the

10  railroad three months before he came to see you.  Is that

11  an accurate summary?

12     A    Yes.

13     Q    Then he tells you that he has had worsening back

14  pain since that time, correct?

15     A    That's correct.

16     Q    Does that help clarify the time relationship

17  here?

18          MS. REIFERS:  Objection, asked and answered.

19     A    It still seemed a little vague to me.  I felt my

20  impression was that he had had some degree of back pain,

21  but that he had had worsening since his fall.

22     Q    (BY MR. WOLFF) All right, we'll get back to that

23  in a moment.  Then did he also report some other symptoms

24  in addition to just pain in his back?

25     A    Yes, he reported bilateral leg pain, worse pain

Page 79

 1    on the right side.

 2         Q    He told you that he'd gone through six weeks or

 3    more of physical therapy?

 4         A    Yes.

 5         Q    Physical therapy actually caused his symptoms to

 6    get worse?

 7         A    Yes.

 8         Q    He had tried anti-inflammatory medication as

 9    well as prescription pain meds and muscle relaxers, was

10    evaluated by a neurosurgeon and has undergone SI joint

11    injections as well as blocks in the lumbar spine.  None of

12    this has any great relief in pain for the patient, and he

13    would like to discuss surgical options.  Do I read that

14    part correctly?

15         A    Yes.

16         Q    Would you characterize the treatment that Brad

17    received from his primary care doctor, the evaluation from

18    the other neurosurgeon, the physical therapist and these

19    injections as being conservative medical treatment?

20              MS. REIFERS:  Objection.  Dr. Gocio has not seen

21    the medical records of the primary care physician or Dr.

22    Vaught.

23         A    As described in this initial evaluation, it did

24    appear to be standard nonsurgical treatment for the

25    patient's condition.

1      Q    (BY MR. WOLFF)  Are those the types of

2  modalities or treatments that are conservative that you

3  provide to many of your patients before you recommend

4  surgery?

5      A    Yes.

6      Q    Is it your opinion to a reasonable degree of

7  medical certainty that the conservative care and treatment

8  provided Brad based upon his history was medically

9  appropriate and reasonable in light of his condition?

10     A    Yes.

11     Q    Then there's an indication of a physical

12  examination.  Why does your office -- why do they perform

13  that kind of exam?  What's the importance of it?

14     A    That's to focus on the patient's general

15  physical condition and also specifically on findings that

16  would relate to his chief complaint, which is low back,

17  hip, and leg pain.

18     Q    Is it a consistent part of your office's

19  practices that when conducting a physical examination of a

20  spine patient that you try to assess whether or not the

21  patient is giving full effort and is providing consistency

22  of response?

23     A    Yes.

24     Q    If there's some concern of exaggeration or

25  inconsistency, is that something that your office would

1   typically note in the records?

2        A    Yes.

3        Q    Based upon your review of the record now and

4   during the two hours before with the railroad lawyer's

5   questioning, is it accurate to say, Dr. Gocio, that

6   there's never been any notation from your office that Brad

7   was ever suspected of exaggerating any symptoms of his

8   pain?

9        A    I don't recall any notations to that effect, and

10  I don't recall any impressions on my part that there was

11  symptom magnification or exaggeration of symptomatology.

12       Q    Was Brad compliant with all of your treatment

13  recommendations?

14       A    Yes.

15       Q    Did he appear to you to be motivated to follow

16  your recommendations?

17       A    Yes.

18       Q    Did Brad talk to you about wanting to go back to

19  work as a result of treatment that you provided?

20       A    Yes.

21       Q    So I know we're jumping ahead a little bit, but

22  was the goal of the treatment to try to put him in

23  condition to have a reduction of pain and to allow him to

24  return to work?

25       A    Yes.

1    Q    Sometimes patients who you treat even with good

2    technical surgery outcomes are not able to return to work;

3    is that a fair statement?

4    A    Yes.

5    Q    Based upon the physical examination and the

6    findings of a painful range of motion with the low back

7    and positive straight leg testing, based upon that history

8    and the review of the MRI, were you able to make a

9    diagnosis to a reasonable degree of medical certainty?

10   A    Yes.

11        MS. REIFERS:  Objection.  He didn't perform the

12   examination on June 6, 2019.

13   Q    (BY MR. WOLFF)  Is it common for neurosurgeons

14   to rely upon physical examinations conducted by their

15   nurse practitioners?

16   A    Yes.

17   Q    There was some questioning asked of you

18   challenging you about whether or not you were even there

19   for that initial evaluation.  Do you remember those

20   questions?

21   A    Yes.

22   Q    If we look down into the paragraph below the

23   assessment and plan, do you see there that it says MRI

24   reviewed with Dr. Gocio?

25   A    Yes.

1      Q    And then do you see a couple of lines down that

2    this -- let's go right after that.  After your review of

3    the MRI, then there's a note that the patient has lumbar

4    spine stenosis.  There also appears to be more of an acute

5    disc herniation at L4-5 level.  This was also discussed

6    with the patient, and surgery was offered.  We offered

7    laminectomy at L3, four and five.  Did I read that

8    correctly, doctor?

9      A    Yes.

10     Q    By the use of the pronoun "we," does that

11   refresh your recollection or is that consistent with your

12   recollection that you actually did meet with Brad during

13   that initial evaluation to discuss these things with him?

14        MS. REIFERS:  Objection, misstates the record.

15     A    I do recall meeting with Mr. Washam discussing

16   that MRI scan, in fact showing the images to Mr. Washam,

17   so that would be consistent with my recollection.

18     Q    (BY MR. WOLFF)  Does a dictation always note

19   every single thing that is discussed or done during the

20   context of an initial evaluation?

21     A    No.

22     Q    The diagnosis is back pain with radiculopathy

23   and herniation of the lumbar disc, correct?

24        MS. REIFERS:  Objection, misstates this doctor's

25   testimony in this deposition today.

1    Q    (BY MR. WOLFF)  Was that your documented

2    assessment in the initial evaluation?

3    A    Yes, I felt that the patient had a significant

4    disc herniation that was consistent with his reports of

5    abrupt onset of symptomatology and worsening over time.

6    Q    Dr. Gocio, you've been here giving answers to

7    questions for approaching three hours.  I'm going to hand

8    you a model of the spine.  Can you take that, please, and

9    show it to the video camera so that we can understand what

10   we're looking at as a basis to explain to the jury to help

11   them understand all of these terms.  What are we looking

12   at here?

13   A    This is a model of the human spine.  It shows

14   the pelvic bones that are attached above the hip joints,

15   and this is the lumbar spine area.  This is the sacrum, or

16   the tailbone, and it represents the spinal nerves as they

17   exit the spine and travel down to the hip, leg, and foot

18   area.

19         These are the disc spaces between the vertebrae,

20   and these are the spinal joints or facet joints along with

21   the spinal lamina, which is the back part of the spine.

22   Q    So in between each bony vertebrae, is there an

23   intervertebral disc?

24   A    Yes.

25   Q    When you made a diagnosis of an acute disc

1    herniation at the L4-5 level, can you point out where on

2    the model that was located?

3         A    That would be at this level here, and the disc

4    herniation was large, central disc herniation.  So it was

5    in the middle of the spinal canal or the spinal space.

6         Q    In this model do you see an example of a

7    herniated disc on the right side at the level above?

8         A    Yes.

9         Q    So would it be that type of image but just one

10   level lower and in the middle back part of the spine where

11   the nerves are?

12        A    That's correct.

13        Q    What can happen to the nerves when you have a

14   disc that herniates or ruptures?  What kind of symptoms

15   can you get?

16        A    The symptoms can be severe back pain, hip and

17   leg pain.  Over time the back pain may gradually decrease.

18   However, the hip and leg pain can worsen or increase.

19   There's kind of variations within that.  The back pain may

20   continue to be severe, especially a central disc

21   herniation can have continued ongoing back pain as a big

22   part of the symptomatology.

23        Q    In summary, Dr. Gocio, were the symptoms that

24   Brad reported to you that were tested and your office's

25   physical examination consistent with your diagnosis based

Case 3:19-cv-00231-RGB Document 108-4 Filed 08/27/20 Page 86 of 183
Case 3:19-cv-00231-RGB Document 99-3 Filed 08/27/20 Page 86 of 183

Page 86

1    on the MRI of a herniated disc at the L4-5 level?

2          MS. REIFERS:  Objection.  Misstates the doctor's

3    earlier testimony.

4      A    Yes, the symptoms and patient's complaint as

5    well as the findings on exam were consistent with the

6    spinal stenosis and the disc herniation.

7      Q    (BY MR. WOLFF)  You've mentioned the L and 4-5

8    level.

9      A    Yes.

10     Q    How many different lumbar vertebrae are there,

11   and then how are they numbered when you talk about them?

12     A    There's five lumbar vertebrae typically in the

13   average patient.  The intervertebral disc is named for the

14   vertebra above and below the disc space.  This is the L4

15   vertebra.  This is the L5 vertebra.  Those are also called

16   spinal segments.  The spinal level is the disc space level

17   between the two vertebrae, so this would be L4-L5 level.

18   There's some older nomenclature that's even more

19   confusing, so the disc is denoted in its anatomic

20   placement between the two numbered vertebrae; in this case

21   the L4-5.

22     Q    Is it generally accepted neurosurgical practice

23   that before you make a recommendation to do surgery that

24   you do exactly what you've done here, take a history from

25   the patient, conduct a physical exam, evaluate the history

1  as well as the imaging such as an MRI?  Is that typical?

2      A    Yes, that's a typical approach.

3      Q    Why did you recommend to Brad to do the kind of

4  surgery that you performed?

5      A    I felt that the correlation of the

6  symptomatology, the physical findings and the imaging

7  along with the history of the patient that surgical

8  treatment could be beneficial to him, and I recommended

9  that to him.

10      Q    Based upon -- excuse me.

11          Notwithstanding all the questioning from the

12  railroad's lawyer earlier in this deposition, have you

13  been shown any other medical records or any other

14  documents that cause you to question the history that Brad

15  reported to you of having injured his low back when he

16  fell while working for the railroad?

17      A    No.

18      Q    Before I ask you about the surgery that you did,

19  you mentioned in the history SI joint injections and

20  blocks in the lumbar spine.  Pulling up the model one more

21  time, can you show the jury where the SI joints are and

22  what that SI stands for?

23      A    This is the sacroiliac joint, and it can have

24  arthritic degenerative changes.  Also traumatic injury to

25  the sacroiliac joint can cause pain in the lower lumbar or

1    gluteal area, and the sacroiliac joint problems can mimic

2    problems in the lumbar spine to an extent.  The pain that

3    radiates down the leg, what we call radiculitis or

4    sciatica, typically is not associated with sacroiliac

5    joint problems, but low back pain, gluteal pain, hip pain

6    is the way some people describe it, can be associated with

7    either lumbar problems or sacroiliac problems.

8            So the sacroiliac blocks are partly diagnostic

9    to determine if that's the source of pain and also can be

10   therapeutic if utilized with local anesthetics,

11   long-acting anesthetics and steroid injections.  So the

12   sacroiliac joint injections can be part of the treatment

13   plan, especially early on with acute low back pain with

14   radiation into the hip and legs.

15       Q    You can go ahead and put that down now, thank

16   you.  Let me hand you what I've marked as Exhibit 21.

17   This is a series of illustrations regarding pain

18   management treatments and an illustration of pain and

19   radiculopathy.  Is this a type of illustration that could

20   be helpful to explain to the jury the symptoms that Brad

21   experienced as well as the conservative injections that he

22   had before you recommended surgery?

23           (WHEREUPON, Exhibit 21 was marked for

24   identification.)

25       A    Yes.

1      Q    If you can turn that to the camera and then

2   using your pen just kind of point, does the illustration

3   on pain and radiculopathy on the top left of that does

4   that show some of the same things you were just explaining

5   from the model about how you can have a pinching of the

6   nerve in the low back that affects symptoms in the leg?

7      A    Yes.

8           MS. REIFERS:  Objection.  This doctor can't give

9   testimony on the injections.  He hasn't seen the medical

10  records from those injections and how they were

11  administered and where.

12     Q    (BY MR. WOLFF)  Doctor, is it true that when a

13  the patient has a herniated disc at the L4-5 level that it

14  can impinge upon the nerves that go into the leg?

15     A    Yes.

16     Q    In fact, was that the diagnosis you made after

17  you personally reviewed the MRI films?

18          MS. REIFERS:  Objection, misstates the doctor's

19  testimony in this case.

20     A    Yes.

21     Q    (BY MR. WOLFF)  Is a facet injection very

22  similar to a medial branch block?

23     A    Yes, the facet injection is in the same area.

24  The medial branch is a specific nerve that supplies the

25  facet joint with the sensory innervation.  Some pain

1    physicians will inject directly into the joint capsule of

2    the facet joints.  Others will do the nerve block to try

3    to achieve the same result, to numb the facet joint and

4    diagnose if that is the source of the patient's back pain

5    and other symptoms.

6         Q    So are both of those types of injections similar

7    in the sense that a needle is inserted into the patient's

8    body, either into the spine area or into the SI joint?

9         A    Yes.

10        Q    The purpose is to try to see if there can be

11   some improvement in symptoms as well as to help diagnose

12   the problem?

13        A    Yes.

14        Q    All right, thank you.  The surgery that you

15   performed on June 20 or the week of June 20, and I believe

16   the date of the surgery was the 26th, but did you have

17   Brad get seen for a preop visit to make sure he was in

18   general good health to have surgery?

19        A    Yes.

20        Q    Page 13 is the operative report.  It also has a

21   surgical pathology report on page 15, and so let me just

22   pause for a moment, Doctor.  You've made the diagnosis and

23   you explained your opinion based on the MRI that there was

24   a herniated disc.  In the course of doing the surgery for

25   Brad, were you able to confirm what you had interpreted on

Page 91

1    the MRI, that there was in fact a herniated disc at that

2    level?

3         A    Yes.

4         Q    Was that herniated disc impinging upon the nerve

5    so as to be consistent with the symptoms that Brad

6    reported?

7              MS. REIFERS:  Objection, misstates the medical

8    records.

9         A    Yes.

10        Q    (BY MR. WOLFF) Is this a significant spine

11   surgery?

12        A    Yes, this is -- I characterize it as a

13   medium-size spine surgery.  It's larger than a

14   microdiscectomy, usually requires two to three-day stay in

15   the hospital, takes about six or eight weeks to heal up

16   from the surgery itself, and then additional treatment is

17   based upon the patient's symptoms and condition.

18        Q    Is the field of neurosurgery highly specialized?

19        A    Yes.

20        Q    Compared to all medical doctors, would you agree

21   that a very small percentage of all medical doctors

22   qualify to be neurosurgeons?

23        A    No.

24        Q    You agree or you don't agree?

25        A    Repeat the question, I'm sorry.

Page 92

1      Q     That's okay.  I've given you the records to take

2   a look at, and I'm asking you questions.  Is it accurate

3   to say that a very small percentage of all medical doctors

4   ever qualify to be neurosurgeons?

5           MS. REIFERS:  Objection.

6      A     Yes.

7           MS. REIFERS:  Lack of foundation.

8      Q     (BY MR. WOLFF)  Is this what you went to medical

9   school to do over 40 years ago and even after medical

10  school, did you do six years of additional training in the

11  field to qualify as a neurosurgeon?

12     A     Yes.

13     Q     Are you certified by the American Board of

14  Neurosurgeons?

15     A     Yes.

16     Q     Have you treated patients in Arkansas, Missouri

17  Illinois and Kentucky over a period of 40 years as a

18  medical doctor?

19     A     Yes.

20     Q     Over 24 years in the state of Arkansas alone?

21     A     Yes.

22     Q     I don't think you were asked about this but, Dr.

23  Gocio, have you also served as a professor of neurosurgery

24  at the University of Arkansas Medical Sciences?

25     A     Yes.

1    Q    Have you been a chief of surgery at Arkansas

2    Veterans Hospital?

3    A    Yes.

4    Q    So utilizing all of that training and all of

5    that experience, did use that to try to get Brad the best

6    possible outcome of his surgery?

7    A    Yes.

8    Q    Before surgery do you provide a patient like

9    Brad with a list of warnings so that you can obtain an

10   informed consent?

11   A    Yes.

12   Q    Do you warn patients like Brad that there can be

13   bad complications?  You could get permanent nerve damage,

14   you could die from the anesthesia, you may get worse

15   symptoms, and you may get better?

16   A    Yes.

17   Q    Was the surgery done at the Baxter Regional

18   Medical Center?

19   A    Yes.

20   Q    Was it done over a period of time that required

21   Brad to be hospitalized approximately two full days?

22   A    Yes.

23   Q    Have you literally done hundreds of these types

24   of surgeries in your career?

25   A    Yes.

Page 94

1      Q    Is it done under general anesthesia with a team

2    of other medical professionals at the hospital?

3      A    Yes.

4      Q    You have an anesthesiologist, you have some

5    nurse assistants and things like that?

6      A    Yes.

7      Q    Let me hand you what I've marked as Exhibit 22.

8    Here you go.  These are some illustrations that I've had

9    prepared.  Do those fairly and accurately describe some

10   aspects of your surgery, and would those be helpful to

11   explain?

12            (WHEREUPON, Exhibit 22 was marked for

13   identification.)

14      A    Yes.

15      Q    So if you can turn that and hold it as still as

16   possible while still using it --

17            MR. WOLFF:  Are you able to get that?

18      Q    (BY MR. WOLFF)  Okay.  So then on the left we

19   have preoperative condition.  Just explaining on a

20   close-up level, does that show where the herniated disc is

21   impinging upon the nerve that's coming out of the L4-5

22   area?

23      A    Yes.

24      Q    On the bottom of the left side it shows a top

25   cutaway view, so that's if you slice Brad along the waist

1    and you look down on top of his spine?

2         A    Yes.

3         Q    Does that identify adequately the components of

4    the disc which is an outer ring called the annulus

5    fibrosis?

6         A    Yes, there was a broad-based herniation of the

7    disc, centrally elevating the posterior ligaments and also

8    compressing the nerves bilaterally.

9         Q    So is disc material something that can be

10   damaged in a traumatic fall?

11        A    It can.

12        Q    If it does, does it rupture out the material

13   that comes and extrudes outside the annulus fibrosis and

14   presses upon the nerves?

15        A    It can.

16        Q    Is this illustration consistent with what you

17   saw on the MRI and with what you saw during the surgery?

18        A    Yes.

19        Q    If we move over to the technical surgery aspects

20   on the right side, the first thing you do is you make an

21   incision in his low back to expose and move aside the

22   muscles and the tissues?

23        A    Yes.

24        Q    Is that generally the kind of view that you

25   would see?

1      A     Yes.

2      Q     Is then the next part of the surgery to actually

3   start chipping away with a surgical tool to remove the

4   lamina part of the vertebrae?

5      A     Yes.

6      Q     What's the reason why you remove the bone?

7      A     The bone is removed for a couple of reasons.

8   One is to give you access to the spinal space where the

9   spinal nerves are to decompress the nerves and also remove

10  any disc material that needs to be removed from the spinal

11  canal.  In Brad's particular case, he had spinal stenosis,

12  or narrowing of the spinal column, and I did additional

13  levels because of the spinal stenosis.  That was

14  exacerbated by the disc herniation, the condition of the

15  spinal stenosis.  The spinal stenosis makes a thorough

16  discectomy more difficult because of the narrow space, so

17  many surgeons, myself included, will do more extensive

18  bone removal to facilitate removal of the disc and

19  exploration of the spinal canal.

20     Q     In your operative report, you noted that during

21  the dissection the patient was found to have a disrupted

22  interspinous and supraspinatus ligament at the L5 S1

23  consistent with his history of recent trauma.  Can you

24  point out what that is and what that means and why it's

25  consistent with his recent trauma report?

1    A    The interspinous ligament is ligaments between

2    the spinous process or the peak of bone on the backside of

3    the lamina, and we see disruption, tearing, chronic

4    changes in the interspinous ligaments in patients that

5    have had spine trauma.

6    Q    So then the illustration in C identifies

7    discectomy was performed at the L4-5 level.  Is that

8    basically where you go in there with another surgical tool

9    and you're removing the part of the disc that has

10   extruded?

11   A    Yes, remove the extruded portion and then any

12   remaining loose portions of disc material within the disc

13   space.

14   Q    Do you also remove bone fragments that are there

15   and that may still be in the space after you've cut away

16   the lamina part of the vertebrae?

17   A    Yes.

18   Q    Now some patients that you remove disc material,

19   do you do a fusion?

20   A    Indications for a fusion are variable,

21   especially patients with spinal instability that have

22   spinal tumors that destabilize the spine or that have had

23   spinal trauma disrupting the normal ligamentous and bony

24   structure of the spine and is the usual indication for

25   fusion.  Additional indication for fusion is patients that

1    have severe degenerative disc disease with low back pain

2    that is chronic and severe in nature that has failed to

3    improve with nonsurgical measures, and that is somewhat

4    controversial still to this day.  The outcomes are less

5    predictably good than, say, for an acute disc rupture like

6    Mr. Washam had.

7        Q   So when we look at that preoperative top view of

8    the disc that's herniated, you have described going in

9    there and carefully trying to remove the extruded portion

10    of the disc.  Does that change the original anatomy of the

11    disc and make it more susceptible to having additional

12    herniations?

13        A   Yes, recurrent disc herniation is a possibility.

14    Additionally, further degeneration of the disc space can

15    lead to chronic back pain and additional surgery, possibly

16    fusion surgery.

17        Q   So when the disc is ruptured like it was in

18    Brad's case from this incident, is the annulus fibrosis

19    disrupted and can be more susceptible to allowing the

20    inside part of the disc to come out and press on the

21    nerve?

22        MS. REIFERS:  Objection, misstates the medical

23    records and the testimony of the Doctor during the

24    deposition.

25        A   Yes.

1     Q    (BY MR. WOLFF) Is that risk even greater if a

2    patient is exposed to physical forces and trauma?

3          MS. REIFERS:  Objection, misstates the testimony

4    and legal records -- medical records, excuse me.

5     A    It's unclear the role that trauma plays in

6    recurrent disc herniations.  Some patients do report disc

7    herniations or new onset of pain associated with injury,

8    but there also are a number of patients that do not have

9    subsequent injury or trauma and have recurrent disc

10   herniation.  So it's unclear the association with activity

11   and recurrent disc creation.

12    Q    (BY MR. WOLFF)  Is one of the functions of the

13   disc in between the vertebrae to be a shock absorber for

14   the spine?

15    A    Yes.

16    Q    So even though it can handle ordinary forces, if

17   a patient falls and lands on his butt, can that expose the

18   disc to forces beyond its capacity that lead to a rupture?

19    A    Yes.

20    Q    In any case, even though some patients who have

21   disc material removed from a herniation get worse and

22   require another surgery, others do not, at least with

23   respect to Brad, is he at increased risk for having

24   recurrent disc herniations compared to somebody who's

25   never had a herniation?

Page 100

1      MS. REIFERS:  Objection, not contained in the

2  medical records of the Doctor.

3      A    Yes, he would be at risk for recurrent disc

4  herniation or other disc problems at the operative level.

5      Q    (BY MR. WOLFF)  Let's go ahead and put that

6  illustration down for a moment and go back to the records

7  on page 16.  This is a progress note from the hospital

8  folks that says he was seen on rounds postoperatively one

9  day after a large open lumbar decompression.  He states

10  overall his leg pain has improved.  Is that a successful

11  marker that your surgery did some of what it intended to

12  accomplish?

13      A    Yes.

14      Q    Because you removed the pressure on the nerve,

15  is that more objective evidence that Brad's symptoms were

16  being caused by the herniated disc?

17      MS. REIFERS:  Objection, misstates the medical

18  records.

19      A    Yes.

20      Q    (BY MR. WOLFF) It says he has postsurgical back

21  pain.  Is that very typical after the general anesthesia

22  wears off from a patient after this kind of surgery?

23      A    Yes.

24      Q    Do you prescribe pretty significant narcotic

25  pain medication for the comfort and humanity of the

Case 3:19-cv-00231-KGB Document 108-4 Filed 09/10/20 Page 101 of 183

Page 101

1    patient?

2        A    Yes.

3        Q    He states that the muscle relaxers have helped

4    as well as the oral pain medication.  He still has a

5    significant amount of pain with any movement.  Is that

6    also typical?

7        A    Yes.

8        Q    But is that part of the postoperative care that

9    the nursing staff tries to provide is to get the patient

10   moving as soon as possible?

11       A    Yes.

12       Q    So in order to do some help for the patient,

13   there has to be some pain, agreed?

14       A    Yes.

15       Q    It says he has not had any IV pain medication

16   and a Foley catheter was removed.  So does that mean

17   during the surgery or before the surgery that a tube had

18   to be inserted into his penis to help him urinate after

19   the surgery?

20       A    Yes.

21       Q    And he is awake and well aware when a nurse has

22   to come in and pull that tube out of his penis?

23       A    Yes.

24       Q    Then let's go to the next page.  This is a

25   discharge summary, so two days after the surgery and the

1    hospital admission there's a document that's created that

2    indicates he's being let go from the hospital but that

3    he's being prescribed medications to help manage some of

4    the symptoms of pain, correct?

5         A    Yes.

6         Q    What are these medications, do you know?

7         A    The pain medication and muscle relaxants are

8    listed, methylcarbinol is a muscle relaxant, Norco

9    hydrocodone is a pain medication.

10        Q    For patients who have this kind of surgery, do

11   you also provide them with activity limitations to protect

12   their spine so that it can heal?

13        A    Yes.

14        Q    In this case on page 18 it indicates you told

15   him do only light activity at home, no work, and no

16   lifting more than five or ten pounds and no driving for

17   two weeks, correct?

18        A    Yes.

19        Q    Why the no driving part?

20        A    Well, that's an uncontrolled situation where a

21   patient may have to move quickly, twist, turn their hips

22   and legs to control the vehicle.  Certainly would be at

23   risk operating a motorized vehicle if they're taking pain

24   medication, muscle relaxants in combination, so we

25   restrict driving for several reasons, particularly to

1    protect the patient and others.

2        Q    Were some X-rays taken after the surgery to

3    compare to before?  Let me just ask you this way.  Did you

4    have some X-rays taken after the surgery?

5        A    Yes, I'm sure he's had follow-up X-rays.

6        Q    Just by way of illustration so we can see what

7    his back looked like afterwards, I'm going to hand you

8    what I've marked as Exhibit 23, and these are X-rays that

9    were provided by your office from before the surgery on

10   June 6, 2019 and then later in March of 2020, so just four

11   months ago, correct?

12            (WHEREUPON, Exhibit 23 was marked for

13   identification.)

14       A    That's correct.

15       Q    I'm going to hand you what will be considered to

16   be 23a.  This is a little bit enlarged version of the same

17   thing.

18            (WHEREUPON, Exhibit 23a was marked for

19   identification.)

20       A    Okay.

21       Q    It might be easier for you to explain to the

22   jury so that they can see with their own eyes the effects

23   of your surgery.  If you can, turn it just a little bit

24   further towards the camera.

25       A    Okay.  So this is the preoperative X-ray showing

1    the vertebral segments, the iliac bone or hip bones

2    bilateral there.  Here's the sacrum.  This is the L5, L4,

3    L3 vertebrae.  The spinous process which extends backward

4    from the spine towards the back of the body appears as a

5    small image there you can see.  Also the lamina, it's a

6    little bit difficult to see, but the lamina supports the

7    spinous process.

8           This is the postoperative film that shows the

9    absence of the lamina and spinous process, and you can see

10   this dark space where there's less bone because the bone

11   has been removed.  So that shows the three-level

12   laminectomy at L3, L4, and L5.

13      Q    Given the removal of that bony armor, is the

14   spinal canal at a greater risk of being injured?

15      A    That is fairly unlikely.  The spinal

16   musculature, the skin, the soft tissue over the spine is

17   very thick.  The spinal structures in the average adult

18   male are pretty deep down inside, so there's very little,

19   if any, mention of spinal injuries associated with

20   laminectomy.  That's one reason that laminectomy is

21   considered a safe surgical procedure.

22      Q    One of the purposes or one of the functions of

23   having a lamina the way that God has created us is that it

24   does provide additional protection of the spinal canal,

25   correct?

1      A    It does.

2      Q    Do you expect that the lamina is just going to

3  grow back to the way it is preoperatively, or is it

4  generally going to stay the same that you see?

5      A    No, it would stay the same.  We wouldn't expect

6  the lamina to reform.

7      Q    Thank you, Doctor.  Let's return to your

8  postoperative records, so two weeks afterwards he comes

9  back to see you.  Page 19?

10      A    Yes.

11      Q    He noted some improvement in the surgical pain

12  and his leg pain has resolved, although he has some hip

13  pain, correct?

14      A    Yes.

15      Q    He has some pain along the incision and he has

16  continued muscles spasm.  Why would a patient continue to

17  have muscle spasm during that period of time?

18      A    That would be from the irritation of the muscles

19  from the healing, also the surgery itself.

20      Q    That's a traumatic surgery, isn't it, and takes

21  time for patients to heal?

22      A    Yes.

23      Q    Is it a fairly long scar?

24      A    Yes.

25      Q    Did you feel it was appropriate to continue him

1  on the pain medication?

2      A    Yes.

3      Q    There's been a lot of discussion about pain

4  medication.  Despite all of the boogeyman types of risks

5  that were discussed in an article written by one person,

6  why is it that you feel that it was still medically

7  appropriate and reasonable to prescribe Brad Washam with

8  narcotic pain medication during the course of all your

9  treatment?

10     A    I felt like he required the medication because

11  of his residual symptomatology and also, of course, the

12  recuperation from the surgical procedure itself, and I

13  feel that the medication was necessary for his comfort and

14  activity level after surgery.

15     Q    Is that part of what doctors are trained to do

16  ethically is to care for the patient and try to help them

17  to reduce pain?

18     A    Yes.

19     Q    Do you know of any ethical doctor that would

20  tell a patient right after surgery don't have any pain

21  medication if you're still having pain?

22     A    No.

23     Q    Then you prescribed physical therapy to begin in

24  two weeks but continue with his lifting restrictions.

25  What's the purpose of the physical therapy?

1     A    That's to try to decrease the muscle spasm, the

2    tenderness, the swelling in the low back area.  Also to

3    try to increase the patient's mobility following surgery

4    to promote healing of the surgical area.

5     Q    Did the therapist periodically send you notes

6    evaluating how he is progressing?

7     A    They do.

8     Q    Based upon your recollection and the review of

9    records that you've done here today, do you recall ever

10    seeing a note from a single physical therapist who ever

11    said Brad wasn't trying hard to get better?

12     A    No.

13     Q    Were all the reports consistent with what you

14    had seen, which is that Brad was compliant with the

15    recommendations?

16     A    Yes.

17     Q    You followed up with him on multiple times

18    afterwards, and let's go to the report from September 5,

19    which is on page 27.  This is about two and half months

20    after the surgery.  He also started a home exercise

21    program.  Is that just another way of trying to help him

22    get the best recovery that he can?

23     A    Yes.

24     Q    There's a note there that says he does have some

25    occasional sciatica, right lower extremity numbness is

1   still present as expected.  Why is that kind of symptom

2   expected even almost two months after surgery?

3        A    There is some nerve irritation, nerve swelling

4   as part of the healing process and the resolution of the

5   surgical changes, the postop bleeding, hematoma, et

6   cetera, so that is not unusual.  The sciatica can be an

7   indicator of additional problems in the spine, could be an

8   indicator of infection, bleeding, other delayed

9   complications from the surgery, facet fracture, spine bone

10  fracture, recurrent disc rupture.

11        So the sciatica is a monitor for those sorts of

12  things.  It's not unusual to have intermittent sciatica

13  even after surgery and still have a good outcome or result

14  with the patient, but it's something you consider and

15  monitor during the postoperative period.

16       Q    Would you please go back to page 23?  That was

17  the visit just before this.  In the subjective part of the

18  report there, the last line it does say that Brad has been

19  able to taper down his narcotic pain medication and

20  instead was taking tramadol intermittently, correct?

21       A    Yes.

22       Q    Is that something that you like to see?

23       A    Yes.

24       Q    As a patient increases activity like Brad was

25  after this surgery, is it sometimes seen that their pain

Page 109

1   does increase?

2          A    It can.

3          Q    So let's go forward to the September 5, 2019

4   office visit that we were looking at just a moment ago.

5   He noted the occasional sciatica but then did he mention

6   that there was something that had aggravated his problems

7   at that visit?

8          A    Let's see, we're on?

9          Q    Page 27.

10         A    He had had increased pain with a car trip

11  driving for approximately three hours, also increased low

12  back, hip, and leg pain at that time.

13         Q    So that was an indication to you that he was not

14  ready to return to work for the railroad?

15         A    Yes.

16         Q    Is this the type of information that you want to

17  hear from your patients as to how they're doing and how

18  they're responding to an increase in activities that you

19  want them to do?

20         A    Yes.

21         Q    So in light of that, did you schedule and have

22  another follow-up with Brad two months later in

23  November 2019?

24         A    Yes.

25         Q    That's on page 31.  In the subjective part

Page 110

1    there, he reported that he's only requiring hydrocodone

2    when the pain is severe and then still taking the tramadol

3    for less severe pain?

4         A    Yes.

5         Q    He had gradually increased his activity with a

6    30-pound lifting and had been doing some light work around

7    the house and around the farm, but he had not yet operated

8    farm equipment, correct?

9         A    Yes.

10        Q    Did he report to you that prolonged sitting and

11   driving of anything more than an hour was increasing his

12   back and hip pain on both sides?

13        A    Yes.

14        Q    The pain he reported was increased with lifting,

15   twisting, stooping, and bending.  Is that consistent with

16   what you talked about before, due to the changes that you

17   performed on his back during the surgery?

18        A    Yes.

19        Q    There's a note here about initiating an opioid

20   treatment agreement.  Is that something you do with all of

21   the chronic pain patients who are taking narcotic

22   medication?

23        A    Yes.

24        Q    Essentially does that say they promise not to

25   try to get pain medication from multiple sources and not

Page 111

1   to abuse the medication?

2       A    Yes, it speaks to taking the medication as

3   prescribed and having a single provider for those

4   medications.

5       Q    Do you also check to make sure the patient is

6   not losing their medication or accidentally flushing it

7   all down the toilet so that they can come in and get new

8   medications before it's due?

9       A    Right.

10      Q    Do you recall a single incident where Brad ever

11  came up with some kind of excuse for needing more pain

12  medication before it was actually due at your visit?

13      A    Yes.

14      Q    You never had an incident like that, did you?

15      A    No.

16      Q    So even in November, so here we are, we're

17  approaching the five-month mark, you told him to stay off

18  of railroad work due to 12-hour shifts, prolonged sitting

19  in close quarters, things like that?

20      A    Yes.

21      Q    So you did have a discussion with Brad about

22  some of his railroad job duties?

23      A    Yes.

24      Q    Have you treated some other railroad workers

25  over the years?

1      A     Yes.

2      Q     Have you had to give depositions like this just

3   because you've provided treatment to try to help those

4   folks?

5      A     I'm sure I have.  I don't have a clear

6   recollection.

7      Q     Then you told him to come back two months later

8   and consider at that time whether or not attempting to

9   return to work on the railroad on a trial basis would be

10  something you would recommend?

11     A     Yes.

12     Q     So let's go to that visit, which would be

13  January 6, 2020.  Was he continuing to report having the

14  same type of symptoms that he was having before?

15     A     We changed systems, so they're different, sorry.

16  I've got it here.

17     Q     So there's another history that's reported, and

18  that's where you're asking what the symptoms are, and what

19  did you report at that time?  This is actually you by the

20  way, right?

21     A     Yes.

22     Q     What did you report based on your interaction

23  with Brad on January 6, 2020?

24     A     He continued to have increased back, hip, and

25  leg pain with activity such as prolonged sitting, riding

Page 113

```
 1    in the car, pushing, pulling, lifting with heavier
 2    objects, 50 pounds or more.  Pain was intermittent, would
 3    be present for a day or two, improved with the rest and
 4    less activity.  Pain medication as needed.  He denied any
 5    new numbness, tingling, loss of sensation or loss of
 6    movement in the lower extremities.
 7         Q    Based on that your plan was to continue
 8    symptomatic treatments.  Does that mean the medication?
 9         A    Yes.
10         Q    You told him at that point in time because he
11    asked you, but you told him that he could return to work
12    with restrictions of no lifting greater than 50 pounds?
13         A    Yes.
14         Q    Why did you provide that kind of restriction?
15         A    Mainly for the patient's reports of symptoms
16    with lifting above that level and feeling that lifting,
17    especially repetitive lifting above that level would
18    worsen his symptomatology.
19         Q    It doesn't take a medical degree to tell a
20    patient that when they have pain lifting the heavy
21    weights, don't lift the weight, right?
22         A    That's correct.
23         Q    In any case Brad took that return to work note
24    with the 50-pound restriction and then followed up with
25    you two months later to have another evaluation, correct?
```

1      A    That's correct.

2      Q    What did he tell you at that time?  Page 34.

3      A    At that time his classroom type activity,

4   sitting, he found that his back and hip pain was

5   aggravated by those activities.  He had, I think this was,

6   an evaluation period with the railroad for his return to

7   light duty.  He described some increased sciatica on the

8   right side with right hip and thigh pain.  He described

9   flareups with some improvement of his symptoms after

10  limiting activity.  So overall, it seemed that he had

11  failed the return to activity, work activity.

12     Q    Did he report to you that trying to do more

13  physically increased his symptoms?

14     A    Yes.

15     Q    That when he reduced those activities that the

16  symptoms got better?

17     A    Yes.

18     Q    There's a note there that muscle spasm was

19  associated with prolonged sitting, standing, bending,

20  stooping, and twisting.

21     A    Yes.

22     Q    Is a muscle spasm something you actually can

23  feel when you're examining the patient with your hands on

24  them?

25     A    Yes.

1    Q    Is that an objective finding on which you even

2    need to rely from the patient?

3         MS. REIFERS:  Objection, misstates the record.

4    A    That's correct.

5    Q    (BY MR. WOLFF)  Then going down to your

6    examination of his low back, does it also describe that he

7    had a reduced range of motion in his lumbar spine?

8    A    Yes.

9    Q    You noted the muscle spasm was on both sides of

10   the spine where you did the surgery, correct?

11   A    Yes.

12   Q    When you wrote down that his pain was aggravated

13   with deep flexion and extension, right lateral bending

14   produces right hip and leg pain, are you standing there

15   with him having him bend over forward and then bend

16   sideways?

17   A    Yes.

18   Q    Are you able to observe him and his physical

19   reaction?

20   A    Yes.

21   Q    Did you note anything unusual or untoward or

22   excessive about his facial expression indicating that he

23   was trying to exaggerate anything?

24   A    No.

25   Q    On that date, Doctor, did you have another

1    specialized radiology test done called a CAT scan?

2        A    Yes.

3        Q    What's the purpose of doing that in light of the

4    symptoms?

5        A    That's to evaluate for unexpected changes in the

6    spine.  A facet fracture is a possibility when you've had

7    a wide decompression.  Increased activity can lead to

8    fracturing of the small facet joints in the back of the

9    spine, and this can reproduce back, hip, and leg pain and

10   cause pain associated with mechanical maneuvers, sitting

11   for long periods of time, standing, stooping, bending,

12   twisting, those sorts of things.

13       Q    Please turn to your March 25, 2020 note on page

14   36.

15       A    Yes.

16       Q    So he'd come back to see you after the CAT scan

17   was done of his low back, and you actually looked at the

18   CAT scan, didn't you?

19       A    Yes.

20       Q    Based upon your 40 plus years in medicine, have

21   you literally reviewed hundreds if not thousands of CAT

22   scans?

23       A    Yes.

24       Q    MRIs as well?

25       A    Yes.

1      Q     Is it important that a surgeon have eyes on

2   scans as part of the decision-making process to do surgery

3   and to inform him or herself about the extent of

4   additional treatment?

5      A     Yes.

6      Q     So when you reviewed this CAT scan of Brad's low

7   back, can you tell us what you found of significance?

8      A     There was the postoperative changes, the

9   laminectomy defect, of course.

10     Q     No surprise there?

11     A     No.  And the spinal alignment and spinal balance

12  appeared to be normal.  There was no suggestion of

13  instability or movement in the spine that would be

14  abnormal.  There was some straightening of the low back,

15  which would be expected after extensive lumbar surgery

16  like he had.  I was concerned that there was a small

17  fracture of the articular process on the left side at

18  L3-4.  That wasn't confirmed.  The radiologist did not

19  comment on that.  That would not be of significant concern

20  since it was not a major fracture.  There wasn't any

21  instability or spondylolisthesis.  It could be a cause of

22  some of the back pain and muscle spasm.

23     Q     Your note says even though that wasn't reported

24  by the radiologist that was your interpretation that

25  indeed there was a small fracture of the articular process

1   at L3-4 on the left side?

2        A    Yes.

3        Q    So holding up the model of the spine for a

4   moment, can you point out where the articular process of

5   L3-4 is, which would be one level above where the

6   herniated disc was?

7        A    Yes, this would be part of the vertebra here,

8   the L3 vertebra here, the articular process.  The facet

9   joint, or the articulation between the vertebrae, is made

10  up from portions of the vertebra above and the vertebra

11  below.  Once again, we denote that by the L3 and L4

12  vertebrae as they're numbered.  So this would be the L3-4

13  facet joint.  Actually it would be on the left side.

14          And the part that appeared to be fractured was

15  just the tip of the articular process.  Now, the facet

16  joint is surrounded with a tough fibrous capsule, so

17  unless you're seeing some migration of the fragment or

18  instability, this is probably not significant from the

19  standpoint of requiring additional surgery, but certainly

20  could explain ongoing symptoms, especially back pain, hip

21  and thigh pain, also muscle spasm.  So this was on the

22  left side.

23          The bulk of his symptoms were on the right side

24  as far as the back pain, although he had bilateral hip and

25  back pain during this period of time.  So I noted it.  I

1    did not feel that treatment needed to be changed but that

2    it could be an explanation of ongoing pain.

3         Q    It's not something you would want to do another

4    full-blown surgery for, though?

5         A    No.

6         Q    When you were moving the spine around, there's

7    quite a bit of flexibility.  Is that another function of

8    the spine is to allow people to bend and twist?

9         A    Yes.

10        Q    So when you find a fracture of part of that

11   spine, is that something that can be caused by trauma?

12        A    Yes.

13        Q    Can you determine whether that was something

14   that was caused from the incident beforehand, or is that

15   something that developed afterwards?

16        A    Probably was not related to the injury of March.

17   Probably is more related to the surgery that the patient

18   had.  The laminectomy can weaken the facet joint.  That's

19   a well-known complication of surgery.  It's hard to say

20   precisely.  MRI scan tends to not show fractures as well

21   as CT scan does, so if there was a fracture there before

22   surgery it could have been missed on the MRI scan.

23             I certainly didn't recognize a fracture at the

24   time of surgery in the facet joint.  I would have had

25   pretty good visualization of the facet joint, but once

1    again the joint is in the thick capsule.  So there could

2    have been a fracture that was not noticed.  I think most

3    likely the fracture occurred subsequent to the surgery.

4        Q    In the process of surgery is some of the tissue

5    cut through obviously, in order to get access.  Does that

6    grow back, the soft tissue and ligaments?

7        A    Somewhat.  It's not as stable and as competent

8    as the original parts, but certainly you can get some

9    regrowth of the ligaments that might have to be cut or

10   torn.

11       Q    Is that part of the body just like the other

12   part susceptible to developing scar tissue?

13       A    Yes.

14       Q    Does scar tissue have a different character to

15   it than regular body tissue?

16       A    Yes, it's typically not as fixable, and patients

17   may lose some degree of mobility because of scar tissue

18   after spine surgery.

19       Q    Can scar tissue in that surgical field also

20   develop and cause symptoms in and of itself?

21       A    Yes.

22       Q    Do patients who have chronic pain following a

23   back surgery and who have attempted to but not been

24   successful in returning to work, do they sometimes develop

25   depression?

1    A    Yes.

2    Q    On this date in March of 2020, did your office

3  conduct a depression screening?

4    A    Yes, that's part of the intake that's done by a

5  medical assistant.

6    Q    This had not been documented in any of the

7  records before from what I recall.  Is it something that

8  you do when a patient exhibits some indication of possible

9  depression?

10   A    Yes, patients essentially are given a

11 questionnaire and they will fill that out, and that is

12 converted to a scale, and you can see the scale, and the

13 interpretation of the scale is mild depression.  This is

14 kind of general recommendations for evaluation of

15 patients, by any physician.  It's considered guidelines

16 for practice, and adherence those guidelines brings higher

17 ratings of practice accountability.  It's some of the

18 newer legislation about healthcare.

19   Q    Based upon this evaluation, was the first time

20 that you diagnosed Brad having any depression in March of

21 2020?

22   A    Yes.

23   Q    This is about nine months after the surgery, and

24 specifically what's documented is that he had a decrease

25 in interest in doing pleasurable things, he was feeling

1    down, depressed, and hopeless several days a week.  He was

2    having trouble falling or staying asleep or sleeping too

3    much, more than half the days.  Feeling tired and having

4    low energy several days during the week.

5         A    Yes.

6         Q    He did not have an indication of any problems

7    with his appetite, which would be another depression

8    marker, correct?

9         A    Yes.

10        Q    He was feeling bad about himself or that he was

11   a failure or had let himself or his family down more than

12   half the days of the week?

13        A    Yes.

14        Q    He was having no trouble concentrating on

15   reading the paper, but he was -- and he had no problems,

16   he wasn't thinking about suicide or hurting himself,

17   correct?

18        A    That's correct.

19        Q    So the total score was seven, but based upon all

20   that, did you diagnose a mild depression for Brad Washam

21   in March 2020?

22        A    Yes, that would be generated by the template.

23        Q    Do you relate that to his postsurgical outcome?

24        A    Yes.

25        Q    Then in the plan from that visit in March, did

1  you tell him that he should not do any work and that he

2  should limit lifting to 20 pounds or less on an occasional

3  basis, limit prolonged sitting as well as standing and

4  walking?

5      A    Yes.

6      Q    He should also limit his stooping, his bending

7  and his twisting and continue with his medications?

8      A    Yes.

9      Q    Was that based upon what you thought was

10 medically appropriate in light of your evaluation, care

11 and treatment of this patient over a period of about

12 nine months to that point?

13     A    Yes.

14     Q    I think you've seen Brad two more times since

15 then.  We'll go through those quickly, but on May 6, 2020

16 he continued to the report depression?

17     A    Yes.

18     Q    Continued to have decreased range of motion in

19 his back and muscle spasms?

20     A    Yes.

21     Q    Then on the very last page of that office visit,

22 page 40, can you tell us what your notes reflect that you

23 prescribed for him as his treating doctor?

24     A    I recommended referral to pain management for

25 management of the chronic pain.  Also continue medication

1    until he could be evaluated and treated.  I advised him

2    that I feel that his back condition is permanent, not

3    likely to improve with additional treatment or the passage

4    of time.  I felt that he had reached maximum medical

5    improvement from his surgical procedure and that his

6    condition could respond to symptomatic treatment but is

7    not likely to change substantially.

8         Q    Did you tell him that you didn't think he was

9    suitable to return to his former job as a railroad worker?

10        A    Yes.

11        Q    You placed permanent restrictions on him of not

12   lifting more than 15 pounds?

13        A    Yes.

14        Q    You also recommended not sitting or standing

15   more than two hours continuously?

16        A    Yes.

17        Q    You recommended no climbing of stairs or

18   ladders, no work on dangerous terrain or equipment or on

19   catwalks, narrow steep steps and ladders?

20        A    Yes.

21        Q    Why is that?

22        A    The transcription service misspelled there.

23   That should say rough or dangerous terrain.

24        Q    So walking on uneven surface like rocky

25   ballasts?

```
 1        A    Right.

 2        Q    That's something that he should not do?

 3        A    Yes.

 4        Q    He will require frequent breaks and changes in

 5   position because of his low back condition on a permanent

 6   basis.  Why do you provide all of these restrictions to

 7   the patient that you're responsible for caring?

 8        A    To give him a guideline for activities to try to

 9   reduce symptomatology and allow him to perform activities

10   that will not worsen his condition.

11        Q    The last time you saw Brad was earlier this

12   month, July 8, 2020?

13        A    Yes.

14        Q    Did he report to you that his symptoms had

15   basically not changed since the last visit but he was

16   going to start injection therapy with pain management?

17        A    Yes.

18        Q    Are those the same types of injections that we

19   looked at earlier that he had tried before your surgery?

20        A    Yes.

21        Q    It says that you have not recommended additional

22   spine surgery.  Does that mean by you?

23        A    That's correct.

24        Q    So you're not recommending going in there trying

25   to remove that one bone that chipped off there or that got
```

1    loose during the surgery or to try to remove any more

2    discs, correct?

3          MS. REIFERS:  Objection, misstates the doctor's

4    testimony.  He did not state that with regard to the

5    fractured bone.

6    Q   (BY MR. WOLFF)  Correct.

7    A   Yes.

8    Q   Even though you didn't want to do anymore

9    neurosurgery, did you believe it was medically appropriate

10    and reasonable for Brad and to continue following up with

11    a pain management doctor who specializes with nonsurgical

12    spine treatment?

13    A   Yes.

14    Q   There's mention about a dorsal column stimulator

15    for this condition.  Can you explain what that is?

16    A   That is a treatment for chronic pain patients

17    that involves an implanted device to stimulate the spinal

18    cord to reduce the appreciation and sensation of pain,

19    reduce the effects of pain on the patient, allow patients

20    to be more active with less sensation of pain.

21    Q   Let me hand you what I'm marking Exhibit 24 and

22    ask you whether or not those illustrations would be

23    helpful to explain and accurately demonstrate types of

24    pain management injections called epidural injections as

25    well as this spinal stimulator implant that you just

1   mentioned?

2          (WHEREUPON, Exhibit 24 was marked for

3   identification.)

4          MS. REIFERS:  Objection, calls for speculation

5   as to future medical treatment.

6       A    Yes.

7       Q    (BY MR. WOLFF) On the left-hand side, this shows

8   the kind of radiculopathy that's already been discussed.

9   Is that an example of how an epidural injection will shoot

10  steroid and pain medication into the spine to try to

11  reduce symptoms temporarily?

12      A    Yes.

13         MS. REIFERS:  I'll have a continuing objection.

14  Is that okay?

15         MR. WOLFF:  Yes.

16         MS. REIFERS:  Thank you.

17      Q    (BY MR. WOLFF)  On the right-hand side is a

18  surgery to implant a spinal cord stimulator.  For this

19  type of situation, that is a type of surgery but that's

20  done by a pain management doctor?

21      A    Can be done by pain management.  Also spine

22  surgeons can do the procedure.

23      Q    So this is something that you are familiar with?

24  Some of your patients have had this done?

25      A    Yes.

1     Q    So can you explain using this illustration how

2    that's done?

3     A    This is a procedure that implants an array of

4    electrodes over the spinal cord, which is higher up in the

5    spine where the spinal nerves and spinal tracts go up the

6    spine to relay pain sensation to the brain.  Stimulating

7    these portions of the spinal cord can reduce the brain's

8    perception of pain, the noxious stimulation that the pain

9    causes to the patient.

10          This device is connected to some leads that go

11   down to a subcutaneous pocket where the generator that

12   sends the electrical impulses over the spinal cord on a

13   repetitive ongoing basis to control the pain.  So this

14   system is implanted and maintained by the pain specialist

15   or the surgeon that does the surgery for the patient.

16   It's typically an outpatient surgery or possibly an

17   overnight stay in the hospital at the most.  It's not a

18   big surgery.  It's a pretty low-risk surgery, but it does

19   require ongoing treatment by a pain specialist to monitor

20   and maintain the system, to maintain the pain relief that

21   the patient may experience.

22    Q    So unlike the surgery that you do to try to

23   remove the damaged part of the body that is contributing

24   to cause symptoms, this pain management surgery is

25   something that is done to try to block the expression of

Page 129

```
 1   pain from the low back up to the brain?
 2       A    That's correct.
 3       Q    Literally a wire is threaded through the back
 4   and put in an area to try to send signals powered by a
 5   battery to disrupt the communication of those signals
 6   along the nervous system?
 7       A    Yes.
 8       Q    That doesn't cure the pain, does it?
 9       A    No.
10       Q    It doesn't cure the anatomical or body problem
11   that's causing the pain?
12       A    No.
13       Q    Will you defer to the pain management doctor as
14   to whether or not that's the type of surgery that is
15   medically necessary for Brad?
16       A    Yes.
17       Q    Is it at least a reasonable option for that
18   medical professional and Brad to consider in light of his
19   continued report of symptoms?
20       A    Yes.
21       Q    Thank you, Doctor.  The last part of your record
22   from this final visit indicates that he should follow-up
23   with that pain management doctor and see you as needed?
24       A    That's correct.
25       Q    I know you were asked a lot of questions about
```

1    causation and that type of thing, but Doctor, based upon

2    the information that you've been provided with regard to

3    Brad's history that he reported experiencing low back pain

4    when he fell at work in March of 2019, if you assume that

5    there is no documented report by any doctor or from Brad

6    of any kind of significant back pain before that, does

7    that give you a sufficient basis to express an opinion

8    that this injury working for the railroad falling when a

9    handrail broke onto his back onto a steel knuckle, a

10   connector of the train, is that enough information for you

11   to conclude that the incident caused the problems that you

12   tried to treat?

13        MS. REIFERS:  Objection, misstates prior

14   testimony.

15        A    I think assuming that, I would say that it's

16   more likely than not that the fall and injury caused or

17   significantly worsened the patient's condition.  I

18   mentioned the condition of spinal stenosis.  I think it's

19   likely that the spinal stenosis predated the injury that

20   has been reported.  I think that the spinal stenosis could

21   have been asymptomatic and is asymptomatic in many

22   patients, even though it exists.

23        So I believe that the spinal stenosis was a

24   pre-existing condition, but assuming that the patient had

25   no symptoms from low back pain prior to the injury in

1   March, I would once again say that it's most likely that

2   the injury caused his condition as it is today.

3         Q   (BY MR. WOLFF)  Let me also ask you to assume,

4   Doctor, that Brad did obtain medical treatment within

5   three days after the incident when he saw his family

6   healthcare practitioner and reported falling off a car at

7   work sustaining injuries to his left knee, his left elbow

8   and his lower back and experiencing at that time bilateral

9   hip pain that radiates into the lower extremities that

10  were like an electrical charge every once in a while, that

11  it hurts worse when he leans back or when he bends down to

12  get something, and that he was prescribed Toradol for that

13  and kept off work.

14          Then he sees his family healthcare provider a

15  week later with severe pain running down both legs.  She

16  diagnosis back pain and muscle spasms and orders an MRI,

17  which you read.  Then he had a sacroiliac joint injection

18  by Dr. Kevin Vaught.  Dr. Vaught's history in his record,

19  I'd like you to assume, shows that he reports the onset of

20  symptoms following a work-related injury on March 11, 2019

21  when he was crossing over a railroad car when the safety

22  bar broke.  He fell onto the knuckle where the railroad

23  cars joined, and then he fell onto the ground.  He

24  described immediate back pain and buttocks pain.  He

25  continued to work rest of the day.  He went to the company

Page 132

1    nurse and was advised to take ibuprofen and utilize a hot

2    shower.

3              Doctor, if you assume those facts of medical

4    treatment and evaluation, are those consistent with the

5    opinion that you expressed that this work-related incident

6    caused or at least was a contributing cause to the back

7    problems that you treated?

8              MS. REIFERS:  Objection, undisclosed opinion in

9    this hypothetical.  The doctor has not seen the records,

10   it's not reflected in his medical records, it's not been

11   produced as part of his medical records.

12        Q    (BY MR. WOLFF)  If you assume that's true,

13   Doctor, does that support your opinion?

14        A    Yes.

15        Q    You were shown a bunch of newsletters in your

16   questioning by the railroad's lawyer.  Did you notice that

17   all of those newsletters were written by the same person,

18   a Robert Barth, PhD?

19        A    Yes.

20        Q    That's not a medical doctor, is it?

21        A    No.

22        Q    Do PhDs have the ability to diagnose spine

23   injuries?

24        A    No.

25        Q    Do they have the capability of doing any

Page 133

1   surgery?

2        A    No.

3        Q    Do you know anything about this Robert Barth at

4   all?

5        A    No.

6        Q    Are you aware that he gets involved in

7   litigation on behalf of companies on a regular basis and

8   gets paid quite a bit of money?

9        A    No.

10       Q    Are you aware that he publishes these things and

11  he's able to charge money for it?

12       A    No.

13       Q    The fact that he's able to publish an article

14  about his opinion, is that something that almost any

15  doctor can do, that they can submit a letter and have

16  somebody write it, have somebody publish it?

17       A    Yes.

18       Q    Just because it's written in a newsletter that

19  has the AMA on it doesn't mean that that's the AMA's

20  opinion, correct?

21       A    Yes.

22       Q    In fact, are you aware that the AMA has issued

23  disclaimers saying it does not necessarily reflect what

24  their opinion is?

25       A    I would imagine they do, but I'm not aware of

1    that.

2        Q    You don't regularly read AMA Guides Newsletters

3    published by guys like Robert Barth in order to inform you

4    how to properly treat patients, do you?

5        A    No.

6        Q    Do you know that the population or the target

7    audience for these newsletters would be lawyers and

8    insurance companies?

9        A    No.

10       Q    Do you have Exhibit 9 there that you can get?

11   There it is.  If you go to the very last page, you see

12   under the box at the top?  It says, Information contained

13   in this newsletter does not constitute legal or business

14   advice and should not be substituted for the independent

15   advice of an attorney or business consultant.  The very

16   last page.

17       A    Yes.

18       Q    Do you make it a priority of your practice to

19   make decisions based upon articles written by nonmedical

20   doctors to the legal or insurance profession?

21       A    No.

22       Q    If you go to Exhibit 10, which is another one of

23   the articles that Barth has written that he's gotten

24   published, do you see on page 1016, page 1016 what is he

25   citing to support his opinions?  You see it's another

1　article that he wrote a few years before this?

2　　　A　　Yes.

3　　　Q　　So this is a man who's expressing opinions about

4　what medical doctors should be doing and not doing and

5　he's citing his own previous articles, correct?

6　　　A　　Yes.

7　　　Q　　As far as articles written by some of these

8　other folks, there's a difference of opinion among some

9　medical professionals, but do you exercise your own

10　independent judgment based upon actually treating patients

11　understanding that there's a variation from patient to

12　patient?

13　　　A　　Yes.

14　　　Q　　So the fact that some other doctors, medical

15　doctors, write articles that express a different opinion

16　than what you have, does that define what the standard of

17　care is for all doctors, or is that just their opinion?

18　　　A　　It's opinion.  It's thought to be a guideline

19　for practice.

20　　　Q　　So a guideline to consider, but ultimately who

21　has the final say so as to ethically what is in the best

22　interest of a patient?

23　　　A　　The treating physician.

24　　　Q　　In this case did you determine that surgery was

25　medically necessary and that Brad's injury was caused by

1    this incident?

2        A    Yes.

3        Q    There's no conflict of interest for you in the

4    sense, Doctor, you haven't been paid a penny by me,

5    correct?

6        A    That's correct.

7        Q    You're being paid by the railroad's lawyer for

8    the purpose of giving this deposition today?

9        A    Yes.

10       Q    You were asked some questions about a

11   personality disorder.  Going back to medical school, did

12   you get some general training and have some general

13   exposure in the course of your practice as a neurosurgeon

14   as to when individuals exhibit symptoms that reflect the

15   possibility of a personality disorder?

16       A    Yes.

17       Q    What do you mean about personality disorder?

18   That has not been defined.

19       A    It's typically a severe psychiatric illness that

20   involves problems with judgment, veracity, manipulative

21   behavior.  I think it used to be called sociopathic

22   personality.  This changes over time, and I don't keep up

23   with psychiatric diagnoses by any means, but it's

24   generally considered to be a severe psychiatric disorder.

25       Q    Did you find any indication apart from some mild

1   depression that Brad had any kind of personality disorder,

2   much less being a psychotic?

3           MS. REIFERS:  Objection, misstates the testimony

4   of the doctor.

5       A   No, I did not.

6       Q   (BY MR. WOLFF)  Have you been shown any medical

7   records by either of the lawyers here today that shows any

8   other doctor has diagnosed him with any kind of

9   personality disorder?

10      A   No.

11      Q   He didn't demonstrate any kind of histrionics.

12  He wasn't flopping all over your operating -- all over

13  your examining room here in your office complaining about

14  his toenail hurting and his fingernails hurting and people

15  coming out to get him?

16      A   No.

17      Q   You were asked some questions about a

18  personality test, the MMPI.  Is that something that is

19  regularly required that a patient complete one of those

20  before you do spine surgery?

21      A   No.

22      Q   Are you aware that some medical folks do that

23  when that when they've been hired by companies for the

24  purpose of doing only a litigation evaluation?

25      A   Yes.

Page 138

1      Q    In this case you weren't hired for the purpose

2   of litigation.  You were contacted by Brad for the purpose

3   of helping him, right?

4      A    Yes, that's correct.

5      Q    Do you believe that the treatment that you

6   provided, including your surgery, has provided him with

7   some help and some relief of his symptoms?

8      A    Yes.

9      Q    Are there many patients who have spine surgery

10  that continue to have some symptoms even when you've

11  provided some improvement?

12     A    Yes.

13     Q    Some of those patients are not able to return to

14  work?

15     A    That's correct.

16     Q    Brad here at least tried.  Do you have some

17  patients that don't even try?

18     A    Yes.

19     Q    Last series of questions.  You were asked

20  whether or not there's a risk of injury.  But if you

21  accept as true what Brad has consistently reported to you,

22  Dr. Gocio, that he experiences an increase in pain when

23  he's exposed to these types of stresses on his spine,

24  would you agree that high levels of pain can be

25  distracting and impair ability to be alert and attentive?

Page 139

1      A    Yes.

2      Q    Can that put other people at risk as well as the

3  patient?

4      A    Yes.

5      Q    Knowing that you've issued these restrictions

6  for Brad that basically keep him permanently off of

7  railroad work, have you ever been contracted by the

8  railroad to challenge your opinions?

9      A    No.

10      Q    Do you agree that the railroad job of conductor

11  is a safety-sensitive position where they're responsible

12  for trains that can be up to miles long and include

13  hazardous materials and chemicals?

14      A    Yes.

15      Q    If they're not able to do their job adequately

16  and safely, do you agree that there is a risk to the

17  general population?

18      A    Yes.

19      Q    In light of all these things, Dr. Gocio, did you

20  make the recommendation to Brad that regardless of

21  whatever kind of management treatment he gets for his pain

22  symptoms that he will permanently be disabled from going

23  back to work to the job that he had done without

24  limitations for 20 years before the date of this incident?

25      A    Yes.

1          MR. WOLFF:  Thank you, sir, I have nothing

2     further.

3          MS. REIFERS:  Just a few more questions.

4              REDIRECT EXAMINATION

5     BY MS. REIFERS:

6     Q    Dr. Gocio, Plaintiff's counsel referenced the

7     boogeyman when he asked you questions about narcotic

8     abuse.  Are you aware that there's a problem with opioid

9     abuse in this country?

10    A    Yes.

11    Q    That's not disputed, is it?

12    A    No.

13    Q    That's not some phantom boogeyman issue, is it?

14    A    No.

15    Q    That's real, right?

16    A    Yes.

17    Q    With regard to disc herniation, you agree that

18    discs can be herniated without injury, correct?

19    A    Yes.

20    Q    You agree that disc herniation can occur with no

21    symptoms of pain, correct?

22    A    Yes.

23    Q    With regard to Mr. Washam's railroad work,

24    you've already testified today that those restrictions are

25    based solely on Mr. Washam's complaints of pain, correct?

```
 1        A     Yes.

 2        Q     Regarding the dorsal -- excuse me.

 3              Regarding this dorsal column stimulator for

 4   pain, you have not said he has to have a pain stimulator,

 5   correct?

 6        A     That's correct.

 7        Q     Regarding radiculopathy, your testimony today

 8   was what you called radiculosis.  That is based on the

 9   patient's subjective descriptions of pain?

10        A     Yes.

11        Q     Not the objective neurological exam, correct?

12        A     Right, radiculitis is a symptom.

13        Q     You did not find radiculopathy in the initial

14   visits before surgery, correct?

15        A     That's correct.

16        Q     With regard to facial expressions of Mr. Washam,

17   you didn't record his facial expressions in your medical

18   records, did you?

19        A     No, I would only do that if I felt that there's

20   some unusual or abnormal response to the exam.

21        Q     You were asked about whether or not you had a

22   conflict of interest.  You've readily admitted that

23   treating physicians should not give testimony as experts

24   generally speaking, correct?

25              MR. WOLFF:  I'll object to the extent that
```

1    misstates his prior testimony.

2        Q    (BY MS. REIFERS)  Do you -- let me rephrase the

3    question.

4            Dr. Gocio, you agree, do you not, that generally

5    speaking treating physicians should not give testimony on

6    causation?

7        A    I think it should be avoided if possible.  I

8    also stated and will state again that sometimes that's

9    unavoidable.  As a treating physician, you have answer to

10   your record of treatment and care, sometimes in a

11   deposition, sometimes in a trial.  As a treating

12   physician, basically I'm here for that.  That was my

13   understanding, at least.

14           I can express opinion.  I think it's not correct

15   to be a treating physician and an expert at the same time

16   if you can avoid it.  I haven't seemed to be able to avoid

17   that at this point in this particular case.  If I had

18   known that litigation was planned or in process, if I had

19   known that I would be expected to offer expert testimony,

20   I would have either withdrawn from Mr. Washam's care or

21   advised that I would be available as an expert for

22   testimony.

23       Q    Thank you, sir.  With regard to your deposition

24   today, you were asked if the railroad contacted you to ask

25   you certain questions or asked you about Mr. Washam's

Case 3:19-cv-00231-KGB   Document 108-1   Filed 09/30/20   Page 144 of 183

Page 143

```
 1    work.  Were you aware that the attorney for the railroad
 2    cannot speak to you outside of a deposition?  That's not
 3    legally allowed.  Did you know that?
 4            MR. WOLFF:  Object to the leading, lack of
 5    foundation.  Also misstates the law.
 6        A    I don't know.  I don't know if that's a fact.  I
 7    don't know.
 8        Q    Had you and I ever met or spoken before this
 9    deposition?
10        A    No.
11            MS. REIFERS:  No further questions.  Thank you,
12    sir.
13                    RECROSS EXAMINATION
14    BY MR. WOLFF:
15        Q    Dr. Gocio, do you often get contacted by
16    employers?
17            MS. REIFERS:  Objection to any
18    re-cross-examination.
19        A    I'm sorry?
20        Q    (BY MR. WOLFF)  Do you ever get contacted by
21    employers who disagree with your workplace restrictions?
22            MS. REIFERS:  Objection to the inadequate
23    hypothetical.
24        A    I mean, I have communications with employers
25    sometimes.  Usually it's in the record and, you know,
```

Case 3:19-cv-00231-KGB  Document 108-4  Filed 02/10/20  Page 144 of 183

Page 144

1   formal documentation.  It's been a long time.  I've seen a

2   lot of patients over a lot of years, and certainly

3   employers would make personal contact at times.  I've had

4   that happen before.  It's unusual, but it does happen.

5       Q    Frankly do a number of the patients that you do

6   back surgery on, have they sustained traumatic injuries in

7   incidents where somebody else was at fault or it was a

8   work-related incident?

9       A    A number have, yes.

10      Q    Are those patients entitled to the same fair

11  consideration of getting appropriate treatment and having

12  opinions provided about the cause of their injuries just

13  as anybody else?

14      A    Yes.

15      Q    So even though you would like to avoid this if

16  at all possible, sometimes it's just a necessary part of

17  your practice to testify as to the treatment that you

18  provided, correct?

19      A    That's correct.

20      Q    And here there's no additional work for you to

21  express your opinion on causation.  It's just helpful to

22  have some additional information which I have now provided

23  you in the way of a hypothetical, correct?

24          MS. REIFERS:  Objection, misstates the doctor's

25  testimony on what he would require for causation testimony

1    as an expert.

2         A    Yes.

3         Q    (BY MR. WOLFF)  Did the railroad's lawyer show

4    you any medical records to dispute what I've asked you to

5    assume?

6         A    No.

7         Q    Even though you haven't recommended the spinal

8    cord stimulator, do you agree that it is reasonable for

9    the pain management doctor to consider that with Brad?

10        A    Yes.

11        Q    The work restrictions you were asked about are

12   also based upon the muscle spasms that you felt in Brad,

13   correct?

14        A    Yes.

15        Q    And his limited range of motion that you were

16   able to see on your examination?

17        A    Yes.

18        Q    Finally, with regard to the herniated disc, even

19   though sometimes some patients can have a herniated disc

20   that was not caused by traumatic event, some do?

21        A    That's correct.

22        Q    So as to whether it's a treating doctor or

23   whether it's an expert doctor who's only involved for

24   litigation, is it important to correlate when the symptoms

25   began relative to a traumatic event?

Page 146

1       A    Yes.

2       Q    And if you as a doctor consider that a patient

3   did not have any kind of significant prior symptoms and

4   then has a traumatic event followed by the onset of

5   symptoms, and then you have objective diagnosis based on

6   MRIs and other tests, is that a sufficient basis to

7   express the opinion that at least in this case that Brad

8   Washam's herniated disc and need for surgery was caused by

9   or as a result of the traumatic railroad incident?

10          MS. REIFERS:  Continuing objection to this

11  inadequate hypothetical.

12      A    Yes.

13          MR. WOLFF:  Thank you, sir.  No more.

14          MS. REIFERS:  No more questions.  Thank you for

15  your time.

16          THE VIDEOGRAPHER:  We're off the record at 8:35.

17           (DEPOSITION CONCLUDED AT 8:35 P.M.)

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E
                                                    Page 147
 2

 3            I, Mike Washkowiak, Certified Court Reporter, do

 4    hereby certify that the above-named ALLAN GOCIO, M.D. was by

 5    me first duly sworn to testify the truth, the whole truth,
      and nothing but the truth, in the case aforesaid; that the
 6    above and foregoing deposition was by me taken and

 7    transcribed pursuant to agreement, and under the

 8    stipulations hereinbefore set out; and that I am not an

 9    attorney for nor relative of any of said parties or

10    otherwise interested in the event of said action.

11            IN WITNESS WHEREOF, I have hereunto set my hand

12    and official seal this 28th day of July, 2020.

13

14

15

16

17

18

19

20

21                  MIKE WASHKOWIAK, CCR

22                  State of Arkansas, No. 654

23

24

25
```

**[& - 84]**

| & | 2 | 220 40:20 | 5 |
|---|---|---|---|
| **&** 1:14 | **2** 2:11 7:21,23 8:9 | **23** 2:14,24 3:2 | **5** 2:14 23:10,15 |

**&**

**&** 1:14

**0**

**00231** 1:4 4:7
**09** 2:15

**1**

**1** 2:10 7:15,18
 8:13
**10** 2:19 55:24 56:5
 134:22
**100** 1:15 22:9
 57:19
**1016** 51:15 52:19
 134:24,24
**1017** 53:9
**103** 2:24 3:2
**104** 64:21
**11** 2:18,20 6:20
 58:19,24 73:14
 131:20
**116** 51:12,14
**12** 2:12 70:22
 73:16 111:18
**120** 43:20 45:10
**1200** 1:15
**127** 3:3
**13** 90:20
**140** 2:5
**143** 2:6
**15** 90:21 124:12
**150** 10:24 11:5
**15th** 51:3
**16** 52:21 100:7
**18** 102:14
**1800** 68:13
**19** 73:16 105:9
**1974** 5:4
**1984** 5:18,22
**1992** 61:19

**2**

**2** 2:11 7:21,23 8:9
**20** 2:17,21 14:4,13
 22:12,12 31:14
 33:14,16,24 34:8
 34:14 73:6,11,15
 73:20 90:15,15
 123:2 139:24
**2000** 6:1,4 53:11
**2002** 66:6
**2003** 6:4,6 66:6
**2005** 6:7,9 61:17
**2006** 57:9
**2007** 6:10,12
**2009** 6:12,17,17,20
**2011** 2:14 6:23
 21:25 49:8
**2012** 6:23 7:1,7
 60:4
**2013** 2:19,20
**2014** 19:16 66:11
**2018** 7:3,4,7
**2019** 2:17 13:23
 14:17 15:14 24:21
 28:3,16 32:9
 33:14,16 34:8
 82:12 103:10
 109:3,23 130:4
 131:20
**2020** 1:10 3:9 4:2
 14:10,11 40:7,12
 103:10 112:13,23
 116:13 121:2,21
 122:21 123:15
 125:12 147:12
**204.59** 41:8
**21** 2:13,22 88:16
 88:23
**22** 1:10 2:23 3:9
 4:2 94:7,12

**220** 40:20
**23** 2:14,24 3:2
 103:8,12 108:16
**23a** 3:2 103:16,18
**24** 3:3 52:22 92:20
 126:21 127:2
**25** 40:6,8,12
 116:13
**250** 10:22
**26** 14:7
**26.26** 41:8
**26th** 90:16
**27** 107:19 109:9
**28** 2:15 40:19
**28th** 147:12

**3**

**3** 2:12 11:22 12:2
**30** 11:5 47:14
 68:16 110:6
**305-308** 33:12
**31** 109:25
**310** 9:3
**314-621-6115** 1:16
**33** 2:16
**331** 33:7
**34** 114:2
**341** 33:8
**35** 2:17
**36** 116:14
**38103** 1:20
**3:19** 1:4 4:7

**4**

**4** 2:3,13 21:9,12
**4-5** 86:7
**40** 92:9,17 116:20
 123:22
**410** 1:20
**4:45** 1:10 4:2

**5**

**5** 2:14 23:10,15
 107:18 109:3
**50** 2:18 22:12,13
 22:22,22,23 23:5,6
 47:11 113:2,12,24
**56** 2:19
**58** 2:20

**6**

**6** 2:15 13:13,17
 14:1,17,19 15:13
 25:7 28:3,5,16
 29:24 31:11,17,25
 32:9,15,23,25
 82:12 103:10
 112:13,23 123:15
**63102** 1:15
**649** 40:10,12
**654** 147:22
**6:46** 69:23,24
**6:54** 69:24 70:1

**7**

**7** 2:10,11,16 13:17
 33:3 70:16
**70** 2:4
**72653** 9:4
**73** 2:21 38:24
**74** 5:9 41:7
**78** 5:9
**7:15** 70:21

**8**

**8** 2:17 35:2,6
 125:12
**80** 1:20 10:23 66:4
**81** 66:4
**82** 66:4
**824** 147:20
**84** 5:25 64:21 66:1
 66:2

| | | | |
|---|---|---|---|
| **88** 2:22 | **accident** 64:14 | 96:12 97:25 98:11 | 140:17,20 142:4 |
| **8:35** 146:16,17 | **accidentally** 111:6 | 98:15 104:24 | 145:8 |
| **9** | **accomplish** 100:12 | 108:7 117:4 | **agreed** 58:20 |
| **9** 2:18 43:20 45:9 | **accountability** | 118:19 124:3 | 101:13 |
| 50:17,20 134:10 | 121:17 | 125:21 144:20,22 | **agreement** 3:7 |
| **90** 43:19 | **accurate** 8:11,16 | **additionally** 98:14 | 110:20 147:7 |
| **900** 68:16 | 25:25 71:15 78:11 | **address** 73:10 | **ahead** 76:17 81:21 |
| **901-521-2860** 1:21 | 81:5 92:2 | **addressed** 27:3 | 88:15 100:5 |
| **94** 2:23 | **accurately** 94:9 | **adequate** 50:9 | **al** 2:13 |
| **a** | 126:23 | **adequately** 95:3 | **alert** 138:25 |
| **aaos** 2:19 51:3 | **acetaminophen** | 139:15 | **alignment** 117:11 |
| **abilities** 50:3 | 43:3 | **adherence** 121:16 | **allan** 1:9 3:6 4:3 |
| **ability** 49:23 | **achieve** 90:3 | **administered** | 4:14,21 147:4 |
| 132:22 138:25 | **acting** 88:11 | 89:11 | **allegation** 65:6 |
| **able** 48:3 64:5 | **action** 64:22 74:15 | **admission** 8:2 | **alleged** 28:17 64:3 |
| 82:2,8 90:25 | 147:10 | 102:1 | **allow** 81:23 119:8 |
| 94:17 108:19 | **actions** 66:13 | **admitted** 141:22 | 125:9 126:19 |
| 115:18 133:11,13 | **activated** 31:8 | **adult** 104:17 | **allowed** 143:3 |
| 138:13 139:15 | **activation** 53:7 | **advice** 134:14,15 | **allowing** 98:19 |
| 142:16 145:16 | **active** 126:20 | **advised** 124:1 | **alluded** 45:23 |
| **abnormal** 15:4 | **activities** 42:3 | 132:1 142:21 | **ama** 49:2,3,7 |
| 117:14 141:20 | 45:21,21 66:19 | **advisor** 2:14 | 50:17 60:4,19 |
| **abnormalities** | 109:18 114:5,15 | **advisory** 21:23 | 133:19,22 134:2 |
| 19:23 39:22 | 125:8,9 | **affect** 69:10 | **ama's** 25:15 |
| **abnormality** 21:18 | **activity** 42:3,7 | **aforesaid** 147:5 | 133:19 |
| 57:25 | 47:25 99:10 | **age** 22:12,21 41:14 | **american** 25:18 |
| **abrupt** 17:13 84:5 | 102:11,15 106:14 | **aggravate** 42:4 | 48:14,16,19 50:19 |
| **absence** 20:3 | 108:24 110:5 | **aggravated** 109:6 | 55:23 61:16 92:13 |
| 104:9 | 112:25 113:4 | 114:5 115:12 | **amount** 101:5 |
| **absent** 25:13 39:6 | 114:3,10,11,11 | **ago** 92:9 103:11 | **analysis** 27:20 |
| 51:7 | 116:7 | 109:4 | 62:21 |
| **absorber** 99:13 | **actual** 77:24 | **agree** 20:12 23:5 | **anatomic** 57:24 |
| **abuse** 111:1 140:8 | **acute** 15:22,24 | 27:23 29:10 34:21 | 86:19 |
| 140:9 | 16:2,9 17:3,10,14 | 39:13 42:19 46:13 | **anatomical** 39:6 |
| **academy** 50:19 | 17:20 18:3 19:1 | 46:22 48:19 50:2 | 129:10 |
| 55:23 | 20:17,24 83:4 | 52:11 55:2,6,21,22 | **anatomy** 98:10 |
| **accept** 138:21 | 84:25 88:13 98:5 | 58:4,13,20,21 | **anchor** 75:22 |
| **accepted** 86:22 | **addition** 26:12 | 60:19 61:2 62:4 | **anderson** 13:15 |
| **access** 96:8 120:5 | 74:4 78:24 | 62:17 67:8 74:12 | 14:1,20,22 28:2,15 |
| | **additional** 32:7 | 77:12 91:20,24,24 | 31:18 33:15,17,22 |
| | 70:23 91:16 92:10 | 138:24 139:10,16 | 34:5 36:7 37:10 |

**anderson's** 29:24 30:18,24 31:23 37:15
**anesthesia** 93:14 94:1 100:21
**anesthesiologist** 94:4
**anesthetics** 88:10 88:11
**ankle** 42:1
**annual** 51:3
**annulus** 20:19 95:4,13 98:18
**answer** 57:15 142:9
**answered** 78:18
**answers** 84:6
**antalgic** 15:3
**anti** 79:8
**anybody** 144:13
**anymore** 8:18 9:20 13:18 126:8
**apart** 136:25
**apotheosis** 19:22
**appear** 15:11 35:4 51:18,23 54:5 74:16 79:24 81:15
**appearance** 17:15 20:25
**appearances** 1:12
**appeared** 117:12 118:14
**appears** 5:21 13:25 14:22 15:16 30:1 31:17 33:9 33:22 35:13 83:4 104:4
**appetite** 122:7
**appointments** 10:8

**appreciate** 33:21 70:23
**appreciation** 126:18
**approach** 87:2
**approached** 63:13
**approaching** 84:7 111:17
**appropriate** 72:5 72:9,15,23 80:9 105:25 106:7 123:10 126:9 144:11
**approved** 65:7
**approximately** 66:3 93:21 109:11
**april** 2:18 49:8
**archives** 61:20
**area** 4:24 15:3 34:17 84:15,18 88:1 89:23 90:8 94:22 107:2,4 129:4
**areas** 31:5,7
**arkansas** 1:1,10 4:6 5:3,11,23 9:4 9:12 66:7 75:11 75:22 92:16,20,24 93:1 147:22
**armor** 104:13
**array** 128:3
**arthritic** 39:23 87:24
**arthritis** 2:14 21:23
**article** 18:9 19:6 19:15 21:9 22:7 22:16,19,22 23:10 26:5 61:19 106:5 133:13 135:1

**articles** 60:16 134:19,23 135:5,7 135:15
**articular** 117:17 117:25 118:4,8,15
**articulation** 118:9
**artificially** 55:13
**arts** 9:24
**aside** 95:21
**asked** 13:2 28:9,12 28:19 45:25 56:2 62:19 63:11 68:1 75:3 77:10 78:18 82:17 92:22 113:11 129:25 136:10 137:17 138:19 140:7 141:21 142:24,25 145:4,11
**asking** 28:20 75:9 92:2 112:18
**asleep** 122:2
**aspects** 94:10 95:19
**assess** 38:13 80:20
**assessment** 38:21 47:21 82:23 84:2
**assistant** 73:25 121:5
**assistants** 40:25 94:5
**associated** 19:18 19:23 20:4 57:11 57:19,21 58:22 88:4,6 99:7 104:19 114:19 116:10
**association** 25:19 48:14,17,19 61:16 99:10

**assume** 24:23 130:4 131:3,19 132:3,12 145:5
**assumed** 11:8
**assuming** 33:18,19 53:6 68:22,23 130:15,24
**assumption** 77:21
**asymptomatic** 130:21,21
**attached** 84:14
**attempted** 120:23
**attempting** 112:8
**attended** 50:25
**attentive** 138:25
**attorney** 28:3,17 28:20 29:7 56:3 74:14 134:15 143:1 147:9
**attorneys** 65:14
**audience** 134:7
**august** 13:23
**author** 19:15
**authored** 49:2,2
**authority** 25:21 48:20
**availability** 69:7
**available** 69:4 142:21
**avenue** 1:20
**average** 10:25 52:21,22 86:13 104:17
**avoid** 142:16,16 144:15
**avoided** 142:7
**awake** 101:21
**aware** 11:10 71:25 101:21 133:6,10 133:22,25 137:22 140:8 143:1

**b**

**ba** 5:2,6
**back** 10:20 15:3
16:15,18 17:17
22:9 23:24 24:20
24:22,24 29:12
31:21 32:21 38:2
38:11,22,25 39:6
39:11,20,24 42:2,6
42:8,13,14,16,19
50:10 55:3 56:17
57:11 58:14 69:2
69:13,25 76:22
77:6,7,7,11,15,20
77:22 78:3,9,13,20
78:22,24 80:16
81:18 82:6 83:22
84:21 85:10,16,17
85:19,21 87:15
88:5,13 89:6 90:4
95:21 98:1,15
100:6,20 103:7
104:4 105:3,9
107:2 108:16
109:12 110:12,17
112:7,24 114:4
115:6 116:8,9,16
116:17 117:7,14
117:22 118:20,24
118:25 120:6,23
123:19 124:2
125:5 129:1,3
130:3,6,9,25 131:8
131:11,16,24
132:6 136:11
139:23 144:6
**background** 49:9
72:2
**backside** 97:2
**backward** 104:3

**bad** 93:13 122:10
**balance** 117:11
**ballasts** 124:25
**bar** 131:22
**barring** 59:10
**barsky** 26:12
**barth** 132:18
133:3 134:3,23
**base** 18:6 24:25
44:17 49:11
**based** 20:1 23:21
25:3,5 29:15
42:20 46:1 47:14
47:17 64:6,8 67:9
72:12,16 77:22
80:8 81:3 82:5,7
85:25 87:10 90:23
91:17 95:6 107:8
112:22 113:7
116:20 121:19
122:19 123:9
130:1 134:19
135:10 140:25
141:8 145:12
146:5
**basically** 97:8
125:15 139:6
142:12
**basis** 18:16 43:5
43:11 61:1 84:10
112:9 123:3 125:6
128:13 130:7
133:7 146:6
**bates** 33:7,12
40:10,10,11
**battery** 129:5
**baxter** 9:8 10:9
93:17
**becoming** 60:6
**began** 23:24
145:25

**beginning** 1:10
61:6,12 68:2
**begins** 53:10
**behalf** 1:9,13,18
4:9 71:12 133:7
**behavior** 136:21
**believe** 13:13
16:14 20:23 24:4
31:23 33:7,25
47:20 68:3,6,11,12
72:12 73:19 90:15
126:9 130:23
138:5
**bend** 115:15,15
119:8
**bending** 45:23
46:7 110:15
114:19 115:13
116:11 123:6
**bends** 131:11
**beneath** 21:3
**beneficial** 53:16
87:8
**benefit** 38:18
**benign** 49:11
51:19,24
**best** 8:11 33:1
57:18 61:2 93:5
107:22 135:21
**better** 54:2 93:15
107:11 114:16
**beyond** 22:16
26:11 99:18
**big** 85:21 128:18
**biggest** 57:25
**bilateral** 20:21
31:3 34:11 35:12
35:20 78:25 104:2
118:24 131:8
**bilaterally** 15:5
95:8

**bit** 11:13 23:2
66:23 70:6 81:21
103:16,23 104:6
119:7 133:8
**bleeding** 108:5,8
**block** 64:25 66:1
89:22 90:2 128:25
**blocks** 79:11 87:20
88:8
**blown** 119:4
**bmi** 40:19 41:8
**bnsf** 1:5 4:4,11
**board** 92:13
**body** 90:8 104:4
120:11,15 128:23
129:10
**bogard** 1:14
**bone** 96:6,7,18
97:2,14 104:1,10
104:10 108:9
125:25 126:5
**bones** 84:14 104:1
**bony** 84:22 97:23
104:13
**boogeyman** 106:4
140:7,13
**bottom** 11:16 26:8
57:4 63:17 73:7
94:24
**box** 134:12
**boyle** 1:19
**boylebrasher.com**
1:21
**brad** 4:9 70:12
71:2,12,14 72:5,8
73:2,22 74:10
77:10,14 79:16
80:8 81:6,12,18
83:12 85:24 87:3
87:14 88:20 90:17
90:25 91:5 93:5,9

93:12,21 94:25
99:23 106:7
107:11,14 108:18
108:24 109:22
111:10,21 112:23
113:23 121:20
122:20 123:14
125:11 126:10
129:15,18 130:5
131:4 137:1 138:2
138:16,21 139:6
139:20 145:9,12
146:7
**brad's** 77:24 96:11
98:18 100:15
117:6 130:3
135:25
**bradley** 1:2 4:4,22
11:7 70:5
**brain** 10:14 76:3
128:6 129:1
**brain's** 128:7
**brainer** 56:23
**branch** 89:22,24
**brandy** 13:15 14:1
14:9 33:22
**brasher** 1:19
**break** 69:20,24
**breakout** 51:5
**breaks** 125:4
**breath** 70:6
**briefly** 31:23
75:18
**brings** 121:16
**broad** 67:25 95:6
**broader** 23:2
**broke** 130:9
131:22
**brought** 15:17
16:7 45:13 77:5

**bulging** 17:7
**bulk** 118:23
**bullet** 51:17 52:1
53:10 54:3,3 55:7
**bulletin** 52:20
**bunch** 132:15
**business** 134:13
134:15
**butt** 75:21 99:17
**buttercup** 9:3
**buttocks** 34:11
131:24

**c**

**c** 4:21 97:6 147:1,1
**call** 10:1 30:10
69:20 88:3
**called** 9:8 18:17,18
47:23 64:24 65:17
86:15 95:4 116:1
126:24 136:21
141:8
**calls** 32:13 50:4
68:9 127:4
**camera** 84:9 89:1
103:24
**camille** 1:19 4:11
**canal** 85:5 96:1
96:19 104:14,24
**capability** 132:25
**capacity** 47:21
99:18
**cape** 6:3 76:7
**capsule** 90:1
118:16 120:1
**car** 109:10 113:1
131:6,21
**carbondale** 6:9
**care** 12:21 23:21
60:1 62:9 63:14
70:11 71:2 72:4
72:12 73:2 75:12

79:17,21 80:7
101:8 106:16
123:10 135:17
142:10,20
**career** 11:1 93:24
**carefully** 98:9
**caring** 125:7
**carragee's** 57:9
**cars** 131:23
**case** 4:3,6 11:7
12:9 13:6 32:19
36:19 62:20 63:12
63:18 64:6,24,24
70:25 73:18 86:20
89:19 96:11 98:18
99:20 102:14
113:23 135:24
138:1 142:17
146:7 147:5
**cases** 64:25 65:1
65:19,25,25 66:1
**casting** 23:2
**cat** 116:1,16,18,21
117:6
**catch** 70:6
**categorize** 40:3,25
**category** 19:17
58:1
**catheter** 101:16
**catwalks** 124:19
**causal** 36:18
**causation** 12:15
12:16 13:3,5 27:9
27:20 60:11 61:3
62:6,20 63:12,17
64:6 130:1 142:6
144:21,25
**cause** 39:6 44:4,8
51:18,23 52:2
72:18 87:14,25
116:10 117:21

120:20 128:24
132:6 144:12
**caused** 64:14 79:5
100:16 119:11,14
130:11,16 131:2
132:6 135:25
145:20 146:8
**causes** 39:19,21,23
46:4,7 128:9
**causing** 129:11
**ccr** 1:11 3:9
147:21
**center** 9:8 10:9
93:18
**central** 85:4,20
**centrally** 95:7
**ceramic** 65:2,6
**certain** 17:1 37:5
43:12 45:20 50:6
53:6 67:23 142:25
**certainly** 17:5
27:22 41:2,18
42:2 48:15 61:6
62:12 63:15
102:22 118:19
119:23 120:8
144:2
**certainty** 67:16,21
68:8 80:7 82:9
**certified** 92:13
147:3
**certify** 147:4
**cetera** 108:6
**challenge** 139:8
**challenging** 82:18
**chambers** 65:17
**chance** 70:6
**chances** 22:10
**change** 8:19 17:13
17:14 20:1 39:6
98:10 124:7

changed 112:15
119:1 125:15
changes 8:20 17:5
19:1 87:24 97:4
108:5 110:16
116:5 117:8 125:4
136:22
character 120:14
characterization
13:10
characterize 30:6
79:16 91:12
characterizes
27:16
charge 68:12,16
68:23 131:10
133:11
chart 18:5 43:24
check 111:5
chemicals 139:13
chief 80:16 93:1
chipped 125:25
chipping 96:3
chronic 38:25 39:6
39:20 44:4 49:11
51:19,24 52:3,13
54:25 57:13,21
58:2 61:18,24
97:3 98:2,15
110:21 120:22
123:25 126:16
circuit 65:22
citing 134:25
135:5
civil 3:8
claim 28:4,13,14
28:21,24 29:11
58:14 74:14
claimant 26:11
27:19,24 55:9
57:17 58:22 59:7

59:9,12
claimants 26:16
29:18 57:20,25
58:8,15
claiming 38:25
clarify 78:16
class 64:23
classified 20:4,13
classroom 114:3
clear 11:4 21:4
37:18 51:11 59:11
68:3 112:5
clearly 62:14
cleveland 21:22,24
22:2
climbing 124:17
clinic 2:16,17 9:9
14:17 21:23,24
22:2 70:15,19
73:23 76:4 77:5
clinical 5:19 17:17
20:1
clinicians 60:9
close 94:20 111:19
column 26:25
61:19 96:12
126:14 141:3
combination
102:24
come 43:22 65:18
70:20 74:17 98:20
101:22 111:7
112:7 116:16
comes 29:12 95:13
105:8
comfort 100:25
106:13
coming 94:21
137:15
comment 117:19

commentary
60:16
common 21:6,19
21:20 59:12 76:19
82:13
commonly 57:16
57:19
communication
129:5
communications
143:24
comp 28:13,13,21
companies 133:7
134:8 137:23
company 1:5 4:4
131:25
compare 103:3
compared 91:20
99:24
compatible 20:17
compensation
28:25 51:4 57:11
57:17 58:21
competent 120:7
complained 30:25
complaining
137:13
complaint 80:16
86:4
complaints 38:22
140:25
complete 33:9
137:19
completed 5:6,13
5:18 74:10 76:24
compliant 81:12
107:14
complication
119:19
complications
59:11 93:13 108:9

components 95:3
compound 30:4
39:16 54:9 56:24
57:14 60:15
compressing 95:8
compression
20:21
concentrating
122:14
concept 27:22
concern 69:4
80:24 117:19
concerned 117:16
concerning 24:1
24:12 57:12
conclude 130:11
concluded 146:17
condition 12:17,18
12:21,24,24 13:3
24:1 30:6 38:20
54:14 62:14 79:25
80:9,15 81:23
91:17 94:19 96:14
124:2,6 125:5,10
126:15 130:17,18
130:24 131:2
conditions 10:17
10:18,18 39:23
74:19
conduct 86:25
121:3
conducted 82:14
conducting 80:19
conductor 139:10
confirm 17:13
23:19 90:25
confirmed 117:18
conflict 136:3
141:22
confused 68:20

**confusing** 13:16
  86:19
**confusion** 70:25
**conjunction** 19:22
  32:6
**connected** 128:10
**connector** 130:10
**consecutively**
  73:17
**consent** 65:8 93:10
**conservative**
  79:19 80:2,7
  88:21
**consider** 20:16
  36:21 57:22
  108:14 112:8
  129:18 135:20
  145:9 146:2
**consideration**
  144:11
**considerations**
  61:18
**considered** 49:13
  55:10 103:15
  104:21 121:15
  136:24
**consistency** 80:21
**consistent** 38:17
  80:18 83:11,17
  84:4 85:25 86:5
  91:5 95:16 96:23
  96:25 107:13
  110:15 132:4
**consistently** 45:21
  138:21
**constitute** 134:13
**consultant** 134:15
**contact** 13:14
  144:3
**contacted** 71:14
  138:2 142:24

  143:15,20
**contain** 8:5,6,14
**contained** 13:7
  100:1 134:12
**context** 77:18
  83:20
**contexts** 38:1
**continue** 44:8
  85:20 105:16,25
  106:24 113:7
  123:7,25 126:10
  138:10
**continued** 2:25
  42:2,22 50:8
  60:16 85:21
  105:16 112:24
  123:16,18 129:19
  131:25
**continuing** 18:15
  19:5 26:19,23
  50:25 52:6 58:11
  60:23 112:13
  127:13 146:10
**continuously**
  124:15
**contracted** 139:7
**contributed** 19:25
**contributing**
  128:23 132:6
**contribution**
  19:20
**control** 102:22
  128:13
**controversial** 98:4
**conversation**
  37:19
**conversations**
  12:16
**converted** 121:12
**copy** 33:5 51:6

**cord** 10:14 126:18
  127:18 128:4,7,12
  145:8
**correct** 5:23 6:10
  6:15 12:12 13:8
  14:6,20 15:6,11,14
  15:23 16:22 19:2
  20:9 22:23 23:14
  25:4,10,13 29:16
  29:19 30:3,13,16
  30:17,20 31:1,6,11
  31:14,19,22 32:21
  33:1,25 34:15,15
  34:19 35:5,15,18
  36:5,13,14 37:3
  39:11 40:15 42:9
  42:12,17 43:8
  45:6 46:2,5,8,11
  46:12 47:4,19
  48:6,17 52:23
  56:4,8,11 58:15
  59:5 64:3,4,14
  67:4,6,13,14 68:17
  71:12,13 74:20
  75:24 78:5,6,14,15
  83:23 85:12 102:4
  102:17 103:11,14
  104:25 105:13
  108:20 110:8
  113:22,25 114:1
  115:4,10 122:8,17
  122:18 125:23
  126:2,6 129:2,24
  133:20 135:5
  136:5,6 138:4,15
  140:18,21,25
  141:5,6,11,14,15
  141:24 142:14
  144:18,19,23
  145:13,21

**corrected** 41:18
**correctly** 20:6
  22:13,17 26:2,6,17
  26:20 27:5 28:24
  49:16 51:20 52:4
  52:9 53:19 55:19
  60:13,17 61:25
  79:14 83:8
**correlate** 24:3,18
  47:7 145:24
**correlated** 57:16
**correlates** 46:25
**correlation** 42:11
  69:4 87:5
**cosigned** 33:23
**could've** 14:8
**counsel** 4:7 73:15
  140:6
**counsel's** 60:15
**country** 140:9
**couple** 29:25 83:1
  96:7
**coupling** 67:1
**course** 10:25
  12:17 26:24 33:23
  51:4 58:19 71:4
  90:24 106:8,11
  117:9 136:13
**court** 1:1 4:5 12:9
  65:15,20,22 71:1
  147:3
**created** 102:1
  104:23
**creating** 55:13
**creation** 99:11
**credibly** 27:3
  49:13 55:10
**creifers** 1:21
**cross** 2:4 70:2
  143:18

crossing 131:21
cs4172876 1:25
ct 119:21
cure 129:8,10
current 9:3 26:16
currently 4:4
cut 97:15 120:5,9
cutaway 94:25
cv 1:4 2:10,11 4:7
7:15,16,22 8:14

**d**

damage 93:13
damaged 95:10
128:23
dangerous 124:18
124:23
dark 104:10
date 4:2 8:10,16
16:24,25 18:14
51:8 72:8 77:12
77:15 90:16
115:25 121:2
139:24
dated 61:16
day 70:22 91:14
98:4 100:9 113:3
131:25 147:12
days 14:3 64:3
66:17 93:21
101:25 122:1,3,4
122:12 131:5
december 6:17,20
decision 117:2
decisions 134:19
declared 65:13
decline 61:11 63:5
63:6
decompress 96:9
decompression
11:3 35:21 100:9
116:7

deconditioning
39:22 40:2
decrease 85:17
107:1 121:24
decreased 123:18
deep 104:18
115:13
defect 117:9
defendant 1:6,9,18
defendants 73:19
defer 77:23 129:13
deficit 30:9 34:18
41:24
deficits 34:10,14
define 62:15
135:16
defined 12:8 17:9
136:18
defining 57:1
definition 20:11
48:7
degeneration 20:5
23:7 98:14
degenerative 17:3
17:5,6 19:1,21,23
19:25 20:13 87:24
98:1
degree 67:16,20
68:7 77:21 78:20
80:6 82:9 113:19
120:17
delayed 108:8
demanding 48:4
demonstrable
38:16
demonstrate
126:23 137:11
demonstrated
26:15
demonstrating
55:12

denied 113:4
denote 118:11
denoted 86:19
denton 1:14
deponent 11:10
deposes 4:15
deposition 1:9 3:6
4:3 11:8 28:23
56:2 67:23 68:12
70:13 83:25 87:12
98:24 136:8
142:11,23 143:2,9
146:17 147:6
depositions 73:18
112:2
depressed 122:1
depression 120:25
121:3,9,13,20
122:7,20 123:16
137:1
dermatomal 34:15
34:25
dermatome 34:16
describe 12:17
21:1 35:24 75:18
75:19 88:6 94:9
115:6
described 24:24
35:23 66:23,25
67:1 79:23 98:8
114:7,8 131:24
describes 34:10
description 2:9
3:1 20:2 34:13
descriptions 141:9
despite 106:4
destabilize 97:22
detail 21:1
determination
16:5

determine 17:2
39:10 88:9 119:13
135:24
determining 17:9
develop 58:14
120:20,24
developed 119:15
developing 12:14
120:12
developmental
74:19
develops 57:13
device 126:17
128:10
diagnose 10:17
37:17 90:4,11
122:20 132:22
diagnosed 121:20
137:8
diagnoses 136:23
diagnosis 82:9
83:22 84:25 85:25
89:16 90:22
131:16 146:5
diagnostic 88:8
dictated 76:23
dictation 83:18
die 93:14
difference 135:8
different 32:6
35:23 41:2 46:20
86:10 112:15
120:14 135:15
difficult 27:23
49:12 61:13 96:16
104:6
dilatory 54:23
direct 2:3 4:17
directly 90:1
disability 54:21

| | | | |
|---|---|---|---|
| **disabled** 139:22 | **discussing** 83:15 | 90:22 92:18 98:23 | **dose** 44:11 |
| **disagree** 143:21 | **discussion** 106:3 | 100:2 105:7 | **downward** 54:25 |
| **disc** 15:24 16:9 | 111:21 | 106:19 115:25 | **dr** 2:21 4:3,22 8:8 |
| 17:2,4,6,6,7 19:17 | **discussions** 18:4 | 123:23 126:11 | 8:22 11:23 12:12 |
| 19:22,23 20:17,19 | 60:12 | 127:20 129:13,21 | 21:10,23 24:10 |
| 20:20,24 21:6,8,10 | **disease** 98:1 | 129:23 130:1,5 | 27:16 28:22 33:11 |
| 21:16,17,18,20 | **dislocation** 19:19 | 131:4 132:3,9,13 | 40:11 44:2 50:13 |
| 22:11,21 23:1,1,2 | **dismissed** 65:13 | 132:20 133:15 | 53:3 54:6,11 57:9 |
| 23:3,6,6,12,17,18 | **disorder** 36:22 | 136:4 137:4,8 | 59:6,14 62:5 |
| 25:9,12 65:2,6 | 37:11,13,17 38:3 | 145:9,22,23 146:2 | 64:16 68:5 76:3,7 |
| 66:1 83:5,23 84:4 | 38:10 39:1 62:23 | **doctor's** 83:24 | 79:20,21 81:5 |
| 84:19,23,25 85:3,4 | 69:1 136:11,15,17 | 86:2 89:18 126:3 | 82:24 84:6 85:23 |
| 85:7,14,20 86:1,6 | 136:24 137:1,9 | 144:24 | 92:22 131:18,18 |
| 86:13,14,16,19 | **disorders** 10:14 | **doctors** 91:20,21 | 138:22 139:19 |
| 89:13 90:24 91:1 | 39:15 | 92:3 106:15 | 140:6 142:4 |
| 91:4 94:20 95:4,7 | **dispute** 145:4 | 134:20 135:4,14 | 143:15 |
| 95:9 96:10,14,18 | **disputed** 140:11 | 135:15,17 | **driving** 42:5 |
| 97:9,12,12,18 98:1 | **disrupt** 129:5 | **document** 26:19 | 102:16,19,25 |
| 98:5,8,10,11,13,14 | **disrupted** 96:21 | 27:25 52:7 55:23 | 109:11 110:11 |
| 98:17,20 99:6,6,9 | 98:19 | 58:18 60:22 62:2 | **dropped** 52:21,22 |
| 99:11,13,18,21,24 | **disrupting** 97:23 | 102:1 | **drops** 53:4 |
| 100:3,4,16 108:10 | **disruption** 19:17 | **documentary** | **due** 25:2 75:15 |
| 118:6 140:17,20 | 97:3 | 24:19 | 110:16 111:8,12 |
| 145:18,19 146:8 | **dissection** 96:21 | **documentation** | 111:18 |
| **discectomy** 11:3 | **distortion** 27:1 | 37:1,7 144:1 | **duly** 4:15 147:5 |
| 35:12,22 96:16 | **distracting** 138:25 | **documented** 32:20 | **duplicative** 8:4 |
| 97:7 | **distribution** 31:1 | 36:3,9 39:9 84:1 | **duties** 66:22 |
| **discharge** 101:25 | 34:15,25 | 121:6,24 130:5 | 111:22 |
| **disclaimers** | **district** 1:1,1 4:5,6 | **documenting** | **duty** 74:14 114:7 |
| 133:23 | **division** 1:1 4:6 | 26:13 | |
| **disclaims** 49:3 | **doctor** 9:23 10:11 | **documents** 87:14 | **e** |
| **disclosed** 11:19 | 13:11 19:2,10 | **doing** 27:19 69:2 | **e** 51:10 147:1,1 |
| **disclosure** 11:22 | 27:7 35:3 36:17 | 70:13 74:4 90:24 | **earlier** 30:20 |
| **disclosures** 2:12 | 39:13,20 41:20 | 109:17 110:6 | 41:14 45:24 56:1 |
| **discs** 20:3 22:8,23 | 48:24 52:18 55:8 | 116:3 121:25 | 62:7 63:3 86:3 |
| 126:2 140:18 | 59:3,22 60:3 | 132:25 135:4,4 | 87:12 125:11,19 |
| **discuss** 79:13 | 68:19,25 69:19 | 137:24 | **early** 28:11 70:20 |
| 83:13 | 70:4 71:10,20,21 | **dorsal** 126:14 | 88:13 |
| **discussed** 52:19 | 72:3,11,17 73:21 | 141:2,3 | **easier** 103:21 |
| 83:5,19 106:5 | 75:5 77:9 79:17 | **dosage** 44:19 | **eastern** 1:1 4:6 |
| 127:8 | 83:8 89:8,12 | | **educated** 10:13 |

**education** 5:2
18:15 51:1 72:3
72:23
**effect** 11:11 32:18
53:16 54:23 81:9
**effects** 54:4 103:22
126:19
**effort** 37:16 39:9
67:24 80:21
**eight** 35:2 43:24
70:19 74:9 91:15
**either** 22:25 47:8
61:8,10 63:4 88:7
90:8 137:7 142:20
**elbow** 131:7
**electrical** 128:12
131:10
**electrodes** 128:4
**elevating** 95:7
**elevation** 17:15
21:2
**eliminate** 37:12
**eliminated** 55:17
**elimination** 55:14
**employee** 29:1
**employers** 143:16
143:21,24 144:3
**encounter** 13:19
**endure** 70:23
**energy** 122:4
**engaging** 60:10
**enlarged** 3:2
103:16
**entered** 40:25
41:17
**entire** 25:1 53:12
57:8
**entitled** 144:10
**entry** 32:18
**epidural** 126:24
127:9

**equal** 22:11,21
**equate** 46:14
**equipment** 110:8
124:18
**equivocal** 17:16
**error** 40:23 41:4
41:16
**especially** 24:3
38:16 41:25 44:4
52:2 54:18 69:3
85:20 88:13 97:21
113:17 118:20
**essentially** 110:24
121:10
**establish** 52:15
**established** 24:6
**establishes** 73:22
**estimate** 10:19
**et** 2:13 108:5
**ethical** 106:19
**ethically** 106:16
135:21
**evaluate** 36:6
86:25 116:5
**evaluated** 71:20
79:10 124:1
**evaluating** 107:6
**evaluation** 27:8
29:14,24 31:24
36:24 37:15 61:23
63:22 71:15,25
72:13 79:17,23
82:19 83:13,20
84:2 113:25 114:6
121:14,19 123:10
132:4 137:24
**evaluations** 27:2,3
**evaluator** 59:22
60:7 62:6
**evening** 70:4,16

**event** 24:21
145:20,25 146:4
147:10
**events** 24:16
**evidence** 19:18
20:4 24:19 32:20
100:15
**evolve** 61:5
**evolved** 12:24
**evolves** 62:9
**exacerbated** 96:14
**exactly** 20:23
47:23 51:11 60:5
71:8 86:24
**exaggerate** 26:16
115:23
**exaggerating** 81:7
**exaggeration**
69:15 80:24 81:11
**exam** 14:23 15:1
15:10,13,17 17:18
25:6,7 29:25
30:19 33:12,19,20
34:3,9 36:8 37:7
69:11 74:4 80:13
86:5,25 141:11,20
**examination** 2:3,4
2:5,6 4:17 70:2
80:12,19 82:5,12
85:25 115:6 140:4
143:13,18 145:16
**examinations**
82:14
**examined** 32:4,10
32:17,20 36:4,11
37:2 76:25
**examinee** 25:25
26:11 27:4
**examinee's** 55:16
**examining** 114:23
137:13

**example** 12:15
85:6 127:9
**exams** 69:9
**excessive** 115:22
**exclude** 62:21
**excluded** 57:20
**excuse** 48:24 59:2
87:10 99:4 111:11
141:2
**exercise** 107:20
135:9
**exhibit** 3:1 7:15,18
7:21,23 8:9,13,14
11:22 12:2 21:9
21:12 23:10,15
28:5 33:3 35:2,6
50:17,20 51:11
55:24 56:5 58:19
58:24 73:6,11,14
73:15 88:16,23
94:7,12 103:8,12
103:18 126:21
127:2 134:10,22
136:14
**exhibits** 2:8,25
73:14,16 121:8
**existing** 130:24
**exists** 41:19
130:22
**exit** 84:17
**expect** 105:2,5
**expected** 59:19
63:9 108:1,2
117:15 142:19
**experience** 21:17
49:20 50:2 54:6
54:12,20 57:12
59:8 72:17,22
93:5 128:21
**experienced** 16:13
16:15,17 23:13

88:21
**experiences**
138:22
**experiencing**
23:24 130:3 131:8
**expert** 2:12 11:7
11:20 12:6,8 13:2
59:16,23 61:9,11
62:6,16,19,20 63:5
63:11,14,18 64:10
68:21 142:15,19
142:21 145:1,23
**experts** 61:3 68:22
141:21
**explain** 53:5 84:10
88:20 94:11
103:21 118:20
126:15,23 128:1
**explained** 57:10
90:23
**explaining** 89:4
94:19
**explanation** 119:2
**exploration** 96:19
**explore** 36:24
68:10
**expose** 95:21
99:17
**exposed** 99:2
138:23
**exposure** 136:13
**express** 72:18
130:7 135:15
142:14 144:21
146:7
**expressed** 132:5
**expressing** 135:3
**expression** 115:22
128:25
**expressions**
141:16,17

**extends** 104:3
**extension** 115:13
**extensive** 96:17
117:15
**extent** 12:8 27:13
32:12 88:2 117:3
141:25
**extra** 26:10
**extreme** 38:19
**extremities** 41:25
113:6 131:9
**extremity** 107:25
**extruded** 20:19
97:10,11 98:9
**extrudes** 95:13
**eyes** 62:20 103:22
117:1

**f**

**f** 147:1
**facet** 84:20 89:21
89:23,25 90:2,3
108:9 116:6,8
118:8,13,15
119:18,24,25
**facial** 115:22
141:16,17
**facilitate** 96:18
**facility** 76:4
**fact** 11:9 23:12
43:13 45:7 62:10
65:13 68:24 83:16
89:16 91:1 133:13
133:22 135:14
143:6
**factor** 29:14 39:10
**factors** 34:9 38:15
55:5 57:23,24,25
62:21
**facts** 12:14 64:11
132:3

**fail** 29:19 39:15
**failed** 26:1 50:12
65:14 98:2 114:11
**failure** 42:17 65:8
122:11
**fair** 11:24 12:6
13:9 58:10 59:16
82:3 144:10
**fairly** 42:6 94:9
104:15 105:23
**fall** 17:17 23:25
25:2 28:18 64:3
78:21 95:10
130:16
**falling** 122:2 130:8
131:6
**falls** 99:17
**familiar** 18:10,19
21:25 22:2 25:15
25:18 27:7,10
44:2 48:16 50:18
52:25 53:21 56:15
56:21 127:23
**family** 71:20 75:5
122:11 131:5,14
**far** 15:9 18:15
41:13 118:24
135:7
**fardon** 2:13 19:16
**farm** 110:7,8
**fashion** 32:4
**fault** 51:15 144:7
**fayetteville** 5:3
**fda** 65:7
**feb** 2:20
**february** 6:17
**fecal** 20:21
**federal** 3:8 12:9
65:20
**feel** 24:2 53:12
57:7 64:5 105:25

106:6,13 114:23
119:1 124:2
**feeling** 36:23
113:16 121:25
122:3,10
**feels** 46:21
**feigned** 38:20
**fell** 75:20 77:7
87:16 130:4
131:22,23
**felt** 15:24 20:16
32:7 50:11 78:19
84:3 87:5 106:10
124:4 141:19
145:12
**fibrosis** 95:5,13
98:18
**fibrous** 118:16
**field** 91:18 92:11
120:19
**file** 24:20 28:17
29:8
**filed** 28:12 56:3
**fill** 43:20 74:5,22
121:11
**film** 104:8
**films** 89:17
**final** 129:22
135:21
**finally** 66:6 145:18
**find** 20:8 119:10
136:25 141:13
**finding** 16:9 17:10
30:2 115:1
**findings** 14:25
15:9,23 16:2
17:17,21 18:3,25
20:12,17,18 21:18
24:3,4,17 25:6
26:9,13 30:1,9,15
32:7,7 36:7 37:10

38:17 52:19 53:1
53:14 72:14 80:15
82:6 86:5 87:6
**fingernails** 137:14
**finished** 5:18
**first** 4:15 13:11,19
14:16,16 22:15
25:23,24 28:16
37:5 49:8 51:7
60:7 61:14 65:20
68:13 71:19 73:21
74:1 76:22 95:20
121:19 147:5
**five** 21:24 83:7
86:12 102:16
111:17
**fixable** 120:16
**flareups** 44:11
66:19 114:9
**flexibility** 119:7
**flexion** 115:13
**flip** 11:16
**flopping** 137:12
**flushing** 111:6
**focus** 12:1,6 61:23
80:14
**foley** 101:16
**folks** 100:8 112:4
135:8 137:22
**follow** 13:20,21
81:15 103:5
109:22 129:22
**followed** 107:17
113:24 146:4
**following** 25:24
49:10 51:17 53:13
54:3 55:8 60:8
61:19 70:7 107:3
120:22 126:10
131:20

**follows** 4:16 19:16
52:1
**foot** 84:17
**foraminotomies**
35:20
**foraminotomy**
35:12
**forced** 61:5
**forces** 99:2,16,18
**foregoing** 147:6
**forensic** 27:2,8
60:10
**form** 12:7,15
17:22 19:3 22:14
24:7 26:3 29:20
38:4 46:15 47:5
48:10 60:14 62:1
74:16,23 77:14
**form's** 76:1
**formal** 20:11
144:1
**former** 124:9
**forms** 55:14,18
74:6,9,23 75:16
76:24
**forward** 109:3
115:15
**found** 17:20 18:3
25:9,12 56:17
96:21 114:4 117:7
**foundation** 17:23
19:4 22:16 26:4
27:15 28:7 29:13
29:21 30:2 32:13
38:5 39:3 47:6
48:11 49:4,18
50:4 52:6,15
56:13,19 57:15
58:7 59:4,18,24
60:22 62:2 63:2
67:18 92:7 143:5

**four** 75:2 83:7
103:10
**fourteen** 14:3
**fourth** 1:15 52:1
**fracture** 18:7
19:19 20:8 108:9
108:10 116:6
117:17,20,25
119:10,21,23
120:2,3
**fractured** 118:14
126:5
**fractures** 119:20
**fracturing** 116:8
**fragment** 21:3
118:17
**fragmentation**
19:21
**fragments** 97:14
**frankly** 144:5
**free** 53:12 57:7
**frequent** 69:6,6
125:4
**frequently** 66:14
66:16
**front** 31:15 40:8
44:25 45:3,6
62:12 63:8
**full** 4:19 7:4 72:11
80:21 93:21 119:4
**function** 53:18,24
119:7
**functional** 47:21
**functions** 99:12
104:22
**fundamental** 27:1
**further** 36:24
69:12 98:14
103:24 140:2
143:11

**fusion** 97:19,20,25
97:25 98:16
**future** 127:5

**g**

**g** 1:14
**gain** 58:11
**gait** 15:4
**general** 11:5 22:20
23:4,7,18 25:13
27:22 57:25 62:7
80:14 90:18 94:1
100:21 121:14
136:12,12 139:17
**generally** 10:11
24:2 61:13 86:22
95:24 105:4
136:24 141:24
142:4
**generated** 76:23
122:22
**generator** 128:11
**generically** 26:12
**getting** 44:13
144:11
**girardeau** 6:3 76:8
**give** 12:19 13:2,6
19:4 26:22 29:4
33:6 44:1 52:5
59:16 63:14 64:5
64:8 89:8 96:8
112:2 125:8 130:7
141:23 142:5
**given** 7:22 26:25
49:10 62:23 92:1
104:13 121:10
**giving** 11:3 26:18
36:18 59:22 60:6
80:21 84:6 136:8
**gluteal** 88:1,5
**go** 5:1 48:3 54:21
55:2 57:3 66:17

73:8 75:14 76:17
81:18 83:2 88:15
89:14 94:8 97:8
100:5,6 101:24
102:2 107:18
108:16 109:3
112:12 123:15
128:5,10 134:11
134:22
**goal** 81:22
**goals** 53:16
**gocio** 1:9 3:7 4:3
4:14,21,22 8:8,22
11:23 12:12 21:10
21:23 24:10 27:16
28:22 33:11 40:11
44:2 50:13 53:3
54:6,11 59:6,14
62:5 64:16 68:5
79:20 81:5 82:24
84:6 85:23 92:23
138:22 139:19
140:6 142:4
143:15 147:4
**gocio's** 2:21
**god** 104:23
**goes** 40:1
**going** 7:15 11:12
26:22 32:24 52:5
62:15,16 69:19
84:7 98:8 103:7
103:15 105:2,4
115:5 125:16,24
136:11 139:22
**good** 38:15 51:18
51:24 70:4 82:1
90:18 98:5 108:13
119:25
**gore** 1:23
**gosh** 9:25 39:21

**gotten** 134:23
**gradually** 44:11
54:17 85:17 110:5
**graph** 43:25
**great** 79:12
**greater** 21:1 50:3
99:1 104:14
113:12
**ground** 75:21
131:23
**group** 9:5,7 58:1
64:22
**grow** 105:3 120:6
**guess** 9:25 57:18
**guide** 50:17 61:15
**guideline** 125:8
135:18,20
**guidelines** 121:15
121:16
**guides** 2:15,18,20
25:15 49:7 60:4
134:2
**guy's** 65:17
**guys** 134:3

**h**

**haley** 26:9
**half** 75:19 107:19
122:3,12
**hand** 18:9 26:25
32:24 33:11 40:10
51:3 60:3 61:15
61:18 73:5 84:7
88:16 94:7 103:7
103:15 126:21
127:7,17 147:11
**handed** 21:23 49:7
73:4
**handle** 99:16
**handrail** 130:9
**hands** 114:23

**happen** 85:13
144:4,4
**happens** 13:7
**happy** 12:10 24:9
45:3,15,17 51:7
68:10
**hard** 11:3 12:25
56:25 62:18
107:11 119:19
**harm** 51:18,24
**harmful** 54:4
**hats** 63:8
**hazardous** 139:13
**head** 44:1
**heal** 91:15 102:12
105:21
**healing** 9:24
105:19 107:4
108:4
**health** 90:18
**healthcare** 76:2
121:18 131:6,14
**hear** 109:17
**hearsay** 22:16
**heavier** 113:1
**heavy** 45:22 46:4
46:21 47:2,3 48:3
66:25 113:20
**height** 41:6,7,8
**held** 10:5
**help** 53:23 73:8
78:16 84:10 90:11
101:12,18 102:3
106:16 107:21
112:3 138:7
**helped** 101:3
**helpful** 54:19
88:20 94:10
126:23 144:21
**helping** 138:3

**hematoma** 108:5
**hereinbefore**
147:8
**hereunto** 147:11
**herniated** 22:8,11
22:23 23:1 85:7
86:1 89:13 90:24
91:1,4 94:20 98:8
100:16 118:6
140:18 145:18,19
146:8
**herniates** 85:14
**herniation** 15:24
16:10 17:2 19:22
20:17,24 21:8,16
21:17 22:21 23:3
23:13,17,19 25:10
83:5,23 84:4 85:1
85:4,4,21 86:6
95:6 96:14 98:13
99:10,21,25 100:4
140:17,20
**herniations** 21:6
21:11,19,20 23:6
25:12 98:12 99:6
99:7,24
**high** 10:12 138:24
**higher** 121:16
128:4
**highlighted** 73:9
75:3
**highly** 91:18
**hip** 16:15,18 80:17
84:14,17 85:16,18
88:5,14 104:1
105:12 109:12
110:12 112:24
114:4,8 115:14
116:9 118:20,24
131:9

| hips 102:21 | hurry 57:8 | image 85:9 104:5 | 138:11 |
|---|---|---|---|
| hired 28:3,16 29:7 | hurting 122:16 | images 20:2,3 | improves 49:23 |
| 56:3 137:23 138:1 | 137:14,14 | 83:16 | 54:7,14 |
| hiring 28:20 | hurts 131:11 | imagine 49:12 | impulses 128:12 |
| history 33:19 | hydrocodone 43:2 | 133:25 | inability 59:25 |
| 40:21,24 41:15 | 43:9,19 44:9 45:6 | imaging 17:10,12 | inadequate 143:22 |
| 62:24 71:24 74:2 | 45:8,9,14 50:3,9 | 19:18 20:3 22:8 | 146:11 |
| 77:3,13,19,24 80:8 | 50:10 66:15 102:9 | 24:4 37:9 38:17 | inches 41:7 |
| 82:7 86:24,25 | 110:1 | 72:14 77:5 87:1,6 | incident 16:13,21 |
| 87:7,14,19 96:23 | hypothetical | immediate 131:24 | 77:12,15 98:18 |
| 112:17 130:3 | 132:9 143:23 | impair 138:25 | 111:10,14 119:14 |
| 131:18 | 144:23 146:11 | impairment 26:17 | 130:11 131:5 |
| histrionic 38:20 | | 27:2 55:12,14,18 | 132:5 136:1 |
| histrionics 137:11 | **i** | 61:22 | 139:24 144:8 |
| hold 10:8 94:15 | ibuprofen 132:1 | impinge 89:14 | 146:9 |
| holding 118:3 | idea 40:23 59:15 | impinging 91:4 | incidents 144:7 |
| home 1:10 7:4,10 | ideal 50:16 | 94:21 | incision 95:21 |
| 8:15 9:4 10:10 | identification 7:19 | implant 126:25 | 105:15 |
| 102:15 107:20 | 7:24 12:3 21:13 | 127:18 | include 10:15 |
| hope 73:7 | 23:16 28:6 33:4 | implanted 126:17 | 12:23 19:19 30:6 |
| hopeless 122:1 | 35:7 50:21 56:6 | 128:14 | 139:12 |
| hospital 10:8 | 58:25 73:12 88:24 | implants 128:3 | included 96:17 |
| 91:15 93:2 94:2 | 94:13 103:13,19 | importance 38:9 | includes 19:17 |
| 100:7 102:1,2 | 127:3 | 80:13 | including 35:21 |
| 128:17 | identified 36:18 | important 29:11 | 60:11 72:13 138:6 |
| hospitalized 93:21 | 70:25 | 38:1,13 117:1 | inconsistency |
| hot 5:22,25 132:1 | identifies 97:6 | 145:24 | 80:25 |
| hour 68:13 70:22 | identify 4:7 95:3 | impression 56:14 | incorrect 41:12,13 |
| 110:11 111:18 | identifying 73:15 | 78:20 | incorrectly 41:17 |
| hours 69:20 70:7 | iliac 104:1 | impressions 81:10 | increase 45:24 |
| 81:4 84:7 109:11 | illinois 6:9,18,21 | improve 49:25 | 85:18 107:3 109:1 |
| 124:15 | 9:17,18 92:17 | 50:1 54:14,16 | 109:18 138:22 |
| house 110:7 | illness 74:25 77:3 | 98:3 124:3 | increased 44:22 |
| huh 7:20 35:8 | 136:19 | improved 41:23 | 48:1,1 99:23 |
| 40:14,16 | illustration 3:3 | 100:10 113:3 | 109:10,11 110:5 |
| human 84:13 | 88:18,19 89:2 | improvement | 110:14 112:24 |
| humanity 100:25 | 95:16 97:6 100:6 | 38:14 41:22 48:8 | 114:7,13 116:7 |
| hundred 42:18 | 103:6 128:1 | 49:14 53:17,18,23 | increases 108:24 |
| hundreds 93:23 | illustrations 2:22 | 53:24 55:11,15 | increasing 110:11 |
| 116:21 | 2:23 88:17 94:8 | 90:11 105:11 | independent 63:13 |
| | 126:22 | 114:9 124:5 | 134:14 135:10 |

**index** 2:1
**indicate** 16:2
  24:20 26:9 28:2
  31:4 32:25 40:17
  51:23 52:19 60:5
  75:25
**indicated** 15:22
  29:7 75:16 76:3
  77:11
**indicates** 19:16
  22:7,19,22 27:8,18
  41:11 44:3 52:12
  53:1,22 56:16
  57:10 102:2,14
  129:22
**indicating** 13:5
  18:25 38:24
  115:22
**indication** 32:10
  32:16 59:19 67:12
  75:8 77:14 80:11
  97:24,25 109:13
  121:8 122:6
  136:25
**indications** 46:10
  97:20
**indicator** 108:7,8
**individual** 38:10
  49:3 58:22 67:21
**individually** 64:24
**individuals** 29:18
  38:2 39:14 58:13
  136:14
**infection** 108:8
**inflammatory**
  79:8
**inform** 117:3
  134:3
**information** 12:14
  13:6 16:19 18:5
  21:22 29:4 48:20

48:23 63:11,16
  64:9 72:11,13
  74:24 109:16
  130:2,10 134:12
  144:22
**informed** 56:2
  65:8 93:10
**initial** 2:16 13:14
  31:24 36:7,25
  45:16 63:19 79:23
  82:19 83:13,20
  84:2 141:13
**initially** 14:10
**initiating** 110:19
**inject** 90:1
**injection** 89:21,23
  125:16 127:9
  131:17
**injections** 79:11
  79:19 87:19 88:11
  88:12,21 89:9,10
  90:6 125:18
  126:24,24
**injured** 87:15
  104:14
**injuries** 57:21
  72:19 74:20
  104:19 131:7
  132:23 144:6,12
**injury** 19:20,24
  20:4 21:11 23:14
  23:18,19,20 24:23
  25:13 46:14,16,23
  46:25 63:19,20
  74:14,25 75:15,17
  75:18 78:9 87:24
  99:7,9 119:16
  130:8,16,19,25
  131:2,20 135:25
  138:20 140:18

**innervation** 89:25
**inquiries** 66:12
**inserted** 90:7
  101:18
**inside** 98:20
  104:18
**instability** 97:21
  117:13,21 118:18
**insurance** 134:8
  134:20
**intake** 121:4
**intended** 100:11
**interaction** 112:22
**interest** 121:25
  135:22 136:3
  141:22
**interested** 147:10
**intermittent**
  108:12 113:2
**intermittently**
  108:20
**internal** 61:20
**internship** 5:15,16
**interpretation**
  117:24 121:13
**interpreted** 90:25
**interrupt** 43:4
**interspinous** 96:22
  97:1,4
**interval** 45:17
**intervals** 43:24
  44:21
**intervertebral**
  84:23 86:13
**inventory** 37:22
**investigated** 66:7
**involved** 71:1
  73:18 133:6
  145:23
**involves** 60:10
  126:17 136:20

**involving** 53:10
**irritation** 105:18
  108:3
**issue** 25:16 31:5
  65:9 140:13
**issued** 133:22
  139:5
**issues** 39:14
**iv** 101:15

**j**

**jan** 2:20
**january** 112:13,23
**job** 1:25 66:22
  67:9,13 111:22
  124:9 139:10,15
  139:23
**jobs** 48:4
**john** 1:23
**joined** 131:23
**joint** 79:10 87:19
  87:23,25 88:1,5,12
  89:25 90:1,3,8
  118:9,13,16
  119:18,24,25
  120:1 131:17
**joints** 84:14,20,20
  87:21 90:2 116:8
**jonesboro** 4:6
  75:22
**journal** 2:13 18:10
  18:10,18,20 19:15
  21:10 57:9
**judgment** 20:1
  65:20,21,23,24
  135:10 136:20
**july** 1:10 3:9 4:2
  14:11 43:16,20
  45:9 125:12
  147:12
**jumping** 81:21

**june** 2:17 13:13,16
13:17 14:1,4,5,7
14:13,17,19 15:13
25:7 28:3,16
29:24 31:11,14,17
31:25 32:9,15,23
32:25 33:14,16,24
34:8,14 60:4
82:12 90:15,15
103:10
**jury** 65:10,12,19
65:24 70:11 84:10
87:21 88:20
103:22

**k**

**keep** 61:9 62:11
136:22 139:6
**kentucky** 6:13,24
9:17,19 92:17
**kept** 131:13
**kevin** 76:3,7
131:18
**key** 53:16
**kgb** 1:4
**kind** 10:20 17:14
23:2 30:11 40:1
54:25 56:22 61:4
62:25 63:5,19
74:15 80:13 85:14
85:19 87:3 89:2
95:24 100:22
102:10 108:1
111:11 113:14
121:14 127:8
130:6 137:1,8,11
139:21 146:3
**knee** 131:7
**knew** 63:8
**know** 9:25,25 11:2
11:6 12:18 13:2
16:4 17:13 25:12

27:21 31:9 36:8
41:1,3,15 43:24
45:5,7 46:16
48:12 57:1 58:8
59:10 61:4,12
62:10,13 63:4,17
66:14 68:21 73:4
76:7,10 78:8
81:21 102:6
106:19 129:25
133:3 134:6 143:3
143:6,6,7,25
**knowing** 44:7
139:5
**knowledge** 8:11
27:22 33:1 41:13
49:10
**known** 55:18
119:19 142:18,19
**knows** 76:16
**knuckle** 75:21
130:9 131:22

**l**

**l** 86:7
**l2-3** 35:21
**l3** 15:25 35:19
83:7 104:3,12
118:8,11
**l3-4** 117:18 118:1
118:5,12
**l4** 35:20 86:14,17
104:2,12 118:11
**l4-5** 15:25 20:20
35:12,22 83:5
85:1 86:1,21
89:13 94:21 97:7
**l5** 16:1 35:20
86:15,17 96:22
104:2,12
**label** 33:18 65:9

**lack** 17:22 19:4
22:15 26:4 27:15
28:7 29:13,20
32:13 38:4 39:2
47:5 48:10 49:4
49:17 50:4 52:6
55:17 56:12,19
57:15 58:6 59:3
59:17,24 60:21
62:1 63:1 67:18
92:7 143:4
**ladders** 124:18,19
**lamina** 84:21 96:4
97:3,16 104:5,6,9
104:23 105:2,6
**laminectomy**
35:11,14,19 83:7
104:12,20,20
117:9 119:18
**landed** 75:20
**lands** 99:17
**lapse** 9:21
**large** 53:10 85:4
100:9
**larger** 91:13
**lateral** 115:13
**law** 143:5
**lawsuit** 28:17,25
29:8 56:3,11,18
59:7 62:22
**lawsuits** 58:5,9
65:10
**lawyer** 70:8 87:12
132:16 136:7
145:3
**lawyer's** 81:4
**lawyers** 134:7
137:7
**layers** 26:10,11
27:1

**lead** 19:15 55:15
98:15 99:18 116:7
**leadership** 10:5
**leading** 17:22 19:3
22:15 24:7 26:3
29:20 30:4 32:22
38:4 39:2 47:5
48:11 49:17 52:14
56:20 57:14 58:6
58:16 59:2,3,5,17
60:14 63:1 67:25
143:4
**leads** 19:12 128:10
**leans** 131:11
**led** 20:23
**lees** 26:9,13
**left** 26:8 89:3
94:18,24 117:17
118:1,13,22 127:7
131:7,7
**leg** 15:4,6 16:15,18
30:19,25 31:2,4,8
31:10 41:23 69:11
78:25 80:17 82:7
84:17 85:17,18
88:3 89:6,14
100:10 105:12
109:12 112:25
115:14 116:9
**legal** 74:15 99:4
134:13,20
**legally** 143:3
**legislation** 121:18
**legs** 88:14 102:22
131:15
**letter** 133:15
**letters** 73:19
**level** 10:12 15:25
30:8 49:22 54:7
64:10 83:5 85:1,3
85:7,10 86:1,8,16

86:16,17 89:13
91:2 94:20 97:7
100:4 104:11
106:14 113:16,17
118:5
**levels** 35:14,20,25
96:13 138:24
**license** 9:21,23
66:7
**licensed** 9:10,13
9:18
**lied** 65:14
**life** 22:10 53:17,24
74:18
**lifetime** 21:8
**lift** 113:21
**lifting** 45:22 46:4
47:2,3,11,13,17
48:1 66:25 102:16
106:24 110:6,14
113:1,12,16,16,17
113:20 123:2
124:12
**lifts** 46:21
**ligament** 17:15
21:2,4 96:22 97:1
**ligamentous** 39:22
97:23
**ligaments** 95:7
97:1,4 120:6,9
**light** 42:7 80:9
102:15 109:21
110:6 114:7 116:3
123:10 129:18
139:19
**limit** 45:25 123:2,3
123:6
**limitations** 72:23
102:11 139:24
**limited** 13:6
145:15

**limiting** 114:10
**line** 75:9 108:18
**lines** 18:5 75:19
83:1
**lippincott** 18:17
**list** 93:9
**listed** 40:20 102:8
**lists** 7:16
**literally** 78:2
93:23 116:21
129:3
**literature** 24:5,12
27:8,17,17 29:16
38:24 44:3 48:7
51:22 52:25 53:21
56:16 61:18
**litigation** 59:23
61:3,11 62:10,13
62:17 71:11 133:7
137:24 138:2
142:18 145:24
**little** 5:12,17 7:2,3
7:6 8:18 13:16
17:16 23:2 36:8
37:7 56:1 66:23
68:20 70:6,20
78:19 81:21
103:16,23 104:6
104:18
**llc** 1:19
**llp** 1:14
**local** 88:10
**located** 9:2 85:2
**location** 8:15,17
**locations** 7:12,16
8:7,10 35:17
**long** 48:8 53:24
56:17 88:11
105:23 116:11
139:12 144:1

**longer** 9:18
**longitudinal** 21:4
**look** 8:9 13:24
14:16 17:14,14
21:22 22:19 25:23
32:9,15,19 40:6
43:14 45:8,12,17
53:9 55:7 61:17
62:20 63:12 75:2
78:2 82:22 92:2
95:1 98:7
**looked** 16:24 23:7
33:24 39:8 103:7
116:17 125:19
**looking** 27:9 34:6
40:9 43:21 69:9
84:10,11 109:4
**looks** 19:10
**loose** 97:12 126:1
**lose** 120:17
**losing** 111:6
**loss** 113:5,5
**lot** 39:21,23 55:5
106:3 129:25
144:2,2
**louis** 1:15 6:6
**low** 15:3 38:25
39:20,24 57:11
58:14 69:13 80:16
82:6 87:15 88:5
88:13 89:6 95:21
98:1 107:2 109:11
115:6 116:17
117:6,14 122:4
125:5 128:18
129:1 130:3,25
**lower** 41:24 85:10
87:25 107:25
113:6 131:8,9
**lozier** 61:21

**lumbar** 10:24 11:2
11:4 15:25 35:11
35:19 77:5 79:11
83:3,23 84:15
86:10,12 87:20,25
88:2,7 100:9
115:7 117:15

**m**

**m.d.** 1:9 3:7 4:14
4:21 147:4
**ma'am** 5:8
**magnetic** 22:8
**magnification**
69:5,13,15 81:11
**mail** 51:10
**maintain** 128:20
128:20
**maintained**
128:14
**major** 117:20
**majority** 58:4,13
**making** 117:2
**male** 104:18
**malpractice** 64:17
64:20
**man** 135:3
**manage** 102:3
**management**
71:21 88:18
123:24,25 125:16
126:11,24 127:20
127:21 128:24
129:13,23 139:21
145:9
**manager** 68:15
**maneuvers** 116:10
**manipulative**
136:20
**march** 2:18 6:20
6:23 16:14 24:21
40:6,8,12 49:8

77:7,15 103:10
116:13 119:16
121:2,20 122:21
122:25 130:4
131:1,20
**marion** 6:18
**mark** 7:15,21
11:22 21:9 23:10
27:25 33:2 35:1
50:17 58:18
111:17
**marked** 7:18,23
12:2 21:12 23:15
28:5 33:3 35:6
50:20 55:24 56:5
58:24 73:6,11,20
88:16,23 94:7,12
103:8,12,18 127:2
**marker** 100:11
122:8
**marking** 8:3,4
73:17 126:21
**massachusetts**
5:16
**material** 8:5 95:9
95:12 96:10 97:12
97:18 99:21
**materials** 139:13
**matter** 70:24
71:11
**maximum** 48:8
49:13 55:11 124:4
**mean** 11:10 12:22
17:12 23:13 35:19
35:22 41:1,13
43:4 46:16,22,24
47:2 63:21 101:16
113:8 125:22
133:19 136:17
143:24

**means** 12:8 77:18
96:24 136:23
**measures** 10:16,16
98:3
**mechanical**
116:10
**mechanisms** 67:1
**medial** 89:22,24
**medical** 2:21 5:6
5:13 9:8 10:2,6,9
10:15 12:20 13:7
13:17 18:15 22:4
24:1,5 25:18
27:17 29:6 31:11
32:3,16,16,19
34:13 35:5 36:4,9
37:2 38:24 39:8
40:21,25 41:10,15
44:2 45:5,12 47:9
48:7,8,14,17,19,23
49:13 51:22 52:11
52:16,25 53:21
55:11 56:16 60:25
61:16 62:24 64:7
64:16,20 65:15
67:16,20 68:8
71:4,23 72:17
73:5 76:13 79:19
79:21 80:7 82:9
87:13 89:9 91:7
91:20,21 92:3,8,9
92:18,24 93:18
94:2 98:22 99:4
100:2,17 113:19
121:5 124:4 127:5
129:18 131:4
132:3,10,11,20
135:4,9,14 136:11
137:6,22 141:17
145:4

**medically** 40:3,17
67:12 72:5,9 80:8
106:6 123:10
126:9 129:15
135:25
**medication** 43:9
43:10,12 44:10,12
44:14 50:12 54:16
54:17,22 55:10,12
55:15 66:18 79:8
100:25 101:4,15
102:7,9,24 106:1,4
106:8,10,13,21
108:19 110:22,25
111:1,2,6,12 113:4
113:8 123:25
127:10
**medications** 42:23
48:9 49:22 50:7
50:14 51:18,23
53:4 54:8,13,18
102:3,6 111:4,8
123:7
**medicine** 9:11
61:20 116:20
**medicines** 43:1
44:8 53:22 55:4
**medium** 91:13
**meds** 79:9
**meet** 74:1 83:12
**meeting** 83:15
**member** 10:2
**memphis** 1:20
**mention** 77:20
104:19 109:5
126:14
**mentioned** 86:7
87:19 127:1
130:18
**mere** 23:12

**met** 17:2 37:2,5,8
143:8
**methylcarbinol**
102:8
**microdiscectomy**
91:14
**middle** 40:21 85:5
85:10
**migration** 118:17
**mike** 1:11 3:9
147:3,21
**mild** 41:24 42:1
121:13 122:20
136:25
**miles** 139:12
**mimic** 88:1
**mine** 69:7
**minnesota** 37:22
**minor** 56:17 57:1
57:10,12,22 58:1
58:14 69:9
**minutes** 68:16
**mischaracterizat...**
52:15 75:6
**misleading** 49:4
**missed** 119:22
**missouri** 1:15 9:17
9:19,23 92:16
**misspelled** 124:22
**misstates** 71:23
83:14,24 86:2
89:18 91:7 98:22
99:3 100:17 115:3
126:3 130:13
137:3 142:1 143:5
144:24
**mistake** 14:11
**mister** 40:9
**mistrial** 65:13
**mmi** 55:11

**mmpi** 37:24
  137:18
**mobility** 15:3
  107:3 120:17
**modalities** 80:2
**model** 84:8,13
  85:2,6 87:20 89:5
  118:3
**moment** 5:1 33:6
  78:23 90:22 100:6
  109:4 118:4
**money** 133:8,11
**monitor** 108:11,15
  128:19
**monroe** 1:20
**month** 14:9 25:16
  111:17 125:12
**monthly** 43:14
**months** 16:21
  77:16 78:4,10
  103:11 107:19
  108:2 109:22
  112:7 113:25
  121:23 123:12
**motion** 82:6 115:7
  123:18 145:15
**motivated** 81:15
**motivation** 57:17
**motorized** 102:23
**mountain** 1:10 7:4
  7:10 8:15 9:4
  10:10
**move** 53:11,13
  95:19,21 102:21
**moved** 6:3,6,9,12
  6:17
**movement** 101:5
  113:6 117:13
**moving** 8:2 44:12
  101:10 119:6

**mri** 15:16,16,19
  15:20,21,22 16:2,3
  16:5,7,24 17:20
  18:2 20:8,12,25
  22:9 25:9 63:24
  77:5 82:8,23 83:3
  83:16 86:1 87:1
  89:17 90:23 91:1
  95:17 119:20,22
  131:16
**mris** 22:19 23:7
  116:24 146:6
**multidisciplinary**
  51:5
**multilevel** 35:11
**multiphasic** 37:22
**multiple** 27:1
  107:17 110:25
**muscle** 15:2,10
  79:9 101:3 102:7
  102:8,24 105:17
  107:1 114:18,22
  115:9 117:22
  118:21 123:19
  131:16 145:12
**muscles** 95:22
  105:16,18
**muscular** 39:22
**musculature**
  104:16

**n**

**name** 4:19 9:7
  70:4
**named** 11:6 59:16
  86:13 147:4
**narcotic** 49:14
  51:18,23 54:15
  55:9 100:24 106:8
  108:19 110:21
  140:7

**narcotics** 44:3
  49:11 51:13 52:2
  52:12,21,23 53:15
  54:4 55:16 66:9
**narrow** 96:16
  124:19
**narrowing** 96:12
**nature** 53:14 98:2
**necessarily** 23:13
  133:23
**necessary** 12:14
  72:5,9 106:13
  129:15 135:25
  144:16
**need** 115:2 146:8
**needed** 43:5,11
  113:4 119:1
  129:23
**needing** 111:11
**needle** 90:7
**needs** 96:10
**nelson** 1:14 4:9
  70:4
**nerve** 89:6,24 90:2
  91:4 93:13 94:21
  98:21 100:14
  108:3,3
**nerves** 10:15
  20:21 84:16 85:11
  85:13 89:14 95:8
  95:14 96:9,9
  128:5
**nervous** 129:6
**net** 23:2
**neuro** 76:10
**neurologic** 25:7
  29:25 30:9 34:18
**neurological** 15:1
  15:10,13 34:9
  72:19 141:11

**neurosurgeon**
  10:12 49:21 61:1
  79:10,18 92:11
  136:13
**neurosurgeons**
  10:13,17 29:12
  82:13 91:22 92:4
  92:14
**neurosurgery**
  4:25 5:17,20 8:24
  9:9 91:18 92:23
  126:9
**neurosurgical**
  86:22
**never** 22:9 27:12
  31:21 36:3 40:25
  41:17 64:1 81:6
  99:25 111:14
**new** 73:22 77:4
  99:7 111:7 113:5
**newer** 121:18
**news** 54:2
**newsletter** 2:15,18
  2:20 25:16 49:8
  50:18 60:4,20
  61:16 133:18
  134:13
**newsletters**
  132:15,17 134:2,7
**nine** 121:23
  123:12
**nomenclature**
  86:18
**non** 11:20
**nonmedical**
  134:19
**nonnarcotic** 54:18
**nonsurgical** 79:24
  98:3 126:11
**norco** 43:2,9 102:8

**normal** 15:11,13
25:7 30:1 34:9
97:23 117:12
**normally** 32:3
**northern** 1:1
**notate** 34:18
**notation** 30:23
77:13,22 81:6
**notations** 29:6
81:9
**note** 2:16,17 20:24
31:25 32:1,23
33:15 73:13 81:1
83:3,18 100:7
107:10,24 110:19
113:23 114:18
115:21 116:13
117:23
**noted** 53:14 96:20
105:11 109:5
115:9 118:25
**notes** 14:10 15:20
30:24 107:5
123:22
**notice** 132:16
**noticed** 120:2
**notwithstanding**
87:11
**nov** 2:19
**november** 109:23
111:16
**noxious** 128:8
**numb** 90:3
**number** 2:9 4:7
11:4 21:24 27:25
31:5 33:2,12 35:2
40:10,10,11 99:8
144:5,9
**numbered** 86:11
86:20 118:12

**numbers** 33:7
73:7
**numbness** 15:10
42:1 107:25 113:5
**nurse** 13:15 14:1
29:23 30:18,24
31:17 32:6 33:17
64:2 74:1 75:7,11
82:15 94:5 101:21
132:1
**nursing** 101:9
**nwolff** 1:16

**o**

**o'clock** 70:16
**obese** 40:4,18 41:1
41:2,3,14,19
**obesity** 39:25
40:22 41:9,11
**object** 12:7 17:22
19:3 22:14 24:7
26:3 27:13 28:7
29:13,20 32:12
38:4 46:15,22
47:5 48:10 49:1
52:14 60:14,15,21
62:1 141:25 143:4
**objection** 8:1,3
19:5 26:18,19,23
30:4,21 32:22
37:4 38:12 39:2
39:16 48:22 49:17
50:4 52:6 54:9
56:7,12,19,24
57:14 58:6,16
59:2,3,17,24 60:23
63:1 67:5,17,25
68:9 71:7,23
72:10 75:6 76:14
77:17 78:18 79:20
82:11 83:14,24
86:2 89:8,18 91:7

92:5 98:22 99:3
100:1,17 115:3
126:3 127:4,13
130:13 132:8
137:3 143:17,22
144:24 146:10
**objections** 22:24
**objective** 14:25
15:9 24:17 25:5
30:1,9,15 32:18
34:9,12 38:16
42:11 46:10 59:10
59:25 72:14
100:15 115:1
141:11 146:5
**objects** 47:3 113:2
**observation** 47:24
**observe** 37:10
115:18
**observed** 36:7
**obtain** 76:19 93:9
131:4
**obtained** 58:11
63:10
**obviously** 120:5
**occasion** 13:11
30:2
**occasional** 66:25
107:25 109:5
123:2
**occasions** 10:19
**occupational** 51:4
**occur** 21:11 23:17
46:16 140:20
**occurred** 25:2
120:3
**oct** 2:15
**october** 6:23 7:7
61:17
**offer** 63:5 142:19

**offered** 60:1 83:6
83:6
**office** 9:3 13:12,16
65:17,18 68:14
71:19 74:9 78:8
80:12,25 81:6
103:9 109:4 121:2
123:21 137:13
**office's** 80:18
85:24
**offices** 9:1 13:25
**official** 147:12
**oh** 14:5 43:23
64:21
**okay** 7:6,25 10:2
11:15,18,21 14:5
14:10,12,16,18
15:9 16:6 19:11
19:14 29:2 33:21
36:20 38:8 46:19
51:16 57:5 61:14
69:18,22 92:1
94:18 103:20,25
127:14
**old** 22:22
**older** 7:16 13:17
86:18
**olds** 22:12,13,22
23:6
**once** 50:3 54:7
118:11 119:25
131:1,10
**ongoing** 85:21
118:20 119:2
128:13,19
**onset** 84:5 99:7
131:19 146:4
**open** 100:9
**operated** 110:7
**operating** 102:23
137:12

**operative** 35:13
90:20 96:20 100:4
**opinion** 12:19 13:1
24:16,25 25:1
27:14 64:8 67:8
72:7 80:6 90:23
130:7 132:5,8,13
133:14,20,24
135:8,15,17,18
142:14 144:21
146:7
**opinions** 12:15,23
13:5 59:16,22
60:6 64:5 67:15
72:18 76:20
134:25 135:3
139:8 144:12
**opioid** 110:19
140:8
**opioids** 54:25
**opposed** 71:8
**option** 129:17
**options** 12:18
61:10 79:13
**oral** 101:4
**order** 17:2 101:12
120:5 134:3
**ordered** 69:1
**orders** 131:16
**ordinary** 71:4
99:16
**organization** 22:4
50:23
**original** 98:10
120:8
**ortho** 64:25
**orthopedic** 50:19
55:24
**orthopedics** 51:4
**outcome** 38:15
41:20 58:23 59:8

59:10 93:6 108:13
122:23
**outcomes** 82:2
98:4
**outer** 95:4
**outpatient** 128:16
**outside** 57:24
95:13 143:2
**overall** 100:10
114:10
**overbroad** 67:17
**overly** 67:25
**overnight** 128:17

**p**

**p.m.** 1:10 4:2
146:17
**packaging** 75:22
**paducah** 6:12,24
**page** 2:2,9 3:1
11:16,17 18:24
19:9,13 25:23
26:8,9 28:23 29:3
40:21 49:8 51:7
51:12 52:19 53:9
54:2 55:8 57:3,4,8
60:7 61:14,17
73:7,22 74:8 75:2
76:22 90:20,21
100:7 101:24
102:14 105:9
107:19 108:16
109:9,25 114:2
116:13 123:21,22
134:11,16,24,24
**pages** 73:4
**paid** 65:19 133:8
136:4,7
**pain** 15:2 16:15,16
16:18 17:18 23:24
24:20,24 30:25
38:22,25 39:6,11

39:20,24 42:2,4,6
42:8,13,14,19,23
43:1,6,9 44:4,5,7,8
45:22 46:5,8,14,21
46:24 47:1,2,7
48:1,9 49:12,22,22
50:14 51:19,24
52:2,3,12,13,20,22
53:4,4,7,7,11,16
53:17,22,23 54:7,8
54:13,15,22,24,24
55:3,14,15,17
56:17 57:11,13,21
58:2,12,14 61:18
61:24 66:19 67:3
67:10 69:13 71:21
77:6,8,12,15,21,22
78:3,9,14,20,24,25
78:25 79:9,12
80:17 81:8,23
83:22 85:16,17,17
85:18,19,21 87:25
88:2,5,5,5,9,13,17
88:18 89:3,25
90:4 98:1,15 99:7
100:10,21,25
101:4,5,13,15
102:4,7,9,23
105:11,12,13,15
106:1,3,8,17,20,21
108:19,25 109:10
109:12 110:2,3,12
110:14,21,25
111:11 112:25
113:2,4,20 114:4,8
115:12,14 116:9
116:10 117:22
118:20,21,24,25
119:2 120:22
123:24,25 125:16
126:11,16,18,19

126:20,24 127:10
127:20,21 128:6,8
128:8,13,14,19,20
128:24 129:1,8,11
129:13,23 130:3,6
130:25 131:9,15
131:16,24,24
138:22,24 139:21
140:21,25 141:4,4
141:9 145:9
**painful** 82:6
**paper** 2:19 122:15
**paperwork** 11:11
**paragraph** 19:12
25:23 49:9 53:12
60:8 82:22
**parameters** 17:1
**paraspinous** 15:2
**parse** 11:2
**part** 9:5 12:24
17:5 35:22 55:6
61:6 73:2 76:23
79:14 80:18 81:10
84:21 85:10,22
88:12 96:2,4 97:9
97:16 98:20 101:8
102:19 106:15
108:4,17 109:25
117:2 118:7,14
119:10 120:11,12
121:4 128:23
129:21 132:11
144:16
**partial** 35:21
**participant's**
52:20
**participants** 53:11
**participate** 61:5
**participated** 60:1
**particular** 42:4
96:11 142:17

Case 3:19-cv-00231-KGB Document 99-3 Filed 08/27/20 Page 169 of 183

| | | | |
|---|---|---|---|
| **particularly** 27:19 29:11 31:9 102:25 | 38:13 63:14 69:10 69:15 79:25 80:14 86:4 90:4,7 91:17 107:3 113:15 130:17 141:9 | **percentage** 22:20 91:21 92:3 | **phd** 27:15 132:18 |
| **parties** 147:9 | | **perception** 128:8 | **phds** 132:22 |
| **partly** 88:8 | | **perform** 34:1 80:12 82:11 125:9 | **physical** 10:16 14:22 17:18 19:18 |
| **parts** 66:25 120:8 | **patients** 24:4,15 27:9 38:25 48:2 49:21,25 50:1 51:19,24 53:3 54:7,12 55:1,2 57:17,20 60:11 61:1 62:9 64:22 67:21 68:25 70:14 70:15,17,19 74:17 74:18,19 76:19 80:3 82:1 92:16 93:12 97:4,18,21 97:25 99:6,8,20 102:10 105:21 109:17 110:21 120:16,22 121:10 121:15 126:16,19 127:24 130:22 134:4 135:10 138:9,13,17 144:2 144:5,10 145:19 | **performed** 14:3 16:3 34:5 37:7 87:4 90:15 97:7 110:17 | 24:3 25:6 33:19 45:19 46:23 49:23 50:3 71:20 72:23 74:4 76:4 79:3,5 79:18 80:11,15,19 82:5,14 85:25 86:25 87:6 99:2 106:23,25 107:10 115:18 |
| **pass** 50:18 | | | |
| **passage** 124:3 | | **period** 11:25 92:17 93:20 105:17 108:15 114:6 118:25 123:11 | |
| **pathology** 23:3 38:18 90:21 | | | |
| **patience** 70:23 | | | |
| **patient** 11:9 23:25 24:6,13,14 27:19 27:23 32:4,5 37:14,16 38:19,21 48:7 49:12,14 54:21 56:18 57:13 60:2 61:7,10,12,23 62:13 63:6,7 64:11 65:15,21,23 70:5 73:23 74:1,2 74:5,5,9,13,22 75:16 76:24 77:4 77:4,13 79:12 80:20,21 83:3,6 84:3 86:13,25 87:7 89:13 93:8 96:21 99:2,17 100:22 101:1,9,12 102:21 103:1 105:16 106:16,20 108:14,24 111:5 113:20 114:23 115:2 119:17 121:8 123:11 125:7 126:19 128:9,15,21 130:24 135:11,12 135:22 137:19 139:3 146:2 | | **periodically** 107:5 | **physically** 9:1 48:4 114:13 |
| | | **periods** 53:25 116:11 | **physician** 12:20 23:22 33:23 61:9 61:22 62:5,16 68:21,22,24 75:4,9 79:21 121:15 135:23 142:9,12 142:15 |
| | | **peripheral** 10:15 | |
| | | **permanence** 55:17 | |
| | | **permanent** 54:5 55:12 72:24 93:13 124:2,11 125:5 | |
| | | **permanently** 139:6,22 | **physician's** 73:25 76:15 |
| | | **person** 16:3 59:7 64:3 106:5 132:17 | **physicians** 61:2 63:7,21 90:1 141:23 142:5 |
| | | **personal** 50:2 54:12 144:3 | **pills** 43:19 45:10 |
| | **pattern** 31:1 | | **pinching** 89:5 |
| | **pause** 90:22 | **personality** 36:22 37:11,13,17,21,22 38:2,10,25 39:14 62:23 69:1 136:11 136:15,17,22 137:1,9,18 | **place** 49:15 55:10 75:22 |
| | **peak** 97:2 | | **placed** 124:11 |
| | **pelvic** 84:14 | | **placement** 86:20 |
| | **pen** 89:2 | | **plaintiff** 1:3,13 33:8 55:9 65:14 |
| | **pending** 4:5 | **personally** 32:10 32:17 36:5 89:17 | **plaintiff's** 73:6,15 140:6 |
| | **penis** 101:18,22 | | |
| | **penny** 136:4 | **persons** 58:5 | |
| | **people** 22:9 30:10 58:1 88:6 119:8 137:14 139:2 | **perspective** 51:5 | **plan** 82:23 88:13 113:7 122:25 |
| **patient's** 12:23 17:18 24:17 27:18 | **percent** 10:23 21:7 21:15 22:12,12,23 23:5 38:24 42:18 52:21,22 57:19 | **pertinent** 32:8 | **planned** 142:18 |
| | | **phantom** 140:13 | |

**planning** 12:25
**play** 62:6
**plays** 99:5
**pleading** 71:7
**please** 4:8,13 8:8
　23:11 28:1 35:2,2
　53:12 55:25 57:7
　60:7 75:2,14 77:2
　84:8 108:16
　116:13
**pleasurable**
　121:25
**plus** 66:4 116:20
**pocket** 128:11
**point** 28:10,11
　37:20 47:10 51:17
　52:1 53:10 55:7
　55:11 67:22 85:1
　89:2 96:24 113:10
　118:4 123:12
　142:17
**pointed** 61:21
**points** 54:3
**poor** 58:22 59:7,9
**population** 21:8
　21:16 22:20 23:8
　25:13 134:6
　139:17
**portion** 31:6 97:11
　98:9
**portions** 35:23
　73:9 97:12 118:10
　128:7
**position** 10:5
　125:5 139:11
**positive** 15:4 31:2
　82:7
**possibility** 37:13
　68:6 98:13 116:6
　136:15

**possible** 44:14
　61:8 62:11 93:6
　94:16 101:10
　121:8 142:7
　144:16
**possibly** 69:3
　98:15 128:16
**posterior** 17:15
　21:2,3 95:7
**postop** 108:5
**postoperative**
　101:8 104:8 105:8
　108:15 117:8
**postoperatively**
　100:8
**postsurgery** 46:23
**postsurgical**
　100:20 122:23
**potential** 11:6,19
　31:5 38:14 39:21
　39:23
**potentially** 36:18
　59:16
**pound** 110:6
　113:24
**pounds** 47:11,14
　102:16 113:2,12
　123:2 124:12
**powered** 129:4
**practice** 5:19,20
　5:22 8:7,23 9:5,7
　9:10,20 18:15
　49:21 61:2 67:19
　67:20 69:6,6 71:5
　86:22 121:16,17
　134:18 135:19
　136:13 144:17
**practiced** 6:4,20
　6:23 7:13,17
**practices** 80:19

**practicing** 7:10
**practitioner** 13:15
　14:1 29:24 30:18
　30:24 31:18 32:6
　33:17 64:2 74:1
　75:7 131:6
**practitioners**
　75:11 82:15
**pre** 130:24
**precisely** 119:20
**predated** 130:19
**predictably** 98:5
**preexistent** 15:25
　77:20
**premise** 25:25
**preop** 90:17
**preoperative**
　14:13 94:19 98:7
　103:25
**preoperatively**
　31:14 105:3
**prepared** 94:9
**prescribe** 43:19
　44:9 72:23 100:24
　106:7
**prescribed** 43:8
　45:6,8,14 102:3
　106:23 111:3
　123:23 131:12
**prescribing** 66:8
**prescription** 42:22
　42:25 43:8 44:3,7
　48:9 49:11,14,22
　50:13 52:23 53:4
　53:22 54:4,8,13,22
　55:3,9 66:8 79:9
**present** 7:1,4 8:14
　56:18 70:11 77:3
　108:1 113:3
**presentation** 52:3
　55:13

**presentations** 44:5
　51:1
**presently** 41:19
**press** 98:20
**presses** 95:14
**pressure** 100:14
**pretty** 13:9 21:19
　100:24 104:18
　119:25 128:18
**prevent** 38:15
**previous** 135:5
**previously** 26:15
**primary** 12:6
　75:12 79:17,21
**prior** 16:22 24:23
　33:12 36:15,22
　130:13,25 142:1
　146:3
**priority** 134:18
**private** 5:19,21
　8:23
**probably** 8:5
　10:22,23,24 11:1,5
　13:23 14:9 31:15
　43:24 54:23 70:20
　118:18 119:16,17
**problem** 22:11
　40:22 41:11 90:12
　129:10 140:8
**problems** 23:1
　24:15 39:5 59:11
　59:21 60:6 65:16
　88:1,2,5,7,7 100:4
　108:7 109:6 122:6
　122:15 130:11
　132:7 136:20
**procedure** 3:8
　104:21 106:12
　124:5 127:22
　128:3

| | | | |
|---|---|---|---|
| **proceed** 28:22 71:9 | **protrusions** 17:4 **provide** 25:1 51:7 | **pursuant** 3:7 147:7 | 142:25 143:11 146:14 |
| **proceeding** 29:5 | 72:11 74:17,23 | **pursuing** 29:11 | **quickly** 102:21 |
| **process** 17:6 19:21 | 75:12 77:24 80:3 | 56:11,18 59:7 | 123:15 |
| 97:2 104:3,7,9 | 93:8 101:9 102:11 | **pushing** 113:1 | **quit** 54:21 |
| 108:4 117:2,17,25 | 104:24 113:14 | **put** 20:23 32:3 | **quite** 24:22 77:6 |
| 118:4,8,15 120:4 | 125:6 | 57:18 81:22 88:15 | 78:3,7 119:7 |
| 142:18 | **provided** 16:19 | 100:5 129:4 139:2 | 133:8 |
| **produced** 33:8 | 26:14 63:23 64:1 | **putting** 47:3 | **r** |
| 132:11 | 70:12 72:8 74:8 | **q** | **r** 147:1 |
| **produces** 115:14 | 74:10 75:20 80:8 | **qualifications** | **radiates** 88:3 |
| **profession** 134:20 | 81:19 103:9 112:3 | 76:15 | 131:9 |
| **professional** 60:25 | 130:2 138:6,6,11 | **qualified** 64:23 | **radiation** 88:14 |
| 76:13 129:18,22 | 144:12,18,22 | 72:3,19,22 75:11 | **radicular** 30:7 |
| **professionals** | **provider** 22:5 76:2 | 76:13 | 34:24 |
| 17:19 18:2 94:2 | 111:3 131:14 | **qualifies** 41:9 | **radiculitis** 30:7,10 |
| 135:9 | **providing** 71:2,2,3 | **qualify** 67:24 | 41:23 88:3 141:12 |
| **professor** 92:23 | 80:21 | 72:16 91:22 92:4 | **radiculopathy** |
| **program** 5:18 | **psychiatric** 136:19 | 92:11 | 30:2,8,8,15 83:22 |
| 107:21 | 136:23,24 | **quality** 53:17,23 | 88:19 89:3 127:8 |
| **progress** 100:7 | **psychological** 39:5 | **quarters** 111:19 | 141:7,13 |
| **progressing** 107:6 | 39:10,14 | **question** 17:25 | **radiculosis** 141:8 |
| **projects** 26:9 | **psychotic** 137:2 | 22:14 24:8 26:4 | **radiographic** |
| **prolonged** 42:4 | **publication** 18:19 | 28:9 32:12 38:6,7 | 17:10 |
| 45:23 66:23 | 18:22 21:25 | 46:18,20 59:6 | **radiologist** 16:3 |
| 110:10 111:18 | **publish** 133:13,16 | 60:15 62:1 68:1 | 117:18,24 |
| 112:25 114:19 | **published** 19:16 | 75:4,14 76:1 | **radiology** 116:1 |
| 123:3 | 57:8 61:20 134:3 | 77:10 87:14 91:25 | **railcar** 75:20 |
| **promise** 110:24 | 134:24 | 142:3 | **railroad** 25:3 28:4 |
| **promote** 107:4 | **publishes** 133:10 | **questioning** 69:10 | 29:1 47:24 66:22 |
| **pronoun** 83:10 | **pull** 101:22 | 70:7 81:5 82:17 | 67:9 78:10 81:4 |
| **pronounced** 26:15 | **pulling** 87:20 | 87:11 132:16 | 87:16 109:14 |
| **properly** 134:4 | 113:1 | **questionnaire** | 111:18,22,24 |
| **propounded** 4:16 | **purpose** 12:14 | 121:11 | 112:9 114:6 124:9 |
| **protect** 102:11 | 71:11,14 90:10 | **questions** 4:16 | 130:8 131:21,22 |
| 103:1 | 106:25 116:3 | 11:14 19:5 36:17 | 139:7,8,10 140:23 |
| **protection** 104:24 | 136:8 137:24 | 60:22 69:16,21 | 142:24 143:1 |
| **protocol** 18:25 | 138:1,2 | 70:10,24 82:20 | 146:9 |
| **protocols** 17:9 | **purposes** 27:1 | 84:7 92:2 129:25 | **railroad's** 70:7 |
| **protrusion** 17:6 | 104:22 | 136:10 137:17 | 87:12 132:16 |
| 20:19 | | 138:19 140:3,7 | 136:7 145:3 |

**railway** 1:5 4:4
**raise** 15:4,6 30:25
  31:2,4,8,10 69:11
**range** 15:3 82:6
  115:7 123:18
  145:15
**ratings** 121:17
**ray** 17:20 18:2
  103:25
**rays** 2:24 103:2,4
  103:5,8
**reached** 49:13
  55:11 124:4
**reaction** 115:19
**read** 16:4,6 18:12
  20:6,11 22:13,17
  26:2,6,17,20 27:5
  27:12,16 38:23
  49:16 51:20 52:4
  52:9 53:12,19
  55:19 57:8 60:13
  60:17 61:25 77:2
  79:13 83:7 131:17
  134:2
**readily** 69:4
  141:22
**reading** 16:18
  35:13 122:15
**reads** 52:1
**ready** 109:14
**real** 140:15
**really** 12:22 17:4
  46:25 65:23
**realm** 12:20
**reason** 61:7 96:6
  104:20
**reasonable** 67:16
  67:20 68:7 72:15
  80:6,9 82:9 106:7
  126:10 129:17
  145:8

**reasonably** 67:23
**reasons** 96:7
  102:25
**recall** 12:16 18:4,8
  20:10 27:21 28:20
  29:5 47:21 81:9
  81:10 83:15 107:9
  111:10 121:7
**receive** 5:2
**received** 79:17
**receptors** 53:7,8
**recognize** 119:23
**recollection** 24:15
  28:14 32:2 37:6
  37:18 44:22 45:2
  66:20 76:18 83:11
  83:12,17 107:8
  112:6
**recommend** 80:3
  87:3 112:10
**recommendation**
  86:23 139:24
**recommendations**
  81:13,16 107:15
  121:14
**recommended**
  87:8 88:22 123:24
  124:14,17 125:21
  145:7
**recommending**
  125:24
**record** 4:1,8,20
  13:13,17 14:13,13
  14:15 16:23 29:6
  31:11,15 32:3,9
  33:9,16,25 34:7,14
  35:1,3 36:9 40:7
  40:11,12 41:10
  43:14,16 45:5
  69:23,25 73:13,22
  74:2 76:23 81:3

83:14 115:3
  129:21 131:18
  141:17 142:10
  143:25 146:16
**recorded** 16:25
**records** 2:21 13:7
  32:16,17,19,24
  35:5 36:4 37:2
  39:8 44:20,23,24
  44:25 45:13,16
  47:10 63:20,23
  64:2,7 73:5,8,9
  77:24 79:21 81:1
  87:13 89:10 91:8
  92:1 98:23 99:4,4
  100:2,6,18 105:8
  107:9 121:7 132:9
  132:10,11 137:7
  141:18 145:4
**recovery** 107:22
**recross** 2:6 143:13
**recuperation**
  106:12
**recurrent** 98:13
  99:6,9,11,24 100:3
  108:10
**redirect** 2:5 140:4
**reduce** 50:7
  106:17 125:9
  126:18,19 127:11
  128:7
**reduced** 47:13
  114:15 115:7
**reducing** 44:11,13
  44:19 54:17
**reduction** 47:17
  50:12 53:17,23
  81:23
**refer** 28:24 63:7
**referenced** 57:6
  140:6

**referral** 123:24
**referring** 14:14
  75:4
**refill** 45:9
**refilled** 43:12 45:9
**refills** 43:11,13
  44:21
**reflect** 123:22
  133:23 136:14
**reflected** 132:10
**reflexes** 15:10
**reform** 105:6
**refrain** 60:9
**refraining** 60:11
**refresh** 83:11
**regard** 15:16 22:7
  23:23 29:23 30:18
  33:24 34:8 42:25
  59:6 66:8 126:4
  130:2 140:17,23
  141:16 142:23
  145:18
**regarding** 19:5
  29:6 34:14 49:11
  54:20 70:11 88:17
  141:2,3,7
**regardless** 139:20
**regional** 9:8 10:9
  76:3 93:17
**regrowth** 120:9
**regular** 18:16 61:1
  120:15 133:7
**regularly** 134:2
  137:19
**reifers** 1:19 2:3,5
  4:11,11,18 8:1,6,8
  12:10,12 14:12
  17:25 19:7,9
  22:17 23:5 24:9
  24:11 26:6,20,24
  26:25 27:16 28:9

29:15,20,23 30:12
30:23 32:14,15
33:6,10 38:6,9,23
39:5,19 46:19
47:9 48:13,23
49:6,7,20 50:13
51:6,10,12 52:8,9
52:18 54:11 56:8
56:15,23 57:3
58:4,10,18 59:5,21
60:3,17,25 62:4
63:10 67:6,22
68:5,10 69:16
71:7,23 72:10
73:13 75:6 76:14
77:17 78:18 79:20
82:11 83:14,24
86:2 89:8,18 91:7
92:5,7 98:22 99:3
100:1,17 115:3
126:3 127:4,13,16
130:13 132:8
137:3 140:3,5
142:2 143:11,17
143:22 144:24
146:10,14
**reinjure** 67:13
**relate** 34:17 80:16
122:23
**related** 17:4 41:16
42:3 53:6 57:24
66:18 75:17
119:16,17 131:20
132:5 144:8
**relating** 65:1
**relation** 28:17
**relationship** 78:16
**relative** 145:25
147:9
**relaxant** 102:8

**relaxants** 102:7,24
**relaxers** 79:9
101:3
**relay** 128:6
**reliability** 24:12
24:18 27:23
**reliable** 24:2 25:21
62:24
**reliably** 52:2
**reliance** 27:3
**relied** 27:10
**relief** 50:9 79:12
128:20 138:7
**rely** 24:6 27:18
82:14 115:2
**remaining** 65:25
97:12
**remarkable** 53:14
**remember** 47:23
82:19
**removal** 96:18,18
104:13
**remove** 96:3,6,9
97:11,14,18 98:9
125:25 126:1
128:23
**removed** 96:7,10
99:21 100:14
101:16 104:11
**removing** 97:9
**repeat** 91:25
**repeatedly** 26:1
**repetitive** 19:20
30:5,21 32:22
37:4 39:17 48:22
49:1 56:7,12 59:3
59:18 67:5 113:17
128:13
**rephrase** 12:10
17:25 24:9 32:14
38:7 142:2

**reply** 4:16
**report** 16:4,6 27:4
35:13 46:14 66:16
70:17 78:23 90:20
90:21 96:20,25
99:6 107:18
108:18 110:10
112:13,19,22
114:12 123:16
125:14 129:19
130:5
**reported** 1:11
23:19,20 24:22
42:8,13 48:1 77:2
77:11 78:8,25
85:24 87:15 91:6
110:1,14 112:17
117:23 130:3,20
131:6 138:21
**reporter** 4:13
147:3
**reporting** 24:15
47:2 53:11
**reports** 17:18
24:17 25:25 27:9
30:12 42:14 46:21
47:1 54:24 58:2
63:19 64:9,12
67:10 84:4 107:13
113:15 131:19
**represent** 28:3
70:5
**representing** 4:11
49:5
**represents** 84:16
**reproduce** 116:9
**reputable** 18:22
22:4 48:20 50:23
**require** 50:8 71:1
99:22 125:4
128:19 144:25

**required** 17:1
59:20 63:9 93:20
106:10 137:19
**requires** 91:14
**requiring** 44:12
110:1 118:19
**research** 26:13
**researchers** 53:14
**residency** 5:17
**residual** 106:11
**resolution** 42:18
108:4
**resolved** 65:10
66:6 105:12
**resonance** 22:8
**respect** 99:23
**respects** 41:22
42:16
**respond** 124:6
**responded** 66:12
**responding** 109:18
**response** 69:10,11
75:25 76:2 80:22
141:20
**responsible** 125:7
139:11
**responsive** 68:4
**rest** 113:3 131:25
**restrict** 102:25
**restricted** 45:21
**restriction** 47:10
47:13 113:14,24
**restrictions** 45:19
71:3 72:24 106:24
113:12 124:11
125:6 139:5
140:24 143:21
145:11
**result** 14:25 81:19
90:3 108:13 146:9

**resulting** 39:11
**retained** 11:20
  71:10
**return** 67:9 81:24
  82:2 105:7 109:14
  112:9 113:11,23
  114:6,11 124:9
  138:13
**returned** 47:23
**returning** 67:13
  120:24
**returns** 43:23
**review** 15:19,21
  18:16 26:14 45:3
  81:3 82:8 83:2
  107:8
**reviewed** 15:20
  17:20 18:2,2 25:9
  26:12 37:9,9
  82:24 89:17
  116:21 117:6
**reviewing** 37:15
  77:22
**ridiculously** 67:17
**riding** 42:5 112:25
**right** 7:8 15:5
  26:25 34:6 36:10
  40:22 41:25 42:1
  44:16 45:10 61:18
  74:18 77:9 78:22
  79:1 83:2 85:7
  90:14 95:20
  106:20 107:25
  111:9 112:20
  113:21 114:8,8
  115:13,14 118:23
  125:1 127:17
  138:3 140:15
  141:12
**ring** 19:22 95:4

**rise** 30:7 64:10
**risk** 46:14,22,25
  47:3,8 99:1,23
  100:3 102:23
  104:14 128:18
  138:20 139:2,16
**risks** 106:4
**robert** 132:18
  133:3 134:3
**rock** 5:12,17 7:2,3
  7:6 8:18
**rockford** 6:21
**rocky** 124:24
**role** 61:23 62:6,15
  99:5
**room** 137:13
**rough** 66:24
  124:23
**roughly** 22:11,21
**rounds** 100:8
**rules** 3:8 71:1
**running** 131:15
**rupture** 95:12
  98:5 99:18 108:10
**ruptured** 98:17
**ruptures** 85:14

**s**

**s** 1:19
**s1** 96:22
**sac** 20:22
**sacroiliac** 87:23
  87:25 88:1,4,7,8
  88:12 131:17
**sacrum** 84:15
  104:2
**safe** 104:21
**safely** 139:16
**safety** 131:21
  139:11
**saw** 11:25 12:5
  13:20,25 14:9

  17:13 31:13,21,23
  32:4 47:9 63:24
  64:3 70:15 76:1
  95:17,17 125:11
  131:5
**saying** 16:17 22:25
  34:24 41:10 45:2
  133:23
**says** 4:15 31:2
  75:9 78:3 82:23
  100:8,20 101:15
  107:24 117:23
  125:21 134:12
**scale** 53:10 121:12
  121:12,13
**scan** 16:5 17:14,16
  20:25 22:9 83:16
  116:1,16,18 117:6
  119:20,21,22
**scans** 116:22
  117:2
**scar** 105:23
  120:12,14,17,19
**schedule** 109:21
**scheduled** 31:18
  31:22 32:21
**schlichter** 1:14
**school** 5:7,13 92:9
  92:10 136:11
**sciatica** 30:10 88:4
  107:25 108:6,11
  108:12 109:5
  114:7
**science** 52:11,16
**sciences** 92:24
**scientific** 24:12
  26:1,14 27:7,17
  29:15 38:23 49:10
  52:18
**score** 122:19

**scotland** 65:16
**screen** 38:2
**screening** 38:10
  121:3
**seal** 147:12
**second** 11:16
  22:15 49:9,9 55:7
  61:17 65:22 76:20
**sedentary** 42:7
**see** 11:19 12:13
  13:12,21,24 14:12
  29:5 30:23 31:25
  32:23 34:6,10
  38:14,22 39:9
  43:15,22 44:20
  47:22 57:20 59:14
  61:14 68:20 70:18
  71:18 73:21 74:8
  74:10 75:2,8 76:5
  77:16 78:10 82:23
  83:1 85:6 90:10
  95:25 97:3 103:6
  103:22 104:5,6,9
  105:4,9 108:22
  109:8 116:16
  121:12 129:23
  134:11,24,25
  145:16
**seeing** 16:22 32:5
  61:7 107:10
  118:17
**seen** 11:11 13:14
  14:19 31:11 39:4
  41:17,18 43:7
  68:25 71:21,22
  79:20 89:9 90:17
  100:8 107:14
  108:25 123:14
  132:9 144:1
**sees** 61:1 131:14

| | | | |
|---|---|---|---|
| **segments** 86:16 104:1 | 131:15 136:19,24 | **similar** 10:20 48:2 53:1 89:22 90:6 | **society** 10:6 |
| **self** 27:4 47:1 | **shifts** 111:18 | **similarly** 53:22 | **sociopathic** 136:21 |
| **send** 107:5 129:4 | **shock** 99:13 | **simply** 46:20 47:1 64:12 78:3 | **soft** 104:16 120:6 |
| **sends** 128:12 | **shoot** 127:9 | **single** 83:19 107:10 111:3,10 | **solely** 14:20 47:17 67:10 71:11 140:25 |
| **sensation** 113:5 126:18,20 128:6 | **short** 50:14 | **sir** 4:19 8:13,19 11:24 12:11 14:17 26:24 32:24 33:10 35:1 40:6,10,12 46:13 48:6,17 49:6,9 50:18 51:13 52:1 61:15 74:12 140:1 142:23 143:12 146:13 | **soloman** 61:20 |
| **sense** 23:4,18 62:17 90:7 136:4 | **should've** 68:1 | | **somebody** 22:10 71:1 99:24 133:16 133:16 144:7 |
| **sensitive** 139:11 | **show** 11:12 30:15 44:20,23 48:13 65:14 84:9 87:21 89:4 94:20 119:20 145:3 | | **somewhat** 76:19 98:3 120:7 |
| **sensory** 34:10,14 34:18 41:24 89:25 | | | **soon** 101:10 |
| **sentence** 25:24 49:9 53:13 57:4 60:8 77:18 | **shower** 132:2 | | **sorry** 14:10 40:6,9 43:4 51:15 91:25 112:15 143:19 |
| **separate** 12:22,25 61:9 62:12,18 | **showing** 83:16 103:25 | **sit** 45:1 64:1 66:14 | **sorts** 42:5 108:11 116:12 |
| **sept** 2:15 | **shown** 11:23 21:10 58:19 87:13 132:15 137:6 | **sitting** 42:5 45:23 65:17 66:24 110:10 111:18 112:25 114:4,19 116:10 123:3 124:14 | **source** 88:9 90:4 |
| **september** 61:17 107:18 109:3 | | | **sources** 110:25 |
| **sequestration** 21:3 | **shows** 84:13 94:24 104:8,11 127:7 131:19 137:7 | | **south** 1:15 |
| **serial** 17:12 | | | **space** 20:20,20 85:5 86:14,16 96:8,16 97:13,15 98:14 104:10 |
| **series** 65:1 88:17 138:19 | **si** 79:10 87:19,21 87:22 90:8 | | |
| **serious** 57:11 58:14 | **side** 41:25 79:1 85:7 94:24 95:20 114:8 117:17 118:1,13,22,23 127:7,17 | **situation** 38:19 102:20 127:19 | **spaces** 84:19 |
| **serve** 61:3,22 62:15,16,19 63:11 | | **situations** 69:3 | **spasm** 15:2 105:16 105:17 107:1 114:18,22 115:9 117:22 118:21 |
| | | **six** 27:25 35:17 43:24 79:2 91:15 92:10 | |
| **served** 92:23 | **sides** 110:12 115:9 | | |
| **service** 124:22 | **sideways** 115:16 | **sixth** 18:24 19:9 | **spasms** 123:19 131:16 145:12 |
| **serving** 63:18 | **signals** 129:4,5 | **size** 91:13 | |
| **session** 51:5 | **signature** 147:20 | **skin** 104:16 | **speak** 37:8,16 76:14 143:2 |
| **set** 68:14 73:6 147:8,11 | **signed** 33:22 | **sleeping** 122:2 | |
| **setting** 57:12 | **significance** 117:7 | **slice** 94:25 | **speaking** 37:14 141:24 142:5 |
| **settled** 65:25,25 66:3 | **significant** 20:3 22:11 23:1,18 46:17 84:3 91:10 100:24 101:5 117:19 118:18 130:6 146:3 | **slight** 34:10 | |
| | | **small** 91:21 92:3 104:5 116:8 117:16,25 | **speaks** 111:2 |
| **seven** 33:2 122:19 | | | **specialist** 8:23 128:14,19 |
| **severe** 42:2 55:13 58:2 85:16,20 98:1,2 110:2,3 | **significantly** 130:17 | **societies** 10:3 | **specialized** 91:18 116:1 |

**specializes** 126:11
**specialty** 4:24
**specific** 34:17 42:3
  66:21 77:20 89:24
**specifically** 13:1
  27:21 28:19 49:3
  75:3 77:2 80:15
  121:24
**specifics** 47:22
  50:11
**speculation** 32:13
  50:5 68:9 127:4
**spinal** 10:14 20:21
  36:22 38:18 41:21
  42:9 65:4 84:16
  84:20,21 85:5,5
  86:6,16,16 96:8,9
  96:10,11,12,13,15
  96:15,19 97:21,22
  97:23 104:14,15
  104:17,19,24
  117:11,11 126:17
  126:25 127:18
  128:4,5,5,7,12
  130:18,19,20,23
  145:7
**spine** 2:13,16 9:9
  10:14,23 18:7,9,10
  18:16,18,20 19:15
  21:10 31:5,6,7,18
  34:18 35:14,17
  36:1 57:9,9 72:19
  76:4,10,11,20 77:5
  79:11 80:20 83:4
  84:8,13,15,17,21
  85:10 87:20 88:2
  90:8 91:10,13
  95:1 97:5,22,24
  99:14 102:12
  104:4,16 108:7,9
  115:7,10 116:6,9

117:13 118:3
  119:6,8,11 120:18
  125:22 126:12
  127:10,21 128:5,6
  132:22 137:20
  138:9,23
**spinous** 97:2 104:3
  104:7,9
**spiral** 54:25
**spoken** 143:8
**spondylolisthesis**
  117:21
**springfield** 5:16
**springs** 5:22,25
**st** 1:15 6:6
**stable** 120:7
**staff** 10:9 101:9
**stairs** 124:17
**standard** 79:24
  135:16
**standing** 66:24
  114:19 115:14
  116:11 123:3
  124:14
**standpoint** 20:2
  118:19
**stands** 87:22
**start** 70:19 96:3
  125:16
**started** 107:20
**state** 4:19 20:15
  92:20 126:4 142:8
  147:22
**stated** 75:17 142:8
**statement** 42:20
  44:17 60:19 62:5
  67:24 71:16 82:3
**statements** 23:23
  23:25 24:6,13,14
  25:4,5 46:2 47:15
  47:18 55:21 62:24

**states** 1:1 4:5 9:10
  9:13,16 77:7
  100:9 101:3
**stating** 71:8
**statistically** 29:18
**status** 58:21
**stay** 18:14 91:14
  105:4,5 111:17
  128:17
**staying** 122:2
**steel** 130:9
**steep** 124:19
**stenosis** 15:25
  83:4 86:6 96:11
  96:13,15,15
  130:18,19,20,23
**steps** 124:19
**steroid** 88:11
  127:10
**stimulate** 126:17
**stimulating** 128:6
**stimulation** 53:7
  128:8
**stimulator** 126:14
  126:25 127:18
  141:3,4 145:8
**stipulated** 3:6
**stipulations** 3:5
  147:8
**stooping** 45:23
  46:7 110:15
  114:20 116:11
  123:6
**stop** 77:9
**stopped** 73:14
**stopping** 54:17
**straight** 5:16 15:4
  15:6 30:19,25
  31:2,4,8,10 69:11
  82:7

**straightening**
  117:14
**street** 1:15
**stresses** 138:23
**strictly** 12:19
  64:11
**structure** 97:24
**structures** 104:17
**studies** 26:14
  27:12
**study** 27:14 53:10
  57:6,9
**sub** 52:20
**subcutaneous**
  128:11
**subject** 57:15
**subjective** 15:7
  30:20 47:25 64:8
  67:4,10 108:17
  109:25 141:9
**subjectively** 42:8
**subligamentous**
  20:20
**subluxations**
  19:24
**submit** 133:15
**subsequent** 13:19
  23:20 58:2 99:9
  120:3
**subsequently**
  13:20 65:24
**substantially**
  124:7
**substitute** 54:18
**substituted** 134:14
**successful** 100:10
  120:24
**sued** 64:16,19,24
**suffer** 74:19
**sufficient** 130:7
  146:6

**suggestion** 117:12
**suicide** 122:16
**suitable** 124:9
**suite** 1:15,20 9:3
**summarizes** 71:7
**summary** 78:11
85:23 101:25
**superficial** 53:15
**superimposed**
19:25
**supervising** 33:23
**supplies** 89:24
**support** 132:13
134:25
**supports** 104:6
**supposed** 50:14
**supraspinatus**
96:22
**sure** 16:4,6 19:7
21:7,14,18 31:12
33:18 36:6 37:19
38:7 39:7 40:1
46:16,17 48:12,21
48:25 51:10 52:8
57:2 58:20 90:17
103:5 111:5 112:5
**surface** 124:24
**surfaces** 66:24
**surgeon** 71:22
72:18 76:10,11
117:1 128:15
**surgeons** 50:19
55:24 96:17
127:22
**surgeries** 10:22,24
29:19 93:24
**surgery** 5:16
10:20,24 11:4
14:3 20:18 28:12
29:12 31:18,22
32:21 33:13,13

35:4,9,17,23,25
36:15,22 38:2,11
38:14,16,18 41:3
41:21 42:9,14,16
42:23 43:8,11
44:15 48:2 50:7
58:23 59:8,10,11
65:4 69:2 71:2
76:20 80:4 82:2
83:6 86:23 87:4
87:18 88:22 90:14
90:16,18,24 91:11
91:13,16 93:1,6,8
93:17 94:10 95:17
95:19 96:2 98:15
98:16 99:22
100:11,22 101:17
101:17,19,25
102:10 103:2,4,9
103:23 105:19,20
106:14,20 107:3
107:20 108:2,9,13
108:25 110:17
115:10 117:2,15
118:19 119:4,17
119:19,22,24
120:3,4,18,23
121:23 125:19,22
126:1 127:18,19
128:15,16,18,18
128:22,24 129:14
133:1 135:24
137:20 138:6,9
141:14 144:6
146:8
**surgical** 10:16
79:13 87:7 90:21
96:3 97:8 104:21
105:11 106:12
107:4 108:5
120:19 124:5

**surprise** 117:10
**surrounded**
118:16
**susceptibility**
54:21
**susceptible** 98:11
98:19 120:12
**suspect** 37:11
**suspected** 81:7
**suspicion** 69:14
**sustained** 144:6
**sustaining** 131:7
**swear** 4:13
**swelling** 107:2
108:3
**switched** 50:10
**sworn** 4:15 147:5
**symptom** 69:5,12
81:11 108:1
141:12
**symptomatic**
113:8 124:6
**symptomatology**
24:16 38:17 44:12
45:20,24 46:1,13
47:18 81:11 84:5
85:22 87:6 106:11
113:18 125:9
**symptoms** 21:17
22:10 23:20 24:17
25:2 37:19 41:23
46:17 69:5,15
78:23 79:5 81:7
85:14,16,23 86:4
88:20 89:6 90:5
90:11 91:5,17
93:15 100:15
102:4 112:14,18
113:15 114:9,13
114:16 116:4
118:20,23 120:20

125:14 127:11
128:24 129:19
130:25 131:20
136:14 138:7,10
139:22 140:21
145:24 146:3,5
**synonymously**
30:11
**system** 13:17,18
128:14,20 129:6
**systems** 112:15

**t**

**t** 75:5,9 147:1,1
**tailbone** 84:16
**take** 5:1 42:22,25
54:12 57:7 66:18
84:8 86:24 92:1
113:19 132:1
**taken** 1:9 3:7 4:3
43:10 49:22 53:24
54:7 55:3 66:13
103:2,4 147:6
**takes** 43:2,5 66:16
91:15 105:20
**talk** 81:18 86:11
**talked** 29:24 30:19
56:1 67:3 110:16
**talking** 23:3 57:6
74:4
**tamara** 64:2 75:5
**taper** 108:19
**tapering** 44:10,18
**target** 134:6
**team** 26:13 94:1
**tearing** 97:3
**technical** 82:2
95:19
**tell** 9:1 10:11
17:19 18:1 20:23
33:7 35:9 38:1,7
44:7 63:16 75:15

106:20 113:19
114:2 117:7 123:1
123:22 124:8
**telling** 13:4 17:11
**tells** 46:4,7 78:13
**template** 122:22
**temporarily**
127:11
**ten** 21:24 66:5
102:16
**tend** 24:4
**tendency** 26:16
**tenderness** 107:2
**tends** 119:20
**tennessee** 1:20
**term** 50:14 56:17
**terms** 84:11
**terrain** 124:18,23
**test** 30:20 69:1,11
69:12 116:1
137:18
**tested** 85:24
**testified** 140:24
**testify** 72:4 144:17
147:5
**testimony** 12:6,8
13:2 17:8 21:15
36:19 60:16 62:17
63:5,14 64:10
68:7 70:11 83:25
86:3 89:9,19
98:23 99:3 126:4
130:14 137:3
141:7,23 142:1,5
142:19,22 144:25
144:25
**testing** 26:1 37:21
46:11 69:8,12
82:7
**tests** 31:4 146:6

**thank** 4:12 8:13,22
12:10 33:10 35:1
49:6 61:14 69:17
88:15 90:14 105:7
127:16 129:21
140:1 142:23
143:11 146:13,14
**therapeutic** 88:10
**therapist** 71:21
79:18 107:5,10
**therapy** 76:4 79:3
79:5 106:23,25
125:16
**thereof** 55:17
**thick** 104:17 120:1
**thigh** 114:8 118:21
**thing** 83:19 95:20
103:17 130:1
**things** 42:6 45:22
61:5 62:12,24
71:3 73:1 83:13
89:4 94:5 108:12
111:19 116:12
121:25 133:10
139:19
**think** 8:4,4,21
13:9,16,18 14:7
20:7 21:19,21
28:19 33:15 38:6
38:13 40:19 41:9
41:15 43:13,20
46:24 47:7,22
49:24 54:23,24
55:5,22 56:21
57:16,18,19,25
58:17,20 59:9,12
61:4,7 62:8,12
64:9,21 65:12
66:2,5 67:1 69:5
92:22 114:5 120:2
123:14 124:8

130:15,18,20
136:21 142:7,14
**thinking** 122:16
**third** 25:23 51:17
**thorough** 63:21
96:15
**thought** 123:9
135:18
**thoughts** 12:23
**thousand** 11:1
**thousands** 116:21
**threaded** 129:3
**three** 16:21 21:7
21:15 26:8 35:14
35:25 65:12 66:17
74:9 77:16 78:10
84:7 91:14 104:11
109:11 131:5
**thresholds** 52:20
**time** 5:19,20 7:4,5
11:3,25 12:5
20:18 24:23 36:25
37:11 41:2 43:7
50:7 53:25 56:25
57:7 62:9 68:12
69:17 70:17 71:19
73:14 74:1 77:6,8
78:4,7,14,16 84:5
85:17 87:21 93:20
105:17,21 109:12
112:8,19 113:10
114:2,3 116:11
118:25 119:24
121:19 124:4
125:11 131:8
136:22 142:15
144:1 146:15
**timeline** 13:22,24
35:3
**times** 11:1 29:25
43:23 64:19 66:17

107:17 123:14
144:3
**tingling** 42:1
113:5
**tip** 118:15
**tired** 122:3
**tissue** 104:16
120:4,6,12,14,15
120:17,19
**tissues** 95:22
**today** 7:22 11:14
45:1,13 64:1
66:14 67:15 68:6
69:17 70:10,13,14
70:15 77:4 83:25
107:9 131:2 136:8
137:7 140:24
141:7 142:24
**today's** 4:2 28:22
**toenail** 137:14
**toilet** 111:7
**told** 79:2 102:14
111:17 112:7
113:10,11
**tolerance** 52:22
53:4 54:7
**tolerate** 54:15,16
**tool** 96:3 97:8
**top** 44:1 89:3
94:24 95:1 98:7
134:12
**topic** 68:5
**toradol** 131:12
**torn** 120:10
**total** 64:21 122:19
**tough** 118:16
**tracts** 128:5
**train** 67:1 130:10
**trained** 10:13,17
106:15

**training** 5:2,14
 72:17 92:10 93:4
 136:12
**trains** 139:12
**tramadol** 50:8,10
 108:20 110:2
**transcribed** 147:7
**transcription**
 124:22
**trauma** 17:11
 18:24 19:1,13,17
 19:21 20:5,11
 56:17 57:1,1,10,13
 58:1,14 96:23,25
 97:5,23 99:2,5,9
 119:11
**traumatic** 74:20
 78:9 87:24 95:10
 105:20 144:6
 145:20,25 146:4,9
**travel** 84:17
**traveling** 65:16
**treat** 10:18 61:10
 63:5,6 70:13 82:1
 130:12 134:4
**treated** 4:22 11:25
 71:20 92:16
 111:24 124:1
 132:7
**treater** 60:6
**treating** 12:20
 23:22 59:22 60:9
 61:2,8,22 62:5,16
 63:7,20 64:11
 68:21,22,23 71:2
 72:3 123:23
 135:10,23 141:23
 142:5,9,11,15
 145:22
**treatment** 10:14
 10:15 11:9 12:1

 12:13,18,25 13:8
 13:24 18:6 23:21
 28:11 37:20 39:15
 50:11,15 53:17
 59:15 60:1 61:6
 61:11,24 62:9
 63:20,23 67:21
 70:12 71:15 72:1
 72:4,8,12 73:2
 74:17 75:12 79:16
 79:19,24 80:7
 81:12,19,22 87:8
 88:12 91:16 106:9
 110:20 112:3
 117:4 119:1
 123:11 124:3,6
 126:12,16 127:5
 128:19 131:4
 132:4 138:5
 139:21 142:10
 144:11,17
**treatments** 80:2
 88:18 113:8
**trial** 112:9 142:11
**tried** 50:6 64:23
 68:3 79:8 125:19
 130:12 138:16
**tries** 101:9
**trip** 109:10
**trouble** 122:2,14
**true** 48:12 89:12
 132:12 138:21
**truth** 147:5,5,5
**try** 61:8 63:4,8
 67:19 80:20 81:22
 90:2,10 93:5
 106:16 107:1,3
 110:25 112:3
 125:8 126:1
 127:10 128:22,25
 129:4 138:17

**trying** 98:9 107:11
 107:21 114:12
 115:23 125:24
**tube** 101:17,22
**tumors** 97:22
**turn** 18:24 26:8
 40:11 51:12 60:7
 76:22 89:1 94:15
 102:21 103:23
 116:13
**twist** 102:21 119:8
**twisting** 45:22
 110:15 114:20
 116:12 123:7
**two** 7:9 21:7,15
 54:3 57:3 60:7
 62:12,18 65:12,19
 65:19,23 66:17
 69:20 70:7 81:4
 86:17,20 91:14
 93:21 101:25
 102:17 105:8
 106:24 107:19
 108:2 109:22
 112:7 113:3,25
 123:14 124:15
**type** 30:7,9 34:25
 35:9 37:21 47:24
 53:1 63:16 69:7
 85:9 88:19 109:16
 112:14 114:3
 127:19,19 129:14
 130:1
**types** 27:2 69:9
 80:1 90:6 93:23
 106:4 125:18
 126:23 138:23
**typical** 87:1,2
 100:21 101:6
**typically** 68:23
 81:1 86:12 88:4

 120:16 128:16
 136:19

**u**

**uh** 7:20 35:8 40:14
 40:16
**ultimately** 44:13
 135:20
**ummmm** 66:10
**unavoidable** 142:9
**unclear** 99:5,10
**uncontrolled**
 102:20
**undergoing** 76:20
**undergone** 79:10
**understand** 8:9,13
 11:13 13:4,22
 17:8 23:22 31:13
 36:10,19 46:17
 51:22 59:14 71:18
 84:9,11
**understanding**
 16:12,23 24:11
 56:10,25 66:21
 135:11 142:13
**understood** 33:10
**underwent** 41:3
**undisclosed** 132:8
**unethical** 61:21
**uneven** 124:24
**unexpected** 116:5
**unfair** 67:18 68:1
**unfortunately**
 25:24
**united** 1:1 4:5
**universally** 49:24
**university** 5:3,11
 92:24
**unreliability**
 26:10,11
**unreliable** 24:14

**untoward** 115:21
**unusual** 108:6,12
  115:21 141:20
  144:4
**updated** 7:22 8:6
**upper** 34:11
**urinate** 101:18
**use** 22:16 26:4
  30:10 52:12 55:16
  62:2 65:9 83:10
  93:5
**uselaws.com** 1:16
**usual** 97:24
**usually** 17:17
  70:20 91:14
  143:25
**utilize** 132:1
**utilized** 88:10
**utilizing** 93:4

**v**

**vague** 12:7 39:16
  46:15 67:18 77:17
  78:19
**variable** 97:20
**variation** 135:11
**variations** 85:19
**various** 43:23
**vaught** 76:3,7
  79:22 131:18
**vaught's** 131:18
**vehicle** 42:5
  102:22,23
**veracity** 136:20
**verdict** 65:11
**version** 103:16
**versus** 4:4 17:3
**vertebra** 86:14,15
  86:15 118:7,8,10
  118:10
**vertebrae** 84:19
  84:22 86:10,12,17

86:20 96:4 97:16
  99:13 104:3 118:9
  118:12
**vertebral** 104:1
**veterans** 93:2
**video** 1:9 84:9
**videographer** 1:23
  4:1,12 69:23,25
  146:16
**view** 23:25 25:21
  94:25 95:24 98:7
**violent** 19:19,20
  19:24 20:4
**visit** 13:20,21
  14:16 28:16 31:17
  33:13,16,24 34:8
  36:7,25 37:6,9
  40:12 41:7 43:13
  45:16,17 66:20
  90:17 108:17
  109:4,7 111:12
  112:12 122:25
  123:21 125:15
  129:22
**visits** 13:20 45:14
  45:18 141:14
**visualization**
  119:25
**volume** 21:24
**vs** 1:4

**w**

**waddell's** 69:12
**waist** 94:25
**walk** 70:6
**walking** 66:24
  123:4 124:24
**walks** 74:18
**want** 11:2 29:3
  36:17,19 45:12
  57:7 58:20 63:21
  109:16,19 119:3

126:8
**wanted** 31:9 33:11
  63:17
**wanting** 81:18
**ward** 64:2 75:5,5,7
  75:9
**warn** 93:12
**warnings** 93:9
**wary** 62:14
**washam** 1:2 4:4
  4:10,22 10:21
  11:7,25 12:5,13
  13:8,12,14,25
  14:17,19 16:12,19
  17:19 18:1 23:12
  23:19 24:20 28:2
  28:15,24 29:7,10
  30:3,13,24 31:13
  31:21 32:10,17,21
  33:13 35:4,10
  36:21 37:2,5
  39:10 40:3,13,17
  41:22 42:8,22
  43:7,22 44:9
  45:19 46:2,4,7,20
  48:3 50:2 56:2
  59:15 62:22,22,23
  63:24 64:12 66:15
  66:22 67:9,12
  70:5 72:10,13
  83:15,16 98:6
  106:7 122:20
  141:16
**washam's** 16:21
  18:7 20:12 23:23
  25:3 36:1 41:20
  42:16 47:15,18
  67:3,10 75:16
  140:23,25 142:20
  142:25 146:8

**washkowiak** 1:11
  3:9 147:3,21
**way** 46:20 49:4
  57:18 72:2,22
  88:6 103:3,6
  104:23 105:3
  107:21 112:20
  144:23
**we've** 69:19
**weaken** 119:18
**weakness** 15:10
  41:24 42:1
**wear** 63:8
**wears** 100:22
**week** 43:24 66:17
  90:15 122:1,4,12
  131:15
**weeks** 79:2 91:15
  102:17 105:8
  106:24
**weight** 40:19 41:6
  41:8 48:1 113:21
**weights** 113:21
**went** 5:6,15,18,21
  65:12,16,19,24
  75:18 92:8 131:25
**whereof** 147:11
**wide** 116:7
**wilkins** 18:17
**williams** 18:17
**wire** 129:3
**wit** 4:16
**withdrawal** 54:15
**withdrawn** 142:20
**witness** 4:13 11:7
  11:9 48:25 65:14
  68:1,24 69:18,22
  147:11
**witnesses** 61:3
**wolff** 1:14 2:4,6
  4:9,9 8:2 12:7

14:7 17:22 19:3
22:14,24 24:7
26:3,18,22 27:13
28:7 29:13 30:4
30:21 32:12,22
33:5 37:4 38:4,12
39:2,16 46:15
47:5 48:10,22,24
49:1,17 50:4 51:6
51:9 52:5,14 54:9
56:7,12,19,24
57:14 58:6,16
59:2,17,24 60:14
60:21 62:1 63:1
67:5,17,25 68:9
69:19 70:3,4
71:10 72:2,16
73:17,21 75:8
76:16,17 77:23
78:22 80:1 82:13
83:18 84:1 86:7
89:12,21 91:10
92:8 94:17,18
99:1,12 100:5,20
115:5 126:6 127:7
127:15,17 131:3
132:12 137:6
140:1 141:25
143:4,14,20 145:3
146:13
**words** 27:18 30:3
58:21
**work** 8:10 23:25
24:21 25:2 31:10
54:24 55:3 60:10
66:5 70:17 71:3
72:24 75:23 81:19
81:24 82:2 102:15
109:14 110:6
111:18 112:9
113:11,23 114:11

120:24 123:1
124:18 130:4
131:7,13,20,25
132:5 138:14
139:7,23 140:23
143:1 144:8,20
145:11
**worked** 5:25
**worker** 124:9
**worker's** 28:25
51:4
**workers** 111:24
**working** 5:22
54:22 78:9 87:16
130:8
**workman's** 28:13
28:13,21
**workplace** 143:21
**works** 76:4
**worse** 78:25 79:6
93:14 99:21
131:11
**worsen** 45:20,22
85:18 113:18
125:10
**worsened** 130:17
**worsening** 16:15
16:17 24:24 44:4
44:8 52:2,12 77:7
77:18 78:13,21
84:5
**would've** 14:8
41:18
**write** 133:16
135:15
**written** 25:24
34:13 49:10 51:17
53:13 54:4 55:8
60:8 61:19 71:8
73:7 76:1 77:18
78:2 106:5 132:17

133:18 134:19,23
135:7
**wrong** 40:9
**wrote** 115:12
135:1

**x**

**x** 2:24 17:20 18:2
103:2,4,5,8,25

**y**

**yeah** 13:9 14:8,8
21:2 33:9 34:22
34:24 36:12 47:25
55:22 61:4 62:17
63:13 66:2 67:19
68:14
**year** 4:2 10:22,25
11:5 22:12,13,22
22:22 23:6 43:17
44:15 72:7
**years** 7:9 11:5
66:5 78:5 92:9,10
92:17,20 111:25
116:20 135:1
139:24 144:2
**yellow** 73:9

**z**

**zero** 77:14

Arkansas Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Review by Witness; Changes; Signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
subdivision (f)(1) whether any review was requested
and, if so, shall append any changes made by the
deponent during the period allowed.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.