# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### NORTHERN DIVISION

**BRADLEY WASHAM**                                                    **PLAINTIFF**

**v.**                          **Case No. 3:19-cv-00231 KGB**

**BNSF RAILWAY COMPANY**                                      **DEFENDANT**

## ORDER

Before the Court are plaintiff Bradley Washam's motions to exclude expert testimony of

three experts designated by defendant BNSF Railway Company ("BNSF"), including

biomechanical expert Dr. Jeffrey Broker, accident reconstruction expert William Neale, and

medical expert Dr. Earl Peeples (Dkt. Nos. 104, 105, 106).  BNSF filed responses to these motions

(Dkt. Nos. 117, 118, 119), and Mr. Washam replied (Dkt. Nos. 123, 124, 125).  Also before the

Court are BNSF's motions to exclude or limit opinion testimony of Mr. Washam's treating

physician, Dr. Allan Gocio, and to exclude the expert opinions of economist Dr. Rebecca Summary

(Dkt. Nos. 99, 108).  Mr. Washam filed responses to these motions (Dkt. Nos. 115, 116), and

BNSF replied (Dkt. Nos. 128, 133).  For the reasons that follow, the Court grants in part and denies

in part Mr. Washam's motion to exclude or limit the testimony of Dr. Broker (Dkt. No. 104), grants

Mr. Washam's motion to exclude the testimony of Mr. Neale (Dkt. No. 105), grants in part and

takes under advisement in part Mr. Washam's motion to limit the testimony of Dr. Peeples (Dkt.

No. 106), denies BNSF's motion to exclude the testimony of Dr. Gocio (Dkt. No. 99), and denies

BNSF's motion to exclude the testimony of Dr. Summary (Dkt. No. 108).

As to those matters about which the Court grants the motion and excludes evidence, all

parties, their counsel, and witnesses are directed to refrain from making any mention through

interrogation, *voir dire* examination, opening statement, arguments or otherwise, either directly or

indirectly, concerning the matters about which the Court grants the motion and excludes evidence, without first approaching the bench and obtaining a ruling from the Court outside the presence of all prospective jurors and the jurors ultimately selected to try this case.  Further, all counsel are required to communicate this Court's rulings to their clients and witnesses who may be called to testify in this matter.

### I.      Background

On March 11, 2019, Mr. Washam was working as a conductor for BNSF when he claims to have suffered a fall from one of BNSF's trains (Dkt. No. 1, ¶ 7).  Mr. Washam subsequently sued BNSF under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.*, and alleged violations of the Safety Appliance Act ("SAA"), 49 U.S.C. § 20302, *et seq.* (*Id.*, ¶¶ 1, 7). On May 22, 2020, the Court received formal notice that BNSF admits the element of breach of duty under the FELA and SAA based on its nondelegable duty as Mr. Washam's FELA employer to provide the employee with a reasonably safe place to work under the circumstances (Dkt. No. 41, at 1).  BNSF clarified that it continues to dispute and does not admit the issues of causation and damages and reserves its right to pursue contribution or indemnity from any third parties as joint tortfeasors (*Id.*).  On August 27, 2020, both parties filed the motions now before the Court to exclude or limit expert testimony of certain experts.

### II.     Legal Standard

Federal Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony.  The rule clearly is one of admissibility rather than exclusion."  *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (internal quotations and citations omitted).

The district court is required to determine at the outset whether an "expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  *Daubert*, 509 U.S. at 592.  An expert's testimony is helpful to the jury if the expert's specialized knowledge allows the jury to better understand the evidence.  *Lee v. Andersen*, 616 F.3d 803, 808 (8th Cir. 2010).  An expert is not helpful to the jury if the expert merely testifies on subject matter within the jury's knowledge or experience.  *Id.* at 809.  A court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) (quoting *Gen. Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

The district court must also decide if the expert's testimony and methodology are reliable, relevant, and can be applied reasonably to the facts of the case.  *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012); *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010).  Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the district court must conduct this initial inquiry as part of its gatekeeping function.  *David E. Watson*, 668 F.3d at 1015.  The Court must be mindful that "*Daubert* does not require proof with certainty."  *Sorensen v. Shaklee Corp.*, 31 F.3d 638, 650 (8th Cir. 1994).  Rather, it requires that expert testimony be reliable and relevant.  *Id.*  "The inquiry as to the reliability and relevance of the testimony is a flexible one designed to 'make certain that an expert, whether basing testimony

upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Marmo v. Tyson Fresh Meats, Inc.,* 457 F.3d 748, 757 (8th Cir. 2006) (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999)).

The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence the admissibility of the expert's testimony. *Id.* at 757-58. To satisfy the reliability requirement for admission of expert testimony, "the party offering the expert testimony must show by a preponderance of the evidence that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." *Barrett*, 606 F.3d at 980 (internal quotation marks and citation omitted). To satisfy the relevance requirement for the admission of expert testimony, "the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue." *Id.* (citing *Marmo*, 457 F.3d at 757).

The Court examines the following four non-exclusive factors when determining the reliability of an expert's opinion: (1) "whether it can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) "[the method's] 'general acceptance.'" *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (quoting *Daubert*, 509 U.S. at 593-94). These factors are not exhaustive or limiting, and the Court must use the factors as it deems fit to tailor an examination of the reliability of expert testimony to the facts of each case. *Id.* In addition, the Court can weigh whether the expertise was developed for litigation or naturally flowed from the expert's research, whether the proposed expert ruled out other alternative explanations, and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case. *Id.* While weighing these factors, the Court must continue to function as a gatekeeper who separates expert

opinion evidence based on good grounds from subjective speculation that masquerades as scientific knowledge.  *Id.*

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  *Bonner v. ISP Techs., Inc.,* 259 F.3d 924, 929 (8th Cir. 2001) (internal citation omitted).  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  *Id.* at 929–30 (quoting *Hose v. Chi. Nw. Transp. Co.,* 70 F.3d 968, 974 (8th Cir. 1996)).

### III.    Analysis

#### A.    Mr. Washam's Motion To Exclude Testimony Of Biomedical Expert Dr. Jeffrey Broker

Mr. Washam requests that the Court exclude expert testimony of Dr. Jeffrey Broker or, alternatively, that Dr. Broker's testimony be limited to biomechanics, his area of expertise (Dkt. No. 104).  Mr. Washam argues that Dr. Broker's testimony improperly comments on Mr. Washam's behavior as "bizarre," "nonsensical," and "outlandish" (*Id.*, at 1).  Mr. Washam alternatively requests that the Court limit Dr. Broker's testimony to biomechanics and exclude his testimony as it relates to areas such as metallurgy, orthopaedic spine issues, and Mr. Washam's medical condition (*Id.*).  Mr. Washam attaches as exhibits Dr. Broker's expert report and curriculum vitae and a deposition transcript from a case in Missouri state court (Dkt. Nos. 104-1, 104-2, 104-3).

BNSF responds that "Dr.  Broker is qualified to opine on Mr. Washam's crossing abilities and fall patterns given his musculature, weight distribution, foot positions, and his hands' points of contact with the train, which all were data taken from Mr. Washam's testimony" (Dkt. No. 119, at 2).  BNSF clarifies that Dr. Broker does not attempt to offer a medical diagnosis but rather relies

on medical reports to conclude that no injury occurred (*Id.*, at 3).  Additionally, BNSF argues that Dr. Broker has training in metallurgy, and any challenge on this issue goes to the weight of Dr. Broker's testimony (*Id.*, at 4).  BNSF concludes by arguing that Dr. Broker does not opine on Mr. Washam's credibility but rather analyzes whether Mr. Washam's account conflicts with scientific principles and physical evidence (*Id.*, at 5–6).  BNSF attaches as exhibits Dr. Broker's expert report and curriculum vitae and a list of cases in which Dr. Broker has apparently testified (Dkt. Nos. 119-1, 119-2, 119-3).

In reply, Mr. Washam reasserts that Dr. Broker should not be allowed to testify as to Mr. Washam's credibility and that Dr. Broker is not qualified to testify on matters outside his area of expertise (Dkt. No. 124, at 1).  Mr. Washam therefore contends that Dr. Broker's testimony should be excluded because, once Dr. Broker's impermissible opinions are excluded, his remaining opinions will not be helpful to the jury (*Id.*, at 6).  Mr. Washam attaches as exhibits excerpts from Dr. Broker's deposition and a memorandum order from a Missouri state court case in which BNSF was a defendant (Dkt. No. 124-1, 124-2).

### 1.    Dr. Broker's Opinions And Testimony

Dr. Broker's report begins with a summary of testimony and medical records he reviewed (Dkt. No. 119-1, at 2–8).  The report next describes a scene inspection which took place on July 29, 2020, at BNSF's Anchor Packaging Facility in Jonesboro, AR (*Id.*, at 9–12).  Dr. Broker then describes the surveillance camera video footage from the date and time of the incident (*Id.*, at 12–13).

The rest of Dr. Broker's report is devoted to analyzing Mr. Washam's claim of injury.  Dr. Broker purports to "address[] Mr. Washam's description of the events in relation to the construction of the railcar and his claimed injuries, from a biomechanical perspective" (*Id.*, at 14).

Dr. Broker details how an individual may walk across a railcar platform using a grab bar and how a grab bar may fail and cause an individual to fall (*Id.*, at 14–16).  In the next section of the report, entitled "Problems with Mr. Washam's Account," Dr. Broker questions Mr. Washam's description of the events that occurred (*Id.*, at 16).  Specifically, Dr. Broker opines that "if Mr. Washam's account is correct, we would expect a significantly greater degree of horizontal bending away from the railcar, in addition to the downward bending of the grab bar," but "[t]he photographic evidence does not support any significant horizontal bending" (*Id.*, at 17–18).  Dr. Broker also suggests that "the grab bar failed well before Mr. Washam's claimed incident" because of "[t]he visible appearance of the rust on both the grab bar end and its remaining attachment" (*Id.* at 18).  Dr. Broker opines that "Mr. Washam's account of his fall makes zero sense" because, according to Dr. Broker, Mr. Washam should have fallen straight backwards rather than at a counter-clockwise angle, as Mr. Washam described (*Id.*, at 18–19).  Dr. Broker asserts that Mr. Washam "would logically become aware of a potential problem with the grab bar as he moved left across the platform," thereby allowing Mr. Washam to "take[] steps to avoid a potential fall" (*Id.*, at 19).  Dr. Broker then describes the surveillance video footage (*Id.*, at 20).  Dr. Broker ends his report with opinions on Mr. Washam's injury and medical treatment, asserting that "although a fall from a railcar platform first onto a coupler and then to the ground could conceivably cause intervertebral disc injuries, a new injury-producing incident is not required, from a biomechanical perspective, to explain the condition of his discs, as documented after his alleged fall event" (*Id.*, at 23).  Dr. Broker therefore concludes in his report that "[t]aking everything into account, from a biomechanical perspective, Mr. Washam's account of his claimed fall from the subject railcar is scientifically unsupportable" (*Id.*, at 25).

2.      **Application Of Rule 702 To Dr. Broker's Opinions And Testimony**

Mr. Washam asserts that Dr. Broker's testimony should be wholly excluded because Dr. Broker improperly opines on Washam's credibility (Dkt. No. 104, at 4–5). In the alternative, Mr. Washam seeks to limit Dr. Broker's testimony to biomechanical opinions because, while Dr. Broker may be qualified in biomechanics, he is not qualified in areas such as metallurgy or medicine (*Id.*, at 7–8).

The Court begins with Mr. Washam's objection to Dr. Broker's qualifications. The Court considers this an objection based on Federal Rule of Evidence 702. Dr. Broker earned his Ph.D. in 1991 in biomechanics and motor control from the University of California, Los Angeles (Dkt. No. 119-2, at 1). He has owned Echelon Biomechanics since that time and has worked as a professor at the University of Colorado at Colorado Springs since 2001 (*Id.*). Dr. Broker has taught courses on biomechanics, biomechanics of musculoskeletal injury, advanced human anatomy, and anatomy and exercise science: applications to golf (*Id.*, at 2). Dr. Broker has published dozens of papers, almost entirely on sports such as on cycling, golfing, softball, discus-throwing, and speed skating (*Id.*, at 3–8). In fact, only two of Dr. Broker's 80 peer-reviewed publications, books, book chapters, and review articles do not appear to involve sports, and those two exceptions are articles on cat hind limbs (Dkt. No. 119-2, at 5).

In his deposition, Dr. Broker held himself out as a mechanical engineer and not a metallurgy expert, though he contended that he took courses in metallurgy (Dkt. No. 124-1, at 13). Similarly, Dr. Broker testified that he is neither a medical doctor nor a medical expert and agreed that he could not testify about appropriate treatment for specific types of injuries (*Id.*, at 14–15). Dr. Broker also testified that he was not qualified to diagnose Mr. Washam's herniated disc as either acute or degenerative (*Id.*, at 16).

8

The record therefore establishes that, pursuant to Rule 702, Dr. Broker is qualified as an expert in biomechanics but not in areas unrelated to biomechanics, such as metallurgy or medicine. Accordingly, the Court grants Mr. Washam's motion in part and determines that Dr. Broker may not testify on areas outside of his expertise, including Mr. Washam's medical condition (Dkt. No. 119-1, at 21–23), Mr. Washam's exhibition of "pain behaviors" or lack thereof (*Id.*, at 12–13), Mr. Washam's allegedly "odd" behaviors such as wiggling or shuffling on the ground in an alleged attempt "to create superficial abrasions/scratches" (*Id.*, at 20), and whether the grab bar failed because of rust prior to Mr. Washam's alleged fall (*Id.*, at 18).

Mr. Washam's next objection is that Dr. Broker's testimony should be entirely excluded because it improperly opines on Mr. Washam's credibility. An expert witness may not opine on a witness's credibility. *Engesser v. Dooley*, 457 F.3d 731, 736 (8th Cir. 2006). Courts in the Eighth Circuit therefore prohibit experts from commenting on the veracity of another witness's testimony. *Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 883 (8th Cir. 1998) (prohibiting testimony where expert claimed she needed "to interpret and weigh" witness's testimony or else "get a very skewed and inaccurate view of what actually happened"); *U.S. v. Whitted*, 11 F.3d 782, 786 (8th Cir. 1993) (prohibiting doctor from opining on findings which required accepting a witness's statements as true because this testimony would permit the doctor to judge the witness's truthfulness); *Hale Cty. A & M Trans., LLC v. City of Kansas City*, 998 F. Supp. 2d 838, 846 (W.D. Mo. 2014) (excluding expert testimony on whether expert found witness's story useful to analysis).

Here, Dr. Broker disputes Mr. Washam's description of the events that occurred throughout his report. For instance, Dr. Broker contends that "Mr. Washam's account and claims [are] non-sensical in many respects, and extremely improbable in others" (Dkt. No. 119-1, at 14), that "[b]iomechanically, Mr. Washam's account of his fall makes zero sense" (*Id.*, at 18), and that

"[t]he most egregious claim in Mr. Washam's story is that he landed on his lower back/butt on the knuckle and then somehow continued to fall to the ground on the far side of the knuckle" (*Id.*, at 19). Statements such as these, and certain of the words Dr. Broker chooses to use, necessarily question Mr. Washam's credibility and are impermissible. The Court will not permit Dr. Broker to offer this type of testimony commenting on Mr. Washam's credibility. To this extent, the Court grants Mr. Washam's motion.

However, the Court does not find that Dr. Broker's testimony must be wholly excluded because of these impermissible statements. Instead, the Court rules *in limine* that Dr. Broker may not offer testimony commenting on Mr. Washam's credibility. Dr. Broker may still offer opinions to the extent that they are within the scope of his expertise as a biomechanical scientist and do not imply that Mr. Washam's testimony is incredible or cannot be believed. Mr. Washam's motion to bar testimony of Jeffry Broker is therefore granted in part and denied in part (Dkt. No. 104).

### B.   Mr. Washam's Motion To Exclude Testimony Of Accident Reconstruction Expert William Neale

Mr. Washam next moves to exclude the expert testimony of William Neale (Dkt. No. 105). Mr. Washam objects to the expert testimony of Mr. Neale on the basis that Mr. Neale's opinions "are nothing more than his personal observations and conclusions about what happened during Washam's injury incident, as drawn from his review of security video footage" (Dkt. No. 105, at 1). Mr. Washam argues that Mr. Neale's testimony will not aid the jury because the jury is equally capable of watching the surveillance video and drawing conclusions for themselves (*Id.*). Mr. Washam attaches Mr. Neale's report to its motion (Dkt. No. 105-1). BNSF argues in response that Mr. Neale is a qualified and credentialed expert in the fields of photogrammetry,[1] video tracking,

---

[1] Photogrammetry is the science of gathering dimensions from photographs. *Heatherly v. Alexander*, 421 F.3d 638, 645 (8th Cir. 2005). It involves "a mathematical method of determining three-dimensional geometric properties of objects and features through the use of two-dimensional

video analysis and enhancement, and computer visualization (Dkt. No. 117, at 1).  BNSF contends that Mr. Neale is thus "uniquely qualified to opine on Mr. Washam's actions for the duration of the surveillance video, in particular at the critical times in which Mr. Washam is not directly visible" (*Id.*).  BNSF asserts that Mr. Neale's testimony will aid the jury because "only Mr. Neale's analysis reveals Mr. Washam's positioning and movements when he is off camera" (*Id.*, at 1–2).  BNSF attaches Mr. Neale's deposition in excerpts, Mr. Neale's resume, Mr. Neale's expert report, and Mr. Neale's affidavit (Dkt. Nos. 117-1, 117-2, 117-3, 117-4).  In reply, Mr. Washam reasserts that Mr. Neale should not be allowed to tell the jury what happened based on his review of the surveillance video footage (Dkt. No. 123, at 4) and argues that Mr. Neale's shadow analysis "constitutes 'junk science' and must be excluded at trial" (*Id.*, at 6).  Mr. Washam also attaches excerpts from Mr. Neale's deposition (Dkt. No. 123-1).  Further, Mr. Washam moves to strike Mr. Neale's affidavit as a belated, untimely expert disclosure.

### 1.     Mr. Neale's Opinions And Testimony

Mr. Neale contends that he analyzed the surveillance video footage from the time of the alleged incident using "techniques of photogrammetry, video tracking, video analysis and enhancement, computer visualization and principles of physics" (Dkt. No. 117-4, ¶ 1).  He submits that he is "imminently [*sic*] qualified to opine on all of the aforementioned topics and employ them to analyze the video footage in this case" (*Id.*).  Mr. Neale received a Bachelor of Arts in Architecture in 1994 and a Master of Architecture in 2000 from Washington University (Dkt. No. 117-2, at 1).  He is an ACTAR accredited traffic accident reconstructionist and has been an author

---

photographs[] to determine the true measured distance in the photos." *Anderson v. Dakota, Minn. & E. R.R. Corp.*, Civ. No. 15–2672 (PAM/TNL), 2016 WL 6916806, at *1 (D. Minn. Nov. 22, 2016).

on dozens of publications, including many technical papers published by the Society of Automotive Engineers (*Id.*, at 4–6).

Mr. Neale's report describes his background as well as the investigation, analysis, and conclusions related to Mr. Washam's alleged incident (Dkt. No. 117-3). The beginning of the report details the scene inspection conducted by Kineticorp, the company for which Mr. Neale works, as well as the digital scanning and computer modeling of the scene (*Id.*, at 3–13). On July 29, 2020, Kineticorp took photographs and performed three-dimensional laser scanning of the area where the incident occurred (*Id.*, at 3). Using these scans, Mr. Neale reports that Kineticorp created a scaled diagram of the scene (*Id.*, at 4). Mr. Neale next describes that Kineticorp created computer models of the scene, vehicles involved, and Mr. Washam (*Id.*, at 9–13). Mr. Neale admits in his deposition that he did not do a reenactment of these events (Dkt. No. 123-1, at 30).

Mr. Neale spends the rest of the report describing the surveillance video footage. Mr. Neale describes the video as 38 minutes and 50 seconds in length with a frame rate of 20 frames per second at a resolution of 2688 x 1520 (*Id.*, at 6). The video is time-stamped with the date and time of the incident (*Id.*). For his analysis, Mr. Neale divides a 10-minute portion of the video into six segments (*Id.*, at 14). Mr. Neale includes select still frames of the video in his report as figures which he analyzes (*Id.*, at 15). Mr. Neale compares these segments and still frames to Mr. Washam's deposition testimony to establish a narrative (*Id.*, at 14–15).

Critical to Mr. Neale's narrative is his analysis of certain still frames which, he argues, show darker and lighter shadows in certain areas of the video (*Id.*, at 15). Based on these darker and lighter shadows, Mr. Neale extrapolates Mr. Washam's movements even when he is out of view of the security camera (*Id.*, at 15–17).

According to Mr. Neale, 29 seconds elapsed between when the train came to a complete stop and when Mr. Washam's foot appears on camera as it contacts the platform (*Id.* at 17).  In this time, Mr. Neale concludes that, based on Mr. Washam's deposition testimony and the shadows in the video, Mr. Washam coupled the trains, laced the air brakes, ascended a ladder, shimmied along the train car's rear step, and stepped onto the platform (*Id.*, at 14–16).  Importantly, Mr. Neale concludes that "since the shadow on the platform appears unbroken, and continuous until the arrival of Mr. Washam's foot, it was determined that Mr. Washam did not fall from the rear step as described in his deposition" (*Id.*, at 18).  Mr. Neale further concludes that the actions Mr. Washam describes in his deposition—including falling to the ground, getting up, ascending the ladder, and crossing the step bar—would take an additional 15 seconds, which are apparently not accounted for in the video (*Id.*, at 18–19).

Mr. Neale includes two demonstrations to illustrate his conclusion.  First, Mr. Neale includes photographs of an individual who was apparently present at the inspection and who, according to Mr. Neale, "performed a demonstration of the motions carried out from his position beginning with the train stopping, radio communication with the train operator, lacing the air brakes, ascending the vertical rungs of the train car, and traversing the rear steps to the platform" (*Id.*, at 17).  According to Mr. Neale, these actions took between 22 and 33 seconds (*Id.*).  Second, Mr. Neale includes stills from a computer animation created by Kineticorp which depict these same movements (*Id.*).  This animation is a 29-second visualization of Mr. Neale's narrative (*Id.*).

For the next five segments, Mr. Neale further narrates Mr. Washam's movements based on Mr. Neale's analysis of the shadows and Mr. Washam's actions on-camera (*Id.*, at 19–26).  Mr. Neale includes several still frames from the surveillance video and some top-down illustrations depicting his analysis of Mr. Washam's position (*Id.*, at 22, 24).  According to Mr. Neale, Mr.

Washam steps back onto the platform, descends to the ground, and stands still for one minute, without crouching or kneeling, until he shifts his foot backward (*Id.*, at 19–22).  Next, Mr. Neale contends that Mr. Washam crouches and eventually lays prone on the ground before standing back up (*Id.*, at 22).  Mr. Neale asserts that he used the same processes of photogrammetry described in his report to locate Mr. Washam on the ground approximately 3.5 feet from the railcar coupler (*Id.*, at 23).  According to Mr. Neale, Mr. Washam then stands back up between the railcars and remains there for three minutes and fifteen seconds (*Id.*, at 24–25).  After this, Mr. Neale asserts that Mr. Washam's shadow moves and reappears on the platform (*Id.*, at 25).  Mr. Neale opines that Mr. Washam does not use the vertical ladder but rather uses some other means to rise to a level even with the platform and then steps onto the platform (*Id.*).  From the platform, Mr. Neale asserts that Mr. Washam takes a cell phone or camera out of his pocket and takes pictures (*Id.*, at 25–26).  Mr. Neale includes still frames from the surveillance video footage of Mr. Washam standing on the platform, which, according to Mr. Neale, depict Mr. Washam appearing to retrieve a cell phone or camera and taking photographs (*Id.*, at 26).  Finally, Mr. Neale contends that Mr. Washam returns to the area east of the railcar coupler to retrieve his glasses, which he bases on Mr. Washam's deposition testimony (*Id.*).  After this, Mr. Washam returns to the platform and exits the field of view of the camera (*Id.*).

Mr. Neale summarizes his conclusions:

- Analysis of the shadows and lighting in the surveillance video results in the conclusion that Mr. Washam did not fall from the rear step on train car FURX 877211 between 10:08:29 and 10:08:57 (Segment #1) of the surveillance video.
- Analysis of the video results in the conclusions that the total time in Segment #1, when the train stops to when Mr. Washam's foot appears on the platform, is approximately 29 seconds. This time is consistent with the time required to perform all the basic train coupling maneuvers. Thus, there is insufficient time for Mr. Washam to also fall to the ground near the end

14

of this sequence, stay on the ground a few seconds, get back up, climb the vertical side ladder of FURX 877211, then cross the rear step a second time.

- Analysis of Mr. Washam's position on the ground between 10:10:15 and 10:12:00 (Segment #3) places him approximately 3.5' away from the coupler, and in an orientation and distance inconsistent with attempting to retrieve items underneath the coupler.
- Analysis of the video and movements of Mr. Washam at 10:15:13am (Segment #4) indicate that he ascended back to the platform through some means other than the vertical ladders on the sides of FURX 877211 or NAHX 580404.
- Analysis of the video and movements of Mr. Washam at 10:17:27am (Segment #6) indicate that he ascended back to the platform through some means other than the vertical ladders on the sides of FURX 877211 or NAHX 580404.

(*Id.*, at 26–27).   Mr. Neale concludes that his "opinions and conclusions were reached to a reasonable degree of scientific and professional certainty" (*Id.*, at 27).

In an affidavit attached to BNSF's response to Mr. Washam's motion to exclude Mr. Neale's testimony, Mr. Neale describes his process and methods for analyzing the surveillance video.  Mr. Neale contends that he was able "to determine and report on where Mr. Washam was located, even when he was not seen by the camera through the advanced methodologies referenced herein" (Dkt. No. 117-4, ¶ 4).  According to Mr. Neale's affidavit, these advanced methodologies included photogrammetry and video tracking techniques; video analysis, frame by frame analysis, and video enhancement; the technique of shadow analysis; computer modeling and visualization; and principles of physics (*Id.*, ¶¶ 5, 9, 11, 14, 16).

## 2. Application Of Rule 702 To Mr. Neale's Opinions And Testimony

Mr. Washam argues that Mr. Neale's testimony should be prohibited because it will not aid the jury (Dkt. No. 105, at 1).  According to Mr. Washam, Mr. Neale's opinions "amount to nothing more than his personal conclusions as to what happened on the day in question based

solely on his review of surveillance video footage" (*Id.*, at 3).  Mr. Washam asserts that the jury is just as capable of drawing their own conclusions from the surveillance video footage (*Id.*).

In response, BNSF argues that Mr. Neale is qualified to offer his opinions and analysis and that Mr. Neale's methodologies are the same as those addressed in the peer-reviewed literature he cites in his report (Dkt. No. 117, at 2–3).  BNSF represents that Mr. Neale "utilized photogrammetry and video tracking to determine the accurate position, orientation, and location of Mr. Washam at critical times" and "used these scientific techniques to locate the position of the train cars, locate the shadows cast by the train cars, locate the direction and angle of the source of light, detect minute changes in the shadows cast, and then extrapolate Mr. Washam's position while he is off camera" (*Id.*, at 5).

In reply, Mr. Washam contends that Mr. Neale's testimony is inadmissible because it "tells the jury what to see" and also "impermissibly opines on Mr. Washam's credibility" (Dkt. No. 123, at 5).  Mr. Washam further argues that Mr. Neale's testimony regarding "shadow analysis" should be excluded because, according to Mr. Washam, Mr. Neale lacked qualifications regarding shadow analysis, failed to describe his methodology for conducting shadow analysis, admitted that his methods were not replicable, and did not base his analysis on important considerations such as lighting conditions (*Id.*, at 6–10).  Mr. Washam thus asserts that Mr. Neale's shadow analysis fails *Daubert*'s reliability standard.

The Court must therefore determine whether Mr. Neale's testimony constitutes reliable, specialized knowledge which will help the jury, as BNSF argues, or whether his opinions are unreliable and within the jury's knowledge or experience, as Mr. Washam argues.  On the record before it, having reviewed the materials submitted by Mr. Washam and Mr. Neale, the Court

cannot conclude by a preponderance of the evidence that Mr. Neale's proposed testimony is reliable, specialized knowledge which will assist the jury.

Mr. Neale opines that Mr. Washam did not fall—as Mr. Washam claims he did—based primarily on Mr. Neale's analysis of "the shadows seen in the light shining through the gap in between the rail cars" (Dkt. No. 117, at 4). Admittedly, Mr. Washam is off camera at the time of these critical events. Several points in the record establish that Mr. Neale's method of analyzing Mr. Washam's shadow involved simply looking at the shadow as it appears in the video. Mr. Neale claims that Mr. Washam's off-screen movements in the video can be "confirmed from both Mr. Washam's deposition and by the change in shadows observable in the surveillance video" (Dkt. No. 105-1, at 14). In Figures 18 and 19 of his report, Mr. Neale writes that "[i]n these images, the area between the rail cars depicts the shadow of Mr. Washam as first darker and then when he vacates, the area the video brightens [*sic*]" (*Id.*, at 15). At other points, Mr. Neale describes a shadow appearing (*Id.*, at 16), Mr. Washam's movements as he lay on the ground (*Id.*, at 22–23), Mr. Washam taking photos with a cell phone or camera (*Id.*, at 25), and Mr. Washam stepping onto the platform and exiting the camera's field of view (*Id.*, at 26). To the extent that Mr. Neale bases his testimony on conclusions he drew about what the video shows based on his observations of the video, these observations are within the jury's knowledge and experience because the jury is just as capable of watching a video and drawing conclusions about what the video shows.

The Eighth Circuit has previously held that an expert's opinion about the contents of an image was properly excluded when that opinion was not sufficiently based on specialized knowledge. *Lee*, 616 F.3d at 809. In *Lee*, an expert proposed to testify about whether still frames from a surveillance video depicted an individual holding a gun. *Id.* at 808. The expert concluded that the individual did not hold a gun and based this conclusion in part on "simple observation."

*Id.* at 809.  The expert also compared the size of objects and considered the shadows in the images and "testified that his experience and training allow him to look at an image more critically than a lay person . . . ."  *Id.*  The expert was asked what specialized knowledge he had to assist the jury, and the expert responded, "I believe a reasonable person looking at the clarified photograph and looking at [the individual's] hand would conclude that his hand does not have a firearm in it."  *Id.*  The Eighth Circuit concluded that "the jury was entirely capable of analyzing the images and determining whether [the individual] had anything in his hands."  *Id.*

As in *Lee*, the Court is not convinced that Mr. Neale's opinions about what the video shows during the time of these critical events are anything more than "simple observation."  *See Lee*, 616 F.3d at 809.  Indeed, Mr. Neale testified that he identified a shadow in Figures 20 and 21 of his report—which depict the points at which Mr. Neale opines that Mr. Washam did not fall—by "analyz[ing] the video" and "see[ing] the shadow appear" (Dkt. No. 117-1, at 10).  Mr. Neale further describes analyzing individual frames, "analyzing the distance, size, and shape of the changes" in pixels, and "linking the beginning of the appearance of that shadow, where it goes" (*Id.*, at 12).  These actions are comparable to those of the expert in *Lee*, who also compared the size of objects and considered the shadows in the images.  *Lee*, 616 F.3d at 809.  Such observations were insufficient to establish specialized knowledge which could assist the jury in *Lee*, and, having reviewed the entire record before it with respect to Mr. Neale's work and proffered opinions, the Court concludes that they are insufficient here.

Further, to the extent that Mr. Neale arrived at his conclusions based on specialized knowledge, it is not clear that Mr. Neale employed reliable methods in his analysis of the video footage.  Mr. Neale concedes in an affidavit that a lay person "may be able to perceive and view the changes in shadows on the platform" but asserts that he "was able to determine and report on

where Mr. Washam is located, even when he is not seen by the camera through the advanced methodologies referenced herein" (Dkt. No. 117-4, ¶ 4). Mr. Neale states that "photogrammetry allowed me to extrapolate Mr. Washam's location and positioning" based on his shadow (*Id.*, ¶ 8). However, simply describing methodologies as advanced and asserting that they allowed one to draw certain conclusions does not establish those methods as reliable. BNSF further asserts that Mr. Neale used "methodologies that utilize principles of physics" and "utilized photogrammetry and video tracking" to conclude that Mr. Washam did not fall (Dkt. No. 117, at 4). However, neither BNSF nor Mr. Neale ever elaborates on which principles of physics Mr. Neale utilized to reach this conclusion. Similarly, the Court cannot determine what the methods involved when Mr. Neale asserts that he utilized photogrammetry and video tracking, and the record is bare on these issues.

Indeed, at his deposition, Mr. Neale would not detail with specificity the methods he used to analyze Mr. Washam's shadow (Dkt. No. 123-1). Counsel for Mr. Washam asked Mr. Neale at least five times what methodology and analysis Mr. Neale used in developing his opinions:

> Q    (By Mr. Wolff) I'm going to go back to your report, and we'll talk about each of these different screens here.
>
> What was your methodology for identifying that a shadow appears on Figure 20 and 21?
>
> A    The methodology involved video analysis and also relate to video analysis.
>
> Q    So are you telling us that you can -- can you identify a shadow appearing on the platform just by looking at the native video from the industry? Can you?
>
> A    Yes. When I analyzed the video, I see the shadow appear, yes.
>
> Q    What other methodology did you use to analyze the shadows that we see at this location?
>
> MS. JOHNSTON: Objection; ambiguous.

A      The methodologies that I used involve photogrammetric analysis and video analysis.

Q      (By Mr. Wolff) Tell us specifically what methodology you used to identify the activities that Mr. Washam was performing based upon the shadows.

MS. JOHNSTON: Objection; ambiguous.

A      Can I have that question again, please?

Q      (By Mr. Wolff) Tell us what methodology you used to correlate the appearance of shadows with what you think Mr. Washam was doing at that time.

A      If you want the specifics of that methodology, I would refer to the report, and I'd be happy to go through the steps of those methodologies. Otherwise, the general answer is photogrammetric modeling, scan data, video analysis. Those are the general methodologies that I used.

Q      Let's go to page 18 of your report.

A      And I'd throw in computer modeling, computer visualization along with it.

Q      Right below Figure 23, you write "Further, since the shadow on the platform appears unbroken and continuous until the arrival of Mr. Washam's foot, it was determined that Mr. Washam did not fall from the rear step as described in his deposition."

MS. JOHNSTON: Is that a question?

MR. WOLFF: Counsel, please stop interrupting me.

Q      (By Mr. Wolff) What was the methodology that you used to determine that the shadow on the platform appears unbroken and continuous?

A      That analysis would involve video analysis and photogrammetric analysis, video enhancements. And then analysis of the physics, geometry of the train cars, the distance between them and their relation to the platform.

Q      Tell me what video analysis you did to determine that the shadow on the platform appears unbroken and continuous.

A      Part of that video analysis involved extracting individual frames, analyzing those frames individually relative to each other, analyzing the distance, size, and shape of the changes of the pixels in that video, and linking the beginning of the appearance of that shadow, where it goes, over what length of time, and then culminating in the foot with the shadow appearing on the platform.

(Dkt. No. 123-1, at 26–29).  The Court cannot credit Mr. Neale's failure to elaborate on any methodology beyond his description of his methodology as various forms of analysis.  To the extent BNSF maintains that this information is included in Mr. Neale's report, the Court has reviewed the report and remains unconvinced.  Mr. Neale's assertions appear to be "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Electric v. Joiner*, 522 U.S. at 146.

Even if Mr. Neale's opinions were based on reliable methodology, the record before the Court does not indicate that Mr. Neale reliably applied any methodology to his analysis of Mr. Washam's shadow.  Mr. Neale's report does not detail the photogrammetrical steps he used to extrapolate Mr. Washam's position when he does not appear on camera (Dkt. No. 105-1, at 21). The report details neither the process Mr. Neale used to determine that certain pixels were darker than others nor how those pixels indicate the movement of Mr. Washam's shadow (*Id.*, at 14–17). Mr. Neale never explains how he concluded that changes in pixel brightness are attributable to Mr. Washam's off-screen movements and not, for instance, due to changes in cloud cover or the position of the sun.  Indeed, Mr. Neale clarified without elaboration that "[w]eather wasn't relevant to [his] analysis" of the shadows on the train platform (Dkt. No. 123-1, at 23).  Mr. Neale did not perform any analysis of shadows at his on-site investigation (*Id.*, at 16).  Mr. Neale himself conceded that the shadow analysis he conducted could not be replicated at an on-site investigation because he "was out there on a different day" and "didn't have the identical train cars in the correct location" (*Id.*, at 31).  There is therefore no record evidence before the Court establishing that Mr. Neale reliably applied any methods to reach his opinions or that his methods and opinions can be tested or falsified.  *See Daubert*, 509 U.S. at 593.

Thus, the Court cannot conclude from the record before it that Mr. Neale would supply the jury with reliable and helpful specialized knowledge because the record is not clear as to whether and how Mr. Neale employed any specialized knowledge in his discussion of the surveillance video footage.  Instead, the jury does not require specialized knowledge such as shadow analysis to watch a video and determine whether a shadow appears in the video and how it moves.  Nor does the jury require specialized knowledge to view the presence or absence of a shadow and extrapolate on the movements of the individual casting that shadow, when that individual admittedly is not captured on the screen.  These issues are within the jury's knowledge and experience.

In coming to this conclusion, the Court makes no decision as to Mr. Neale's qualifications as an expert in general.  Nor does the Court make any broad or categorical determinations as to the sufficiency of Mr. Neale's methodologies.  Instead, the Court limits its decision to the record before it.  On this record, BNSF does not meet its burden of establishing by a preponderance of the evidence that Mr. Neale's testimony will be reliable or helpful to the jury in this case.  The Court therefore grants Mr. Washam's motion to bar testimony of BNSF's designated expert William Neale (Dkt. No. 105).

### C.      Mr. Washam's Motion To Limit Testimony Of Medical Expert Dr. Earl Peeples

Finally, Mr. Washam requests that the Court limit the testimony of Dr. Earl Peeples (Dkt. No. 106).  Mr. Washam makes three primary arguments for limiting Dr. Peeples's testimony.  First, Mr. Washam argues that Dr. Peeples should not be allowed to opine on Mr. Washam's credibility (Dkt. No. 106, at 3).  Second, Mr. Washam argues that Dr. Peeples should be precluded from testifying on concepts like malingering and secondary gain (*Id.*, at 5).  Third, Mr. Washam seeks to preclude Dr. Peeples from critiquing the care of the physicians who treated Mr. Washam (*Id.*,

at 6).  BNSF responds that Dr. Peeples's testimony will be relevant and helpful to the jury on the issues of the credibility of Mr. Washam's report of injury and symptoms and the care of Mr. Washam's treating physicians (Dkt. No. 118, at 7, 13).  In reply, Mr. Washam reasserts the three arguments in his motion and further argues that Dr. Peeples is not qualified to opine on psychological conditions (Dkt. No. 125).  To the extent that Mr. Washam makes objections under Federal Rules of Evidence 401, 402, and 403, aside from those objections specifically addressed by the Court in this Order, the Court reserves ruling on these issues at this time.  Accordingly, the Court will not address Mr. Washam's arguments that are premised on the relevance and potential prejudice of Dr. Peeples's opinions, save and except for what is discussed in this Order.  The parties may revisit these issues during the pretrial hearing to be conducted in this matter, and the Court also will rule on contemporaneous objections made during trial.

Mr. Washam attaches as exhibits Dr. Peeples' expert report, curriculum vitae, excerpts from Dr. Gocio's deposition, and excerpts from Dr. Broker's deposition (Dkt. Nos. 106-1, 106-2, 125-1, 125-2).  BNSF also attaches as exhibits Dr. Peeples' C.V. and expert report, as well as a letter from Dr. Peeples regarding Dr. Gocio's deposition testimony, Dr. Gocio's deposition transcript in its entirety, an article on herniated discs, and an article on the credibility of patient-reported history (Dkt. Nos. 118-1, 118-2, 118-3, 118-4, 118-5, 118-6).

### 1.      Dr. Peeples's Opinions And Testimony

According to Dr. Peeples's curriculum vitae, he graduated from medical school in 1974, spent several years as a surgery intern, an orthopaedic surgery resident, and a fellow in hand surgery and microsurgery, and worked at OrthoArkansas, P.A., from 1979–2013 (Dkt. No. 118-1, at 1).  He has an active medical license from the Arkansas State Medical Board and is certified by

the American Board of Orthopaedic Surgeons (*Id.*).  Since 2009, he has also worked at Peeples

Medical Legal Consulting, LLC (*Id.*).

In his report, Dr. Peeples analyzes Mr. Washam's medical records as they relate to this

case.  First, Dr. Peeples reviews the available medical records in chronological order, from March

14, 2019, when Mr. Washam first sought medical treatment for a fall at work, to July 28, 2020,

when Dr. McAllister, BNSF's designated medical expert, reviewed Mr. Washam's records (Dkt.

No. 118-2, at 2–9).  Dr. Peeples emphasizes in his review that Mr. Washam's medical history and

symptoms were based on subjective reports of injury and pain (*Id.*, at 3–4).  Dr. Peeples also

contends that none of the diagnoses of Mr. Washam's treating physicians "represented a traumatic

event or alteration of anatomy due to violence" (*Id.*, at 5).  According to Dr. Peeples, "[n]o

objective finding required medical treatment" (*Id.*, at 6).

Dr. Peeples then analyzes and critiques Mr. Washam's medical care and recommends

alternative diagnoses based on quotations from medical publications (*Id.*, at 9–21).  Dr. Peeples

opines that lower back pain is common and that nurse practitioner Tamara Ward failed to follow

published standards for diagnosing Mr. Washam's condition (*Id.*, at 11).  Regarding the care that

Ms. Ward provided, Dr. Peeples asserts that "[h]er care has little to commend," that "she failed to

perform and document any of these primary health care provider duties," and that "there is no

evidence Ms. Ward understands the differential diagnosis for lower back pain or how to evaluate

this very common clinical problem" (*Id.*, at 11–12).  Dr. Peeples further asserts that "Nurse Ward

did not apply best medical science which indicates that in the absence of acute physical damage

and with the presence of normal neurological stateu [*sic*], the best treatment was return to work

unlimited without further medical care" (*Id.*, at 13).

Dr. Peeples then turned to the care provided by Dr. Gocio.  Dr. Peeples asserts that Dr. Gocio diagnosed Mr. Washam with L4-5 acute disc extrusion and radiculopathy in addition to acquired lumbar stenosis and that "[b]oth of these diagnoses are false" (*Id.*, at 15).  Instead, Dr. Peeples asserts that "[w]hen best level published science is applied it is clear that Mr. Washam had no change in his preexisting multi-level lumbar degeneration" (*Id.*).  Dr. Peeples further concludes that "[t]here was no radiculopathy.  There was no acute disc herniation.  There was no pseudo-claudication.  I cannot identify medical logic for multilevel decompression to correct back pain complaints.  Surgery predictably failed" (*Id.*, at 17).

Dr. Peeples concludes his summary with an alternative diagnosis and recommended treatment.  Dr. Peeples opines that the appropriate treatment was "a return to work, unlimited with cessation of care" (*Id.*, at 18).  Dr. Peeples further suggests that "Mr. Washam should be tested for the most likely cause of his prolonged pain complaints, personality disorder or other psychological cause.  Secondly, the importance of compensation as the dominant factor for chronic pain complaints should be recognized by those involved" (*Id.*, at 19).  Dr. Peeples concludes that "[t]here are no physical findings at present which prevent Mr. Washam from regaining his position and becoming gainfully employed for the railroad, which would in the long term be in his best interest" (*Id.*, at 20).

Finally, Dr. Peeples appends his report with a methods addendum and a relevant science section.  The methods section includes guidelines for treatment of work-related injuries and quotations from medical publications (*Id.*, at 24–26).  Dr. Peeples's relevant science section includes Dr. Peeples' analysis of certain quotations from medical publications regarding degenerative disc disease, indications for herniated disc surgery, and personality disorder as it relates to chronic pain (*Id.*, at 27–30).  Dr. Peeples' relevant science section further opines on the

benefits of returning to work, the benefits of working at a railroad, the epidemic of opioid use, and the psychological nature of pain (*Id.*, at 31–36).

BNSF also attaches to its response a letter from Dr. Peeples reviewing and critiquing Dr. Gocio's medical care as Dr. Gocio described it in his deposition.  Dr. Peeples opines that Dr. Gocio failed to follow proper standards for diagnosing Mr. Washam, that Dr. Gocio had "his own classification system, based on his feelings," and that Dr. Gocio did not consider the possibility of personality disorder, which was the "most probable diagnosis" according to Dr. Peeples (Dkt. No. 118-3, at 2–7).  Dr. Peeples also takes issue with Dr. Gocio's conclusion that Mr. Washam required work restrictions (*Id.*, at 10).  Dr. Peeples opines that "[r]isk is not a basis for work restriction" and that "[w]ork restriction is only appropriate 'only if, on the basis of objective information, the work activities of the "essential job functions" pose a substantial risk of significant harm to self of [*sic*] others that is imminent'" (*Id.* (citations omitted in original)).  Finally, Dr. Peeples asserts that Dr. Gocio's testimony as to the cause of Mr. Washam's injury was not based on protocol and was instead biased because Dr. Gocio, as Mr. Washam's treating physician, owed allegiance to his patient (*Id.*, at 10–11).

### 2. Application Of Rule 702 To Dr. Peeples's Opinions And Testimony

As stated above, the Court begins its analysis in this Order to the application of Rule 702. To the extent that the parties wish to object to Dr. Peeples's testimony on the bases of Rules 401, 402, and 403, aside from those objections specifically addressed by the Court in this Order, the parties may do so at a later time.

Dr. Peeples is trained as an orthopaedic surgeon and practiced for 33 years.  Dr. Peeples is therefore qualified to opine on orthopaedic surgery.  *See Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100–01 (8th Cir. 2006).  However, this does not qualify Dr. Peeples to testify on areas

outside of his expertise. *Smith v. Rasmussen*, 249 F.3d 755, 759 (8th Cir. 2001). The record does not indicate that Dr. Peeples has the requisite training or experience to opine on matters unrelated to orthopaedic surgery, such as Mr. Washam's financial motivations (Dkt. No. 118-2, at 18), psychological conditions (*Id.*, at 20), or whether working at a railroad is beneficial because it is exercise (*Id.*, at 34). Mr. Washam's motion to exclude the testimony of Dr. Peeples on psychological conditions is therefore granted (Dkt. No. 106).

Mr. Washam makes a related argument that Dr. Peeples should not be allowed to opine on psychological concepts like malingering to the extent that such testimony would attack Mr. Washam's credibility (Dkt. No. 106, at 3–4). BNSF argues, though, that Dr. Peeples' testimony should not be limited because it is up to the jury to determine the weight and credibility to be given to witnesses' testimony (Dkt. No. 118, at 7). Mr. Washam replies that such testimony is improper because a jury may more readily accept an expert's testimony on a witness's credibility (Dkt. No. 125, at 4). Because the Court decides that Dr. Peeples is not qualified to opine on Mr. Washam's psychological state, the Court concludes that Dr. Peeples may not testify on malingering, secondary gain, and other psychological concepts as they relate to Mr. Washam's credibility.

Further, controlling case law in the Eighth Circuit holds that "testimony about psychiatric credibility, malingering, recall bias, and secondary gain [go] beyond the permissible areas of [expert] testimony." *Nichols*, 154 F.3d at 883–84. An expert may not suggest that a witness's version of the facts is inconsistent or "tainted by bias and desire for financial gain." *Id.* at 884. These areas are "inferences for the jury to draw from the admissible evidence before it," so experts may not "instruct[] the jury on how to weigh that evidence." *Id.* The cases which BNSF cites from courts outside of the Eighth Circuit are therefore unpersuasive (Dkt. No. 118, at 9). Rather, here "[e]ach side offer[s] a different version of what had occurred so credibility [is] of critical

importance." *Nichols*, 154 F.3d at 884.  One of the jury's fundamental roles is to determine the credibility of the witnesses it hears.  Rule 702 does not allow experts to testify as to psychological conditions affecting witness credibility.  Dr. Peeples may not testify as to Mr. Washam's credibility, including but not limited to testimony based on his psychological condition, malingering, or secondary gain.  The Court therefore grants in part Mr. Washam's motion to limit the testimony of Dr. Peeples (Dkt. No. 106).  The Court takes under advisement the remaining arguments in Mr. Washam's motion to limit the testimony of Dr. Peeples.

### D.   BNSF's Motion To Exclude Or Limit Opinion Testimony Of Treating Physician Dr. Allan Gocio

BNSF moves to exclude the expert testimony of Dr. Allan Gocio, Mr. Washam's treating physician (Dkt. No. 99).  BNSF makes two primary arguments.  First, BNSF argues that Dr. Gocio's testimony was not disclosed pursuant to Federal Rule of Civil Procedure 26(a)(2) and should therefore be excluded (Dkt. No. 100, at 10–11).  Second, BNSF argues that Dr. Gocio's opinions on causation and permanent disability fail to follow any accepted methodology and lack sufficient factual foundation (*Id.*, at 11–12).  Mr. Washam responds that he properly disclosed Dr. Gocio's testimony in accordance with Federal Rule of Civil Procedure 26(a)(2)(C) and that Dr. Gocio's opinions comply with *Daubert* and with Federal Rule of Evidence 702 (Dkt. No. 116, at 4, 9).  In reply, BNSF asserts that the record and Dr. Gocio's testimony establish that his methodology was not valid and that Mr. Washam's disclosure of Dr. Gocio was insufficient (Dkt. No. 128, at 1, 3).

BNSF attaches as exhibits BNSF's fifth supplemental response to Mr. Washam's request for production, BNSF's notice of deposition of Dr. Gocio, and Dr. Gocio's deposition transcript in its entirety (Dkt. Nos. 100-1, 100-2, 100-3).  Mr. Washam includes as exhibits excerpts from Mr. Washam's deposition, Mr. Washam's personal injury report, excerpts from Dr. Gocio's

deposition, excerpts from BNSF employee Richard Vanginhoven's deposition, a May 6, 2020, medical record from Dr. Gocio, Mr. Washam's expert disclosures, Mr. Washam's initial disclosures, Mr. Washam's intake form at Dr. Gocio's office, and Dr. Gocio's operative report (Dkt. No. 116-1, 116-2, 116-3, 116-4, 116-5, 116-6, 116-7, 116-8, 116-9).

### 1.     Disclosure Of Dr. Gocio's Testimony Under Rule 26(a)(2)

BNSF initially argues that Dr. Gocio should be precluded from testifying because Mr. Washam's disclosure of Dr. Gocio's testimony failed to comply with Rule 26(a)(2).  Rule 26(a)(2) states, in relevant part:

(2) *Disclosure of Expert Testimony.*

(A) *In General.* In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

(B) *Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report-- prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;

> (ii) the facts or data considered by the witness in forming them;

> (iii) any exhibits that will be used to summarize or support them;

> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

> (vi) a statement of the compensation to be paid for the study and testimony in the case.

(C) *Witnesses Who Do Not Provide a Written Report.* Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:

> (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
>
> (ii) a summary of the facts and opinions to which the witness is expected to testify.

Fed. R. Civ. P. 26(a)(2)(A)–(C).  BNSF asserts that Dr. Gocio should have provided an expert report under Rule 26(a)(2)(B) (Dkt. No. 100, at 11).  BNSF also argues that Mr. Washam's disclosure was insufficient under Rule 26(a)(2)(C) because Mr. Washam did not disclose Dr. Gocio's specific expert opinions (*Id.*, at 10).

Rule 26(a)(2)(B) applies "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."  Fed. R. Civ. P. 26(a)(2)(B).  Dr. Gocio is not retained or specially employed to provide expert testimony in this case nor is he Mr. Washam's employee (Dkt. No. 99-3, at 136). Rule 26(a)(2)(B) therefore does not apply, and Dr. Gocio was not required to submit an expert report.

BNSF's reliance on *Montes v. Union Pac. R. Co.*, No. 8:09CV226, 2011 WL 1343200 (D. Neb. Apr. 8, 2011), is misplaced.  The court in *Montes* recognized that a treating physician must provide an expert report under Rule 26(a)(2)(B) if that physician did not make a causal determination in the course of treatment.  *Id.*, at *2.  However, the court also recognized that "[i]f the treating doctor forms an opinion about causation at the time of treatment, rather than at the request of counsel in anticipation of litigation, expert reports need not satisfy Rule 26(a)(2)."  *Id.*

Even assuming the law as stated in *Montes* applies here, Dr. Gocio made a causal determination in the course of his treatment.  Dr. Gocio testified in his deposition:

> Q      In this case did you determine that surgery was medically necessary and that Brad[ Washam]'s injury was caused by this incident?
>
> A      Yes.

(Dkt. No. 100-3, at 135–36).  Dr. Gocio also testified in his deposition that, upon reviewing an MRI of Mr. Washam, "I felt that he had an acute disc herniation at L4-5 level" (*Id.*, at 15).  Dr. Gocio later testified that "Mr. Washam reported an injury and reported subsequent symptoms, and that's what I based my care and treatment on" (*Id.*, at 23).  The record therefore establishes that Dr. Gocio made a causal determination in the course of his treatment.  Rule 26(a)(2)(B) does not apply.

BNSF next argues that Mr. Washam failed to comply with Rule 26(a)(2)(C).  BNSF asserts that Mr. Washam did not provide a summary of the facts and opinions to which Dr. Gocio would testify.  BNSF contends that Mr. Washam "failed to disclose Dr. Gocio's specific expert opinions that (1) Plaintiff's condition more than likely resulted, in whole or in part from an alleged March 11, 2019 fall while working for BNSF, i.e. causation; and (2) Dr. Gocio's disability opinions concerning Plaintiff's ability to return to the workplace" (Dkt. No. 100, at 10).  BNSF argues that Mr. Washam's initial disclosure of Dr. Gocio's testimony was "meager" and should have instead included a "full summary of Dr. Gocio's opinions and grounds for same" (Dkt. No. 128, at 3–4).

The disclosure requirements under Rule 26(a)(2)(C) are "considerably less extensive than the report required by Rule 26(a)(2)(B)."  Fed. R. Civ. P. 26 committee notes on rules—2010 amendment.  Accordingly, "[c]ourts must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained and may not be as responsive to counsel as those who have."  *Id.*  Courts in the Eighth Circuit agree that the requirements of Rule 26(a)(2)(C) are less demanding.  *See Hoyland v. McMenomy*, Case No. 14-cv-2977 (SRN/JSM), 2016 WL 2619768, at *2 (D. Minn. May 5, 2016)

The Court is not convinced that Mr. Washam's disclosure did not meet the summary requirements of Rule 26(a)(2)(C).  On July 15, 2020, Mr. Washam disclosed several treating

physicians, including Dr. Gocio, who would potentially testify as non-retained experts "regarding facts and opinions that are consistent with the medical records and based on their education, training, experience, and the overall evaluation/treatment of Plaintiff concerning the injuries that he sustained as a result of the March 11, 2019 on-duty incident" (Dkt. No. 116-5, at 3).  Further, Mr. Washam disclosed that Dr. Gocio may testify that, among other things, "[t]he incident caused or contributed to cause, in whole or in part, Plaintiff's injuries, past and future need for treatment, physical pain and emotional distress, physical and occupational impairment/disability, and disfigurement" (*Id.*).  BNSF was therefore on notice that Dr. Gocio may testify as to facts and opinions on causation and permanent disability, consistent with Mr. Washam's medical records.  BNSF does not argue that it lacked access to Mr. Washam's medical records.  In fact, at his deposition, Dr. Gocio specifically testified that his testimony would be limited to the information contained in his medical records from treatment of Mr. Washam:

> Q      If I understand what you're telling me, you're indicating that any causation opinions that you were to give in this case would be limited to the information that happens to be contained in your medical records from treatment of Mr. Washam; is that correct?
>
> A      Yeah, I think that's a pretty fair characterization.

(Dkt. No. 99-3, at 13).  The record therefore supports the conclusion that Mr. Washam adequately disclosed the facts and opinions on which Dr. Gocio would testify and that BNSF had adequate notice of Dr. Gocio's testimony.

The decisions of other courts within the Eighth Circuit support this conclusion, whether those decisions exclude or include expert testimony based on the adequacy of disclosure under Rule 26(a)(2)(C).  On the one hand, some courts have concluded that parties failed to meet the requirements of Rule 26(a)(2)(C) when their summary disclosures did not adequately give the opposing party notice of the non-retained expert or their proposed testimony.  *See, e.g.*, *Post v.*

*Dolgencorp, LLC*, Case No. 4:19-cv-00171-JAR, 2020 WL 3412238, at *6 (E.D. Mo. June 22, 2020) (concluding that party failed to disclose expert testimony under Rule 26(a)(2)(C) where party stated only that expert was "expected to have knowledge concerning the cause . . . of Plaintiff's injuries"); *Anderson v. Bristol, Inc.*, 936 F. Supp. 2d 1039, 1059–60 (S.D. Iowa 2013) (finding that Rule 26(a)(2)(C) requires more than stating witness's connection to case or reference to medical records, absent summary of witness's expected testimony).   BNSF also refers the Court to *Brooks v. Union Pac. R. Co.*, 620 F.3d 896 (8th Cir. 2010), but *Brooks* is easily distinguishable because the plaintiff in *Brooks* did not disclose any experts at all.  620 F.3d at 899–900.  On the other hand, courts have found that disclosures satisfied Rule 26(a)(2)(C) when they listed the main points of a non-retained expert's testimony or specifically included a treating physician's medical records.  *See, e.g.*, *Oskar v. United States*, 4:14–CV–04144–KES, 2017 WL 2937598, at *3 (D.S.D. July 10, 2017) (finding that expert physicians were properly disclosed under Rule 26(a)(2)(C) where party disclosed that each physician would testify as to party's health before surgery, the actual surgery the physician performed, and the party's prognosis); *Cattanach v. Burlington N. Santa Fe, LLC*, Civil No. 13-1664 (JRT/JSM), 2015 WL 5521751, at *12 (D. Minn. Sept. 18, 2015) (concluding that treating physician was adequately disclosed where party produced medical records of the party's only visit with physician).  Relatedly, some courts have concluded that the opposing party's retention of a medical expert to rebut a treating physician's opinions is "strong evidence" that Rule 26(a)(2)(C)'s notice and disclosure requirements have been met. *Hoyland*, 2016 WL 2619768, at *3; *see also Waste Connections, Inc. v. Appleton Elec., LLC*, No. 8:12CV436, 2014 WL 1794883, at *6 (D. Neb. May 6, 2014) ("[T]he defendants seemingly had proper notice of [the plaintiff's] treating physicians' opinions about causation because the defendants retained an expert to counter any causation opinions.").

Based on the record and the parties' arguments, the Court concludes that Mr. Washam's disclosure of Dr. Gocio's testimony is more consistent with these latter cases and meets the requirements of Rule 26(a)(2)(C).  Mr. Washam neither failed entirely to disclose Dr. Gocio nor failed to specify the grounds on which Dr. Gocio would testify.  Mr. Washam produced medical records related to his visits with Dr. Gocio and disclosed four areas of expected testimony (Dkt. No. 116-5, at 2–3).  These four areas included the scope of medical treatment, whether the incident caused Mr. Washam's injuries and need for future treatment, the expenses of treatment, and the nature of Mr. Washam's injuries and the extent to which they are permanent (*Id.*, at 3).  BNSF apparently had notice of Dr. Gocio's expected testimony because BNSF retained at least one medical expert whose testimony includes an extensive critique of the care Dr. Gocio provided and explanations of alternative causation (Dkt. No. 118-2, at 7–9, 14-20).  Mr. Washam therefore satisfied Rule 26(a)(2)(C)'s requirements of identifying the subject matter of Dr. Gocio's proposed testimony and providing a summary of the facts and opinions on which Dr. Gocio will testify.

## 2.   Dr. Gocio's Opinions And Testimony

As explained above, Dr. Gocio is an unretained expert treating physician under Rule 26(a)(2)(C) who was not required to file an expert report.  Mr. Washam disclosed that Dr. Gocio may testify that:

> i.      The scope of medical treatment Plaintiff has received to-date and which he is reasonably certain to require in the future as a result of the Incident is reasonable and necessary;

> ii.     The incident caused or contributed to cause, in whole or in part, Plaintiff's injuries, past and future need for treatment, physical pain and emotional distress, physical and occupational impairment/disability, and disfigurement;

> iii.    The treatment expenses incurred to date and that which is necessary in the future are reasonable and customary;

> iv.     That the nature and extent of Plaintiff's injuries are permanent.

(Dkt. No. 116-5, at 3).  Accordingly, Dr. Gocio testified on these topics at his deposition on July 22, 2020 (Dkt. No. 100-3, at 1).  Dr. Gocio described the treatment he provided to Mr. Washam and the surgery he performed (*Id.*, at 93–97).  Dr. Gocio testified that Mr. Washam's surgery was medically necessary (*Id.*, at 135–36), that his injury was caused by a fall (*Id.*), and that Mr. Washam's condition was acute and not degenerative (*Id.*, at 20–21).  Dr. Gocio also testified that he advised Mr. Washam that his condition was permanent and not likely to improve with additional treatment or the passage of time (*Id.*, at 123–24).

### 3.    Application Of Rule 702 To Dr. Gocio's Opinions And Testimony

No party disputes that Dr. Gocio is qualified to offer expert opinions.  Dr. Gocio has been a practicing neurosurgeon since 1984 (Dkt. No. 100-3, at 4–5).  He testified that he has performed thousands of surgeries of the kind that he performed on Mr. Washam (*Id.*, at 10–11).  Dr. Gocio is therefore qualified by knowledge, skill, experience, training, and education to offer his opinions as an expert in neurosurgery.

BNSF argues that Dr. Gocio failed to follow any accepted methodology and lacked sufficient factual foundation (Dkt. No. 100, at 11–12).  As to this latter point, Dr. Gocio was Mr. Washam's treating physician, performed surgery on him, and has followed up periodically for more than a year following the surgery.  Dr. Gocio has a sufficient factual foundation to testify as to his treatment of Mr. Washam and his opinions on the nature and extent of Mr. Washam's condition.  To the extent that BNSF disputes the factual basis of Dr. Gocio's testimony, that goes to the weight of Dr. Gocio's testimony and is a determination for the jury to make.  *See Marvin Lumber & Cedar Co. v. PPG Indus. Inc.*, 401 F.3d 901, 916 (8th Cir. 2005) ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." (quoting *Bonner*, 259 F.3d at 929)).

35

BNSF argues that Dr. Gocio did not follow any accepted methodology because Dr. Gocio allegedly did not conduct any causation analysis or differential diagnosis or etiology (Dkt. No. 100, at 19).  Regarding his practice for diagnosing Mr. Washam, Dr. Gocio testified:

> Q      Is it generally accepted neurosurgical practice that before you make a recommendation to do surgery that you do exactly what you've done here, take a history from the patient, conduct a physical exam, evaluate the history as well as the imaging such as an MRI? Is that typical?
>
> A      Yes, that's a typical approach.
>
> Q      Why did you recommend to Brad [Washam] to do the kind of surgery that you performed?
>
> A      I felt that the correlation of the symptomatology, the physical findings and the imaging along with the history of the patient that surgical treatment could be beneficial to him, and I recommended that to him.

(Dkt. No. 100-3, at 86–87).  Thus, according to Dr. Gocio's testimony, he followed the typical neurosurgical approach in reviewing and diagnosing Mr. Washam's condition and recommending appropriate treatment.  BNSF's objection to the facts and reports on which Dr. Gocio relied in making his diagnosis and treatment decision goes to the weight of Dr. Gocio's testimony, not its reliability under Rule 702.  Similarly, BNSF's contention that Mr. Washam's physical condition "more likely resulted from degeneration rather than any alleged, acute event" is a question of fact for the jury to decide and does not impact the reliability of Dr. Gocio's testimony under Rule 702 (Dkt. No. 128, at 9).

Dr. Gocio's methodology for determining that Mr. Washam's condition was acute rather than degenerative also meets the reliability requirements under Rule 702.  Dr. Gocio testified that there are no defined parameters for determining whether a disc herniation is acute or degenerative and that he "look[s] at the scan and look[s] at the elevation of the posterior ligament and the appearance on the scan" (Dkt. No. 100-3, at 17).  Where the scan is "a little equivocal," he "usually

fall[s] back on clinical findings, patient's reports of pain and their physical exam" (*Id.*).  When

asked about reviewing Mr. Washam's MRI, Dr. Gocio testified:

> Q       Having read the formal definition of trauma, do you agree that the findings
> on Mr. Washam's MRI should have been classified as degenerative?
>
> A       No.
>
> Q       Why do you state that?
>
> A       No, I felt like he had what I would consider an acute disc herniation, and
> the findings were compatible with the findings at the time of surgery that he had a
> disc protrusion that was extruded through the annulus in the subligamentous space
> at the disc space at L4-5 with bilateral compression of the spinal nerves and the
> fecal sac.
>
> Q       Tell me exactly what led you to believe and put in your note that his disc
> herniation was acute?
>
> A       Well, the appearance on the MRI scan.
>
> Q       Can you describe in any greater detail?
>
> A       Yeah, the elevation of the posterior ligament, the sequestration of the
> fragment beneath the posterior longitudinal ligament. It seemed clear to me and still
> does.

(*Id.*, at 20–21).  Dr. Gocio later testified that his opinion that Mr. Washam suffered a fall which

caused his injury was based on Mr. Washam's statements, objective findings, and physical

examination:

> Q       What documentary evidence do you have in your file that would indicate
> whether Mr. Washam had back pain before a March 2019 event at work?
>
> A       He had reported that he had back been for quite some time, and I assume
> that is prior to his injury. He described a worsening of his back pain, so that's what
> I base that opinion on.
>
> Q       So your entire opinion, if you provide one on whether or not his symptoms
> occurred at work due to a fall at the railroad, those are all based on Mr. Washam's
> statements to you; is that correct?
>
> A       No, based on his statements, also objective findings and physical exam.

(*Id.*, at 24–25).  The record evidence before the Court does not support BNSF's assertion that "Dr. Gocio admitted and ultimately confirmed that [his causation opinion testimony] was based solely on Washam's statements to him about the fall" (Dkt. No. 100, at 14).  Further, despite BNSF's assertions to the contrary (Dkt. No. 128, at 9), Dr. Gocio testified that he considered the possibility that Mr. Washam's condition was acute and ruled out that it was degenerative based on his analysis of the MRI, physical examination of the patient, and subsequent observations of and operation on Mr. Washam's exposed spine during surgery.  The record therefore establishes that Dr. Gocio's methodology for determining that Mr. Washam's condition was acute is reliable.

BNSF's citation to *Maras v. Avis Rent A Car System, Inc.*, 393 F. Supp. 2d 801 (D. Minn. 2005), is not persuasive here because that case is distinguishable.  In *Maras*, the plaintiff was diagnosed with fibromyalgia and claimed that a car crash with the defendants caused her fibromyalgia.  *Id.* at 803.  The plaintiff proposed to call two experts to testify that the car crash caused her fibromyalgia.  *Id.* at 804.  The court concluded that the plaintiff did not meet her burden of establishing that the experts' testimony was reliable because, as both experts conceded, the cause of fibromyalgia is unknown.  *Id.* at 808.  Here, Dr. Gocio has not testified that the cause of Mr. Washam's injuries is unknown.  To the contrary, Dr. Gocio testified in his deposition that Mr. Washam's injuries were caused by a fall and required surgery (Dkt. No. 100-3, at 135–36).

BNSF's citation to *Marks v. Union Pac. R. Co.*, No. 5:11-cv-319-DPM, 2013 WL 5309135 (E.D. Ark. Sept. 19, 2013), is similarly unpersuasive.  In *Marks*, the parties moved for summary judgment, which required the Court to determine whether there was an issue of material fact as to causation.  *Id.*, at *4–5.  The Court concluded that the evidence was "all too thin to create a jury question about the cause" of the plaintiff's injury because the defendant's expert unequivocally stated that the plaintiff's injury did not cause his condition, whereas the plaintiff offered only a

single medical record from a treating physician which equivocally stated only that the physician "anticipate[d] this was an acute injury." *Id.*, at *4. Given this paucity of evidence, the Court granted the defendant's motion for summary judgment but allowed the plaintiff opportunity to move to reconsider by offering a sworn opinion from the treating physician consistent with Rule 702. *Id.*, at *5. However, the issue presently before this Court is not whether there is an issue of material fact but rather whether Dr. Gocio's testimony is reliable under Rule 702. Therefore, *Marks* does not guide this Court's Rule 702 analysis.

Finally, BNSF argues that Dr. Gocio's opinions on Mr. Washam's permanent disability are unreliable (Dkt. No. 100, at 19–20). In his deposition, Dr. Gocio testified about his follow-up visits with Mr. Washam which included discussions about Mr. Washam's symptoms, observations, physical examinations, and a CAT scan (Dkt. No. 100-3, at 107–117). Dr. Gocio testified that, on May 6, 2020, he advised Mr. Washam that "his back condition is permanent, not likely to improve with additional treatment or the passage of time. I felt that he had reached maximum medical improvement from his surgical procedure and that his condition could respond to symptomatic treatment but is not likely to change substantially" (*Id.*, at 124). The Court does not find a "glaring 'analytical gap'" between Dr. Gocio's opinion and the basis for his opinion (Dkt. No. 100, at 20). Instead, Dr. Gocio's conclusion that Mr. Washam's condition was permanent appears to be based on Dr. Gocio's year-long course of treatment of Mr. Washam and on Dr. Gocio's experience with performing surgery on other patients, some of whom are not able to return to work (Dkt. No. 100-3, at 138). Dr. Gocio's opinions on the permanent nature of Mr. Washam's injuries, which were made within the course and scope of his treatment, are therefore admissible under Rule 702.

Mr. Washam's disclosure of Dr. Gocio's testimony complied with Rule 26(a)(2)(C). Dr. Gocio's testimony was also consistent with the requirements of Rule 702. Accordingly, the Court

denies BNSF's motion to exclude or limit opinion testimony of treating physician Dr. Gocio (Dkt. No. 99).

### E.    BNSF's Motion To Exclude Expert Opinions Of Economist Dr. Rebecca Summary

BNSF moves to exclude the expert opinions of Mr. Washam's designated economist, Dr. Rebecca Summary (Dkt. No. 108). BNSF argues that Dr. Summary's testimony should be excluded because she failed to review any medical records and because her opinions on Mr. Washam's lost earning capacity lack a scientifically valid basis (*Id.*, at 1–2). In response, Mr. Washam argues that Dr. Summary is qualified, that she did not assume that Mr. Washam's future earning capacity would be zero, and that her methodology was reasonable (Dkt. No. 115, at 1–2). BNSF replies that Dr. Summary's opinions lack a foundation in competent evidence as required under *Daubert* (Dkt. No. 130, at 1).

BNSF includes as exhibits Mr. Washam's expert designations, Dr. Summary's expert report, and an excerpt from Dr. Gocio's deposition (Dkt. Nos. 109-1, 109-2, 133-1). Mr. Washam includes as exhibits Dr. Summary's curriculum vitae, excerpts of Mr. Washam's deposition, a May 6,2020, note from Dr. Gocio, excerpts from Dr. Gocio's deposition, Dr. Summary's expert report, webpages depicting salaries for school teachers in Mammoth Springs School District, excerpts from the deposition of BNSF's vocational expert Patsy Bramlett, and a webpage depicting jobs to which Mr. Washam has applied (Dkt. Nos. 115-1, 115-2, 115-3, 115-4, 115-5, 115-6, 115-7, 115-8).

### 1.    Dr. Summary's Opinions And Testimony

Dr. Summary provided a written report calculating several different future earning scenarios for Mr. Washam (Dkt. No. 109-2). Dr. Summary reports that she calculated the present value of net lost earning capacity "to determine the amount of money that is necessary today to

replace the stream of lost earnings" (*Id.*, at 1).  Dr. Summary reviewed Mr. Washam's earnings

history and projected earnings at BNSF between 2013 and 2020, assumed retirement ages of 62,

65, and 68, and assumed future earnings offsets of $10,000 from trial until July 2022 and either

$20,000 or $35,000 beginning August 2022 (*Id.*, at 1–2).  Dr. Summary calculated Mr. Washam's

past net lost BNSF earning capacity at $94,906 (*Id.*, at 4).  Dr. Summary further calculated Mr.

Washam's present value of lost earnings at sums between $532,728 and $1,581,614, depending on

factors such as retirement age, offset earnings of $20,000 or $35,000, and after-tax lost BNSF

earning capacity of either $64,878 or $99,388 (*Id.*, at 5–8).  Dr. Summary then calculated Mr.

Washam's value of lost household services, assuming ten hours per week of lost household

services and a healthy life expectancy of 72, for a total of $150,343 (*Id.*, at 9–10).  Dr. Summary

therefore calculated total economic loss based on Mr. Washam's past lost wages, future lost BNSF

earning capacity, future lost BNSF health insurance, and future lost household services for totals

between $1,040,216 and $2,186,066 (*Id.*, at 11).

### 2. Application Of Rule 702 To Dr. Summary's Opinions And Testimony

No party disputes Dr. Summary's qualifications.  According to Dr. Summary's curriculum

vitae, she received her Ph.D. in Economics from the University of Illinois, Urbana-Champaign, in

1983 and has been a professor of economics at Southeast Missouri State University since that time

(Dkt. No. 115-1, at 1).  She has authored more than 30 publications on topics such as opportunity

cost, consolidation in the lodging industry, and the economic impact of childcare in Missouri (*Id.*,

at 1–2).  Dr. Summary is therefore qualified as an expert in economics.

BNSF argues that Dr. Summary's expert opinions should be excluded because she failed

to review Mr. Washam's medical records and because she failed to document how she arrived at

her conclusion that Mr. Washam had no future earning capacity (Dkt. No. 109, at 8–9).  As to this

first argument, BNSF contends that "[i]f Summary had reviewed Plaintiff's medical records, it would have been clear that no medical professional ever opined that Plaintiff's [*sic*] was permanently disabled, or had any other impairment that would prevent him from obtaining gainful employment in the future" (*Id.*, at 8–9).  BNSF's argument that Dr. Summary's testimony should be excluded because she did not apparently review Mr. Washam's medical records goes to the weight of her testimony, not whether it is admissible under Rule 702.

BNSF further argues that Dr. Summary's testimony should be excluded because "Summary's calculations necessarily infer a total loss of future income without providing any reasoning as to why that would be the case" (*Id.*, at 10).  The contention that Dr. Summary assumed a total loss of income is not supported by the record.  Dr. Summary makes clear in her report that she assumed future offset earnings of either $20,000 or $35,000 (Dkt. No. 109-2, at 2).

BNSF makes the related arguments that Dr. Summary's assumptions of residual earning capacity are "arbitrary and unsupported" and that her assumptions on loss of household services lack foundation (Dkt. No. 130, at 1, 8).  Courts in the Eighth Circuit have consistently recognized that the assumptions underlying an economist's report on future lost wages go to the weight and credibility of the expert's opinions, not their admissibility.  *See, e.g.*, *Vanskike v. ACF Indus., Inc.*, 665 F.2d 188, 211–12 (8th Cir. 1981) (recognizing that economist's assumptions go to weight of evidence and not admissibility); *Taenzler v. Burlington N.*, 608 F.2d 796, 798 n.3 (8th Cir. 1979) (same); *Streit v. Halverson*, No. 17-4225-CV-WJE, 2018 WL 3763811, at *5 (W.D. Mo. Aug. 8, 2018) (same).  Indeed, at least one court in the Eighth Circuit has specifically concluded that Dr. Summary's testimony on future lost wages, future earning capacity, and lost household services was admissible and that any disputes with the factual underpinnings of her testimony go to the credibility of the testimony, not its admissibility.  *Cowden v. BNSF Ry. Co.*, 980 F. Supp. 2d 1106,

1123 (E.D. Mo. 2013) (citing *David E. Watson*, 668 F.3d at 1014).  The Court makes the same conclusion here.  Accordingly, the Court denies BNSF's motion to exclude the expert opinions of Dr. Summary (Dkt. No. 108).

### IV.    Conclusion

For the foregoing reasons, the Court grants in part and denies in part Mr. Washam's motion to exclude or limit the testimony of Dr. Broker (Dkt. No. 104), grants Mr. Washam's motion to exclude the testimony of Mr. Neale (Dkt. No. 105), grants in part and takes under advisement in part Mr. Washam's motion to limit the testimony of Dr. Peeples (Dkt. No. 106), denies BNSF's motion to exclude the testimony of Dr. Gocio (Dkt. No. 99), and denies BNSF's motion to exclude the testimony of Dr. Summary (Dkt. No. 108).

As to those matters about which the Court grants the motion and excludes evidence, all parties, their counsel, and witnesses are directed to refrain from making any mention through interrogation, *voir dire* examination, opening statement, arguments or otherwise, either directly or indirectly, concerning the matters about which the Court grants the motion and excludes evidence, without first approaching the bench and obtaining a ruling from the Court outside the presence of all prospective jurors and the jurors ultimately selected to try this case.  Further, all counsel are required to communicate this Court's rulings to their clients and witnesses who may be called to testify in this matter.

It is so ordered this 2nd day of October, 2020.

Kristine G. Baker
United States District Judge